**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Commonwealth of Pennsylvania, by Attorney General Josh Shapiro; District of Columbia, through the Office of the Attorney General; Matthew J. Platkin, Acting Attorney General of the State of New Jersey; State of Oregon, *ex rel.* Ellen F. Rosenblum, in her official capacity as Attorney General; State of Utah, by Attorney General Sean D. Reyes; and State of Washington,<br><br>          Plaintiffs,<br><br>          v.<br><br>Mariner Finance, LLC,<br><br>          Defendant. | Case No. 2:22-cv-3253<br>Hon. _____<br><br>          (Electronically Filed) |

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF**

**Table of Contents**

Introduction, Legal Authority, Jurisdiction and Venue, Parties, and Background .........................1

Factual Allegations

I.      Mariner Charges the Majority of Consumers for Add-Ons Without Their Consent...........19

II.     Mariner's Rushed, Electronic Closings Deprive Consumers of the Chance to Read the Documents and Notice the Hidden Add-On Charges ........................................................23

III.    Mariner Deceives Consumers by Failing to Disclose the Substantial Commissions It Retains on the Premiums It Charges Consumers for Insurance Add-Ons ......................................33

IV.     Mariner Employees Mislead Consumers Because Their Supervisors and Headquarters Set High Sales Goals and Pit Branches Against Each Other with Incentive Compensation ....35

V.      Mariner's Board and Top Executives Are Directly Involved ...........................................41

VI.     Mariner Engages in Other Harmful Practices to Maximize Add-On Charges...................47

VII.    Mariner Continues to Hide Add-Ons from Consumers after Closing and Obstructs Consumers' Attempts to Cancel if They Do Discover the Add-Ons ................................49

VIII.   As a Result of this Conduct, Mariner Makes Enormous Ill-Gotten Profits from Add-Ons 53

IX.     Mariner Incentivizes Employees to "Flip" Consumers' Existing Loans by Inducing Borrowers to Enter into Larger, Refinanced Loan Obligations that Impose Far More Costs Over Time......................................................................................................................54

X.      Mariner Ignores Pennsylvania Law that Requires the Sale of AD&D Insurance to Be Separated from the Loan Transaction. ...............................................................................60

XI.     Interviews with a Random, Representative Sample of Mariner Customers Demonstrate Widespread Add-on Product Packing .................................................................................63

## Claims for Relief

COUNT I – CFPA: Mariner Engages in Deceptive Acts and Practices by Charging Consumers for Add-On Products Without Obtaining their Consent and by Loan Flipping............................70

COUNT II – CFPA: Mariner Engages in Unfair Acts and Practices by Charging Consumers for Add-On Products Without Obtaining their Consent and by Loan Flipping .................................73

COUNT III – CFPA: Mariner Engages in Abusive Acts and Practices by Designing and Implementing a Loan Closing Process that Materially Interferes with the Ability of a Consumer to Understand a Term or Condition of a Consumer Financial Product and by Loan Flipping......74

COUNT IV – CFPA: Mariner Engages in Abusive Acts and Practices that Take Unreasonable Advantage of a Lack of Understanding on the Part of the Consumer of the Material Risks, Costs, or Conditions of Add-On Products and by Loan Flipping ...........................................................75

COUNT V – CFPA: Mariner Violates TILA by Requiring Consumers to Pay for Add-On Products Incident to the Extension of Credit ...............................................................................77

COUNT VI – CFPA: Mariner Violates TILA by Failing to Provide Required Disclosure .........79

COUNT VII – PA CPL: Mariner Charges Consumers for Add-On Products Without their Consent and Engages in Loan Flipping (Asserted by Commonwealth of Pennsylvania) ...........80

COUNT VIII – NJ CFA: Unconscionable Commercial Practices Related to the Extension of Loan and Insurance Products to New Jersey Consumers (Unconscionable Commercial Practices) (Asserted by the State of New Jersey) ...........................................................................................82

COUNT IX – NJ CFA: False Promises and/or Misrepresentations Related to the Extension of Loan and Insurance Products to New Jersey Consumers (False Promises, Misrepresentations) (Asserted by the State of New Jersey) ........................................................................................84

COUNT X – WA Consumer Protection Act: Unfair and Deceptive Acts and Practices Related to the Extension of Loans and Insurance, Including Charging for Add-Ons Without Consumers' Consent, Concealing Commissions, and Loan Flipping (Asserted by State of Washington) .......85

COUNT XI – WA Consumer Protection Act: Unfair and Deceptive Non-Disclosure of Commissions (Asserted by State of Washington) ........................................................................88

Count XII - PA CPL: Failure to Make Required Disclosures Prior to Consummation of the Loan (Asserted by Commonwealth of Pennsylvania) .......................................................................90

COUNT XIII – NJ CFA: Requesting or Requiring Consumers Execute Insurance and Loan Agreements without Simultaneously Providing Consumers a Print Copy of Same (Failure to Provide a Copy) (Asserted by State of New Jersey) .................................................................92

COUNT XIV – PA CPL: Charging Interest Rates in Excess of the Usury Limit (Asserted by Commonwealth of Pennsylvania) ......................................................................................93

COUNT XV – PA CPL: Sale of AD&D in Violation of CDCA Regulation (Asserted by Commonwealth of Pennsylvania) ......................................................................................95

Prayer for Relief.....................................................................................................................97

Plaintiffs, Commonwealth of Pennsylvania, by Attorney General Josh Shapiro, ("Commonwealth"); District of Columbia, a municipal corporation, through the Office of the Attorney General; State of New Jersey, by Matthew J. Platkin, Acting Attorney General of the State of New Jersey, Cari Fais, Acting Director of the New Jersey Division of Consumer Affairs; State of Oregon; State of Utah; acting through Sean D. Reyes, Attorney General of Utah; and State of Washington, (referred to collectively, "Plaintiffs" or "Plaintiff States") bring this action against Mariner Finance, LLC ("Mariner" or "Defendant") and allege the following:

## **<u>INTRODUCTION</u>**

1.      Defendant Mariner Finance, LLC is a subprime installment lender engaged in a nationwide scheme that takes advantage of low-and-moderate income consumers. Among other aggressive sales tactics, Mariner engages in widespread credit insurance packing, which is the practice of adding costly insurance policies and other products ("add-ons" or "add-on products") to loans without the consumer's knowledge and, in some cases, despite the consumer's explicit rejection of the add-ons. These costly add-ons significantly increase the cost of the loan—and Mariner's profit. Additionally, Mariner encourages employees to "flip" existing loan obligations by deceptively inducing consumers to refinance their loans through frequent financings that result in little or no economic benefit to the consumer in order to increase Mariner's loan volume and generate new loan fees, additional add-ons, and more profits for Mariner.

*Mariner Exists to Generate Ever-Increasing Profits for Its Executives and Private Equity Owners—At Great Expense to Its Customers.*

2.      Mariner's unlawful behavior is motivated by the high-growth demands of its owner: a private equity fund managed by Warburg Pincus LLC, a Wall Street private equity firm.

3.      Mariner was formed through an aggressive string of acquisitions financed by private equity. Mariner's first private equity investor was Milestone Partners III, LP and Milestone Partners Management Co., LP, which acquired a stake in Mariner in 2009.

4.      Warburg Pincus LLC's fund then acquired Mariner in 2013 for $234 million. Warburg Pincus LLC has over $80 billion in assets under management and is led by CEO Charles "Chip" Kaye and President Timothy Geithner.

5.      Warburg Pincus LLC controls Mariner's Board of Directors. At least two of Mariner's Board members are Warburg Pincus LLC Managing Directors. One of Mariner's Board members, Michael E. Martin, is the leader of Warburg Pincus LLC's Financial Services Team.

6.      When Warburg Pincus LLC acquired Mariner, Mariner had 57 branches in seven states.

7.      Today, just nine years later, a company that began with a single brick-and-mortar branch has morphed into a sizeable conglomerate with over 480 branches in 27 states. Mariner manages $2 billion in loans every year.

8.      Mariner portrays itself as a community-oriented lender operating small, local branches with strong ties to its local geography. In reality, Mariner deploys aggressive, high-pressure sales tactics, dictated by a profit-driven model that operates according to the famous maxim articulated in *Glengarry Glen Ross*: Always Be Closing.

9.      Contrary to Mariner's portrayal of itself as a "community based" lender, Mariner's policies and business practices are set and directed by headquarters, leaving minimal discretion to branch managers and loan officers to extend loans that work best for consumers according to their needs and financial condition. The primary directive is to sell.

10. Mariner exists to create value for its investors, not its customers. To that end, Mariner's private equity owners depend on and expect Mariner to generate substantial profits to create ever higher returns.

11. Mariner maintains several avenues of customer acquisition, including, among other things, soliciting potential borrowers through live check mailings, local branches, the Internet, telephone sales, acquisition of competitors' existing borrower pools and loan origination platforms, and acquiring leads through third-parties such as Credit Karma and LendingTree.

12. Mariner targets its loans and aggressive sales tactics at the most vulnerable borrowers, offering low-and-moderate income consumers small dollar personal loans with high interest costs. These are often subprime and deep subprime borrowers with FICO scores of 629 or less. They often already have significant credit card, installment loan, and/or student loan debt. These consumers are most likely to fall prey to lenders such as Mariner when an emergency or unplanned life event occurs because their income and credit history often makes it challenging to obtain a lower interest loan through a bank or credit union.

13. In states with usury laws, including but not limited to the District of Columbia, New Jersey, Oregon, Pennsylvania, and Washington, Mariner charges interest at or near the maximum allowable under state law.

14. To grow the company, Mariner engages in aggressive sales tactics in order to find and extend credit to new borrowers. Mariner markets the fact that consumers can come into a branch and procure a check on the same day (often within an hour), following a soft credit check. Mariner mails unsolicited "live checks" to consumers that Mariner prescreens using credit bureaus and "proprietary scoring data." Mariner also aggressively pushes consumers to refinance existing credit and take out new loans, even if it is not in the best interest of the consumer. These are the

kind of sales practices that can ensnare vulnerable consumers into a cycle of debt, keeping borrowers captive and away from competing financial service providers.

15.     In order to drive growth internally, Mariner also requires employees to meet defined sales goals or face discipline, docking incentives, and possible termination.

16.     Mariner employs a variety of aggressive tactics both to engage new customers and to keep existing customers in a perpetual cycle of debt. For one, the company mails unsolicited "live checks" to consumers that merely require endorsement and deposit to trigger a loan transaction. Mariner targets live checks to those consumers who meet Mariner's proprietary models. These consumers are often in financial crisis, decidedly unfamiliar with receiving unsolicited checks in the mail, and in desperate need of economic relief. Mariner uses live checks as an entrée to the most vulnerable portion of the targeted population.

17.     After a consumer cashes a live check, Mariner immediately begins soliciting the consumer by phone, email, and other methods to come into the branch and borrow additional money by refinancing the loan.

18.     If a borrower falls behind on payments, the first option Mariner offers the consumer is not a payment or deferment plan but is instead an offer to refinance the loan and borrow additional cash.

19.     As described in detail below, when the consumer comes into the branch to refinance, Mariner maximizes the amount of the new loan by charging consumers for—and financing—hidden add-on products.

20.     Mariner pushes each branch to sell a minimum amount of add-ons by setting baseline performance metrics connected to the sale of ancillary products that are incentivized through bonuses, and disciplining employees that fail to upsell.

21.     Mariner's incentive structure thereby encourages its employees to deceive, mislead, and otherwise confuse financially desperate consumers into paying for products that add hundreds or thousands of dollars to the loan.

22.     Most often, Mariner tells consumers nothing about these products, rushing consumers through electronic paperwork, keeping consumers in the dark about the existence and cost of the add-ons.

23.     Mariner sells its add-ons only as single-premium products in order to maximize the consumers' long-term debt load. Single-premium means the entire premium is paid upfront and financed into the loan instead of paying the premiums in monthly installments. This unnecessarily inflates the size of the principal obligation for the unwitting borrower and balloons the interest Mariner earns over the life of the loan.

24.     At the same time, Mariner retains a substantial portion of the premium charge for each insurance add-on as a sales commission—essentially a kickback to Mariner—ranging from 21% to 75% of the net written premium amount depending on the add-on and the state in which the loan is made. Mariner fails to disclose the commissions it earns.

25.     While Mariner's stated policies discourage employees from hiding the add-ons from consumers—affording Mariner plausible deniability with regard to its sales and marketing misconduct—Mariner's marketing and sales incentives are, in fact, structured to drive this unlawful conduct. Mariner trains, instructs, and directs its employees to "offer" *every* add-on product to *every* consumer *every* time. And, Mariner regional and branch managers are disciplined for failing to meet expected add-on sales goals, thereby encouraging employees to disregard stated corporate policies related to the sale and marketing of these products.

5

26. Mariner's relentless internal sales goals and incentives ensure that there will be winners and losers among regional and branch managers and branch employees as a matter of their personal compensation.

27. Mariner incentivizes this pattern of unlawful conduct because it derives enormous profit from packing additional, hidden products into its consumer loans. In 2019 alone, Mariner charged consumers $121.7 million nationwide in premiums and fees for add-on products. Notably, these numbers exclude all of the interest Mariner earns on the add-on premiums.

****** 

*Mariner's Corporate Policies and Practices Result in Employees Charging Consumers for Add-On Products They Do Not Know About and Have Not Consented to Buy.*

28. In many instances, Mariner tacks on charges for add-ons at loan origination without obtaining the consumer's consent. In other instances, Mariner mentions add-ons but falsely tells the consumer they are mandatory. As described in detail below, Mariner employees make misleading statements or material omissions concerning what it is consumers are actually agreeing to purchase, leaving many borrowers with no knowledge of the add-on product(s) or a mistaken belief about the value and/or cost of the product(s).

29. Mariner's corporate policies and practices encourage employees to perpetrate this unlawful conduct, including by rewarding employees who maximize add-on charges and formally disciplining branch managers whose levels of add-on charges fall below established, minimum expectations.

30. Mariner sells two categories of add-on products: (A) credit insurance products: (1) life (pays off the loan balance if the borrower dies), (2) disability (makes some payments on a loan if the consumer becomes disabled for a covered reason, after a waiting period), (3) involuntary unemployment (likewise, due to unemployment), (4) household property (pays to repair or replace

covered personal property due to a covered loss), and (5) non-filing insurance (protects Mariner from loss of its interest in the personal property collateral due to its failure to perfect a security interest); and (B) so-called "non-credit" or "ancillary" products: (1) accidental death & dismemberment insurance (AD&D) (pays for certain accidental injuries and death), (2) Auto Club (similar to AAA), (3) Home & Auto (similar to AAA), and (4) Guaranteed Asset Protection (GAP) (on a car title loan, pays any difference between the outstanding loan balance and the auto insurance payout in the event the car is a total loss).

31.     Mariner stands to gain substantially more from a credit insurance policy than the borrowing consumer stands to gain because, *inter alia*: (A) Mariner makes itself the policy's primary beneficiary; and (B) Mariner earns substantial commission revenue that exceeds claim payouts on most or all insurance products.

32.     Credit insurance products typically cost far more per dollar of coverage as compared to freestanding life or renter's insurance policies.

33.     It is often not in the consumer's best interest to purchase credit insurance or other add-ons, particularly when the consumer has existing insurance or an AAA membership rendering Mariner's insurance product duplicative and unnecessary. For this reason, when asked, the vast majority or Mariner customers charged for add-ons say they would have declined if they had known about them.

34.     Nevertheless, as explained below, Mariner charges its customers for one or more add-on products on 80% of its loans nationwide. It does so through a loan origination process that deprives most customers of any meaningful opportunity to review add-on product options and make an informed decision whether to purchase such products.

*Mariner's Corporate Policies and Practices Incentivize Employees to "Flip" Existing Loan Obligations into Refinanced and/or Larger Loan Obligations.*

35.     Mariner's policies, practices, and incentive structure also encourage employees to "flip" consumers' loans into refinanced and/or larger loan obligations. Employees are expected to keep loan applications flowing, and Mariner tracks their performance using metrics based on the number of loans each employee closes per day. The only way for employees to meet Mariner's aggressive sales goals is by refinancing existing loans at every opportunity.

36.     Mariner trains employees to reach out to consumers as soon as they miss a loan payment and to use a missed payment as an opportunity to induce consumers to refinance existing loans (which Mariner refers to as "renew the DQ"). By renewing instead of collecting overdue loan payments under the existing terms, and by selling the renewal as a benefit to consumers when it is not, Mariner's employees improve their sales metrics and qualify for additional compensation while simultaneously generating more add-ons charges and increasing Mariner's total loan volume. This is because Mariner typically requires the consumer to borrow at least $500 more in a refinancing.

## **LEGAL AUTHORITY**

37.     Plaintiffs bring this action to prevent unfair, deceptive, or abusive acts or practices under Section 1042 of the Consumer Financial Protection Act of 2010 ("Dodd-Frank Act" or "CFPA"), 12 U.S.C. § 5552(a), which authorizes Plaintiffs to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for Defendant's acts or practices that violate the CFPA.

38.     Plaintiffs also bring this action pursuant to Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A), which authorizes Plaintiffs to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for Defendant's acts or practices that violate

other Federal consumer financial laws set forth in the CFPA, including the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. (TILA).

39.     In addition, Plaintiffs bring this action pursuant to their respective state consumer protection laws:

      a.     The Commonwealth brings this action pursuant to the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*. (PA CPL), to restrain unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by Section 201-3 of the PA CPL.

      b.     The State of New Jersey brings this action pursuant to its authority under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-8, 56:8-11, 56:8-13, and 56:8-19 (NJ CFA), to permanently enjoin Mariner from engaging in unconscionable and deceptive commercial practices and misrepresentations, and to recover statutory civil penalties, consumer restitution, attorneys' fees and costs and other equitable and monetary relief.

      c.     The State of Washington brings this action pursuant to its authority under the Washington Consumer Protection Act, chapter 19.86 RCW (WA CPA), to enjoin Mariner from engaging in these unfair and deceptive practices, and to recover statutory civil penalties, consumer restitution, attorneys' fees and costs, and other equitable and monetary relief.

40.     At all times relevant hereto, Mariner engaged in trade and commerce by marketing, offering, selling, and originating personal loans to residents of the Plaintiff States and by servicing and collecting on these loans.

41.     The public interest is served by seeking before this Honorable Court a permanent injunction to restrain the methods, acts, and practices alleged, restitution, and disgorgement of

money that Mariner has derived from these methods, acts, and practices, as well as civil penalties and investigative and litigation costs.

42.     Defendant is using, has used, or is about to use methods, acts, or practices declared unlawful by Section 201-3 of the PA CPL, the NJ CFA, the WA CPA, and/or by the CFPA.

43.     The CFPA, which prohibits "unfair, deceptive or abusive acts or practices," explicitly delegates to state attorneys general the authority to bring Federal civil enforcement actions in order to enforce the Act and to secure remedies provided therein. 12 U.S.C. § 5552(a)(1). This provision is subject to a requirement that an attorney general provide prior notice to the Consumer Financial Protection Bureau (CFPB). Plaintiffs have provided such notice.

44.     Section 1036 of the CFPA prohibits a "covered person" from offering or providing to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise committing any act or omission in violation of a Federal consumer financial law, or from committing or engaging in any "unfair, deceptive or abusive act or practice" in connection with any transaction with a borrower for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5536(a)(1)(A), (B). Defendant is a "covered person" within the meaning of the CFPA. 12 U.S.C. § 5481(6).

45.     Citizens of the Plaintiff States are suffering and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

### JURISDICTION AND VENUE

46.     This Court has subject-matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), and presents a Federal question, 28 U.S.C. § 1331. Plaintiffs are authorized to initiate civil actions in Federal district court to enforce provisions of the CFPA. 12 U.S.C. § 5552(a)(1).

47.     This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

48.     Venue is proper in this district because Defendant is located, resides, and/or does business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

## PLAINTIFFS

49.     Plaintiff is the Commonwealth of Pennsylvania, acting by Attorney General Josh Shapiro, with offices located at 15th Floor, Strawberry Square, Harrisburg, PA 17120.

50.     Plaintiff is the District of Columbia, through the Office of the Attorney General, Karl A. Racine, with offices located at 400 6th Street, N.W., 10th Floor, Washington, D.C. 20001.

51.     Plaintiffs are Matthew J. Platkin, Acting Attorney General of the State of New Jersey, with offices located at 124 Halsey Street, 5th Floor, Newark, NJ, and Cari Fais, Acting Director of the New Jersey Division of Consumer Affairs, with offices located at 124 Halsey Street, 7th Floor, Newark, NJ (collectively, the "State of New Jersey" or "New Jersey").

52.     Plaintiff is the State of Oregon, *ex rel.* Ellen F. Rosenblum, in her official capacity as Attorney General for the State of Oregon, with offices located at 100 SW Market Street, Portland, Oregon.

53.     Plaintiff is the State of Utah, acting through Sean D. Reyes, Attorney General of Utah, with offices located at Utah State Capitol, 350 N. State St. Suite #230, Salt Lake City, UT 84114.

54.     Plaintiff is the State of Washington, through Attorney General Robert W. Ferguson, with offices located at 800 Fifth Avenue, Suite 2000, Seattle, WA 98104 ("State of Washington"

or "Washington"). The Washington Attorney General is also authorized to commence this action pursuant to RCW 19.86.080 and RCW 19.86.140.

## DEFENDANT

55.     Mariner is a Maryland limited liability company with its principal executive offices located at 8211 Town Center Drive, Nottingham, MD 21236. Joshua Johnson is Mariner's President and CEO.

## BACKGROUND

56.     Mariner's target consumers are subprime borrowers with below average credit history and low FICO scores.

57.     Mariner offers loans of between $1,000 and $25,000, with terms between 12 and 60 months. Mariner charges high interest rates that range from 18.99% to 35.99%. For Mariner's "direct" branch loans, the average APR is around 28%, and the average loan size is about $3,650.

58.     Mariner obtains leads for potential borrowers through online lead generators such as LendingTree and Credit Karma. Many branch loans also begin as "loans by mail" which can be refinanced into a larger loan at a branch.

59.     Mariner markets itself as a lender—not an insurance broker.

60.     Consumers come to Mariner to borrow money; they do not come to Mariner for the purpose of buying insurance.

61.     Mariner never sells insurance on its own, without a loan, and consumers cannot pay for the insurance premiums up front to avoid amortization of the costs of the add-ons. Rather, the premiums are added on top of the loans and incur additional interest over the course of the loans, increasing the profits for Mariner and increasing the cost to consumers.

62.     Mariner markets itself to consumers as a place to get personal loans, debt consolidation loans, car loans, and—recently—mortgage loans. Mariner's website contains extensive marketing information and FAQs about every loan product. But the website contains no information about add-ons.

63.     The following is typical marketing language from Mariner's website, captured on July 21, 2022:





64.     Yet, despite the fact that Mariner does not mention its insurance products on its website and consumers do not come to Mariner seeking insurance, Mariner manages to charge the vast majority of its customers (about 80% of loans nationwide as of early 2020) for expensive insurance and other add-ons.

65.     Add-ons are one of the key drivers, if not *the* key driver, of Mariner's profits.

*Hidden Add-Ons Cost Consumers an Average of $500 Per Loan Nationwide.*

66.     In 2020, nationwide, Mariner charged consumers an average of $360 in add-on products per loan. Since the premiums and fees are financed, these add-ons increase interest

payments by an average of about $180 in interest to the loan, for a total added cost to the consumer of approximately $540.

67.     In some states, Mariner's add-on charges are far higher. For example, Mariner produced to the Commonwealth a random sample of 100 loan files for loans originated in Pennsylvania in December 2020. Of those 100 loans, 75 loans included charges for at least one add-on product.

68.     For these 75 loans, the average cash borrowed was $3,394. The consumers were charged an average of $725 each for add-on products, plus $360 more in interest, as illustrated below.[1] This amounts to an average of $1,085 in add-on costs for every $3,394 in cash borrowed – or $32 in add-on costs for every $100 borrowed.

**Figure 1: Average Add-On Costs Per-Consumer from PA Random Sample, Dec. 2020**



---

[1] For each loan, interest attributable to add-ons was calculated by dividing the finance charge by the amount financed (including add-ons), and then multiplying that ratio by the add-on charges. Throughout this Complaint, dollar amounts are rounded to the nearest whole dollar.

69.     In another example, Mariner produced to New Jersey a random sample of 42 loan files for New Jersey consumers with loans that originated in December 2020. Of those 42 loans, 21 included charges for at least one add-on product.

70.     Of the 21 New Jersey loans that originated in December 2020 with one or more add-on products, the average cash borrowed was $4,667. These New Jersey consumers were charged an average of $267 for add-on products, which added $207 more in interest. This amounts to an average of $474 for every $4,667 in cash borrowed – or $10 in add-on costs for every $100 borrowed.

71.     Of course, Mariner charges some consumers far more than the average. For example, one consumer borrowed $2,981 in cash in December 2020, at 27.69% APR. In addition to the cash loan, Mariner charged this consumer $1,700 for five add-on products, which added $1,135 in interest to the loan, for a total cost of add-ons of $2,835. Mariner charged this consumer $95 in add-ons for every $100 she borrowed.

72.     In September 2017, another consumer borrowed $16,594 in cash, putting down a car title as collateral. Mariner charged this consumer $5,641 for the following *seven* add-on products: Auto Club ($432), Credit Involuntary Unemployment Insurance ($1,780), Accidental Death & Dismemberment (AD&D) (Policy 1) ($480), AD&D (Policy 2) ($480), Credit Accident & Health Insurance ($1,430), Credit Life Insurance ($1,025), and Non-Filing Insurance ($12). Mariner added $3,519 in interest to the loan as a result of these add-on charges. In total, Mariner charged this consumer $9,160 for add-on products, or $55 for every $100 borrowed on this particular vehicle title loan.

73.     In another example, a consumer borrowed $5,000 in cash in December 2020, at 29.98% APR. In addition to the cash loan, Mariner charged this consumer $1,238 for four add-on

16

products, which added $371 in interest to the loan, for a total cost of add-ons of $1,609. Mariner

charged this consumer $32 in add-ons for every $100 he borrowed.

*Mariner Uses an Electronic Closing Process to Conduct a Bait-and-Switch that Packs in Add-*
*On Products and Results in Costs Far Higher than Consumers Expect to Pay.*

74.    Mariner's add-on packing operation takes place primarily in its branch locations.

As described in more detail herein, on average Mariner adds hundreds or thousands of dollars in

add-ons to every loan—removing them only if the consumer notices and asks.

75.    But most consumers have no chance to notice the add-ons. At the in-branch loan

closings, Mariner rushes applicants through an electronic display of 44-plus pages of loan

documents on a hard-to-read computer screen mounted on the wall. A redacted exemplar of a 57-

page loan packet is attached as Exhibit A.

76.    Within the electronic display of loan documents are purported disclosures about the

add-on products. Mariner hides the disclosures from most of its customers, so they never know

they are being charged hundreds of dollars for add-ons. The Mariner employee—not the

consumer—controls the pace of scrolling.

77.    For example, one consumer borrowed from Mariner in January 2021 after she drove

by a Mariner location and decided to apply for a loan online. She reported that auto protection was

offered on top of the loan, relaying that she thought it was "really weird" that a product like auto

protection was being offered at a lending establishment. This consumer was given 15 minutes to

look over the paperwork and shown the screen of a tablet displaying the documents, but was not

given a chance to scroll through them herself before she signed. Mariner ultimately charged her

for four add-ons, none of which she was aware: Life, Accident & Health, Involuntary

Unemployment Insurance, and an auto membership. She borrowed $3,000 in cash, but was charged

$909 in add-ons, totaling $1,236 in add-ons including interest; for every $100 she borrowed, she

was charged $41 in add-ons. She stated that had she been offered these products as optional, she would have declined all of them without any regard to how much they cost.

78.     Because consumers are not afforded the opportunity to adequately read and understand the purported disclosures contained in the electronic display of loan documents before signing, most consumers rely on the oral representations of Mariner employees to explain what the add-on products are and how they work.

79.     Mariner's oral representations of the add-on products during loan closings, to the extent they are even provided, fail to disclose the basic obligations and terms of the loan agreement and add-on products, including, among other things: (1) that the add-on products are an additional cost that is added to the loan; (2) that the entire premium of credit insurance products are financed upfront; and/or (3) that the purchase of add-on products is ostensibly optional and not required to obtain the loan.

80.     Mariner further misleads consumers by concealing the substantial commissions it retains on the amounts it charges consumers for credit insurance by falsely stating in its written disclosures that the premium amount is paid "To Ins. Company," without disclosing the substantial commissions that Mariner deducts and retains for itself.

81.     Mariner's acts and practices during and prior to loan closing are misleading and cause a likelihood of confusion and misunderstanding for consumers as to the cost of the loan and the add-on products Mariner is selling.

82.     In addition to being unfair, deceptive, abusive, and/or unconscionable, Mariner's practice of requiring consumers to purchase add-on products through deceptive statements or omissions also violates the Truth in Lending Act (TILA), 15 U.S.C. 1601 *et seq*., and Regulation

Z, 12 C.F.R. § 1026, which require that mandatory charges be disclosed as part of the finance charge.

## FACTUAL ALLEGATIONS

I.      **Mariner Charges the Majority of Consumers for Add-Ons Without Their Consent.**

83.     In many loan transactions, Mariner packs add-ons into the loan without properly obtaining consumers' consent. Although add-on charges commonly add hundreds or thousands of dollars to the loan, Mariner employees often make no oral mention of them and, given Mariner's failure to properly provide disclosures, many consumers do not notice that large sums have been added to what they believe they are borrowing.

84.     In some instances, Mariner falsely tells consumers that add-on products are required to obtain the loan. In other instances, Mariner falsely tells consumers, explicitly or implicitly, that the add-ons are free or much cheaper than they in fact are.

85.     In yet other instances, Mariner falsely tells consumers, explicitly or implicitly, that they are entitled to the add-on products as a "perk" or as a benefit to being a Mariner customer.

86.     The methods differ, but the result is the same: consumers end up being charged and paying hundreds or thousands of dollars for add-ons for which they did not provide consent.

87.     As demonstrated by extensive interviews with consumers who were nearly all chosen at random, Mariner misled the overwhelming majority of the consumers whom it charges for insurance in the Plaintiff States.

88.     Of the 44 consumers the Commonwealth interviewed, at least 36 had one or more credit insurance or ancillary products added to their loan. Of these 36 consumers with add-on products, only one person provided her consent.

89.     Of the 36 Pennsylvania consumers who were interviewed and had add-on products, 35 (97 percent) told the Commonwealth that they either: (1) did not know they had an add-on, (2) did not know it was optional, and/or (3) did not know that it cost additional money.

90.     Of the 16 New Jersey consumers interviewed with loans that originated between November and December 2021, and who were charged for four or more add-on products, all 16 consumers told New Jersey that they either: (1) did not know they had add-on products attached to their loan, (2) did not know one or more add-on products were optional, and/or (3) did not know that one or more add-on products cost additional money.

91.     Of the 10 Washington consumers who were interviewed and had add-on products, 9 of those consumers (90%) told Washington that they either: (1) did not know they had an add-on, (2) did not know it was optional, and/or (3) did not know that it cost additional money.

92.     Mariner engages in many unfair, deceptive, abusive, and/or unconscionable acts or practices in charging consumers for add-on products. Most prominently, alternately or in combination:

a.   Mariner designs its loan origination process to minimize the chance that consumers will notice the inclusion of add-on products in their loan documentation;

b.   Mariner charges consumers for add-ons without ever mentioning them;

c.   Mariner charges consumers for add-ons that consumers explicitly declined;

d.   Mariner falsely claims that add-ons are mandatory; and/or

e.   Mariner misleads consumers about the cost of add-ons.

This Complaint includes detailed examples from consumer interviews that illustrate these unfair, deceptive, abusive and/or unconscionable acts or practices. Based on consumer interviews in a

number of states, the Plaintiffs aver that Mariner is engaged in these unfair, deceptive, abusive, and/or unconscionable acts or practices in every state in which it does business.

93.     Nationwide, Mariner has charged consumers hundreds of millions of dollars in fees and interest for hidden and unwanted add-on products.

94.     In 2019 alone, Mariner charged consumers nationwide $121.7 million in premiums and fees for add-on products. The average add-on premiums and fees was $364 per loan in 2020. These figures exclude interest.

*In Many Cases, Mariner Never Tells the Consumer About Add-On Insurance. In Some Cases, Mariner Pitches Insurance on an Unrecorded, Unscripted Phone Call.*

95.     The first contact consumers have with Mariner is typically through the online application or by applying over the phone. Mariner never provides information about add-ons to consumers in its marketing or during the application process. Instead, the first time Mariner *might* mention the add-on products is on an "approval call."

96.     The "approval call" is a telephone call that a branch employee makes to notify the consumer of the loan terms for which the consumer is approved for the loan closing. The approval calls are unrecorded and unscripted. Mariner does not have a policy of requiring its employees to explain the add-on products to consumers on the approval call, and many employees fail to do so.

97.     In interviews, consumers recall being quoted monthly payment amounts that were significantly lower than the payments they ended up being charged by Mariner. This is because, on the approval call, some Mariner employees quote the monthly payment amount without any add-on products. Then, at loan closing, the monthly payment amount is significantly higher because the add-ons have been packed into the loan. Instead of providing a script for, or recording, approval calls to ensure its employees properly explain the add-ons, Mariner looks the other way when employees mislead consumers to reach the company's lofty sales goals.

98.     On the "approval call," the Mariner employee focuses the consumer on two numbers: (1) the amount of cash that Mariner approved for the loan, and (2) the monthly payment amount. Whether or not consumers are informed of the monthly price including the add-on depends on the particular practices of individual Mariner employees.

99.     One Pennsylvania Branch Manager said that her personal practice is to quote two monthly payments on the approval call: one with no add-ons, and another with add-ons. Mariner does not have a formal policy that requires this. Many consumers told Plaintiffs that Mariner never mentioned insurance and thus did not give two payment quotes.

100.    But even if some of Mariner's employees do quote a monthly payment that includes add-ons on the approval call, this practice hides the full cost of add-ons by focusing the consumer's attention on the much smaller *monthly* cost of add-ons.

101.    On the approval call, many Mariner employees simply offer the monthly payment that includes add-ons. For example, a District Manager in Wisconsin explained in a May 2020 email how his team had been so successful in selling Auto Plus plans: "I advised my team that the first quote given to the customer should include all qualified products, including a multi-year auto plus plan."[2]

102.    In a similar example, one New Jersey-based Assistant Vice President instructed New Jersey branch managers to pressure consumers, during the introductory "approval call," into agreeing to commit to a monthly payment amount that includes all add-on products. He explained that "… the best way to offer is to make the initial quote payment with all products and then get verbal buy in from the customer that they are ok with the payment before they ever come into the office."

---

[2] Multi-year auto plus plans range from $380 (2 years) to $800 (5 years), excluding interest.

## II. Mariner's Rushed, Electronic Closings Deprive Consumers of the Chance to Read the Documents and Notice the Hidden Add-On Charges.

103.    The consumer harm caused by Mariner's failure to properly explain add-ons is compounded by its all-electronic closing process, where consumers are not given a meaningful opportunity to read and understand the loan and add-on agreements, which typically consist of more than 44 pages of small text written in legalese.

104.    Mariner often schedules loan closings when the consumer is on the way to or from work, when their time is limited, allowing Mariner to rush the consumer through the process.

105.    At closing, Mariner brings the consumer into a small "closing room" or a cubicle that has a computer screen mounted on the wall. For many consumers, the screen is too far away and the text too small to read. For much of 2020 and 2021, Mariner had a clear 2 foot by 3-foot glass shield that separated the employee and the consumer on the table, which further obstructed the consumer's view of the computer.

106.    When scrolling through the loan documents, Mariner exercises exclusive control over the pace and movement of the computer's displayed text of the insurance and loan agreement terms up, down, or across the computer screen. Mariner employees control the mouse and scroll through the pages quickly.

107.    The Mariner employee pauses at more than a dozen signature and initial lines, indicating where to electronically sign. Mariner allows consumers to momentarily use a digital signature pad only to digitally acknowledge acceptance of the insurance and loan agreements.

108.    As Exhibit A illustrates, Mariner buries the disclosures about the add-ons in the middle of the flurry of electronic documents, knowing that most consumers lack the time and financial literacy to read and understand all of the documents.

109.    Even if consumers had the time and financial literacy to read and understand the terms and obligations contained in the insurance and loan agreements, consumers are not simultaneously provided a printed copy of those documents (except perhaps the loan note) when they are requested to digitally acknowledge them.

110.    Numerous consumers reported that Mariner did not give them a chance to read the documents at closing.

111.    For example, one consumer reported that he was not close enough to comfortably read the screen. He said, "I spent twelve years in the United States Army, so I usually like to read through the things I am signing. I did not feel like I had the chance to read through the documents."

112.    Another consumer stated: "While we were electronically signing the loan documents by clicking 'I agree' on a signature pad, we could not see the loan documents at all. [The Mariner employee] had the computer monitor facing him, and he did not give us any chance to review or read the loan documents."

113.    Another consumer said she was unable to "see everything [contained in the loan documents] because [the Mariner employee] scrolled through it so fast." According to the consumer, the entire "process took between 10 to 15 minutes."

114.    Another consumer reported he was "unable to follow along with the document," as it was being described to him on a computer monitor and at "the end was told where to initial." The consumer reported that his loan closing "was very quick," and that he "finished reviewing the document[s] in 8 to 10 minutes."

115.    Another consumer reported that the Mariner employee at closing went through the documents and summarized what they said, but that the consumer had "no chance to actually read" them and was "in and out in within 10 minutes." The consumer additionally reported that the

process did not include enough time to look over the paperwork and that it was "like you have to hurry up and get out."

116. Yet another consumer indicated that when a Mariner salesperson reviewed loan documents with her, "[t]he loan documents were on the computer screen. The salesperson did everything. They clicked everything and I just signed. I did not read over the paperwork. I wasn't given the time to sit and read it."

117. Even though Mariner's 44-plus page closing packets include disclosures about add-products being optional and costing extra, nearly every consumer interviewed who was charged for add-ons (more than 60 people) told the Plaintiffs that they did not know about the add-ons (or did not know they cost extra). Consumer interviewees were nearly unanimous in saying that they would have declined the add-ons if they had known the information contained in the disclosures.

118. Indeed, in every state where the Plaintiffs have interviewed consumers, the vast majority of consumers told the Plaintiffs that they did not know about the add-ons (or did not know they cost extra). Mariner's business model and policies are, with minor exceptions, the same in every state where it does business. Therefore the Plaintiffs aver that Mariner is charging consumers for hidden add-on products in every state where it does business. Since Mariner often lends to consumers who reside in neighboring states, Mariner's unlawful conduct also impacts the residents of many states where Mariner does not have brick-and-mortar locations.

119. In some instances, Mariner employees do not even have the customer provide electronic signatures. Of the 36 consumers interviewed by the Commonwealth who were charged for add-on products, three consumers (8 percent) said that the Mariner employee filled in all the signatures at closing. According to one of these consumers, the Mariner employee told her that "because of COVID" the consumer had to give verbal consent and the employee would click the

signature pad. Another customer said the Mariner employee signed all of his paperwork at the front counter.

120.   Mariner headquarters has been aware that Mariner employees sometimes sign for customers since at least May 2021.

121.   Mariner's policies and procedures do not require employees to provide consumers with paper copies of the loan documents, other than the 3 page loan note. Mariner does not track whether it gives a consumer a printed copy.

*Mariner Requires Its Employees to "Always" Offer Every Add-On.*

122.   Formal corporate policy and daily reminders from executives and branch-level managers require Mariner employees to "offer" all eligible add-ons, for every loan, to every consumer, without exception.

123.   This policy is featured prominently in the first pages of Mariner's employee training curriculum and is one of the first corporate rules on which employees are instructed. "Always offer all products that the borrower is eligible for" even when the consumer does not request or need such products.

124.   In many cases, Mariner employees "offer" these products by including them in the loan without any prior consent from the consumer.

125.   "Offering" add-ons in this manner leaves consumers with either: (A) no awareness of the products, or (B) the false impression that the products are mandatory.

126.   To demonstrate compliance with this policy, Mariner employees are required to save a copy of the "payment calculation" screen in the loan origination system, showing the terms of the consumer's loan with every add-on product packed in.

127.    In New Jersey, for example, Mariner has an explicit policy to always offer Credit Involuntary Unemployment Insurance and Credit Property Insurance to "all eligible customers" even if the consumer had not requested such products.

128.    In addition to formal corporate policies, management at both the executive and branch levels of the company constantly monitor and aggressively pressure Mariner employees to offer all add-on products at every conceivable opportunity.

129.    At the executive level, for example, a Mariner Vice President emailed all of the employees in his region—Pennsylvania, New Jersey, and New York—and accused the branches of not doing enough in "… Offering ALL Products to ALL customers ALL the time."

130.    In another example, one New Jersey Branch Manager explained in an email that one of "the best way [sic] to steadily increase revenues over time," includes presenting all add-on products on every loan. The branch manager reiterated the Mariner-wide policy that "[i]nsurance must be presented on all loans …."

*Mariner Misrepresents the Extent of Protection Provided by the Insurance and Add-ons.*

131.    Even when Mariner employees do mention the add-ons, they do so using misleading language that exaggerates their benefits. One Pennsylvania District Manager told the Commonwealth that, in his district, Mariner typically describes a loan with all potential add-ons as "fully protected." In his emails to his employees, he directs them to make "[f]ully protected payment calculations for every customer." When his employees are trying to sell insurance, they misleadingly describe a monthly payment with insurance as "fully protected."

132.    The phrase "fully protected" is misleading to consumers in several ways.

a.    First, calling a loan payment "fully protected" could lead the consumer to believe that the credit life, disability, and unemployment insurance covers all possible

reasons for death, illness, job loss, etc. In fact, the insurance policies have a disability waiting period and many exclusions and limitations that make them far less than "fully" protective. These exclusions are buried in the fine print, and Mariner does not meaningfully discuss them with customers, if it discloses them at all.

b.      Second, "fully protected" implies that without Mariner's insurance, a consumer will somehow be unprotected. In fact, many Mariner customers already have life, disability, or casualty insurance and do not need Mariner's duplicative policies. When deciding what add-ons to offer, Mariner does not take into account what insurance a consumer already has.

c.      Third, Mariner calls a loan "fully protected" in reference not only to credit insurance but also to non-credit insurance products which do not "protect" against delinquency.

d.      Fourth, even some of the credit insurance products that Mariner charges consumers for do not "protect" the payment: credit property insurance merely insures the consumer's personal property, which (unlike income) is not a source of funds for the consumer to repay the loan. Mariner does not repossess personal property when consumers default on the loan, so the loss of a consumer's personal property has no bearing on whether the loan is "protected" from default. Like the AD&D insurance (*infra* at para. 184), the property insurance provides almost no value to consumers. Mariner customers are unlikely to make a claim against credit property insurance, which covers the consumer's property that Mariner lists as collateral for the loan. Nationwide, Mariner charged 79,834 consumers $18.9 million for credit property insurance in the year ending July 31, 2020. Only 234 consumers were paid a total of $557,000 in claims.

133.    "Fully protected" is also used for internal communications: an email from a Mariner Senior Vice President (SVP) directed all Mariner North Branches to "[s]trive for secured, *fully protected* loan packages to all eligible customers." (Emphasis Added).

134.    Similarly, a Mariner Vice President described consumers who did not buy credit insurance or other add-on products as "unprotected" and therefore potential upsell opportunities. "They are ALL Unprotected and [that] gives you an opportunity to provide Superior Customer Service by Offering All of our Coverages!"

*Mariner Has Known About the Insurance Packing for Years*
*and Has Done Nothing to Stop It.*

135.    Mariner has known for years that its employees were failing to disclose the ostensibly optional nature of the add-on products.

136.    Yet the company has made few changes to its policies or practices to protect consumers. As a result, the insurance packing has continued unabated.

137.    As mentioned above, most of Mariner's calls are not recorded or scripted. But Mariner does script and record a small portion of its calls: the loan by phone closings. During the COVID pandemic, loans by phone grew significantly. For example, in April 2020, Mariner made over 7,000 loans by phone, comprising nearly 35% of Mariner's loans nationwide.

138.    Loan by phone closings were generally done by the branch personnel that the consumer would have dealt with in person if not for COVID.

139.    Even on these loan by phone closings that employees know are scripted and recorded, Mariner has observed widespread misleading practices by its branch employees.

140.    For example, on May 18, 2021, a Mariner Vice President in the Pennsylvania area sent an email to the District Managers of Region 4 that said, among other things:

[T]he company is seeing a huge spike in employees not disclosing our Insurance Products as "Optional."
I was amazed to learn it was nearly 50% of all loan closing [sic] observed. THAT IS UNBELIEVABLE TO ME.
I am not a betting man, however if I were I would bet it is occurring right here in our branches as well.

141.   The District Manager for District 515 (a Pennsylvania district within Region 4) forwarded this email to his Branch Managers, with a note that said:

We have been over this several times in each branch… [sic] Please make sure after the note, that your people are reading the optional insurance section prior to go [sic] over the insurances. I have been going over this for months and still find issues. Please make sure we eliminate these issues ASAP.

142.   The reason Mariner's District Manager for District 515 is still seeing insurance packing is simple: Mariner executives and managers talk out of both sides of their mouths in communicating with employees. On the one hand, this District Manager sends an occasional email instructing employees to "read[] the optional insurance section" to consumers at closing. On the other hand, as described below in paragraph 182, he sends his employees daily reminders that they should average at least $200 per loan in AD&D and Auto Club charges (not including interest) and offer every customer every add-on. And Mariner's compensation model incentivizes employees at all levels to maximize add-on charges.

*Mariner Obtains Beneficiary Names Under False Pretenses.*

143.   In order to fill out the life insurance and AD&D policy applications in Pennsylvania, Mariner's employees must obtain the names of one or more beneficiaries for the consumer. Mariner's employees have obtained these beneficiary names under false pretenses in order to complete the applications while still keeping the add-ons hidden from the consumer.

### i. Obtaining Beneficiary Names Under False Pretenses: Consumer Example 1

144.     For example, a consumer refinanced his $3,837 loan balance at 26.63% APR in December 2020 in order to obtain $500 in additional cash. Despite never telling this consumer about add-ons, Mariner charged him $951 in premiums and $551 in interest for three hidden add-ons. *For every $100 in additional cash that he borrowed, Mariner charged him $300 in add-ons.*

145.     Mariner asked for the consumer's daughter's name under false pretenses so that it could list her as the beneficiary on his life insurance policy. He said Mariner had asked for his daughter's name as an emergency contact or someone money could be disbursed to or if something happened to him and Mariner needed to reach his family. Mariner did not tell him it wanted to list her as a beneficiary on an insurance policy.

146.  This consumer reported that he would not have purchased add-ons if Mariner had told him about them because he already had homeowners and life insurance.

### ii. Obtaining Beneficiary Names Under False Pretenses: Consumer Example 2

147.     A repeat Mariner customer came in for a new loan. He told Mariner he did not want any insurance products because he had coverage through his employer.

148.     Mariner told the consumer that he needed to provide the name of someone to be responsible for the loan in case something happened to him, or he didn't pay. He assumed this meant that Mariner wanted a co-signer and therefore he provided his girlfriend's contact information.

149.     On the loan documents, instead of listing the consumer's girlfriend as a co-signer, Mariner listed her as the beneficiary for a life insurance policy that the consumer did not ask for and did not want.

31

*Mariner Fails to Disclose Mandatory Add-On Charges as Finance Charges, as Required by the Truth in Lending Act.*

150.    As described herein, Mariner charges many consumers for add-on products without their knowledge. Some consumers are completely unaware of the add-ons. Others think they are free. Others think they are required.

151.    Under the TILA and Regulation Z, the add-ons constitute a "finance charge" because Mariner requires many consumers to pay for them "as a condition of or an incident to the extension of credit." 12 C.F.R. § 1026.4(a)(1)(i). As described above, Mariner requires the add-ons by either charging the consumer without the consumer's consent or by telling the consumer falsely that the add-ons are required or free.

152.    Under TILA and Regulation Z, Mariner may only exclude credit insurance premiums from the finance charge if "[t]he insurance coverage is not required by the creditor."

153.    However, Mariner does not disclose the add-ons as part of the finance charge. Rather, it counts them as part of the amount financed. As a result, for many consumers, Mariner fails to disclose the finance charge and annual percentage rate, in violation of Regulation Z, 12 C.F.R. § 1026.18(d), (e).

154.    Moreover, even in instances when the consumer is not required to buy the add-on product, Mariner uses deceptive language within the loan agreement that obscures the charges for the add-on products. Mariner's standard "Note, Security Agreement & Arbitration Agreement" ("Loan Note") obscures from the consumer charges related to its Auto Club and AD&D Insurance products by deceptively characterizing the expenses as "Cash to Borrower(s)," rather than, as it does with the other add-ons, itemizing the cost of Auto Club and AD&D separately in the "Itemization of Amount Financed" section of the Note.

### III.   Mariner Deceives Consumers by Failing to Disclose the Substantial Commissions It Retains on the Premiums It Charges Consumers for Insurance Add-Ons.

155.   As described herein, Mariner's rushed closing process prevents consumers from reading the written disclosures and noticing the add-on charges.

156.   But even if a rare consumer manages to read the Loan Note, Mariner further deceives the consumer by stating in its written disclosures that the premium charged for each insurance product Mariner adds to a consumer's loan is paid to "To Ins. Company" when, in fact, Mariner deducts and retains for itself a substantial portion of the premium for each insurance add-on product as a commission.

157.   In the fine print "Itemization of Amount Financed" on the first page of each Loan Note, Mariner lists the premium charged for each insurance product added to the loan and states that the premium for such products is paid "To Ins. Company."

158.   Next to that statement, Mariner includes an asterisk which refers the consumer to a deceptive caveat in fine print stating, "[w]e or our affiliates *may* receive benefits from your purchase of these items." (Emphasis added.)



159.   Mariner's statement that the premium is paid "To Ins. Company" is false because Mariner only pays a portion of the premium to the insurer.

160.    Under its Producer Agreement with each insurer, Mariner keeps or a substantial portion of the premium charged for each insurance product, ranging from 21% to 75% of the net written premium amount depending on the add-on product and the state in which Mariner is making the loan.

161.    Mariner's inadequate disclosure to the consumer that it or its affiliates "*may*" receive benefits from the amount charged for credit insurance is also deceptive because it contradicts Mariner's statement that the entire premium amount is paid "To Ins. Company."

162.    The inadequate disclosure further misleads consumers by stating that Mariner "*may*" receive benefits when Mariner knows it is contractually entitled to receive a substantial commission on each insurance product.

163.    For example, the itemization of amount financed for one consumer stated that she paid a total of $1,746 in premiums for credit life, credit disability, and involuntary unemployment insurance "To Ins. Company." Of that amount, however, $739 was retained by Mariner in commission, without written disclosure to the consumer.[3] The remaining $1,007 was the true price of the insurance premiums actually paid to the insurer.

164.    Similarly, the itemization of amount financed for a different consumer stated that he paid Mariner a $227 premium for credit property insurance which, according to Mariner's written disclosure, was all paid "To Ins. Company." In fact, Mariner retained a $148 commission under its Producer and Commission Schedule for loans made in Washington, totaling 65% of the premium amount that Mariner itemized and described as going to the insurer.

---

[3] The commission breakdown was $144 for credit life ($361 premium at 40%), $221 for credit disability ($552 premium at 40%), and $374 for credit IUI ($831 premium at 45%), for a commission total of $739.

165.     As a result of Mariner's failure to disclose, in the itemization of amount financed, the commission it retains on each insurance product it sells, the portion of the amount financed paid "To Ins. Company" is inaccurately stated and the true price of the credit insurance—after deducting the commissions Mariner retains—is hidden from consumers.

### IV.     Mariner Employees Mislead Consumers Because Their Supervisors and Headquarters Set High Sales Goals and Pit Branches Against Each Other with Incentive Compensation.

*Mariner's Compensation System Incentivizes Field Employees to Pack Insurance.*

166.     Mariner has more than 1,500 employees in the field. Its compensation system strongly incentivizes these field employees to maximize add-on charges because this increases the size of each individual loan. Like the rest of its policies that underlie the unlawful conduct described herein, the compensation system applies in every state where Mariner does business.

167.     The targets Mariner sets for its employee bonus program can be met in one of two ways: making more loans, or making bigger loans by charging consumers for more add-ons per loan.

168.     From at least 2016 until April 2020, when Mariner modified its compensation program, employee (and manager) bonuses were heavily tied to a metric called "new cash," which included not only monthly cash loaned out but also financed add-on charges. The use of this metric put significant pressure on employees (and their managers) to maximize the loan size.

169.     In turn, Mariner employees had a powerful incentive to maximize add-ons on every loan. Although the maximum loan size that a consumer qualified for under Mariner's underwriting standards excluded the add-on charges, the value of the add-ons counted toward an employees' "new cash" amount. This means that a consumer who had been approved to borrow $2,000 in cash could be booked for a $2,700 loan if the Mariner employee added $700 in add-on charges. Until

April 2020, this additional $700 would have a direct impact on the "new cash" component of employees' quarterly bonuses.

170.    Even after the April 2020 change, Mariner still allows add-ons to be added on top of a loan that is at the maximum size allowed by underwriting. Thus Mariner lends above a limit set by its own underwriting standards, making it more likely consumers will be unable to afford the loans and forcing more consumers into refinancings.

171.    After April 2020, add-on premiums and fees are not included in the "loan amount" component of the quarterly bonus program. However, even after that policy change, Mariner branch employees are still under pressure from their superiors to maximize loan size and add-on charges, as shown by emails below.

172.    Moreover, even if Mariner excludes add-on charges from "loan amount" for the quarterly bonus metrics, add-on charges remain a key factor in how Mariner measures its overall growth and profitability. Indeed, a slide deck for an August 2021 Board of Directors meeting has a slide entitled "Direct Loan Source of Business Key Metrics." One of the four "key metrics" is Net New Cash per Loan, which includes add-on charges.

*Managers Have Even Stronger Incentives to Maximize Add-On Charges.*

173.    Managers (Branch Manager and above) have even stronger incentives to maximize loan sizes and add-on charges because their annual bonuses are tied to their branches' loan growth and return on assets (ROA). Both these figures are impacted by add-on charges and the interest that results from add-on charges. ROA is calculated using the following formula: ROA = (revenue – [charge offs + expenses]) / average net receivables. Charges for add-on products can positively impact ROA because add-on charges and interest are counted as part of revenue, and credit insurance can reduce charge offs.

174.    To receive an annual bonus, a Branch Manager must meet or exceed a yearly ROA goal and the branch must be in the top 40% of ROA in its peer group.

175.    This requirement that a branch be in the top 40% pits branches against each other. This competition between branches is something that Mariner headquarters directs the District Managers to remind branch employees about on a daily basis.

176.    In an email on May 12, 2021 sent to all of his district employees, a Pennsylvania District Manager strongly emphasized the ROA metric:

> For the month The 515 [region] posted an ROA of 8.17% with a bottom line income of $218,363 with 6 of 7 branches North of 7% and 3 above 10%... YTD we fell under 10% and now sit at 9.55% with a Net Profit of $1,031,110. Very solid start to 2021!!!
> Always remember, Loan volume triggers everything!!! It increases Net Interest Income which is the fastest way to increase your ROA... It gives you a chance to sell more Credit and NON Credit Insurances, which also have a tremendous impact.

177.    The District Managers' annual bonuses are tied directly to the Branch Managers' annual bonuses, which means they too have a strong incentive to maximize add-on charges within their districts. The VPs to whom the District Managers report, and the SVPs to whom the VPs report, also have incentive compensation that motivates them to maximize the loan sizes and add-on charges within their regions.

178.    Mariner ties a significant amount of employees' compensation to quarterly performance goals. Non-managerial employees, who handle the bulk of Mariner's loan closings, can earn quarterly bonuses worth up to 20% of their salaries. In the first quarter of 2021, the average quarterly bonus for non-management employees was $1,038, and the maximum payout was $4,459. Of all eligible employees, 92% received a quarterly bonus.

179.    Branch Managers and their superiors can also earn quarterly and annual bonuses worth thousands of dollars. In Q1 2021, the maximum quarterly bonus for Branch Managers was

$6,800 and the average was $1,338. Ninety-five percent of Branch Managers qualified for the quarterly bonus.

180.    District Managers receive quarterly and annual bonuses that are tied to the performance of their Branch Managers. In Q1 2021, 99% of Mariner's District Managers qualified for a *quarterly* bonus averaging $3,789. The maximum District Manager *quarterly* bonus was $11,348. In 2020, a Pennsylvania District Manager could have received up to $63,000 in *annual* bonus, which is 50% of the sum of seven Branch Manager bonuses.

181.    Thus, all of Mariner's consumer-facing employees—managers and non-management employees—are highly motivated to meet the targets that Mariner attaches to its bonus programs.

*Mariner Managers Aggressively Push Employees to Sell the Most Profitable Add-Ons with Explicit Sales Goals.*

182.    Mariner's District Managers are expected to send daily emails to all of their branch employees, drawing attention to key profit measures that are selected by headquarters. The daily email contains, among other information, the latest numbers for the most profitable add-ons: non-credit products (e.g. AD&D and Auto Club). Mariner headquarters does not provide a script for the daily email, but it does give (via Vice Presidents) the District Managers direction on the metrics that the email should focus on. These metrics are periodically updated.

183.    Mariner headquarters also provides District Managers with certain goals that are then pushed out to their employees in the daily emails. For example, in Pennsylvania Region 4, Mariner set a goal of averaging $200 per loan for "ancillary" charges, which (in Pennsylvania) refers only to AD&D insurance and Auto Club. This goal does not include the additional interest that AD&D premiums accrue.

184.    Charging consumers for AD&D without their knowledge is particularly harmful because Mariner customers are highly unlikely to receive any claim payments from an AD&D policy: from August 2019 to July 2020, Mariner charged 53,028 consumers $12.3 million for AD&D, but only 33 consumers received a total of $673,000 in claim disbursements. One reason there are so few AD&D claims is that AD&D excludes many leading causes of death and disability (disease, suicide, drug overdoses, military service, alcohol, pre-existing conditions) that are covered by typical term life and disability policies.

185.    The $200 per loan ancillary sales goal in Region 4 was in place from at least July 2020 to July 2021. Upon information and belief, other regions had similar ancillary sales goals.

186.    One Mariner Vice President, expressing frustration and dissatisfaction over lower than expected add-on sales for one New Jersey branch, stated in an email to the branch manager that: "[y]ou're [sic] A&H and IUI Credit Products are down and shouldn't be?[sic] … This must improve immediately. I want you to review each Quote prior to Approval/Funding and assure we are offering ALL eligible Products to ALL customers ALL of the time. Let's get those products back on track!"

187.    The following excerpts are from daily emails sent by a Pennsylvania District Manager to the employees of the seven branches in his district. The emails rank the branches on several different metrics, and they rank employees as well.

May 2, 2021:

WE WILLL [Sic] OFFER 100% OF OUR PRODUCTS TO EVERY CUSTOMER 100% OF THE TIME. Team Reading led the way with $1,299 in Ancillary Sales, they were followed by Team Wilkes Barre with $1,020, Team Bloomsburg $840, Team Pottsville $558, Team Pittston $390 and Team Dickson City $199. MTD [month to date] we are at $210 per loan, GREAT JOB!!! .. Now to stay above $200/loan... ... Team, We are to be offering to every customer every time…Keep

the focus .....We need to get to $200 per loan in every branch as we start to raise the bar . . . .

May 4, 2021:

Top 5 Ancillary April

1) [Employee name redacted]     $7,870
2) [Employee name redacted]     $6,381
3) [Employee name redacted]     $6,120
4) [Employee name redacted]     $4,981
5) [Employee name redacted]     $4,980

**Team, the bottom line #'s for 2021 start at** LPE [loans per employee], minimum 2 DACC [auto title loans] per month and **$200/loan in Ancillary**... It starts with 2 apps daily, following the DACC process, BM [Branch Manager] involvement and the Daily sense of Urgency to WIN!!!!!
(Emphases in original.)

May 12, 2021:

AREAS to Drive Income:  . . . 3) Credit and Non Credit Insurance- Added income but also protects your customer which protects your balance.

188.    At the individual branch-level, Branch Managers also encourage their employees to hit high sales goals for add-ons. In one example, a New Jersey Branch Manager suggested that to improve the total number of add-ons sold in his branch, "[e]ach employee [meet] a monthly goal in auto plus [sales], and everyone understand the importance of hitting that goal." This branch manager also took the additional step of "creat[ing] a board so everyone [will] know where they are at as far as insurance sale and auto plus [goals]."

189.    In sum, Mariner employees face constant pressure from their managers to sell more add-on products. Each branch's add-on sales numbers are compared via email to the other branches, and individual employees' numbers are also emailed around to the whole region for everyone to see.

40

190.    Finally, in addition to providing strong financial incentives to sell more add-ons, Mariner *punishes* employees for failing to sell enough add-ons.

191.    Mariner has placed numerous Branch Managers in multiple states on formal performance improvement plans (PIP) for failing to meet its performance metrics, including those related to add-on charge targets. For example, in September 2019, a Branch Manager was put on a PIP for, among other things, failing to meet expectations for loan originations, specifically because the branch was not producing at *minimum* a $7500 overall ancillary product volume per month. (emphasis added).

192.    In a March 2020 PIP, an employee was cited because the branch's ancillary sales were below the minimum of $100/loan. The employee was instructed to "offer optional products to all consumers that 'qualify'" without further explaining what constitutes eligibility.

193.    Additionally, an employee was placed on a PIP for failing to meet the expectation of $100/loan for all Auto Club enrollments. This employee was directed to "include the auto club cost in the overall quote."

## V.    Mariner's Board and Top Executives Are Directly Involved.

*Mariner's Top Executives and Board of Directors Receive Regular Updates*
*on the Company's Add-On Revenue and Initiatives.*

194.    Mariner headquarters closely monitors the sales of add-ons using a "Monthly Insurance Business Review" slide presentation and other reports. The monthly review is sent to its President and CEO, Joshua Johnson, its COO, James Schneider, and its CFO, Mark Keidel. These slides track credit insurance trends and non-credit add-ons on a "dollars per loan" basis. For the month of March 2020, the highest insurance sales on a dollars per loan basis were, among Plaintiff States: Pennsylvania ($528), Utah ($440), Washington ($389), and New Jersey ($300). Of course, these numbers do not include the additional interest attributable to insurance charges.

195.    The Monthly Insurance Business Review tracks month-to-month changes down to the state level. For example, the August 2020 Review slides note changes in insurance sales:

- Large decrease [in credit insurance sales] due to change from Securian feature forms sold in July to LOTS [Life of the South] products sold in August
- State did a good job mitigating the loss with Non Credit sales
- Sales should stabilize in September

The comment that Mariner's branches in this particular state "did a good job mitigating the loss with Non Credit sales" suggests that Mariner headquarters views the add-on products as fungible. Mariner does not care which kind of add-ons its branch employees charge consumers for, as long as they reach or exceed their add-on sales and revenue goals.

196.    Mariner's COO, to whom all the field employees and their chain of command report, emails regular updates on financial results to his fellow executives, including the CEO. For example, on Friday, April 9, 2021, he sent an email with the subject line "April MTD" (month to date). Among other things, the email said:

> Following a slow start last week, things have been picking up the past few days – hopefully a sign that the stimulus checks and their negative impact on consumer demand (and our lending efforts) are behind us! . . . **Sales of non-credit and credit products at/near all-time highs at $104.16 and $298.24 per unit respectively – NICE!**

(Emphasis added.)

197.    Mariner's executives are well aware that Mariner itself collects most of the claims on the insurance policies. For example, according to the Monthly Insurance Business Review slides, in December 2020, Mariner made $1,341,594 in claims against credit insurance policies. By comparison, Mariner consumers nationwide received only $243,621 in claims that month. This compares to $11.2 million in add-ons (not including interest) that Mariner charged consumers on loans originated that month.

42

198.    The push to maximize loan size is a goal that Mariner's highest executives and Board of Directors from Warburg Pincus LLC explicitly set for themselves. In an August 2021 Board of Directors slide deck, a slide entitled "The State of Mariner Finance" lists one of the Opportunities as "Maximizing loan size opportunities in our credit grades and online lending." The Board of Directors deck also includes, as part of the Q2 2021 P&L, Insurance Income of $9.2 million (up from $7.9 million in the prior year but less than the $10.0 million in the Plan).

199.    Mariner's SVP for insurance is so focused on maximizing revenue from add-on products that he told the CFO in a September 2020 email with the subject line "RE: Insurance Income by State" that Mariner should research what add-on products it can sell in a state to help it decide whether to expand into that state. He wrote: "we don't have Legal identify products until we identify the state (for expansion). Should probably be the other way around."

200.    Mariner headquarters emphasizes the importance of add-on product sales to profitability in its communications with its managers in the field. In an August 2021 Field Leadership Meeting, a Mariner executive presented a slide on "State Profitability Analysis" that says, in part, "we will need to *continue to emphasize Optional Product sales* as a way to offset the inevitable increase in Cost of Funds rates" (emphasis added).

201.    In an email to the heads of all four of Mariner's Regions, the COO attached a report on sales of Auto Plus, broken down by branch, district, and divisions. He wrote:

> I hope you are all using the attached report to recognize your top producing districts and branches, and coaching/training the low/non-producers. . . . Please be sure to take advantage of the FIMC [Auto Plus provider] sales team and their resources to get the low producers trained up and selling. **No room in our new "lean and mean" organization for non-producers.** Accountability starts today.

(Emphasis added.)

*Mariner's CEO is Personally Involved in Expanding the Company's Add-On Offerings and Increasing Add-On Revenues.*

202.    Mariner's CEO was personally involved in reviewing FIMC Home & Auto, a new, more expensive add-on that Mariner began offering in 2020. Mariner's top executives met with the FIMC CEO about this product in September 2020. FIMC's presentation to Mariner was entitled "New Revenue Opportunities" and said "FIMC Can Help You **Maximize Revenue**" (emphasis in original).

203.    The slides that FIMC sent Mariner's CEO and other top executives estimated that the new add-on product would increase Mariner's commission revenue by about $2.8 million annually because the retail price (and commissions) range from $330 to nearly $1,200, up from the previous product's price of $200 to $800:

# Home & Auto Conversion Opportunity

- We estimate Mariner's commission revenue will increase by +34% by converting Auto Plus to Home & Auto. This would generate an additional ~$2.8M in commission revenue.
- Assuming 100% flow through of H&A commission revenue, and not including the benefit of incremental interest expense, that results in incremental $2.8M in cash flow every year for Mariner.

| Mariner Product Conversion from Auto Plus to Home & Auto | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Baseline 2019 | | | | | | Proforma Run-rate | | | | | |
| Term | Auto | H&A | % of Net Units | Auto Plus Retail Price | Net CAR | Net Sales | Auto | H&A | % of Net Units | H&A Retail Price | Net CAR | Incremental Net Sales from H&A Conversion |
| 1 Year | 54% | 1% | 55% | $199.95 | 9.7% | $6,090K | 11% | 44% | 55% | $329.95 | 9.7% | $3,142K |
| 2 Year | 24% | 0% | 24% | $379.95 | 4.3% | $4,975K | 5% | 20% | 24% | $499.95 | 4.3% | $1,242K |
| 3 Year | 16% | 1% | 17% | $499.95 | 3.0% | $4,263K | 3% | 14% | 17% | $599.95 | 3.0% | $662K |
| 5 Year | 3% | 0% | 3% | $799.95 | 0.6% | $1,308K | 1% | 3% | 3% | $1,195.95 | 0.6% | $518K |
| Total | 98% | 2% | 100% | $287(1) | 17.6% | $16,636K | 20% | 80% | 100% | $384(1) | 17.6% | $5,564K |

Note: (1) Refers to blended net average price per unit. Net of impact of renewals and cancellations.

44

The FIMC slide notes that this potential added commission revenue does not include "the benefit of incremental interest expense."

204.    In October 2020, Mariner's Senior Vice President responsible for add-on products emailed the CEO regarding the introduction of Home & Auto in Kentucky. He said the "Goal is to increase overall sales with a product that provides good value to the consumer and then consider the product for other states based on the test."

*In Marketing the New, More Expensive Add-On Products to Consumers, Mariner Deliberately Conceals the Price.*

205.    As described above, Mariner does not tell consumers the price of add-on products until the consumer is set to close on the loan and, even then, the price is buried in many pages of fine print. This is intentional and directed by Mariner's executives at the most senior levels. In May 2020, the SVP responsible for add-on products received an inquiry about a marketing email to be sent prior to closing to certain Mariner borrowers about the FIMC Auto Plus plan. The marketing person asked, "Do we want to include any cost information in this email?" The SVP responded, "Short answer is, no." Mariner leaves the cost information out of the marketing email because disclosing the high cost will make the consumer more likely to notice and reject the add-on product.

206.    Some consumers asked to see information about Auto Plus before deciding whether to buy it. But until at least late June 2020, Mariner senior executives prohibited employees from sending that information to consumers—even though Mariner had a trifold brochure in the branches that it could have emailed.

207.    Without any cost information in the marketing email or a brochure on what the product covers, consumers cannot make an informed decision on whether to buy a product.

*Mariner Headquarters Deploys a "Focus Team" to Help Branches Increase Insurance Sales.*

208.    In 2018, Mariner established a Focus Team that travels around the country to help branches become more profitable. One priority for the Focus Team is increasing the sales of add-on products. The Focus Team prepares a monthly "Impact Report" that summarizes sales increases in branches it recently visited.

209.    For example, in a December 2019 "Impact Report," one slide touted improvements in add-on sales in a particular branch:

> Improvements over November
> ➤ Optional products increased by 85%
>   ➤ Credit insurance increased 61%
>   ➤ Non-Credit insurance increased 171%
> ➤ Direct loan growth improved by 65k

The slide for each branch visited provides a detailed chart that breaks out the total volume of credit and non-credit insurance sales and average insurance sales per unit.

210.    In November 2019, this branch's average add-on charges per loan was $396. Thanks to Mariner headquarters' Focus Team's visit in November, the branch nearly doubled add-on charges—to $721 on average (or over $1,000 with interest) in December 2019.

211.    In March 2020, a Focus Team visited a Pennsylvania branch and wrote, "Penetration remains steady, but does leave opportunity for improvement in most all products." Under Next Steps, the Team wrote, "All staff to work up all loans for *largest possible deal*. Utilize DACC [auto secured loan] worksheet to present, and *overcome objections*" (emphasis added).

*Mariner's Compliance Management System Is Woefully Inadequate.*

212.    Mariner's compliance management system is woefully inadequate. Despite knowingly charging consumers for insurance without their consent for years, Mariner does not

provide its employees with scripts for marketing and approval calls. Nor does Mariner permit its employees to email customers, which would create a written record. Nor does Mariner record phone calls so that it can monitor its employees and verify what consumers were told when they complain about insurance charges.

213.    Banks and other consumer lenders make it a standard practice to record every single call. Yet despite having the technological capability to record calls since at least March 2020, Mariner has refused to implement this practice except on loan by phone closings.

214.    Even when they know they are being recorded, Mariner employees *still* fail to disclose and describe the add-on products it is packaging with the consumer's loan. In May 2021, Mariner discovered that in "nearly 50% of all loan closing observed" for loans by phone, the employee failed to describe the add-ons as optional.

215.    When Mariner does disclose the add-on products as optional, consumers often decline them. Penetration rate data suggests that Mariner employees have a harder time charging consumers for add-ons when they are on a (purportedly scripted) recorded phone closing than they do when they have an unscripted closing that is not recorded: in April 2020, Mariner charged consumers for at least one add-on on 72% of loans by phone, compared to 81% of in-branch loans.

## VI.    Mariner Engages in Other Harmful Practices to Maximize Add-On Charges.

*Mariner Mails Hundreds of Thousands of Unsolicited "Live Checks" to Consumers Each Year, Exposing them to Identity Theft Risks.*

216.    Mariner acquires half of its customers with its Loan by Mail (LBM) program, using prescreening of consumer files from a consumer reporting agency. Mariner mails live checks made out in targeted consumers' names, with loan terms on the back. If a consumer or someone who intercepts the consumer's mail cashes an LBM check, Mariner opens a loan in the consumer's name. A true and correct copy of an LBM solicitation is attached and includes the following:



**Money when you need it most**

T00001****AUTO**MIXED AADC 390

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖


000001

Lancaster, PA 17601-4934

Dear ████.

You have been selected to receive extra money from Mariner Finance! **The attached check is real.** It represents a loan for you to use for whatever purpose you choose. Simply sign the back of the check and deposit it in your bank account, or cash it today!

**Why cash this check?**

Use this money for auto repairs, home improvements, or for any purpose you choose! Once you deposit this check, you'll receive a coupon booklet in the mail confirming the due dates and monthly payments. The Loan Agreement and Disclosure Statement are on the reverse side of this letter. This letter and the Loan Agreement and Federal Disclosure Statement are your Statement of Contract. Keep it for your records. The check is good for 30 days. The estimated Loan Date is 1/23/2015 and the estimated Maturity Date is 05/23/2018. So, cash it today and enjoy the benefit of your new purchasing power!

Remember, you can cash this check, today! If you don't want to receive future solicitations of this type, call us at (443) 438-2036, email us at LBM@marinerfinance.com, or write us at the address on the reverse side of this letter and let us know.

**Who is Mariner Finance?**

With over 160 branches in 11 states, Mariner Finance is a trusted financial institution whose goal is to provide consumers like you with **money when you need it most.**

**Need more money?**

If you should need a loan amount larger than the amount on this check, call your local **Lancaster** Branch at **717-208-7025, or visit us at 2044 Fruitville Pike, Lancaster, PA 17601**, to speak with a knowledgeable member of our staff. We'll be glad to arrange for you to receive a larger loan.* You may also visit us online at www.marinerfinance.com.

Sincerely,

*Josh Johnson*

Josh Johnson
President and CEO

> No prepayment penalties
>
> Need even more money?
> Contact your local branch!*
>
> Still not sure? We offer a
> **15-day satisfaction guarantee,** so if for any reason you are not satisfied with your loan, you can return it risk-free.†



*You can choose to stop receiving "prescreened" offers of credit from this and other companies by calling toll-free 1-888-567-8688. See PRESCREEN & OPT-OUT NOTICE on reverse for more information about prescreened offers.*

†If, for any reason, you are dissatisfied with your loan and you repay it within 15 days, we will refund all finance charges and cancel all coverage with no penalties. *Subject to normal lending requirements.

---

**MARINER FINANCE**

BANK OF AMERICA

7-169
520

00001-6004

Date: 1/23/2015
Check #0002552230

**Pay**   TWO THOUSAND FIVE HUNDRED THIRTY NINE AND 00/100

**$2,539.00**

Payee's Endorsement and Two Forms of ID Required

TO THE ORDER OF

000001

*Josh Johnson*

Lancaster, PA 17601-4934

AUTHORIZED SIGNATURE
VOID AFTER 30 DAYS FROM DATE

217.    Numerous consumers have complained to law enforcement that the unsolicited checks create an unreasonable risk of identity theft. Multiple consumers report checks stolen from their mailboxes, cashed in their names, and loans opened with Mariner without the consumer's knowledge or consent.

218.    LBM loans carry high interest rates. But Mariner uses them as a mere foot in the door to originate larger branch loans. The company's stated goal is to convince consumers to refinance as many LBMs as possible. Mariner regularly contacts LBM customers by unsolicited mail, marketing emails, and telephone calls inviting them into the branch to borrow more money.

219.    If a consumer falls for Mariner's pitch to borrow more money, Mariner employees are instructed to draw up a whole new loan, which refinances the existing loan, adds additional cash, and—typically—includes hundreds or thousands of dollars in add-on products.

## VII.    Mariner Continues to Hide Add-Ons from Consumers after Closing and Obstructs Consumers' Attempts to Cancel if They Do Discover the Add-Ons.

*Mariner Refuses to Give Consumers Printed Copies of Documents During and after Closing.*

220.    When consumers call to ask for a printed copy of their loan documents during and after closing, Mariner has misrepresented that it is a "paperless" company and therefore cannot send consumers paper copies of disclosures related to their loans. Instead, Mariner employees tell borrowers to register for online access, log onto the website, and download and print the 44-plus pages of documents, at their own expense.

221.    In New Jersey, Mariner does not simultaneously provide a printed copy of the loan documents when it requests or requires consumers to digitally acknowledge insurance and loan agreements.

222.    The E-Sign Act requires that a person providing electronic records to a consumer must inform the consumer of any right to withdraw consent to electronic records and to receive paper copies of the information. 15 U.S.C. §§ 7001(c)(1)(A), (B)(i), (B)(iii).

223.    Although Mariner's E-Sign Disclosure form permits the consumer to withdraw her consent for no fee and says that consumers "can obtain a paper copy . . . by requesting that we mail you a paper copy," Mariner branches are not offering consumers this option when they call and ask Mariner to mail them paper copies of agreements.

*Mariner's Loan Closings Do Not Comply with the E-Sign Act.*

224.    Although Mariner's default method of providing disclosures is electronic, Mariner does not have a process in place to ensure that every consumer demonstrates that they can access electronic disclosures, as required by E-Sign.

225.    The E-Sign Act requires that, "[T]he consumer . . . confirms his or her consent electronically, in a manner that reasonably demonstrates that the consumer can access information in the electronic form . . . ." 15 U.S.C. § 7001(c)(1)(C)(ii).

226.    Although *some* Mariner customers demonstrate their ability to access electronic disclosures by applying on their own electronic device, many Mariner customers *do not*. Instead, these customers apply via a phone call or in person at a branch. For these customers, Mariner's process violates the E-Sign Act.

*Mariner's Website and App Hide the Loan's Unpaid Principal Balance*
*which Obscures Add-On Charges from Consumers.*

227.    On Mariner's website and app, when consumers go to look for their unpaid principal balance, Mariner displays a "balance" that equals the total of the remaining scheduled

payments on the loan. Mariner hides the unpaid principal balance (or payoff amount) on a page that requires multiple clicks to find.

228.    By displaying only the total of payments and not the unpaid principal balance, Mariner makes it less likely that consumers who have been charged for add-ons without their knowledge or consent will notice the extra principal costs they have incurred. For example, a consumer who borrows $2,950 in cash and logs onto her Mariner account a few weeks after loan origination might be surprised to see a balance of $3,734 (the Amount Financed on the loan plus the add-ons). She might call Mariner to ask why the balance is higher than what she borrowed, and she might then discover the $785 that Mariner charged her for add-on products without her permission.

229.    But instead of seeing the unpaid principal balance when she logs onto her Mariner account, this consumer sees her "balance" listed as $5,435, which is the total she will pay over her 36 month loan. This consumer is likely to believe that the difference between what she borrowed and her "balance" consists entirely of unpaid, future interest. In reality, her loan has $1,700 in finance charges (which includes interest on the add-ons) and $785 in hidden add-on charges.

230.    Displaying the smaller unpaid principal balance first on the website could also incentivize consumers to pay off their loan more quickly, thus reducing Mariner's interest revenue over the long term. Conversely, if consumers think the loan balance is higher than it actually is, they may be less likely to even attempt to make additional payments to pay down the principal.

*Mariner Obstructs Consumers' Attempts to Cancel Add-Ons.*

231.    Not only does Mariner harm consumers when it puts them into contracts for add-ons without their knowledge, but it compounds the harm to consumers who discover the add-ons and seek to cancel them.

232.    All the add-ons that Mariner sells have a right to cancel and receive a pro-rated refund.

233.    Mariner commonly tells consumers that if they cancel, it will not impact their monthly payment amount.

234.    Even if a consumer says they never agreed to purchase the add-on products, Mariner will only provide a one-time, pro-rated refund. Mariner will not re-amortize the loan to reduce the monthly payment to the amount it would have been without the unwanted add-ons.

235.    Consumers told the Plaintiff States that Mariner took the following actions when the consumer tried to cancel: (A) refused to cancel unless the consumer returned her original insurance documents to the branch; (B) required a consumer to obtain Manager approval and visit a physical branch location to sign a paper form; (C) required a consumer to contact the add-on provider; (D) refused to send a copy of the cancellation form and failed to provide written confirmation of the cancellation and refund; (E) cancelled only one add-on product despite the consumer asking to cancel all four add-ons on his loan; (F) refused to cancel property insurance unless the consumer listed Mariner on her homeowner's insurance policy; (G) falsely stated that the window of cancellation had long passed for all add-on products.

236.    The examples above are drawn from interviews of a random sample of consumers. This conduct harms consumers by imposing charges that Mariner should have refunded.

237.    Mariner requires all borrowers to sign E-Sign agreements, and it obtains electronic signatures from nearly every consumer at closing. Mariner has the ability to email documents to consumers for their electronic signature; it does so for every loan by phone.

238.    Mariner's policy of requiring an in-person paper signature to cancel (but not to purchase) add-ons compounds the harm of the initial add-on charges.

**VIII.   As a Result of this Conduct, Mariner Makes Enormous Ill-Gotten Profits from Add-Ons.**

239.    Mariner and its employees make substantial profits by charging consumers for hidden and unwanted add-on products. In May 2020, Mariner forecast that it would earn $51.9 million in insurance income in 2022.

240.    Commissions on Mariner's insurance and non-credit products are high. The add-ons that Mariner sells are incredibly profitable because, with one or two exceptions, consumers make few claims against the policies. As a result, the insurers pay Mariner sales commissions that far exceed the amount consumers are paid in claims. Everyone wins in this arrangement *except* the consumer.

241.    For example, a Mariner Senior Vice President reported in email that Mariner branches receive a 41% commission on every sale of the Auto Plus program to consumers.

242.    Nationally, Mariner earned $600,000 in February 2020 on sales of AD&D. On average, Mariner's commission was $233 per sale, or 75% of the gross premium charged to the consumer. In May 2020, Mariner forecast that its annual AD&D revenue would grow to $12.5 million in 2022.

243.    Adding hidden and unwanted add-on charges inflates the loan's amount financed, earning Mariner millions more in interest (at high APRs) than cash loans alone would generate. Often, this inflated amount financed is money the consumer would not have chosen to borrow or that Mariner's underwriting guidelines would not have allowed employees to loan—unless the consumer spent it on add-ons.

244.    Add-ons also contribute directly to Mariner's revenue when consumers miss a payment for a reason covered by a credit insurance policy. Mariner makes the claim directly to the

53

insurance company, and the payment goes directly to Mariner, reducing Mariner's charge off rate and loan losses.

245.    Finally, Mariner's offshore insurance subsidiary, MF Insurance, reaps further profits on the add-on products by selling reinsurance to Mariner's hand-picked insurance providers. According to the *Washington Post*, MF Insurance, which is based in the Turks and Caicos, made $20 million in premiums in 2017.

246.    Since Mariner—not the consumer—chooses which add-on products to offer, Mariner can demand lucrative deals from its insurance and non-insurance partners. This enables Mariner to maximize its share of the insurance premiums, reinsurance and fees for non-insurance products. This market dynamic is known as reverse competition because, unlike a competitive market where the consumer can choose the lowest cost product, it is a market where a middleman (Mariner) chooses the product leads to higher prices, which maximize the middleman's fee. *See* Exhibit B, page 253, for a fuller explanation of reverse competition.

247.    An example of reverse competition is Mariner's 2020 "Profit Improvement" initiative whereby it made Fortegra / Life of the South its sole credit insurance provider. In exchange, Life of the South agreed to pay Mariner a regular "marketing agreement bonus."

## IX.    Mariner Incentivizes Employees to "Flip" Consumers' Existing Loans by Inducing Borrowers to Enter into Larger, Refinanced Loan Obligations that Impose Far More Costs Over Time.

248.    In addition to Mariner's above-described conduct related to add-ons, Mariner misleads and fails to disclose relevant information to existing borrowers when it reaches out and invites them to renew or convert existing loans into larger, refinanced loan obligations.

249.    Mariner's internal policies identify loan renewals and loan conversions as an important source of new loans for Mariner.

250.    To that end, a Mariner internal report entitled "2021 Strength In Numbers" identified Mariner's "key drivers" to include "[i]ncreas[ing] conversions" and "[r]esolv[ing] Delinquency through Renewals."

251.    Mariner defines a loan renewal (Renewal) as "[a] new Direct Loan transaction made to a current Direct Loan customer, where we refinance the balance of the current loan as part of the new loan and typically advance additional cash to the customer."

252.    Mariner defines a loan conversion (Conversion) as:

A new Direct Loan transaction made to a current LBM [Loan by Mail], Online, SF [Sales Finance], HI [Home Improvement] or Indirect Auto customer. The existing balance in the customer's current loan is typically refinanced into the new Direct Loan.  An LBM Conversion takes an LBM loan customer and refinances the balance of the LBM into a Direct Loan plus advances new money to the customer. A SF Conversion is the same thing, but with a SF loan customer.  The SF or HI loan balance doesn't have to be rolled into the new transaction, but a balance on an LBM or Online loan does have to be included.

253.    In the consumer finance industry, the refinance or conversion of a retail installment loan, live check, or other small loan into a new personal or home equity loan is often referred to as "flipping."[4] Loan flipping, together with abusive insurance add-ons as those described above, is particularly common in sub-prime credit markets.[5]

254.    Professor Gene A. Marsh of the University of Alabama School of Law testified about the practice of loan "flipping" before the U.S. Senate's Special Committee on Aging on March 16, 1998, describing the practice as follows:

Finance companies frequently will contact existing customers, offering a few hundred additional dollars. … If the debtor bites at the apple, the existing loan will be "paid off" and a new loan will start, but with a great deal of the balance being

---

[4] See Ex. B at 31, "Equity Predators: Stripping, Flipping and Packing Their Way to Profits," Hearing Before the Special Committee on Aging, U.S. Senate, 105th Congress, Second Sess., March 16, 1998, Serial No. 105-18, at 31 (whistleblower testimony of "Jim Dough," former finance officer, assistant branch manager, and branch manager for three of the country's largest consumer lending companies).

[5] Id. at 44 (testimony of Professor Gene A. Marsh, University of Alabama School of Law).

"old money." That is, after rebates (most likely credits on the account) for unearned interest and insurance premiums, the new amount financed will be comprised of the unpaid principal balance from the old loan, the few hundred additional dollars given to the debtor in the new loan, and new credit insurance products…that were sold and financed by the creditor.[6]

255.   On February 21, 2003, the U.S. Office of the Comptroller of the Currency (OCC) issued Advisory Letter AL 2003-2, entitled "Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices" (OCC Alert). It later extended this guidance to Federal savings associations on November 12, 2013.

256.   The OCC Alert's description of loan "flipping" is consistent with Professor Marsh's description above:

Loan "flipping" is generally understood to mean the repeated refinancing of a loan under circumstances that result in little or no economic benefit to the borrower, with the objective of generating additional loan points, loan fees, prepayment penalties, and fees from financing the sale of credit-related products. In addition, the practice is frequently targeted to consumers with limited financial options. … As a general matter, many terms or practices associated with loan flipping carry risks that the borrower cannot reasonably be expected to appreciate in the absence of clear and understandable explanatory information.[7]

257.   Mariner's practices with respect to its renewals and conversions of existing loan obligations bear all the hallmarks of abusive and predatory loan "flipping." In Mariner's case, loan "flipping" takes several forms, including: (1) converting LBMs and other indirect loans to branch (direct) loans, (2) renewing branch loans that are current, often where that loan is close to being paid off, and (3) refinancing delinquent loans instead of collecting a payment on the loan.

258.   Consistent with the descriptions above, Mariner's policies, practices, and incentive structure encourage employees to "flip" consumers' loans through loan renewals and conversions, even where refinancing terms do not benefit the consumer. Mariner employees are expected to

---

[6] *Id.*

[7] Office of Comptroller of the Currency, "Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices," (OCC) AL 2003-2 (Feb. 21, 2003).

continually process loan applications and close loans, and their performance is tracked using metrics based on the number of loans each employee closes per day. This metric is also used to evaluate performance at the branch and district levels.

259.    Mariner also trains its employees to contact consumers whose loan payments are delinquent by one to thirty days and use the missed payment as an opportunity to induce the consumer to renew their existing loan.

260.    Mariner instructs its employees to prioritize refinancing for borrowers who have missed a payment, rather than asking them simply to make a payment. For example, the District Manager for Region 3 wrote the following in a July 2021 email, encouraging his 245 employees to use refinancing as the first option to reduce the number of "Current Month Lates": "Lend your way lower first, payments 2nd!"

261.    Mariner's "permanent corrective arrangements"—policies intended for "[a]ccounts that are 60 days or more past due [that] may be considered an advanced collection situation"— specifically suggests soliciting from the consumer "a new loan [which] may be the best solution for the customer and for Mariner Finance."

262.    Mariner's Refinance, Renewal, and Conversion Guidelines say, "it is our preference to renew a customer up to three times per year." Mariner pushes consumers to refinance even if the borrower is delinquent and unable to pay. Each time a customer refinances, Mariner collects a new service charge of up to $150, and of course it typically charges consumers for hidden add-ons as well.

263.    As outlined above, Mariner's stated goal is to convince consumers to refinance as many LBMs as possible. Mariner regularly contacts LBM customers by unsolicited mail, marketing emails, and telephone calls inviting them into the branch in the effort to negotiate a

Renewal of the LBM. Indeed, Mariner trains, expects, and incentivizes its employees to sell Renewals in every welcome call following a new LBM.

264.    Delinquent consumers, with LBM or direct loans, are easier to "flip," because Mariner employees can use the delinquency to pressure them to refinance their loans. Even though the consumer would nearly always be better off in the long term by simply making the payment due, Mariner pressures the consumer to renew the loan and skip another payment, thereby adding hundreds or thousands of dollars in interest to the loan.

265.    Employees are continuously encouraged by everyone from Branch Managers to District Managers to Regional Vice Presidents to convert delinquent accounts into new loans by calling delinquent borrowers up to five times per day.

266.    Examples of Mariner's company-wide emphasis on renewing delinquent loans abound in its internal documents and e-mail communications. In an April 24, 2021 email addressed to "Region 71," a Mariner Regional Vice President communicated in a "Friday recap":

> **Delinquency**—no movement on our 30's yesterday----***maximize your 5 attempts per day, call all available numbers and skip trace where needed…. Then we look to renew!!!*** Don't give up!!! CML's [collateralized mortgage lines of credit] are running high as well—another great source of renewals!

(Emphasis added).

267.    In another instance, a Mariner Regional Vice President forwarded the following communication to all his Branch Managers as "a success story that CAN BE DUPLICATED BY EVERYONE":

> The focus in March is sticking to basics and what makes us profitable. More importantly, achieving all the goals that are set in place, as a branch and individually. Basics are what? … Max out allowable calls to DQ [delinquent] accounts, and convert. EVERY CALL MUST INCLUDE AN OFFER TO RENEW. EVERY WALK-IN NEEDS TO HEAR WHAT WE CAN DO FOR THEM. Our customers do not know what their options are, unless….. WE TELL THEM.

(Emphasis original).

268.    This message is also a frequent refrain of Mariner Branch Managers, such as an August 5, 2020 email from a Branch Manager in Puyallup, Washington with the subject "Daily Goal Board" indicating "DQ is [sic] still needs work but it is the 5th day of the month, we know to convert those DQ accounts into loans."

269.    Mariner's policy of pushing refinancing aggressively is implemented at the highest levels. For example, one Mariner Vice President emailed instructions to several New Jersey and Pennsylvania-based Assistant Vice Presidents, among others, instructing them not to "[f]orget to [s]olicit a renewal BEFORE you start to collect."

270.    Two common types of flipping, what Mariner calls Renewal and Conversion loans, provide limited funds to consumers because they only provide consumers with the amount of funds that they have already paid off. For instance, if a consumer's first loan was for $1000, and the consumer paid off $200 in principal, the consumer would receive only $200 in the refinance, to bring the new principal balance back to $1000.

271.    As outlined above, each time a consumer enters into a loan Renewal or loan Conversion, Mariner collects a new service charge of up to $150, and it has another opportunity to charges the consumer for hidden add-ons.

272.    Moreover, Mariner designed the terms of its hidden add-on policy contracts to maximize the cost to the consumer each time a loan is flipped. When a loan is paid off early (as it is when it is flipped), some of the unearned interest and unearned insurance premiums from are refunded. But Mariner fails to disclose to consumers that the methods it uses to calculate these refunds penalize consumers and reward Mariner when the loan is flipped early in the loan term.

273.    First, under the AD&D policies that Mariner negotiates with its hand-picked exclusive insurance provider, Life of the South, Mariner, and/or Life of the South have chosen to calculate the earned premium using the short-rate method. This method allows the insurer to retain a greater percentage of unearned premium than would apply with a pro rata refund.

274.    Second, Mariner chooses to use the Rule of 78's to calculate the interest refund. This method results in a disproportionate amount of interest being collected in the early part of the loan term (before the loan is flipped) as compared to the simple interest method.

275.    In a loan flip, because the existing balance of the prior loan is rolled into a new loan, the term of repayment is extended and the borrower ends up paying more in interest than if they had just obtained a new loan and paid off each loan separately. Notably, in its communications with consumers, Mariner representatives fail to mention that refinancing, renewing, or converting a current loan is nearly always more costly over the loan term than simply making a late payment and/or obtaining a second loan.

### X.    Mariner Ignores Pennsylvania Law that Requires the Sale of AD&D Insurance to Be Separated from the Loan Transaction.

276.    Under the Pennsylvania Consumer Discount Company Act (CDCA) Regulations, 10 Pa. Code § 41.3(l), AD&D sales must be "completely voluntary." When an AD&D purchaser is also a borrower, "the disbursement of the loan proceeds to the borrower, shall be concluded before the licensee may initiate an effort to sell the services to the borrower."

277.    Mariner completely disregards this regulation. Mariner has been on notice that its procedures violate this regulation since at least 2015, when Mariner exchanged letters on this topic with the Pennsylvania Department of Banking and Securities. Mariner promised to abide by the regulation's requirement that, "[i]n cases where the purchaser of AD&D insurance is also a

borrower, Mariner may not initiate any attempts to sell AD&D until the loan has closed and the loan proceeds have been disbursed to the borrower."[8]

278.    Despite Mariner's promise to wait to sell AD&D until *after* closing, Mariner's policies and computer software require employees to sell the AD&D *during* closing. In policy and practice, the consumer is required to sign the AD&D application and agreement in the middle of closing. The funds are disbursed only at the end of closing—after all the paperwork has been signed.

279.    Mariner is well aware of the CDCA Regulation and has designed a process that confuses consumers in an attempt to evade the Regulation. In order to pretend that it is "disbursing" the loan proceeds to the consumer and then having the consumer pay for the AD&D separately, Mariner lists the cost of AD&D on the TILA disclosures as a separate and simultaneous amount of cash to the consumer, prints one or more checks in the amount of the AD&D, and has the customer endorse and return the AD&D check(s) to Mariner.

280.    This process has a tendency to mislead or confuse customers. One Pennsylvanian said that when a Mariner employee brought him three checks face down, shuffling between them and asking him to sign two and hand them back, he felt like he "was in Las Vegas playing three-card Monte."

281.    Moreover, the procedure of giving the consumer the second check—and listing it on the TILA disclosure as cash disbursed to the consumer—is a façade. Contrary to Mariner's promise to the Department that it would follow the procedure that gives the consumer "the option

---

[8] Letter from Bonnie Klapaska, SEVP/Chief Compliance Officer, Mariner, to James Keiser, Administrator, Compliance Office, PA Dept. of Banking and Securities (Sept. 25, 2015).

not to purchase the product" and thus to keep the second check, Mariner never allows the consumer to keep the second check.

282.    If the consumer refuses to endorse the second check, the Mariner employee is required to rewrite all of the paperwork to reduce the amount financed to the approved *cash loan* amount—thereby depriving the consumer of the funds that Mariner had previously approved and handed over in the form of the second check.

283.    For many consumers, Mariner does not even go through the façade with the second check. In the December 2020 random sample of 100 Pennsylvania loan accounts, Mariner charged 55 consumers for AD&D. Of those 55 consumers, 13 consumers (nearly a quarter of them) were loan-by-phone transactions and thus never even saw a second check.

*Mariner's Failure to Name New Jersey Consumers as a Second Beneficiary Denies Consumers Their Rightful Benefits under the Credit Life and Disability Policies.*

284.    Mariner is named as the primary beneficiary on the credit life and credit disability insurance policies it sells to New Jersey consumers.

285.    Under these policies, if a consumer dies or becomes disabled but still owes money on their loan, the insurer agrees to pay Mariner a certain amount to reduce the loan's outstanding balance.

286.    However, if the amount the insurer pays Mariner exceeds the outstanding amount owed on the loan, the credit life and credit disability insurance policies provides any excess amount " . . . be paid to the second beneficiary."

287.    Failure to add a second beneficiary to credit life and credit disability policies is considered a violation according to Mariner's internal "*Credit and Compliance Audit*" procedures under designation "x11730."

288.    Notwithstanding Mariner's own compliance rules and the representation Mariner employees make to consumers about the protection afforded by the company's add-on product offerings, Mariner routinely fails to name New Jersey consumers as a second beneficiary under the credit life and disability policies it issues.

289.    For instance, in a sample of 18 credit life and credit disability policies reviewed by the State of New Jersey, 17 policies failed to name the consumer as the second beneficiary.

## XI.    Interviews with a Random, Representative Sample of Mariner Customers Demonstrate Widespread Add-on Product Packing.

290.    The following interview summaries are provided as additional examples of the ways that Mariner charges consumers for add-ons without obtaining their consent.

*Mariner Charges Consumers for Add-Ons without Ever Mentioning Them.*

### iii.    Charging for Add-Ons With No Mention: Consumer Example 1

291.    Many consumers reported that Mariner never told them about the add-on products. For example, an Army veteran said the Mariner employee never mentioned insurance products during or prior to the closing. When the consumer got home, he read through the paperwork and realized he had been charged for insurance policies that he did not ask for and did not want. This consumer said that he did not need any insurance coverage because he already had insurance policies through his employer, his credit union, and the Department of Veterans Affairs (VA), along with AAA breakdown coverage.

292.    This consumer had been a customer of Mariner for nearly 13 years. In the past, Mariner did all of the loan documents on paper, and he could clearly see what was happening to his balance when he refinanced a loan. But since Mariner went to all electronic closings in 2019, this consumer found that doing business with Mariner has become more difficult. He said, "Now

everything is on the computer. When I look at the account online, the balance always seems much higher than I think it should be."

293.     In October 2020, this consumer went to refinance his loan at a Mariner branch. At closing, the loan documents were all on a mounted computer screen that the Mariner employee controlled. The consumer was not close enough to comfortably read the screen. Mariner charged this consumer $1,911 in fees and $1,001 in interest for add-ons that he did not consent to. Despite being charged nearly $3,000 for add-ons without his consent, this 12-year Army veteran walked out of the Mariner branch with a check for only $1,000—the additional cash Mariner loaned him when it refinanced his car title loan.

### iv.    Charging for Add-Ons With No Mention: Consumer Example 2

294.     Another consumer borrowed $8,621 at 26.62% APR from Mariner in December 2020 to finance the purchase of a vehicle. Without telling him about any add-on products, Mariner charged him $2,066 in premiums and $1,312 in interest for three add-ons: credit life insurance, credit disability insurance, and involuntary unemployment insurance. For every $100 he borrowed, Mariner charged him another $39 for hidden add-ons.

295.     The Mariner employee did not give this consumer a chance to review the documents. According to the consumer, the employee inserted all of the signatures herself, and he never touched the mouse during the loan closing.

296.     This consumer said that if the Mariner employee had told him about the add-ons, he would have declined them. He and his wife already had life insurance policies through their employers, and they did not want unemployment or disability insurance.

*Mariner Charges Consumers for Add-Ons that They Explicitly Declined.*

**v.   Charging for Add-Ons Consumers Declined: Consumer Example 1**

297.    In other instances, Mariner charges consumers for add-on products that they have explicitly declined. For example, a consumer refinanced her $2,422 balance in December 2020 and borrowed another $2,000 in cash at 27.31% APR. Mariner offered her insurance products at closing and she declined all of them because she has insurance through her job. This consumer reported that she has obtained other loans from Mariner and its competitors in the past, and, when asked, she has always declined the optional insurance products.

298.    Despite the fact that this consumer declined all add-ons, Mariner charged her $1,439 in premiums and $941 in interest for 4 different add-ons. In other words, *Mariner charged her $2,380 for add-ons that she specifically declined*, on a refinancing where she borrowed just $2,000 in new cash.

299.    After being interviewed and learning that she had been charged for the add-ons, this consumer called the Mariner branch where she took out her loans to cancel all of her insurance policies. The branch manager falsely told the consumer that she could not cancel the AD&D policy after 30 days.

**vi.   Charging for Add-Ons Consumers Declined: Consumer Example 2**

300.    When another consumer raised questions about charges for the Auto Plus Plan, the loan officer told her it was standard for the loan. After the consumer told the Mariner representative that he did not need the Auto Plus Plan, the employee said it would be taken off the loan. Yet Mariner still charged this consumer $380 plus interest for the Auto Plus Plan.

*Mariner Falsely Claims that Add-Ons Are Mandatory.*

301.    In numerous instances, Mariner tells consumers that the purchase of add-ons is required to obtain the loan, purportedly due to company policy. In actuality, under Mariner policy, add-ons are supposed to be optional. Nevertheless, when consumers ask to have charges for add-ons removed, Mariner employees often tell them falsely that the charges are not optional.

### vii.    Falsely Claiming Add-Ons Are Mandatory: Consumer Example 1

302.    For example, a Mariner consumer refinanced her $1,950 loan balance at 26.21% APR in December 2020 in order to obtain $1,000 in additional cash. Mariner charged her $785 in premiums and $357 in interest for four insurance policies. For every $100 in new cash she borrowed, Mariner charged her $114 for in add-ons.

303.    At closing, Mariner's employee falsely told this consumer that these add-ons were included in the loan for no extra charge, and that the consumer could not decline them. The consumer said that she would have declined the add-ons if Mariner had told her the truth.

### viii.    Falsely Claiming Add-Ons Are Mandatory: Consumer Example 2

304.    Another consumer borrowed $2,000 from Mariner in October 2020. At closing, the Mariner employee scrolled through the loan documents while giving the consumer summaries of what she was required to electronically sign.

305.    The Mariner employee mentioned insurance products and led the consumer to believe the add-ons were included in the loan and mandatory. The employee did not tell the consumer that she would be charged for the add-ons. In fact, Mariner charged her $556 in premiums and $162 in interest for four insurance policies.

### ix.      Falsely Claiming Add-Ons Are Mandatory: Consumer Example 3

306.    Mariner told a consumer that she was required to buy a Guaranteed Asset Protection (GAP) insurance policy in order to obtain the loan. The Mariner employee did not explain what purpose it would serve. The consumer said that, had Mariner given her the option to purchase the GAP policy, she would have declined it.

*Mariner Misleads Consumers about the Price of the Add-ons.*

307.    Mariner employees mislead numerous consumers about the price of the add-ons, leading them to believe the prices are free or lower than they are.

### x.      Misleading Consumers About Add-On Pricing: Consumer Example 1

308.    In December 2020, a consumer visited Mariner, intending to borrow $2,000 without putting down his car title as collateral.

309.    The consumer walked out with a $4,081 loan at 25.73% APR, after putting down his vehicle title as collateral.

310.    Mariner charged this consumer $1,980 for add-ons, which also added $989 in interest to the loan, for a total of $2,969 in add-on charges. For every $100 of cash he borrowed, Mariner charged him $73 for add-ons.

311.    The consumer is a totally and permanently disabled combat veteran who was deployed four times while serving in the United States Army.

312.    Prior to and during the loan closing, the Mariner employee who dealt with the consumer asked him questions about golf for nearly the whole time the consumer was in the branch, including while the consumer was trying to read the 44+ pages of loan documents. According to the consumer, the Mariner employee continually changed the subject back to golf throughout loan closing to distract him from noticing the details of the loan documents.

313.    The loan officer told the consumer that credit life insurance and Auto Club were included with the loan for no additional fee. Relying on this misrepresentation, the consumer agreed to obtain the credit life insurance and Auto Club. He planned to cancel his AAA membership (which then cost $130 per year) since he thought he was receiving a free Auto Club.

314.    In reality, Mariner charged the consumer $218 plus $109 in interest for the credit life insurance policy, and it charged him $380 plus $190 in interest for the Auto Club. The consumer said that, if he had known about these charges, he would have declined both products. He already had AAA, which offers better coverage and is cheaper than the Auto Club, and he had life insurance through the VA.

315.    In addition to charging this veteran $897 for two products that the Mariner employee falsely said were free, Mariner charged him another $2,072 (including interest) for three more add-ons that its employee did not mention at all.

316.    The consumer said that, if the Mariner employee had asked him whether he wanted to buy these policies, he would have declined them because he had life insurance through the VA and homeowners' insurance.

317.    This consumer thought he was signing a loan for $4,081 and nothing more. He was completely unaware of the $2,969 in add-on related charges.

318.    In January 2021, the disabled veteran saw his credit report and was surprised to see Mariner had reported his loan principal balance as over $6,000. He did not understand why it was so high when he had only borrowed $4,081.

319.    He called a Mariner branch to ask about this discrepancy, and the employee who had misled him at loan closing lied to him again. The Mariner employee said that the loan had a

68

$2,000 mandatory "guaranteed fee" added to it and that even if the consumer paid off the loan early, he would have to repay at least $6,000—not just the $4,081 he had borrowed.

320.    This "guaranteed fee" was a lie. There is no such fee in the loan. On the phone call, the Mariner employee did not mention anything about the $2,060 in charges for add-ons, which is actually what inflated the loan principal balance to $6,000.

**xii. Misleading Consumers About Add-On Pricing: Consumer Example 2**

321.    Another Mariner customer refinanced her loans in December 2020. The Mariner employee falsely told her that Mariner only offered an "all or nothing" insurance policy that included credit life, credit disability, and involuntary unemployment insurance, and cost less than $100.

322.    Relying on this false price and the false statement that the add-ons had to be bought together, the consumer agreed to buy the "all or nothing" policy. The actual cost of the add-ons was *fifteen times higher* than the Mariner employee had promised: $1,003 in premiums and $497 in interest ($1,500 total). This consumer said that she would not have agreed to buy the add-ons if she had known how expensive they were.

323.    As described above, a Mariner Branch Manager in one Pennsylvania district has a personal practice of quoting two monthly payments on the approval call: one with no add-ons and one with all the add-ons for which the consumer is eligible. This practice could mislead a consumer into believing, as the consumer above did, that the insurance is "all or nothing" (*i.e.*, that the consumer must either purchase *all* of the insurance as a single package, or no insurance).

**xiii.    Misleading Consumers About Add-On Pricing: Consumer Example 3**

324.    A consumer who took out a loan in the amount of $3,000 to get her car fixed in December 2021 was charged a premium of $380 for the Auto Plus Plan. However, at the time of

loan closing, the consumer was led to believe that the add-on was included in the loan and she did not have to pay extra for it.

325.    The Mariner loan officer explained that the Auto Plus Plan would provide roadside assistance and protection in the event of an accident.

326.    In May 2022, this consumer totaled her car in an auto accident and she is turning to her private auto insurance for relief because the Auto Plus Plan sold to her by Mariner did not cover her accident.

327.    In addition to charging this consumer $380 for the Auto Plus Plan add-on that the Mariner employee falsely said was free, Mariner charged her another $921 in premiums for three more add-ons—1) credit life, 2) involuntary unemployment, and 3) accident & health. The loan officer represented to the consumer that all of these products were included with her loan and that she would not incur additional cost.

## CLAIMS FOR RELIEF

### COUNT I – CFPA:
**Mariner Engages in Deceptive Acts and Practices by Charging Consumers for Add-On Products Without Obtaining their Consent and by Loan Flipping[9]**

328.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

329.    Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

330.    As described above, Mariner misrepresents, either expressly or by implication, that the consumer is getting a loan with no add-on products, or that the add-on products are free,

---

[9] The CFPA claims (Counts I through VI) are asserted by all Plaintiffs.

required, or both. These misrepresentations are material because they are likely to affect a consumer's choice of a product.

331.    In fact, Mariner charges consumers hundreds or thousands of dollars in premiums, fees, and interest for add-on products without their consent.

332.    Mariner also misrepresents to (some) consumers that if they purchase the add-on products, their loan will be "fully protected." This is misleading in the ways described above.

333.    In marketing its loans and in its rushed loan closings, Mariner omits key loan terms, including, *inter alia*: (a) that the monthly payment amount includes add-ons which are additional costs added to the loan, (b) that the purchase of add-ons is ostensibly optional and not required to obtain the loan, or (c) the price of the add-ons, including the added interest cost. This information constitutes a material omission because it would have influenced consumers' decisions whether to obtain a loan with Mariner, and whether to pay for add-on products from Mariner.

334.    Mariner also misleads consumers through loan flipping: refinancing consumers' loans when it is not in their interest to do so. Mariner repeatedly refinances loans in order to maximize the loan balance and assess new fees and add-on products. Mariner misleads consumers by inducing them to refinance or renew LBM and other existing loans without disclosing that it is often more expensive for them to refinance an existing loan than to simply make a payment or take out a new loan.

335.    Mariner's misrepresentations and omissions regarding loan refinancing or renewal are material because they are likely to affect a consumer's choice of a product.

336.    The above-described statements and omission are likely to mislead a consumer acting reasonably under the circumstances.

337.     As described above, it is reasonable for consumers to sign the loan documents and only expect to be taking out a loan because Mariner does not market add-ons products on its website or in any of its marketing materials. Unless a Mariner employee raises the add-on products in an honest manner, the consumer has no reason to know about them because they are buried in the flurry of 44-plus pages of electronic loans documents.

338.     Mariner's loan sales process and rushed closings are likely to leave many of its consumers with the false net impression that their loans do not contain any add-on products.

339.     Similarly, Mariner's loan flipping conduct is likely to leave consumers with the false net impression that refinancing will not significantly increase the cost of the loan and/or that a delinquent borrower has no other option except to refinance the loan.

340.     These representations and omissions, in light of the representations made, are deceptive omissions and deceptive acts or practices that violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

341.     The CFPA empowers this Court to grant any appropriate legal or equitable relief with respect to violations of Federal consumer financial law, including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties. 12 U.S.C. § 5565.

342.     The Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will likely show that Mariner knowingly violated a Federal consumer financial law when it engaged in the acts and practices described herein. Accordingly, the Plaintiffs seek the imposition of third tier civil penalties of up to One Million Dollars ($1,000,000) for each day during which such violation continues. *See* 12 U.S.C. §§ 5565(a)(2)(H), 5565(c)(1), 5565(c)(2)(C).

**COUNT II – CFPA:**

**Mariner Engages in Unfair Acts and Practices by Charging Consumers for Add-On Products Without Obtaining their Consent and by Loan Flipping**

343.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

344.    Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

345.    Mariner's acts and practices relating to charging consumers for hidden add-ons cause, or are likely to cause, substantial consumer injury. The hidden add-ons cause substantial injury by adding hundreds or, in some cases, thousands of dollars in unwanted charges to consumers' loans. The loan flipping causes substantial injury by adding hundreds or thousands of dollars in finance charges and even more add-on fees.

346.    This consumer injury from add-ons is not reasonably avoidable because Mariner charges consumers for add-ons without obtaining their consent. In some cases, Mariner misleads consumers into thinking the add-ons are mandatory, free, or both.

347.    The consumer injury from loan flipping is not reasonably avoidable because Mariner induces consumers into refinancing or renewing LBM or other existing loans without disclosing that refinancing is often significantly more expensive than simply making a payment or taking out a new loan

348.    The substantial consumer injury caused or likely caused by Mariner's add-on practices and loan flipping is not outweighed by countervailing benefits to consumers or to competition. Charging consumers for hidden add-ons without their consent does not benefit consumers or competition. Any temporary benefit to some consumers from loan flipping—reducing delinquency fees or providing them a small amount of additional cash—does not

outweigh the harm caused by the extra interest and add-on fees that each flip adds to the consumer's account.

349.     Therefore, Mariner's acts and practices as set forth herein constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT III – CFPA:
**Mariner Engages in Abusive Acts and Practices by Designing and Implementing a Loan Closing Process that Materially Interferes with the Ability of a Consumer to Understand a Term or Condition of a Consumer Financial Product or Service and by Loan Flipping**

350.     Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

351.     Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

352.     The CFPA defines an "abusive" act or practice as, *inter alia*, one that "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d).

353.     As described above, Mariner's all-electronic closing process often includes at least 44 and sometimes more than 50 pages of small print. Mariner employees give consumers an oral "summary" of the paperwork, often misrepresenting or omitting key terms such as the cost and ostensibly optional nature of add-on products.

354.     Mariner rushes consumers through the closing process, thereby depriving them of an opportunity to make a meaningful informed purchasing decision.

355.     Mariner's practice of loan flipping also constitutes an "abusive" act or practice. Mariner repeatedly refinances consumers' loans when it is not in their best interest in order to maximize the loan balance and assess new fees and add-on products.

356.     In its effort to renew or convert as many loans as possible—including loans that are delinquent—Mariner induces consumers into refinancing or renewing LBM or other existing loans without disclosing that it is often more expensive for them to refinance an existing loan than to simply make a payment or take out a new loan. This deprives them of an opportunity to make a meaningful informed decision.

357.     These acts and practices materially interfere with the ability of consumers to understand a term or condition of the consumer financial products at issue—those being the add-on products and loan refinancings.

**COUNT IV – CFPA:**
**Mariner Engages in Abusive Acts and Practices that Take Unreasonable Advantage of a
Lack of Understanding on the Part of the Consumer of the Material Risks, Costs, or
Conditions of Add-On Products and by Loan Flipping**

358.     Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

359.     Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

360.     The CFPA defines an "abusive" act or practice as, *inter alia*, one that "takes unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." 12 U.S.C. § 5531(d).

361.     Most of Mariner's victims whom it charges for hidden add-on products have no or little idea that their loans are saddled with fees for products that are supposed to be optional and which the consumers, when interviewed, almost universally say they would have declined to purchase.

362.     Most of Mariner's customers have no reason to expect add-ons to be packed into the loan, and they therefore lack understanding of the cost of the hidden add-ons.

363.     Moreover, since most Mariner customers do not know about the add-ons at all, most Mariner consumers lack understanding of the material risks of the add-ons, which include exclusions, waiting periods, and limitations that make the chances a consumer will successfully make a claim against some products as low as 1 in 1,607.

364.     And yet other Mariner customers lack an understanding of the conditions of the add-on products. As described herein, Mariner falsely tells some consumers the add-ons are required as part of the loan. Mariner's rushed closing process then takes advantage of these consumers' lack of understanding about a key condition of the loan: that the add-ons are supposedly optional.

365.     Mariner's practice of rushing consumers through loan closing and burying the disclosures in a flurry of electronic documents takes unreasonable advantage of this lack of understanding on the part of consumers.

366.     Mariner employees scroll too fast through the paperwork and/or position the computer too far for the consumer to read and understand it.

367.     In Pennsylvania, these hidden charges are costing consumers, on average, $1,085. In charging its customers for hidden add-on products, Mariner takes unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service.

368.     Yet other Mariner customers fail to understand the impact of refinancing their loans instead of obtaining a new loan or paying off the existing loan. Mariner's conduct related to loan flipping—refinancing consumers' loans where they do not understand, and Mariner fails to explain, that it is not in their interest to do so—constitutes an "abusive" act or practice.

369.    Again, Mariner's policies emphasize repeatedly refinancing loans in order to maximize the loan balance and assess new fees and add-on products. In its effort to renew or convert as many loans as possible, Mariner induces consumers into refinancing or renewing LBM or other existing loans without disclosing that it is often more expensive for them to refinance an existing loan than to make a payment or take out a new loan. In its zeal to renew or convert as many loans as possible, Mariner takes unreasonable advantage of this lack of understanding on the part of consumers.

370.    Therefore, Mariner's acts and practices as set forth herein constitute abusive acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

### COUNT V – CFPA:
### Mariner Violates TILA by Requiring Consumers to Pay for Add-On Products Incident to the Extension of Credit

371.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

372.    Section 1036(a)(1)(A) of the CFPA prohibits covered persons from offering or providing consumer-financial products or services not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

373.    TILA and Regulation Z are each a "Federal consumer financial law." 12 U.S.C. § 5481(14) (defining "Federal consumer financial law" to include "enumerated consumer laws" and "any rule or order prescribed by the Bureau under this title"); 12 U.S.C. § 5481(12)(O) (defining "enumerated consumer law" to include TILA).

374.    At all times relevant hereto, Mariner has regularly extended or offered consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, making Mariner a creditor within the meaning of TILA, 15 U.S.C. § 1602(g) and Regulation Z, 12 C.F.R. § 1026.2(a)(17).

375.    As described above, under the TILA and Regulation Z, in many cases the add-ons constitute a "finance charge" because Mariner requires the consumer to pay for them "as a condition of or an incident to the extension of credit." 12 C.F.R. § 1026.4(a)(1)(i).

376.    But Mariner does not include the cost of the add-ons when it calculates the finance charge for the TILA disclosures. Instead, even in the many cases where Mariner requires consumers to pay for the add-ons, Mariner improperly includes the add-ons in the amount financed.

377.    As a result of failing to include the add-ons in the finance charge, Mariner is disclosing inaccurate annual percentage rates (APRs), in violation of TILA and Regulation Z. If Mariner properly disclosed the cost of the add-ons as part of the finance charge, the disclosed APR would be far higher.

      a.    For example, as set out in paragraphs 302-303, above, Mariner disclosed an APR of 26.21% to a consumer. Given that Mariner required that consumer to pay $785 for add-on products that it told her were free and mandatory, Mariner should have disclosed that $785 as part of the finance charge, not the amount financed.

      b.    Properly disclosing the add-on charges as part of the finance charge would have reduced the amount finance on this loan to $2,950 (the amount the consumer thought she was borrowing). And it would have increased the finance charge to $2,485.

c.      Properly disclosing the add-on charges on this loan would have increased the APR to 45.2%.

378.    The disclosures Mariner provides to its customers fail to disclose the finance charge and APR, and therefore they do not comply with the requirements of Regulation Z, 12 C.F.R. § 1026.18(d) and (e).

379.    Mariner's violations of TILA and Regulation Z constitute violations of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

### COUNT VI – CFPA:
### Mariner Violates TILA by Failing to Provide Required Disclosure

380.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

381.    At all times relevant hereto, Mariner has regularly extended or offered consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, making Mariner a creditor within the meaning of TILA, 15 U.S.C. § 1602(g) and Regulation Z, 12 C.F.R. § 1026.2(a)(17).

382.    TILA requires lenders to provide a meaningful disclosure of credit terms so that consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit, and to protect consumers against inaccurate and unfair lending practices. 15 U.S.C. § 1601(a).

383.    Under TILA, when a lender provides written disclosures and an itemization of the amount financed to consumers it must accurately disclose "each amount that is or will be paid to third persons by the creditor on the consumer's behalf." 15 U.S.C. § 1638(a)(2)(A)(iii).

384.    The written disclosures and itemization of amount financed that Mariner provided and regularly provides to consumers violate the requirements of TILA by failing to disclose the

amounts that Mariner pays to the credit insurers for the insurance products Mariner adds to consumers' loans.

385.    By failing to disclose to consumers in its written disclosures the substantial commissions it retains and deducts from each insurance premium amount identified in the disclosures it provides to consumers, while falsely stating that the entire premium is paid "To Ins. Company," Mariner has systematically misled consumers and has not accurately disclosed the amounts it paid to third-party insurers on consumers' behalf in violation of TILA, 15 U.S.C. § 1638(a)(2)(A)(iii).

386.    Mariner's violations of TILA and Regulation Z constitute violations of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

## COUNT VII – PA CPL:
**Mariner Charges Consumers for Add-On Products Without their Consent and Engages in Loan Flipping**
**(Asserted by Commonwealth of Pennsylvania)**

387.    Plaintiff Commonwealth of Pennsylvania re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

388.    As described above, Mariner misrepresents, either expressly or by implication, that the consumer is getting a loan with no add-on products, or that the add-on products are free, required, or both.

389.    In fact, Mariner charges consumers hundreds or thousands of dollars in premiums, fees, and interest for add-on products without their consent.

390.    Mariner rushes the consumer through the closing process in hopes that he or she will not notice the unauthorized charges.

391.    Charging consumers for unwanted and duplicative credit property insurance also violates the Pennsylvania CDCA Regulations, which require that credit property "insurance may

be sold by a licensee only when similar coverage is not carried by a consumer or when the consumer has similar coverage but is *unable or unwilling* to offer the insurance to secure a loan transaction." 10 Pa. Code § 41.3(k). Mariner has no policy or procedure that ensures it sells property insurance only to consumers who lack similar homeowners or renter's coverage or who are unwilling or unable to use that to cover their property. As a result, and as demonstrated by consumer interviews, Mariner frequently charges consumers for credit property in violation of this regulation.

392.    Mariner continues to hide the add-ons from consumers after loan origination and obstructs consumers' attempts to cancel the add-ons when consumers do discover them.

393.    Mariner also misleads consumers through its practice of loan flipping: refinancing consumers' loans when it is not in their interest. Mariner induces consumers to refinance or renew LBM and other existing loans in order to maximize the loan balance and assess new fees and add-on products without disclosing that it is often more expensive for them to refinance an existing loan than to simply make a payment or take out a new loan.

394.    Mariner executes it loan flipping scheme by taking advantage of consumers' lack of understanding that refinancing or renewing their loans is more expensive than paying off the existing loan or taking out a new loan. This deprives them of an opportunity to make a meaningful informed decision with regard to their refinancing options.

395.    The aforesaid methods, acts and practices constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce prohibited by Section 201-3 of the PA CPL, as defined by Section 201-2 of said Law, including, but not limited to, the following:

a.      Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

b.      Section 201-2(4)(iii), by causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

c.      Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; and

d.      Section 201-2(4)(xxi), engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. §§ 201-3, 201-2(4)(ii), (iii), (v), (xxi).

396.    The Commonwealth alleges that all of the practices described herein are performed willfully. Accordingly, and pursuant to Section 201-8 of the PA CPL, 73 P.S. § 201-8, the Commonwealth seeks the imposition of civil penalties of One Thousand Dollars ($1,000) for each violation of the PA CPL, including enhanced civil penalties of Three Thousand Dollars ($3,000) for each violation involving victims age sixty (60) or older, in addition to other relief sought, as appropriate.

**COUNT VIII – NJ CFA:**
**Unconscionable Commercial Practices Related to the Extension of Loan and Insurance**
**Products to New Jersey Consumers**
**(Unconscionable Commercial Practices)**
**(Asserted by the State of New Jersey)**

397.    Plaintiff, the State of New Jersey re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

398.    The NJ CFA, N.J.S.A. 56:8-2, prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

399.    The NJ CFA defines "merchandise" as including "any objects, wares, goods, commodities, services, or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

400.    At all relevant times in the course and conduct of offering and extending loans to New Jersey consumers, Mariner has engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c).

401.    In operating its business, Mariner has engaged in the use of unconscionable commercial practices and/or acts of deception.

402.    Mariner has engaged in unconscionable commercial practices and/or acts of deception including, but not limited to, the following:

a.    Refusing to provide New Jersey consumers the opportunity to read, understand, raise questions, or make objections to the cost, terms, or other obligations pertaining to add-on products during loan closings;

b.    Charging New Jersey consumers for add-ons without ever mentioning them;

c.    Failing to disclose to New Jersey consumers the cost and material terms of credit insurance and/or other add-on products including: (i) that the entire premium for such products is financed up-front; (ii) that the consumer is paying interest on the premium for such products; and (iii) that Mariner, not the consumer, is the primary beneficiary on credit insurance policies;

d.    Requiring New Jersey consumers to purchase ancillary and credit insurance to significantly increases the cost of installment loans and then continuing to charge interest on those add-ons after they were cancelled by the consumers;

83

e.      Failing to timely refund New Jersey consumers either in whole or in part and/or respond at all to consumer inquiries regarding cancelling one or more add-on products;

f.      Refusing to name New Jersey consumers as a second beneficiary to credit life and credit disability insurance policies' that consumers have paid and are continuing to paying for;

g.      Providing inadequate written disclosures during loan closings that do not correct misleading, material oral representations concerning the terms, price and/or optionality of the add-on(s); and

h.      Mailing unsolicited "Live Checks" to consumers, exposing them to identity theft risks.

403.    Each unconscionable commercial practice and/or act of deception by Mariner constitutes a separate violation under the NJ CFA, specifically N.J.SA. 56:8-2.

**COUNT IX – NJ CFA:**
**False Promises and/or Misrepresentations Related to the Extension of Loan and Insurance Products to New Jersey Consumers**
**(False Promises, Misrepresentations)**
**(Asserted by the State of New Jersey)**

404.    Plaintiff, the State of New Jersey re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

405.    Mariner's conduct in violation of the NJ CFA includes, but is not limited to, the following false promises and/or misrepresentations:

a.      Representing to New Jersey consumers that premium payments were paid "To Ins. Company" when, in fact, Mariner deducts and retains a substantial portion of the premium as commission for each insurance add-on product;

b.      Representing to New Jersey consumers that Mariner "may" receive benefits when, in fact, Mariner knows it is contractually entitled to receive a substantial commission on each insurance product it sells;

c.      Representing to New Jersey consumers, directly, indirectly, expressly, or by implication that in order to obtain a loan, New Jersey consumers are required to purchase add-on products, when such is not the case;

d.       Representing to New Jersey consumers, directly, indirectly, expressly, or by implication that it is in their financial interest to refinance or renew existing loans, when such is not the case; and

e.       Representing to New Jersey consumers that monies are paid to The American Traveler Motor Club, LLC, and Home Benefits, LLC (or other provider for the Auto Club product) as "Cash to Borrower," when such is not the case.

406.       Each false promise and/or misrepresentation by Mariner constitutes a separate violation under the NJ CFA, specifically N.J.SA. 56:8-2.

## COUNT X – WA Consumer Protection Act:
**Unfair and Deceptive Acts and Practices Related to the Extension of Loans and Insurance, Including Charging for Add-Ons Without Consumers' Consent, Concealing Commissions, and Loan Flipping**
**(Asserted by State of Washington)**

407.       Plaintiff State of Washington re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

408.       Pursuant to the WA CPA, RCW 19.86.020, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

409.       At all relevant times in the course and conduct of offering and extending loans to Washington consumers, Mariner engaged in "trade or commerce" as those terms are defined by RCW 19.86.010(2).

410.       In the course of operating its business, including offering and extending loans and associated insurance products to Washington consumers, Mariner engaged in unfair and/or deceptive acts and practices including, but not limited to, the following:

a.       Refusing to provide consumers the opportunity to read, understand, raise questions, or make objections to the cost, terms, or other obligations pertaining to add-on products during loan closings;

b.       Charging consumers for add-ons without ever mentioning them;

c.      Concealing from consumers the substantial commission it earns from credit insurers;

d.      Affirmatively representing to Washington consumers that premium payments were paid "To Ins. Company" when, in fact, Mariner deducts and retains a substantial portion of the premium for each insurance add-on product as a commission;

e.      Affirmatively representing to Washington consumers that Mariner "may" receive benefits when Mariner knows it *will* receive a substantial commission on each insurance product;

f.      Representing, directly or indirectly, expressly or by implication, that in order to obtain a loan, consumers are required to purchase add-on products;

g.      Failing to disclose the cost and material terms of credit insurance and/or other add-on products including: (i) that the entire premium for such products is financed up-front; (ii) that the consumer is paying interest on the premium for such products; and (iii) that Mariner, not the consumer, is the primary beneficiary on credit insurance policies;

h.      Requiring consumers to purchase ancillary and credit insurance to significantly increases the cost of installment loans and then continuing to charge interest on those add-ons after they were cancelled by the consumers;

i.      Failing to timely refund consumers either in whole or in part and/or respond at all to consumer inquiries regarding cancelling one or more add-on products;

j.      Refusing to name Washington consumers as a second beneficiary to credit life and credit disability insurance policies that consumers have paid and are continuing to paying for;

k.      Repeatedly refinancing consumer installment loans in order to assess new fees and add-on products resulting in an increase in the cost of the loan and compounding consumers' terms of indebtedness;

l.      Misleading consumers into believing that add-on products provide more coverage than they actually provide; and

m.      Providing inadequate written disclosures during loan closings that do not correct misleading, material oral representations concerning the terms, price and/or optionality of the add-on(s);

n.      Mailing unsolicited "Live Checks" to tens of thousands of Washington consumers each year, exposing them to identity theft risks;

o.      Misrepresenting monies paid to providers of Auto Club products as "Cash to Borrower" without corresponding itemization on the Note; and

p.      Misleading consumers by inducing them into refinancing or renewing LBM and other existing loans without disclosing that it is often more expensive for them to refinance an existing loan than to simply make a payment or take out a new loan ("loan flipping").

411.    Mariner's aforesaid unfair and deceptive methods, acts, and practices have affected the public interest in that they impacted numerous Washington consumers. These practices constituted a pattern of conduct that Mariner committed in the course of business and are likely to continue without relief from this Court.

412.    The conduct described in Counts I and II herein in violation of the CFPA's prohibition of "any unfair, deceptive, or abusive act or practice" pursuant to 12 U.S.C. § 5536(a)(1)(B) also constitutes unfair and/or deceptive acts or practices in trade or commerce in violation of the WA CPA, RCW 19.86.020. These practices constitute a pattern of conduct impacting the public interest and are likely to continue without relief from this Court.

413.    The conduct described in Count V herein that constitutes a violation of the CFPA's prohibition on covered persons offering or providing consumer-financial products or services not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law" pursuant to 12 U.S.C. § 5536(a)(1)(A) also constitutes unfair and/or deceptive acts or practices in trade or commerce in violation of the WA CPA, RCW 19.86.020. These practices constitute a pattern of conduct impacting the public interest and are likely to continue without relief from this Court.

414.    The conduct described in Count VI herein in violation of the TILA's requirement that lenders provide meaningful disclosure of credit terms, pursuant to 15 U.S.C. § 1601(a), and that written disclosures and itemizations of the amount financed to consumers must accurately disclose "each amount that is or will be paid to third persons by the creditor on the consumer's

behalf" pursuant to 15 U.S.C. § 1638(a)(2)(A)(iii), also constitute unfair and/or deceptive acts or practices in trade or commerce in violation of the WA CPA, RCW 19.86.020. These practices constitute a pattern of conduct impacting the public interest and are likely to continue without relief from this Court.

415.    Based on the above described unfair acts and practices, Washington is entitled to relief under the WA CPA, including injunctive relief and restitution pursuant to RCW 19.86.080, civil penalties pursuant to RCW 19.86.140 for each and every violation of RCW 19.86.020, and reimbursement of the costs of this action, including reasonable attorneys' fees, pursuant to RCW 19.86.080.

### COUNT XI – WA Consumer Protection Act:
### Unfair and Deceptive Non-Disclosure of Commissions
### (Asserted by State of Washington)

416.    Plaintiff State of Washington re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

417.    As a licensed insurance producer in the State of Washington, Mariner is required to disclose to consumers, in writing, the full amount of each commission it receives from credit insurers for the credit insurance products it adds to consumer loans in Washington.

418.    Under the Washington Insurance Code, RCW 48.17.270, if the compensation Mariner receives on the sale of credit insurance includes a fee, it is required as an insurance producer to disclose in writing "the full amount of any commission paid to the insurance producer, if one is received."

419.    Mariner charges Washington consumers a "Prepaid Finance Charge (Loan Origination Fee)" on all loans made in Washington, which is a fee that is tied to the total amount

financed, and includes a fee for all credit insurance premiums added by Mariner which are financed as part of the loan.

420.    In the course of operating its business, including offering and extending loans and associated insurance products to Washington consumers, Mariner violated RCW 48.17.270 including, but not limited to, the following acts and practices:

    a.    Failing to disclose to consumers that Mariner deducts and retains a substantial portion of the premium for each insurance add-on product as a commission;

    b.    Failing to disclose to consumers that Mariner only pays a portion of insurance premiums to the insurer while deducting and retaining a substantial portion for itself as a commission; and

    c.    Failing to disclose to consumers that Mariner deducts a commission of 25% to 75% of the net written premium charged to the consumer for each insurance product.

421.    The conduct described in this Count XI in violation of RCW 48.17.270 also constitute unfair and/or deceptive acts or practices in trade or commerce in violation of the WA CPA, RCW 19.86.020. These practices constitute a pattern of conduct impacting the public interest and are likely to continue without relief from this Court.

422.    Based on these unfair acts and practices, Washington is entitled to relief under the WA CPA including injunctive relief and restitution pursuant to RCW 19.86.080, civil penalties pursuant to RCW 19.86.140 for each and every violation of RCW 19.86.020, and reimbursement of the costs of this action, including reasonable attorneys' fees, pursuant to RCW 19.86.080.

**Count XII - PA CPL:**
**Failure to Make Required Disclosures Prior to Consummation of the Loan**
**(Asserted by Commonwealth of Pennsylvania)**

423.    Plaintiff Commonwealth of Pennsylvania re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

424.    Under the TILA and Regulation Z, in many cases the add-ons constitute a "finance charge" because Mariner requires consumers to pay for them "as a condition of or an incident to the extension of credit." 12 C.F.R. § 1026.4(a)(1)(i).

425.    In many cases, therefore, the disclosures Mariner provides to its customers fail to disclose the finance charge and APR as defined in Regulation Z, 12 C.F.R. § 1026.18(d) and (e).

426.    As described above, Mariner has every consumer sign an E-Sign Agreement as part of the electronic closing process that takes place using Mariner's far-away hard-to-read computer screen. However, this process does not comply with the E-Sign Act's requirement that, "[T]he consumer ... consents electronically, or confirms his or her consent electronically, *in a manner that reasonably demonstrates that the consumer can access information in the electronic form* that will be used to provide the information that is the subject of the consent." 15 U.S.C. § 7001(c)(1)(C)(ii) (emphasis added).

427.    When the consumer signs the E-Sign Agreement using Mariner's computer, this signature does not reasonably demonstrate that the consumer can access the information in electronic form. (Some consumers have provided such demonstration by signing an E-Sign Agreement from their home computer when they first applied for the loan – but Mariner skips this step with many consumers).

428.    Mariner has no way of knowing whether every one of its consumer has access to a computer, internet, or even a smart phone at home.

429.     As described in Count V Mariner also violates TILA's requirement that lenders provide meaningful disclosure of credit terms, pursuant to 15 U.S.C. § 1601(a), and that written disclosures and itemizations of the amount financed to consumers must accurately disclose "each amount that is or will be paid to third persons by the creditor on the consumer's behalf" pursuant to 15 U.S.C. § 1638(a)(2)(A)(iii).

430.     The aforementioned acts and practices constitute unfair methods of competition and/or unfair acts or practices as prohibited by Section 201-3 of the PA CPL, as defined by Section 201-2(4) of said Law, including without limitation:

   a.     Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

   b.     Section 201-2(4)(iii), by causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

   c.     Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; and

   d.     Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, in violation of Section 201-2(4)(xxi).

73 P.S. §§ 201-3, and 201-2(4)(ii), (iii), (v), (xxi).

431.     The Commonwealth alleges that all of the practices described herein are performed willfully. Accordingly, and pursuant to Section 201-8 of the PA CPL, 73 P.S. § 201-8, the Commonwealth seeks the imposition of civil penalties of One Thousand Dollars ($1,000) for each

violation of the PA CPL, including enhanced civil penalties of Three Thousand Dollars ($3,000) for each violation involving victims age sixty (60) or older, in addition to other relief sought, as appropriate.

**COUNT XIII – NJ CFA:**
**Requesting or Requiring Consumers Execute Insurance and Loan Agreements without Simultaneously Providing Consumers a Print Copy of Same**
**(Failure to Provide a Copy)**
**(Asserted by State of New Jersey)**

432.    Plaintiff State of New Jersey re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

433.    The NJ CFA, specifically N.J.S.A. 56:8-2.22, prohibits:

a person in connection with a sale of merchandise to require or request the consumer to sign any document as evidence or acknowledgment of the sales transaction, of the existence of the sales contract, or of the discharge by the person of any obligation to the consumer specified in or arising out of the transaction or contract, unless he shall at the same time provide the consumer with a full and accurate copy of the document so presented for signature but this section shall not be applicable to orders placed through the mail by the consumer for merchandise.

434.    At all relevant times in the course and conduct of offering and extending loans to New Jersey consumers, Mariner has engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c).

435.    At all relevant times, Mariner uses computer monitors to display the terms of insurance and loan agreements during loan closings.

436.    When describing the terms of insurance and loan agreements, Mariner exercises exclusive control over the action of moving the computer's displayed text of the insurance and loan agreement terms up, down, or across the computer screen.

437.    Mariner requires or requests consumers momentarily use a computer mouse or digital signature pad only to digitally acknowledge acceptance of the insurance and loan agreements.

438.    Mariner does not simultaneously provide a printed copy of the loan documents when it requests or requires consumers to digitally acknowledge insurance and loan agreements.

439.    Mariner's conduct constitutes a violation of the NJ CFA, specifically N.J.S.A. 56:8-2.22.

### COUNT XIV – PA CPL:
### Charging Interest Rates in Excess of the Usury Limit
### (Asserted by Commonwealth of Pennsylvania)

440.    Plaintiff Commonwealth of Pennsylvania re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

441.    In Pennsylvania, lenders such as Mariner that are licensed under the Consumer Discount Company Act (CDCA), 7 P.S. §§ 6201-6219 are permitted to charge an annual interest rate up to approximately 24-27%. See *Pa. Dept. of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752 (Pa. 2008). (The CDCA provides a discount rate and service charge limit, which is why the maximum permissible rate fluctuates depending on the loan term and size.) The CDCA's usury limit applies to all credit-related charges, however labeled, and applies to credit lines as well as fixed-amount loans. *Id*.

442.    In many cases Mariner charges consumers interest that is at or near the maximum interest under state law.

443.    As described above, in many cases Mariner is disclosing inaccurate finance charges and APRs to consumers.

444.     As shown in the example above, with the add-ons properly included in the finance charge, the disclosed APR on the loan can exceed 40%.

445.     Therefore the interest rates on many of Mariner's loans in Pennsylvania exceed the CDCA's usury limit.

446.     These practices constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce prohibited by Section 201-3 of the PA CPL, as defined by Section 201-2 of said Law, including, but not limited to, the following:

    a.     Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

    b.     Section 201-2(4)(iii), by causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

    c.     Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; and

    d.     Section 201-2(4)(xxi), engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. §§ 201-3, and 201-2(4)(ii), (iii), (v), (xxi).

447.     The Commonwealth alleges that all of the practices described herein are performed willfully. Accordingly, and pursuant to Section 201-8 of the PA CPL, 73 P.S. § 201-8, the Commonwealth seeks the imposition of civil penalties of One Thousand Dollars ($1,000) for each violation of the PA CPL, including enhanced civil penalties of Three Thousand Dollars ($3,000)

for each violation involving victims age sixty (60) or older, in addition to other relief sought, as appropriate.

**COUNT XV – PA CPL:**
**Sale of AD&D in Violation of CDCA Regulation**
**(Asserted by Commonwealth of Pennsylvania)**

448.     Plaintiff Commonwealth of Pennsylvania re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

449.     Under the Pennsylvania CDCA regulations, 10 Pa. Code § 41.3(*l*), sales of accidental death and dismemberment insurance (AD&D), service club memberships, or association-type membership policies shall be "completely voluntary." In order to prevent lenders from adding such services to a consumer's loan without the consumer's consent, Pennsylvania law explicitly prohibits lenders from "initiat[ing]" an effort to sell these types of add-ons to a borrower until *after* the lender has given the borrower the loan proceeds: "the disbursement of the loan proceeds to the borrower, shall be concluded before the licensee may initiate an effort to sell the services to the borrower." *Id.*

450.     As described above, Mariner, as a licensed consumer discount company, has been violating this regulation since at least 2015. In the course of its business and as described in its policies and procedures, Mariner routinely initiates the effort to sell AD&D and auto club to Pennsylvania borrowers *before* it disburses the loan funds to them.

451.     Mariner's policy and practice require consumers to sign the AD&D and/or auto club paperwork on the electronic closing system *before* any check is handed over.

452.     Mariner caused a likelihood of confusion or misunderstanding by misrepresenting, explicitly or implicitly, that it was legal for Mariner to initiate an effort to sell AD&D and Auto Club to consumers prior to the disbursement of loan funds. In fact, such conduct explicitly violates

95

the CDCA regulations' prohibition on selling such add-ons prior to disbursement of funds. 10 Pa. Code § 41.3(*l*).

453.     The aforementioned acts and practices constitute unfair methods of competition and/or unfair acts or practices as prohibited by Section 201-3 of the PA CPL, as defined by Section 201-2(4) of said Law, including without limitation:

   a.     Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

   b.     Section 201-2(4)(iii), by causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

   c.     Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; and

   d.     Section 201-2(4)(xxi), by engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. §§ 201-3, and 201-2(4)(ii), (iii), (v), (xxi).

454.     The Commonwealth alleges that all of the practices described herein are performed willfully. Accordingly, and pursuant to Section 201-8 of the PA CPL, 73 P.S. § 201-8, the Commonwealth seeks the imposition of civil penalties of One Thousand Dollars ($1,000) for each violation of the PA CPL, including enhanced civil penalties of Three Thousand Dollars ($3,000) for each violation involving victims age sixty (60) or older, in addition to other relief sought, as appropriate.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request that this Honorable Court issue an Order:

A.    Declaring Mariner's conduct as described herein above to be in violation of the CFPA, the PA CPL, the NJ CFA, and the WA CPA.

B.    Permanently enjoining Mariner and all other persons acting on its behalf, directly or indirectly, from violating the CFPA, the PA CPL, the NJ CFA, the WA CPA, or any other provision of Federal consumer financial law, as defined by 12 U.S.C. § 5481(14), and any amendments thereto;

C.    Directing Mariner to make full restitution to all borrowers who have suffered losses as a result of the acts and practices alleged in this complaint and any other acts or practices proved by the Plaintiffs;

D.    Permanently enjoining Mariner from selling, assigning, transferring, conveying, collecting or causing to be collected (including but not limited to through litigation or judgments) any portion of a loan (including principal and interest) that resulted from charges for add-on products;

E.    Directing Mariner to withdraw any judgments, liens, garnishments, claims in bankruptcy, or other legal proceedings that Mariner have been initiated or entered against consumers relating to any loans that included charges for add-on products;

F.    Directing Mariner to cease and desist furnishing any negative credit information to a consumer reporting agency with respect to any loans that included charges for add-on products;

G.      If Mariner has furnished such negative credit information to a consumer reporting agency with respect to any loans that included charges for add-on products, directing Mariner to instruct the consumer reporting agency to delete all such negative credit information;

H.      Directing Mariner to disgorge and forfeit all money it has derived as a result of the conduct alleged herein;

I.      For those loans where required add-ons cause the interest rate to exceed a state usury limit, invalidating any beneficial interest in consumer debt purportedly owed by consumers and declaring that those balances were void *ab initio*;

K.      Directing Mariner to pay to Plaintiffs appropriate civil penalties pursuant to the CFPA, the PA CPL, the NJ CFA, and/or the WA CPA;

L.      Directing the rescission or reformation of contracts where necessary to redress injury to borrowers;

M.      Directing Mariner to pay the Plaintiffs' investigative and litigation costs in this matter;

N.      For any loans with add-ons that are secured by a motor vehicle, directing Mariner to, within thirty (30) days: (1) provide the state department of motor vehicles with all documents necessary to mark as satisfied and released any related liens, and (2) convey proper and rightful vehicle title to the owners of such vehicles; and

O.      Granting such other general, equitable, and/or further relief as the Court deems just and proper.

[Signature Pages Follow]

98

Dated:  August 16, 2022

Respectfully submitted,

**FOR THE COMMONWEALTH OF PENNSYLVANIA:**

Josh Shapiro
*Attorney General*

 */s/ Nicholas Smyth*
Nicholas F. B. Smyth, PA 307972
*Senior Deputy Attorney General*
*Assistant Director for Consumer Financial Protection*
Christopher T. Dey, PA 330000

Attorneys for Plaintiff Commonwealth of Pennsylvania
Office of Attorney General
1600 Arch St, 3rd Floor
Philadelphia, PA 19103

**FOR THE DISTRICT OF COLUMBIA:**

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

*s/  Adam Teitelbaum*
ADAM TEITELBAUM (#1015715)
Director, Office of Consumer Protection

*s/  Wendy Weinberg*
WENDY J. WEINBERG (#44560)
Senior Assistant Attorney General
Office of Consumer Protection
Office of the Attorney General
400 Sixth Street, N.W., 10th Floor
Washington, D.C. 20001
(202) 717-1383
Wendy.Weinberg@dc.gov

**FOR THE STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN
ACTING ATTORNEY GENERAL OF NEW JERSEY

*/s/Yale Leber*
YALE LEBER, NJ 207732017
ZEYAD ASSAF, NJ 290002021
ANDREW ESOLDI, NJ 326042020
CATHLEEN O'DONNELL, NJ 002311999
Deputy Attorneys General

Attorneys for the State of New Jersey
New Jersey Office of the Attorney General
Division of Law
Consumer Fraud Prosecution Section
124 Halsey Street, Fifth Floor
Newark, NJ 07102
(973) 648-3798
yale.leber@law.njoag.gov
zeyad.assaf@law.njoag.gov
andrew.esoldi@law.njoag.gov
cathleen.o_donnell@law.njoag.gov

**FOR THE STATE OF OREGON:**

ELLEN F. ROSENBLUM
Attorney General

*s/ Joseph Ferretti*
JOSEPH S. FERRETTI, OSB 201944
Assistant Attorney General

Attorney for the State of Oregon
Oregon Department of Justice
Civil Enforcement Division
Consumer Protection Section
100 SW Market St., Fourth Floor
Portland, OR 97201
Phone:  (971) 718-6066
Email:  joseph.ferretti@doj.state.or.us

**FOR THE STATE OF UTAH:**

Sean D. Reyes
Attorney General

*s/ Kevin McLean*
KEVIN MCLEAN (UT State Bar #16101)
Assistant Attorney General
TOM MELTON (UT State Bar #4999)
Section Director, Assistant Attorney General
Attorneys for the State of Utah
Utah Attorney General's Office,
White Collar and Commercial Enforcement Division
160 East 300 South, 5th Floor
PO Box 140872
Salt Lake City, UT 84114-0872
Phone: (801) 366-0310
Email: kmclean@gutah.gov
tmelton@agutah.gov


**FOR THE STATE OF WASHINGTON:**

ROBERT W. FERGUSON
Attorney General

*s/ Heidi Anderson*
HEIDI C. ANDERSON, WSBA #37603
MATTHEW GEYMAN, WSBA #17544
CAMILLE M. MCDORMAN, WSBA #53036
Assistant Attorneys General

Attorneys for State of Washington
Office of Attorney General, Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Phone: (206) 464-7744
Email:  Heidi.Anderson@atg.wa.gov
Matt.Geyman@atg.wa.gov
Camille.McDorman@atg.wa.gov