# Exhibit B

S. Hrg. 105–508

# EQUITY PREDATORS: STRIPPING, FLIPPING AND PACKING THEIR WAY TO PROFITS

# HEARING

### BEFORE THE

## SPECIAL COMMITTEE ON AGING
## UNITED STATES SENATE

### ONE HUNDRED FIFTH CONGRESS

#### SECOND SESSION

WASHINGTON, DC

MARCH 16, 1998

## Serial No. 105–18

Printed for the use of the Special Committee on Aging



U.S. GOVERNMENT PRINTING OFFICE

47–447          WASHINGTON : 1998

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-057106-5

## SPECIAL COMMITTEE ON AGING

CHARLES E. GRASSLEY, Iowa, *Chairman*

| | |
|---|---|
| JAMES M. JEFFORDS, Vermont | JOHN B. BREAUX, Louisiana |
| LARRY CRAIG, Idaho | JOHN GLENN, Ohio |
| CONRAD BURNS, Montana | HARRY REID, Nevada |
| RICHARD SHELBY, Alabama | HERB KOHL, Wisconsin |
| RICK SANTORUM, Pennsylvania | RUSSELL D. FEINGOLD, Wisconsin |
| JOHN WARNER, Virginia | CAROL MOSELEY-BRAUN, Illinois |
| CHUCK HAGEL, Nebraska | RON WYDEN, Oregon |
| SUSAN COLLINS, Maine | JACK REED, Rhode Island |
| MIKE ENZI, Wyoming | |

THEODORE L. TOTMAN, *Staff Director*
KENNETH R. COHEN, *Minority Staff Director*

(II)

# CONTENTS

|  | Page |
|---|---|
| Opening statement of Senator Charles E. Grassley | 1 |
| Statement of Senator John Breaux | 3 |
| Statement of Senator Susan Collins | 5 |
| Prepared statement of Senator Larry E. Craig | 6 |
| Prepared statement of Senator Michael Enzi | 7 |

## PANEL I

| | |
|---|---|
| Helen Ferguson | 8 |
| Accompanied by: Jerome Swindell, Attorney | |
| Gael Carter | 10 |
| Vireta Jackson Arthur, testifying on behalf of her parents | 22 |

## PANEL II

| | |
|---|---|
| Jim Dough, former employee of a predatory lender | 30 |

## PANEL III

| | |
|---|---|
| Gene A. Marsh, Professor of Law, University of Alabama Law School, Tuscaloosa, AL | 39 |
| Jodie Bernstein, director, Bureau of Consumer Protection, Federal Trade Commission, Washington, DC. | 58 |
| William J. Brennan Jr., director, Home Defense Program, Atlanta Legal Aid Society, Atlanta, GA | 80 |

## APPENDIX

| | |
|---|---|
| Testimony submitted by Home Equity Lender Leadership Organization (HELLO) | 109 |
| Testimony submitted by Finkelstein, Thompson, and Loughran | 125 |
| Testimony submitted by the Office of The District Attorney of San Diego County | 131 |
| Written comments submitted by Elizabeth Renuart, Margot Saunders Attorney | 238 |
| Testimony submitted by the National Home Equity Mortgage Association | 259 |
| Testimony submitted by the Senior Benefit Association | 267 |
| Prepared statement of the Consumer Credit Insurance Association | 271 |

# EQUITY PREDATORS: STRIPPING, FLIPPING AND PACKING THEIR WAY TO PROFITS

---

## MONDAY, MARCH 16, 1998

UNITED STATES SENATE,
SPECIAL COMMITTEE ON AGING,
*Washington, DC.*

The committee met, pursuant to notice, at 1:01 p.m., in room SD–628, Dirksen Senate Office Building, Hon. Charles E. Grassley (chairman of the committee), presiding.

Present: Senators Grassley, Collins, and Breaux.

## OPENING STATEMENT OF SENATOR CHARLES GRASSLEY, CHAIRMAN

The CHAIRMAN. Good afternoon. I welcome all of you to our hearing, which is on the subject of "Equity Predators: Stripping, Flipping and Packing Their Way to Profits."

First, let me say welcome and thank you to each of our witnesses, one of whom is jeopardizing his future in the industry by being here, three of whom will relive some very painful situations, and our panel of experts who have taken time to share their expertise with us.

Next, let me also say welcome and thank you to other members, particularly Senator Breaux who is here, and there will be others coming along shortly because I know they want to take time out of their busy schedules to be with us, and of course, the members of the public who are here and are very much interested in this issue.

We are pleased to have in attendance today Mr. Raymond White, another victim of predatory lending practices. Mr. White is here today because he believes strongly that such practices must be stopped. I would like to ask Mr. White to stand so we can recognize him at this point.

[Mr. White stands.]

Thank you very much, Mr. White, for your interest in this issue.

"Equity predators" at first blush might sound like a new horror movie targeted to bring chills and thrills to teenagers across America. Unfortunately, the topic that we are talking about today is in fact a horror. However, there are no chills and thrills, and the target of these equity predators is not teenagers, but anyone who has a good deal of equity in their home, especially unsuspecting senior citizens, especially females, who are equity-rich and cash-poor.

What exactly are we talking about when we say that equity predators target folks who are equity-rich and cash-poor? These folks are our mothers and our fathers, our aunts and uncles, and all

(1)

people who live on fixed incomes. These are people who oftentimes exist from check to check and dollar to dollar, and who have put their blood, sweat and tears into buying a piece of the American dream, and that is their own home.

This should not come as a surprise. In fact, do not be surprised, because it is estimated that more than 23 million American homeowners have no mortgage debt and that the average age of such a homeowner is 64½. Indeed, for many senior homeowners, the equity in their homes represents their lifetime savings and their largest asset. In fact, the estimates of their collective equity range from 600 billion to more than 1 trillion. So it is no wonder that these folks have become the apple of many a lending company's eye.

Before I get into a little bit more depth about the practices used by some lending companies to rip off our senior citizens, there is something that needs to be said clearly and unequivocally. Most subprime lending institutions operate in an appropriate, ethical, moral, compassionate and legal manner. They provide a vital service to those borrowers who may be unable to take advantage of traditional lending institutions because of such things as poor credit and insufficient income. These lending companies are providing thousands of seniors with needed cash—cash that is used to pay for everything ranging from medical bills to transportation.

Now let me turn more directly to our matter at hand. Equity predators, these con artists, are in the cheating and swindling business. They make money by stripping, flipping and packing the loans they make to unsuspecting consumers. These are often trusting senior citizens with little knowledge about finance and the practices of lending institutions.

You just heard me say a few terms that might have different meanings depending on what part of the country you come from. Those terms are "stripping," "flipping" and "packing." We have a chart up here that will give you the definitions—a glossary of terms that will be useful as we discuss the practices used by some in this industry.

Another question legitimately asked is just how prevalent this problem is. I wish I had a statistically valid number for you, but none exists, and that is very unfortunate. But there are a few things I can say and can say with certainty. During the course of conducting the investigation for this hearing, it became apparent that often the victims of equity predators are rarely aware of the fact that they have been the subject of a scam. In fact, it has been reported that home repair and equity fraud have stripped the value from the homes of about 100,000 unsuspecting people in 20 States.

In addition, the sheer size of the home equity market is incredible and would naturally attract unworthy business people. Just imagine—home equity loans jumped from 1 billion in 1982 to 600 billion in 1996. Next, it is estimated that about 663,000 elderly households have lived in their homes for over 20 years, own their homes free of mortgage debt, have incomes of $30,000 or less and have equity of $100,000 or more. Even the experts to whom we spoke all seemed to agree on one thing—they are seeing more and more cases of predatory lending and, as I said, who knows what we are not seeing.

3

In fact, we learned that the State of California determined the problem of predatory lending was significant enough to merit a fraud unit with local district attorneys' offices devoted solely to addressing this problem.

Today we are going to hear from seven panelists. Three witnesses are going to talk about their personal and very painful experiences with lending institutions. While listening to these witnesses, please pay particular attention to each of their stories. One will explain how her family was scammed through a home repair scheme, one through the financing of a consumer item, and one by simply calling one of the 800 numbers advertising that the company sold money.

These witnesses all ended up in the same boat—just about losing their homes—but the way it happened was tailored to their particular situations at the time.

Then we will hear from a gentleman who worked in the lending business. He will give us the real scoop on how predatory lenders do what they do to unsuspecting homeowners and the crafty, systematic practices employed by some lending institutions that actually "bleed" the equity from the borrowers' homes.

Thereafter we will hear from a professor of law who will speak about some internal corporate documents and provide his opinion on some segments of the training tape used to train employees in the "ways of lending."

The Federal Trade Commission will speak about their most recent investigation into predatory lending practices; and last but not least, we will hear from a committed, experienced, legal aid attorney who has devoted the last decade to helping unsuspecting borrowers on the verge of collapse.

Before we begin, I want to quote a victim—a quote that in my mind sums up what we are all talking about here today. She said the following: "They did what a man with a gun in a dark alley could not do. They stole my house."

I will now turn to Senator Breaux and then to Senator Collins.

## STATEMENT OF SENATOR JOHN BREAUX

Senator BREAUX. Thank you very much, Chairman Grassley, for having these extremely important hearings at this particular time.

There is clearly no greater violence to standards of decency and justice in America than to have predators who prey on children and predators who prey on the elderly in our country. Our hearing this afternoon focuses on what is, unfortunately, just the latest scam that is being perpetrated against older Americans in this country.

Victims of predatory lending practices often spent an entire lifetime building equity in their homes. They become vulnerable to unscrupulous lenders because of their limited incomes and trusting natures, essentially being tricked into mortgaging what is probably their only tangible asset—their home. Because of limited cash flow, these homeowners are often tempted to refinance their homes to consolidate debts, or to make needed home repairs or improvements to their homes.

In recent years, the subprime lending market, where credit is extended to high-risk borrowers, has greatly expanded. Some may argue that this is only in response to increasing demand for credit

4

and that subprime lenders are in fact providing a service to those who cannot simply walk into a bank and get a low, fixed-rate loan. Nevertheless, from what we will hear today, the subprime industry appears to be ripe for abuse.

Many lenders, and in fact most lenders, in the subprime market are reputable lenders and are not the subject of this hearing today. We are here today to discuss, rather, those who are thriving in the market by taking advantage of unsuspecting, needy and elderly homeowners.

What makes these bad apples different from the good guys in the industry is the use of deception, forged documents, and intimidating borrowers into borrowing money based not on their ability to repay the loan, but rather on the equity that exists in their home. And it takes cash—not a home—to repay a loan.

Some of these lenders in the subprime industry seek to profit by taking advantage of some of the weakest, least informed members of our society. Our goal for this hearing is to raise awareness of these kinds of practices and to educate seniors on how to identify and avoid these problems before they are drawn into a loan or a mortgage that they will not be able to repay before they lose their homes.

Elderly people who live on fixed incomes are often easy prey for lenders who seek to take advantage of them. An older homeowner is often a predatory lender's dream. After years of making timely mortgage payments, these men and women have built up a wealth of equity in their homes, and they usually get by on fixed incomes and may not have enough money to make the necessary repairs to their homes or to make purchases of high-cost necessities such as prescription drugs. They are equity-rich but cash-poor. A home equity loan is similar to dangling a bundle of cash in front of them.

The predatory lenders use deceptive and intimidating practices to coerce homeowners into accepting loans that will ultimately prove detrimental to their financial situation. These practices, as Chairman Grassley has pointed out, include "stripping," which is extending a loan based on the equity accrued in a home and not the ability to repay the loan, or making a loan that is intended to fail; "flipping," which is continually inducing the borrower to refinance his or her loan while the loan balance simply grows larger and larger each time, and the lender makes more and more money through the high points that are charged; and finally, "packing," which is tacking unnecessary or overpriced credit insurance onto the loan balance.

Predatory lending can strip our seniors who have worked hard their entire lives of their one form of financial security—their homes. These homes represent their past, their hard work, perhaps where they raised their children, and hope to spend their final years.

It is easy for critics of hearings like this to say simply, "Well, the buyer should beware." While that is important to bear in mind, it does not mean that we should not also raise awareness about this issue and the deceptions involved. All borrowers, particularly seniors, should know about these predatory lending practices and be equipped with the knowledge and the tools that they need to avoid financial disaster.

5

Unlike a bad financial decision made when one is young, mortgaging a home the wrong way late in life usually cannot be corrected if it goes sour.

Thank you again, Mr. Chairman, for chairing these very important and worthwhile hearings.

The CHAIRMAN. I appreciate your cooperation, Senator Breaux, as the ranking member of this committee, not only on this hearing but on the several hearings that we have had.

Senator Collins.

### STATEMENT OF SENATOR SUSAN COLLINS

Senator COLLINS. Thank you, Mr. Chairman.

Mr. Chairman, I want to start today by applauding you for holding these hearings to shine the light of day on predatory practices in the subprime mortgage lending market. While any scam that targets our senior citizens is deserving of our condemnation, there is something particularly cruel and callous about schemes which have as their objective, or even as their likely outcome, the removal of people from their homes.

For most older Americans, a home represents far more than just a shelter. It is a source of security in what are often insecure times. It is a symbol of continuity during periods of rapid and sometimes unwelcome change. It is a repository of memories of young children and neighborhood friends who may have moved away. For some of our elderly, their home is their one substantial asset to which they can turn in the event of a personal or family emergency.

In preparing for this hearing, Mr. Chairman, I was particularly struck by the couple who had raised 10 foster children in their home, only to experience the fear and pain of a foreclosure proceeding brought about by clearly unfair lending practices. There is a tragic irony in the fact that a structure that had been the site of so much kindness could become the target of such unprincipled greed.

There is also a cruel irony in the fact that the abuses which are the subject of today's hearing exploit character traits that our society holds in high regard. People become the targets of these scams not because they have led extravagant lives, but because they have made the sacrifice to pay off their mortgages and to accumulate substantial equity in their homes. The reward for this financial responsibility is that they show up as large blips on the radar screens of the mortgage loan predators.

As with other scams directed at older Americans, this one exploits the trusting nature of so many of our senior citizens. One cannot help but be struck by the fact that the victims of shady financial practices are usually people who treat others with honesty and fairness, and they assume in turn that they will be treated in a like manner. It is a sad thought, Mr. Chairman, that we may have to start teaching suspicion and mistrust in our schools if we are to spare our young people the experiences of their grandparents.

Mr. Chairman, I spent many years as the head of the State agency in Maine that regulates the financial services industry. I am all too familiar with the abusive practices directed at our senior citizens, whether it be the sale of unnecessary insurance or the

6

marketing of unsuitable investments or the making of unconscionable loans. All of these practices are really part of the larger problem of the exploitation of our older Americans, and it is a problem for which we have not yet found a satisfactory answer.

We live in a time when we are justly proud of the accomplishments of American capitalism, but there are those in our society who fail to understand that it is not the profit motive alone that drives our system, but also a sense of fair play and integrity. Strip away those latter values, and you are left with a perversion of the American ethic.

Although this issue is beyond the scope of today's hearing, I would suggest, Mr. Chairman, that ultimately, we may need higher legal standards for those who provide financial services to our senior citizens. The ordinary rules of the marketplace may simply not suffice; they may not be adequate. To make an unfair loan to an elderly person who does not appreciate the significance of the transaction should not be right even if done without telling outright lies and in compliance with all the legal technicalities. The day may come when people whom we treat as salespersons will have to take on more of a fiduciary role when they are dealing with our vulnerable senior citizens.

Mr. Chairman, let me end on a more upbeat note. While I am dismayed at the practices that you have uncovered and that we will be discussing today, I am heartened that there are people in this country who are committed to fighting them. I would especially note that one of our witnesses has spent 29 years advocating for the poor and the disadvantaged as a member of a legal aid office, and that we have another lawyer present who is representing a victim on a pro bono basis.

While I usually try to avoid being "politically incorrect" by saying something nice about lawyers, these individuals and others engaged in combating abuses of this nature certainly merit our praise and our gratitude.

Again, Mr. Chairman, thank you so much for holding this vitally important hearing today.

The CHAIRMAN. And thank you for the support you have given our efforts.

[The prepared statements of Senator Craig and Senator Enzi follows:]

PREPARED STATEMENT OF SENATOR LARRY E. CRAIG

Mr. Chairman, thank you for holding this very important hearing on predatory lending practices. The tactics used by sub-prime lending agencies are nothing less than legal scams preying on the vulnerability of the elderly. This is an issue of national significance and needs to be addressed.

My hope is that this hearing today will help to expose predatory lending practices, educate seniors about these practices, and empower seniors with the information so that they can avoid these scams. I commend the Chairman and the Ranking Member for gathering such a broad-based and experienced panel of victims and witnesses. I look forward to listening to everyone here today.

Seniors with fixed incomes and large amounts of equity have little to offer traditional loan services. This forces them into sub-prime lending agencies, who do provide a necessary service. It must be noted that not all lenders are predators. However, there are many loopholes found in existing protection laws which can and are easily exploited.

Stripping, flipping, and packing are the three most prevalent abuses perpetrated by equity predators. Traditionally, a senior's largest asset is his or her home. Unsa-

7

vory practices place seniors' homes on the line, with the very real risk of fore-closure—with the promise of quick cash. These homes are their memories, their security, and represent a lifetime of effort and achievement.

Seniors are not powerless to this abuse. First and foremost, they need to be aware that predatory lending practices exist and how to avoid them. If they do fall prey and fraudulent procedures are used, there is legal recourse available through existing protection laws. Exposure, education, and empowerment are our greatest weapons.

I look forward to the discussions here today. It is important that we do what we can to stop these practices, and stop the victimization of seniors.

————

PREPARED STATEMENT OF SENATOR MICHAEL ENZI

Thank you Mr. Chairman for holding this important hearing to highlight the unethical and unscrupulous lending practices that target our nation's senior citizens. It is extremely unsettling that anyone could take advantage of an unsuspecting senior citizen, deprive him or her of income and assets, and potentially leave the individual homeless. Unfortunately, such predatory lending practices have been increasing as the sub-prime lending market expands. Since one of the primary roles of this Committee is to raise awareness of various frauds that target the elderly, I commend the Chairman for bringing this matter to the attention of Congress and the American public.

It is important that we educate our senior citizens so that they can avoid being the victim of an unscrupulous lending company. The complexity of today's financial products makes it easy for lenders to distort the terms of loans to many people, not just senior citizens. The fact that seniors often possess a great deal of equity in their homes but are living on fixed or limited incomes makes them a particularly appealing target. This hearing will help make seniors aware of the risks involved in agreeing to loans that appear to be perfectly reasonable. In addition, I am hopeful that this hearing will encourage those who have been victimized by unscrupulous lenders to step forward and bring their problem to the attention of someone who may be able to help them, such as an attorney or a local Legal Aid Office. Our first group of panelists should be applauded for their willingness to bring their own unfortunate experiences with lenders to the public's attention in an effort to prevent others from having similar problems.

This hearing will also expose some of the ruthless, cut-throat practices that exist in the sub-prime lending industry. It is important to know how and why lending institutions conduct these fraudulent practices so that we can work to eliminate them. It is also important to recognize, however, that most lenders in the sub-prime industry are conscientious businessmen that serve a valuable role by providing loans to individuals who may need money for unexpected expenses and may not be qualified for loans through traditional sources such as banks. I am hopeful that this hearing will put those lenders who choose to engage in abusive lending practices on notice that we will not tolerate their unethical behavior that harms our elderly population.

Once again, I thank the Chairman for holding this hearing. It is important that we raise the awareness of predatory lending practices that target our nation's vulnerable senior citizens and threatens their financial and emotional well-being. I am pleased that the Committee has addressed this particular issue in our ongoing efforts to improve the retirement security of all retirees, both current and future.

The CHAIRMAN. I will now call forward our first panel. This panel consists of three individuals, two of whom are here at the table in person, and the third who will be on videotape. These three individuals have experienced either first-hand, or through parents, the devastation caused by predatory lending practices. These witnesses will provide insight into how trusting individuals become entangled in unaffordable loans and expensive refinancing schemes offered by these predatory lenders.

Our first panelist is Ms. Helen Ferguson. Ms. Ferguson is a 76-year-old widow who resides here in Washington, DC. Her story is a classic case of mortgage flipping, which is an abusive practice that may subprime lenders engage in. She will tell us the story of

8

how an unscrupulous subprime lender took advantage of her vulnerability and her trust.

Our second witness is Gael Carter, a 55-year-old widow who found herself saddled with debt from her husband's funeral expenses. She lives in fear that she is going to lose the home in which she raised seven children over the course of 35 years. She will share her story from a hospital room where she is today, of how she was relentlessly pursued by a subprime lender to secure a variety of loans and to ultimately refinance her home mortgage. Those decisions have led her into an unsurmountable mountain of debt, and she is currently litigating the legitimacy of the loan.

Our last witness is Ms. Vireta Jackson Arthur, here to testify on behalf of her parents, Rosie and Ormond Jackson. Her parents lived in their home in Brooklyn, NY, since 1969. Ms. Jackson will tell us how her parents were tricked into financing home improvements which were unknowingly secured against their life savings, which happened to be in their home. Ms. Jackson is here today to expose the deceptive subprime market practices. She hopes to prevent this from happening to others, especially the elderly, who are most vulnerable.

I am going to turn to Helen Ferguson, and then we will hear from Gael on video, and then to Ms. Arthur.

## STATEMENT OF HELEN FERGUSON; ACCOMPANIED BY JEROME SWINDELL, ATTORNEY

Ms. FERGUSON. Good afternoon, Mr. Chairman, and thank you for allowing me this opportunity to come before your committee.

My name is Helen Ferguson. I am a 76-year-old resident of the District of Columbia. I have lived at my present home at 236 Gallatin Street, N.W. since 1965, but my ability to remain in my home is in doubt because of the unfair practices of two lenders.

In 1991, my total monthly income from Social Security and SSI was about $504. With that income and the help of my family, I was able to make my $229 monthly mortgage payment for two loans from Lender A. But on that fixed income, I was not able to make much-needed repairs around the house. In order to make these repairs, I was forced to borrow money.

At around that time, I began to see and hear television and radio advertisements for Lender B. The ads said that Lender B could provide me with the money I needed at low interest rates and low closing fees.

Because of these advertisements, I went to Lender B to get a loan to pay for home repairs. That is when everything began to go wrong. On July 16, 1991, I signed the papers for a $25,000 loan with Lender B. This loan was intended to pay off my entire debt to Lender A so that I would have only one mortgage payment. For some reason that was never explained to me, this loan was never funded or recorded. Mixed in with all the other loan papers, Lender B placed a deed granting an interest in my home to my sister, Eloise Johnson. This was done without my knowledge or consent. Because I did not fully understand what I was signing, and because the documents were never explained to me, I did not discover the change in the deed until years later.

Two weeks after I signed the papers for the $25,000 loan on July 30, 1991, Lender B, prepared a second set of documents and had me sign them. I did not know that the documents were for a different loan. I later learned that Lender B only paid off the smaller of my two Lender A loans. Thus, I was now making two mortgage payments. My monthly payment increased to about $400. I have since discovered that Lender B collected over $5,000 in fees and settlement charges for a $15,000 loan. They also charged me interest at 17 percent.

Over the course of the next few years, Lender B repeatedly tried to convince me to take out more loans. They called me at home and called my sister at work. They sent letters and Christmas cards. All of this was aimed to get me further in debt.

In March 1993, I finally gave in, because I needed more home repairs. But once again, two sets of documents were prepared with different figures. In fact, Lender B changed the loan amount at least three times in March 1993. Eventually, the March 31, 1993 loan documents for $25,000 were recorded. Those documents included an interest rate of 18 percent and settlement fees of $5,900.

By March 1994, my financial condition had gotten worse. I could not keep up with my monthly payments. In an effort to reduce my monthly payments, I obtained a loan from Lender C through a loan broker. However, my monthly payments increased to almost $600 and later rose to $723. I was not aware that I had a variable interest rate, and the monthly payment would increase. I also did not know that I paid over $5,000 in fees to the broker who solicited me on behalf of Lender C and more than 14 percent in total fees and settlement charges. My loan payment to Lender C exceeded my combined Social Security and SSI income by $200.

Needless to say, my circumstances only worsened over the next 10 months. During that time, Lender B continued to call me and my sister and send advertisements to our home. In dire financial need, I entered into a fourth loan with Lender B in February 1995 for $67,000 at 15 percent interest. My monthly payments were over $783, and I was charged settlement fees in excess of $7,000.

Even though I defaulted on the fourth loan, in late November 1995, Lender B called and convinced me to get yet another loan. Their representative came to my home to collect information for a loan application from my sister and me. He told me that Lender B would fix my rates so that I would not have any trouble meeting my monthly payments.

In late December 1995, he returned to my home with a lawyer. I entered into a fifth loan agreement for $85,000. They charged me $9,424 in lender fees. They left my house, taking all the papers with them.

When my payment notice arrived, I discovered that I was obligated to make monthly payments of more than $800. They also did not tell me that because of taxes and insurance for the new year, my payment would increase to over $900. From 1991 to 1996, the debt on my home had increased from less than $20,000 to over $85,000. My income had increased only slightly. Neither Lender B nor Lender C cared if I was able to make the payments. They just seemed to want to get me further in debt.

10

If I had been told the true terms of these loans from the beginning, I would not have signed the papers. If I had the means to cancel the loans, I would have done so immediately. But Lender B would not give me the signed papers at the settlements. Instead, they would mail the papers after I had received the check and spent it on necessary repairs.

The check and the papers always came after the 3-day rescission period had passed. If I had known all the terms of the loan in time, I would have canceled. But because I did not receive either the notice of right to cancel or the copies of the loan terms until after the rescission period, I felt helpless. At the time, I did not know that Lender B had violated the law. It was only after I talked to lawyers at AARP that I was told that I did have some rights to get away from Lender B and save my home.

I have filed a lawsuit against Lender B, Lender C, and others with respect to these loans.

Thank you for listening to my story.

The CHAIRMAN. Well, don't you thank us; we thank you for taking time out of your busy schedule. So many people are reluctant to come and tell their stories, and the fact that you would come and do this publicly is a benefit not only to the Congress but to all the other people hearing your testimony who know that the same thing could happen to them.

We will now turn to the video testimony from the hospital bed of Gael Carter.

## STATEMENT OF GAEL M. CARTER

Ms. CARTER. My name is Gael M. Carter, and I would like to be part of this hearing about these lenders and predators who are preying on people and basically destroying their lives. I could not make it to the hearing. I am hoping to still make it, but if I cannot, I want to give part of my testimony here, so I can have a chance to tell other Americans and people that things just cannot go on this way; they have to stop.

I am 55 years old. When my husband died in 1992, I was left with the house in which I have lived since 1963. It is in this home that I raised my four children, two step-children, an adopted daughter, and a whole lot of other kids who did not belong to me, but they thought they did.

I had about $150,000 equity in my home at the time my husband died, and we were quite a bit in debt. The only thing I had in this whole world was my house. I was worried about how I was going to take care of it, so a friend of mine loaned me a small mortgage that would pay for the house. This would give me a lower monthly payment, from $1,200 a month to $400, and she told me they were going to charge me 6.5 percent.

So, of course, I jumped at that chance. It gave me more money coming in, and more money so I could help take care of my daughter.

I have only a ninth grade education. I last worked in 1978, and that was as a night cleaning lady in a movie theater. I had to quit working because of high blood pressure, liver problems and other problems. Now, I get by primarily on Social Security payments.

11

Starting in 1994, I was taken advantage of by a financial service company. It all began when I bought a toy car as a gift for my son-in-law. I took out a small loan for it, because I did not want part of my cash to pay for it. The man said that I had to fill out some paperwork. So he went and talked to somebody for a few minutes, and he came back, and he said, "You now have a loan. You have no problem whatsoever, Ms. Carter. We thank you."

Well, after I got that loan for that toy car, within 2 days, I was getting phone calls from this company, thanking me for being part of their growing business, a part of their family, and that this was going to really help because it was going to help me get my finances in order, and consolidate all my bills.

It turned out not to be true, it really did not. By the end of January 1995, I owed them payments totaling $328,322. With only Social Security, I was scared to death I was going to lose my home.

This company kept calling me all the time. They became very, very friendly with me. After they had made about 10 phone calls to me, I called up there, and I asked to speak to this lady. I said that she had promised me a loan and I wanted to come up and talk to her. She called back, and she took all the information over the phone, and when the day came for me to sign the papers, I was too sick to go. So I called her and told her—she had called me earlier in the morning—I called her back to tell her I was too sick, and I could not come out. And she said, "That is okay. I am going into Falls Church anyway, and I will come by your house with all the paperwork," which she did.

At my house, she was leaning on the table, pushing the papers at me, very fast, and going over things very fast. She told me that I had to have life insurance on this loan. She said the insurance was going to cost me $6,500. But she said, "Do not worry about that. You will not have to come up with that amount. We can just wrap it into the loan." And I told her at that time that I had all these health problems, and she said, "Oh, do not worry about that. I can get around that."

So I took her at her word. She talked me into taking out $100,000 worth of insurance on a $54,000 loan, and she told me that whenever something happened to me, there would be money left over to take care of my teenage daughter.

Then she told me that she would send me the checks. She gave me a check right there at the table for me to sign, because they needed to check out the creditors and everything. And she said that in 2 days, I could cash my check. I thought it was OK. Well, then, I started getting more papers, and it was not even time for the first monthly payment, and they told me I could get more.

Well, my daughter was getting married, and she wanted to borrow $8,000 for a wedding. Now, she did have money in the bank, but she could not touch it then. They told me that she could not have the loan, and I asked if I could cosign for her so she and her husband could have their wedding. I was told no, I could not do that, but I could increase my loan. Since I had not already made any payments this was good, because now they were not going to charge me anymore fees; they could just go ahead and put all the fees in the new loan, and since I was not borrowing that much more, there would be no problem getting it.

12

So once again, I went ahead with it. I went to their office with my son-in-law and daughter, and we got out there, and the kids sat out there, waiting for me. I went back and signed the papers, and she had the insurance in there. And she passed the papers to me and I signed the papers and she said, "OK. If you want to change your mind, you have 3 days; you can just call us."

So I started making payments, but they never gave me what I needed to borrow. They always kept telling me, "Well, if you make a couple payments, we can go ahead and increase it, and you will not be out a whole lot more. But you have just got to get rid of all these high credit cards."

So I came to find out later, though, she was not telling me everything. The insurance, which was something I never knew anything about, was a decreasing policy that might not even pay the loan off at all if I had died during the period of the loan, because this insurance was only good for 10 years, and the loan itself was for 15 years. But she said I could always take out a new loan, or I could refinance the last 5 years at that time and take it out of that.

After the second home equity loan, I kept getting calls and things in the mail, asking me to come back out. They told me that they could solve all my problems if I would just give them my first mortgage, which they kept trying to get all along, and I would not give it to them. I told them, "I have to be totally honest with you. She is likely to forgive this mortgage one of these days because she has the money to do it if she wants to." So, no, I do not want to give you my mortgage.

Well then, in October of that year, I went ahead and sent two house payments in; one on the 1st and one at the end of the month, because they kept sending me coupons every month. That way, they have always got you; you always have mail coming from them, and you are looking for your coupons, so you open it and look at it.

So that came, and there was a check—it was Christmas time, and there was a check for—I think that particular one was $1,500. Just sign this check. We have already approved you for it. Come out and get it. I told the kids, "I am going to do it, so we can get some stuff for the babies for Christmas."

So we went out there. We talked to the manager on the phone, and she said she was going to be there. We went out there, and a man came out and brought me all the papers to sign for this $1,500 "instant check"—it did not seem like an "instant," but it was supposed to be. Then he said, "I will get your check for you. I will get you the money."

So he went out and came back, and he said, "Here is another piece of paper you have to sign."

I said, "Why do I have to sign that? What is that for?"

He said, "This is the letter stating that you know this loan is at 31 percent, because you had a mortgage with us and you would not increase it, so we have to charge you this 31 percent."

He said, "But do you know something? You were talking about wanting to change your due date and everything. You do not have to keep this until the month and a half, two months, whatever. You can pay this one off when you increase your other mortgage."

I said, "I do not know about that." So I went over, and I talked to the manager, and I said to her—because we were friends; I called her by her first name—and I said, "Judy, what can I do to get my payoff date changed on my other loans?" I said my son-in-law was a car salesman and only got paid once a month. I said every month, my house payment is going to be late, and I am going to have to pay late charges—plus it is not helping my credit any.

She said, "Oh, well, you cannot do that unless you have $1,200 to give me."

I said, "What do I have to give you $1,200 for?"

She said, "Because that is interest you owe."

I said, "I do not owe any interest. I have paid all my payments. I even made November's back in October."

"Well, I should have told you about something like that. Our computer does not see it that way. All our computer knows is that you have not made a payment since October, so now you owe us all this interest."

So then I thought, now I am really in a pickle. She kept talking and talking, and she said, "Well, think about it. This can solve all your money worries. You can just go ahead and take out this loan." That was in late November, early December. So then I kept getting letters and phone calls, calling to see how the baby was doing and what was going on and all kinds of things, you know, being friends. I finally gave up. I said I cannot make all these payments, and I have all these credit cards here.

She kept saying, "Yes, remember, they are 22 percent and 26 percent."

I said, "Yes, but the loan with you is at 31 percent."

She said, "Well, I am sorry, but that is the way we have to do things. We will go ahead and draw you up papers, but you will have to have your son-in-law and your daughter sign as co-borrowers." I did not see how that was possible, but I said okay, because my son-in-law had had some problems earlier, a couple years before. Also, they were not on the loan mortgage with me—it was just me.

But as I got to looking at my papers, I realized afterward, after I took out this new loan, that number one, they did not say anything to me about points. I had never paid points on a loan to my knowledge. I went out there, and we were passing the baby around. My son-in-law, my daughter, then I would hold the baby, so we could each take our turn signing our name. She just kept flipping papers real fast and she said, "This is your payoff, this is where this is going, this is where that is going, this is your credit amount, but you have a variable rate."

I said, "Wait a minute, wait a minute. I did not hear anything about a variable rate, not until just now." I said, "I do not want a variable rate."

She said, "Well, you talk to your son-in-law. He has more business sense than you have."

I said, "Well, thanks a lot, Judy." She gave my son-in-law a piece of paper about half the size of this, and it showed that the payments would only go up a $100 at the most a month. But I did not have any choice. I went ahead and signed the papers, and we went

home, and the more I thought about it, and the more I kept looking at the figures, it just did not add up to me.

So I started calling other banks and places, and they all kept saying, "You are not giving me all the figures, you are not giving me all the figures." They told me that they needed all the papers I had, and one of them was a HUD paper I had never received. That was where the problem was. They charged me 10 points, $14,500, plus the insurance, $6,500. The bank told me it was going to cost me $50,000 on that over the cost of the loan, and I still would not be insured. So I was just really scared to death.

I tried to call them four times in one day to cancel it, and no one would ever return my calls. They had told me someone would always man that line, and they would get back to me—but no one ever got back to me.

Monday was a legal holiday; they were not there. Tuesday, I got a call saying that we had to change the figures a little bit because I had forgotten to tell them I owed taxes, and they did not have enough money to pay off all these bills.

So the gist of that was that I was going to have to keep the 31 percent loan with them, and they were not going to pay off all these other bills. I told the kids, "We cannot go through with this." So I called my first mortgage lady, and I said, "Margaret, if you get a check in the mail, do not go to the bank with it. It will not do you any good. I have to sign it, and the kids have to sign it, and I know you will get scared when you get there and cannot get your money. I will give you the money."

Then I went and saw the attorneys and asked them to help me get this mess straightened out in my life, because my friend called back, and she told me that she knew my signature was a forgery. So she drove—well, she did not drive, because she is 84 years old, and she has never driven—she had someone bring her to my house to get all of our signatures to make sure, for her own peace of mind, that our signatures were not on those checks.

So that is what happened, and as I said, I contacted an attorney after that. I felt that if they did this to me to get this loan, they would do it to a lot of other people, a lot of old people, and a lot of people have been taken to the cleaners. I really felt that this needed to come to this Senate hearing so that the word could get out to help elderly people from getting caught up in the same mess that I did. It nearly ruined my life. I got deathly sick from trying to keep my house, and I have not been well since, and I do not want them to hurt somebody else.

That is my story.

[The prepared statement of Ms. Carter follows:]

**TESTIMONY OF GAEL M. CARTER**
**before the Hearing of the**
**UNITED STATES SENATE SPECIAL COMMITTEE ON AGING**
**"Equity Predators: Stripping, Flipping**
**and Packing Their Way to Profits"**

**March 16, 1998**

My name is Gael M. Carter.  Thank you for inviting me to appear here today to share my experiences.  Thank you also for your patience while I read my statement.  I have asthma and blurred vision.  It is hard for me to read things close up.

I am 55 years old.  When my husband died in 1992, I was left with the house in which I have lived since 1963.  It is in this home that I raised my four children, two step-children, an adopted daughter and a foster child.  At the time of my husband's death, I had about $150,000.00 in equity in my house.  My house is the only thing of value that I own.

I have a ninth-grade education.  I last worked in 1978 as a night cleaning lady in a movie theater.  I had to quit working because of high blood pressure, liver trouble and other health problems.  Now I get by primarily on Social Security payments.

Starting in 1994, I was taken advantage of by a financial services company.  It all began when I bought a toy car as a gift for my son.  I took out a small loan for about a thousand dollars to pay for it.  It turned out that the loan was from a company that makes its business out of tricking people like me.  Over the next year, they kept giving me advice on my finances and getting me to take out loans with them.  Every time,

- 1 -

they told me they were going to put my finances in order and consolidate all my bills, and that just wasn't true. By the end of January 1995, I owed them payments totaling $328,322. I was scared to death I was going to lose my home.

After I bought the toy car, this company kept calling me all the time. They told me that they knew about the loan for the toy car and that they knew I owed some other bills. They kept calling and telling me that they could consolidate my bills and save me quite a bit of money per month. This woman from the company took an application for a home equity loan over the phone; later she came over to my house with all the papers for me to sign. She was leaning on the table and pushing papers at me fast, when I first heard the word "insurance". There was a $100,000 life insurance policy included in the loan papers, even though I had never asked her for insurance. When I asked about the insurance, she told me I had to have it. She told me that it would pay off the loan and have something left over to raise my daughter if I died. As I came to find out later, she didn't tell me a lot about the insurance, including that I would be paying finance charges for the cost of the insurance over the entire 15 years of the loan, even though the insurance was only good for 10 years.

When the papers were signed, it turned out that this loan didn't pay off my bills. The company told me not to worry about this, and that after I had the loan for a few months, I could come back to them and "re-up" the loan for the extra money

17

I needed for my bills.  After this first loan, the company still
kept calling me on the phone and sending me mail about borrowing
more money, and so it was arranged that I would do a new loan the
next month.  The second time around, they again charged me for
$100,000 in life insurance and told me that if I died the money
would go to my estate.  Again, they told me I had to have the
life insurance to get the loan.  As with my prior loan, I told
the woman at the company about my serious health problems.  A2s
it seemed to me that my health problems might present a big
problem in the insurance ever paying off.  The woman from the
company didn't care about the health problems, though, and she
went right ahead and checked all the boxes on the form to show
that I didn't have any health problems.  She said that she was a
manager at the company and could take care of things so I
shouldn't worry.  I was told that I wasn't going to be charged
any points or fees for redoing the loan.

        After the second home equity loan, I kept getting
things in the mail from this company, as well as phone calls.  It
seemed like every time I opened the mailbox, there was something
from them.  They sent me these checks, telling me I was cleared
for $3,000 in credit or $1,500 in credit, and all I had to do was
cash the check.  They were always telling me that I was a good
customer and my credit was good with them.  Finally, I cashed one
of them to buy Christmas presents.

        My third home equity refinance with this company
started in late fall of 1994.  Besides all the phone calls and

- 3 -

18

mail from the company, I had been talking to the company's branch manager about trying to get the due date on the loan straightened out.  In all of the phone calls with the company, the people from the company would act really friendly, asking about my kids and things like that.  They always acted like they were family friends.  This friendliness is one of the main reasons that I came to trust them so much.  So, this woman from the company was telling me about how we could go about getting all my credit cards paid off finally.  She said that to do that they would have to have a first mortgage on my house.  This concerned me, because it would mean that I would have to pay off my existing mortgage of about $50,000 at the very low interest rate of 6.77% and almost double the interest rate through the new loan with the company.  I didn't think this was such a good idea, but the woman kept talking to me and assuring me that this was the best way to go because my total monthly payments would be lower.  She never said anything about points on the loan.  She said that I had to have the credit life insurance, though, on the loan.  I eventually went along with her suggestion and she arranged for me to take out another loan in early 1995.  This time around she had my daughter and son-in-law co-sign on the loan papers.

After she got me to sign the paperwork for this loan, I started noticing that some things were wrong.  At a certain point I made my mind up to go to a lawyer to get help.  I started trying to figure out all the paperwork and where all the money had gone.  As a result, we got the company to re-do the loan and

- 4 -

19

I got some of the money back that they had charged me for points. By the time of the third home equity loan for $154,500 they had charged me $17,848 in points, as I later found out.

I then spent the next year and one-half trying to get out from under this company. You see, I thought that a company that could lie to me as they had was capable of just about any kind of trickery. I was worried to death the whole time that the company was going to come after me somehow and take my house. With my health situation, I have enough worries on my mind anyway. I finally got some help from a regular lender to get me away from the company.

You see, I now know that the way this company gets you to take out all these loans and buy all the insurance and extras is that they tell you some lies and they just don't tell you anything at all about a lot of things. When it comes time to sign the loan papers, they just sail right through them. When you arrive at the closing, they've already prepared all the papers, with the life insurance and the points and extras added on. At the closing, they point at this and that in the papers but they don't explain really what any of it means. There's a whole lot of fine print in the papers that even now I just don't know what it means. At the loan closing, they don't give you any chance to figure it out. They don't want you to understand what's going on. And since they always act so nice and friendly, you come to trust them and rely on them to tell you all the important information about the loan.

- 5 -

What the company had told me over the phone about what they were doing turned out to be a lot different from what they did, as I found out later. They told me that they weren't going to charge me any points on the loans, but they did -- every time. They told me that I would have a fixed interest rate; I later found out that on the one loan it was variable. Later, I found out that the $100,000 credit life insurance that they made me buy with every loan decreases over the length of the loan and doesn't even cover the whole length of the loan. Also, because of my health problems, the company probably wouldn't pay anything on the insurance anyway. The insurance was all a scam so that the company could make money off me.

And that's not all. One of the pay-off checks on the third equity loan was supposed to go to the friend who held my $50K mortgage. I knew I hadn't signed the check for her so I called her up to let her know that. She told me that the check had already been signed. In fact, they forged my name on nine checks that were supposed to be pay-offs to my creditors from the third equity loan. They also forged my initials on a health questionnaire for the life insurance, saying I didn't have any health problems when they knew better.

As things started to get a little clearer for me, I was talking to my children and telling them about how I had been taken by this company and, I found out that my daughter-in-law had also been a victim of this same company.

- 6

21

        I felt that if they did this to me and my daughter-in-law, they did this to a lot of other people and they should be called to account for it.  I am now a plaintiff in a class action lawsuit against the company that did these things to me.  I hope that as a plaintiff in the class action I can make a difference by getting justice for myself and all the other people who were hurt by that company.  The class action has given me the chance, which I wouldn't have on my own, to do something about this problem.  I also hope that by appearing here today I can help put an end to this kind of fraud.

22

The CHAIRMAN. Even though Ms. Carter cannot hear us, I thank her very much for her testimony, particularly, because she is in the hospital. I know she feels strongly about it, because it is not the best way for her to be able to testify.

We will now go to Ms. Arthur. Thank you for participating.

## STATEMENT OF VIRETA JACKSON ARTHUR

Ms. ARTHUR. Good afternoon. My name is Vireta Jackson Arthur. My parents are Ormond and Rosie Jackson. My mother passed away in December 1996, and my father is too ill to come here today to tell you what happened to them beginning in August 1990. My parents were victims of a home improvement mortgage foreclosure scam that left them penniless, traumatized and humiliated.

Both of my parents were retired at the time, and my father had to start looking for work again. He did odd jobs in the neighborhood, like sweeping out the corner bakery. They had to take boarders, complete strangers, into their home to try to make ends meet.

My father is from Barbados, and my mother was from Virginia. They came to new York and were married in the 1950's. They were hardworking people and saved their money to buy a house one day. My mother worked as a hairdresser and later for a laundry service. My father worked for a plastics company. They bought their home in the Crown Heights section of Brooklyn, NY, in 1970. We were happy in our home in Brooklyn.

But a knock on my parents' door on August 27, 1990 changed all that. A man by the name of Jimmy knocked on my parents' door that day. We later learned that Jimmy worked for GML Construction Company, a home improvement company in Brooklyn. Both of my parents were home at the time.

Jimmy told them that he noticed that they needed new windows. My parents told Jimmy that they did not have the money for new windows because they were both in their late 60's, living on a fixed income of Social Security, of $635 per month combined. Jimmy told them not to worry about that. He said they could pay for the windows at a cost of $43 per month over a 15-year period.

Jimmy never told them about a mortgage. My parents were honest, hardworking people, not very sophisticated in the business world. They thought that Jimmy was a nice young man, and they trusted him. They never thought the day would come where they would be in jeopardy of losing the only thing they had left—their home.

Before all of this happened, my parents had a mortgage of $10,800 left on their house. Their monthly payment was only $235 per month.

A few days later, Jimmy came back to the house. He told my parents that for a few extra dollars a month, he could renovate their kitchen and bathroom, along with putting in new windows. My parents were excited about fixing up the house and agreed. They shook Jimmy's hand and waited for the next step.

A week later, on September 6, 1990, Jimmy took my parents to an office someplace in Brooklyn to sign some papers. My father asked if he had to have a lawyer, but Jimmy said that he should not bother with that expense and that the papers were just a formality to get the work started. My parents had to sign the papers

23

really fast and did not have time to read anything. Since Jimmy said it was just a formality, my parents went along with it.

There were several people at the meeting, but my parents did not know who anyone was. They only knew Jimmy. Of course, they had signed a first mortgage on their home for $75,038.79 at an interest rate of 17.71 percent, with monthly payments of $1,156.22, with hard-money lender named The Associates. The closing costs were high. They had to pay $6,500 in points and $3,538 for a credit life insurance policy.

The next month, my parents received mortgage coupon books and were shocked to learn that they owed $1,156.22 per month to The Associates. Their new mortgage payment with The Associates was practically twice the amount that they received in Social Security benefits each month. They were stunned. They felt too embarrassed to tell anyone, believing that they had been duped. They started making the monthly payments.

After just a few months, they telephoned The Associates because they were worried that they would not continue making these monthly payments for very long. They were told by The Associates that they could refinance the new mortgage and get more money to help with the monthly mortgage payments.

Feeling desperate about not being able to meet their new mortgage payments, and too embarrassed to tell anyone that they had been tricked by this home improvement scam, they agreed to refinance and close on a new mortgage on April 2, 1991, just 6 months after they had signed paperwork for the first mortgage. The Associates told my parents that the refinance would help them with their new mortgage payments.

They were distraught, could not afford an attorney, and barely had enough money to eat. They believed they had no other choice. But before the refinance with The Associates in April 1991, my parents did try to refinance their mortgage with a legitimate lender. They learned that given their income, they did not qualify for a mortgage of this magnitude.

I am still puzzled how The Associates qualified my parents, who live on Social Security, for a loan this size, when no one else would qualify them. The Associates' loan documents show that my parents received rental income from two tenants. They did not. But I found two leases in my parents' mortgage papers with The Associates showing that my parents received rent from two different tenants of $1,575 a month. The house is only a two-family house, and my parents lived downstairs. There is only one apartment to rent out. My parents had one tenant, and she paid, although not every month, $300 in cash. There was never a lease.

It is my opinion that these were forged leases, so that on paper, it would look like my parents had sufficient income to qualify for The Associates mortgage. I saw the signature on the lease and showed it to the tenant. She said that the signature on the lease was not hers and that it was definitely a forgery.

Having no other choice, on April 2, 1991, my parents refinanced with The Associates. The new mortgage amount was $87,971.99, with an interest rate of 15.92 percent. The monthly mortgage payments went up to $1,237.47 a month, which is $81.25 more per month than the first mortgage with The Associates. Again, the

closing costs were high, the points were $7,500, the credit life insurance premium was $5,472.

Incredibly, in February 1994, The Associates again contacted my parents about still another refinance. I have an internal document from The Associates with a written comment dated April 6, 1994 that reads: "Elderly couple, both on Social Security. Have boarders. Finding it hard to scrape up payments each month. We suggested refinance, but daughter advised family against it. Cooperative people. No equity in property."

My parents paid The Associates from October 1990 to September 1995. They paid almost $68,000 in mortgage payments over this 5-year period. To this day, I do not know how they got the money. My father took odd jobs in the neighborhood to try to scrape up the money. He worked sweeping out the bakery and did other odd jobs. They borrowed from family and friends. They took in boarders.

When they were late in their payments, a man by the name of "Mr. B" would come to the house for money. If they were not home, he would wait on the stoop. After 5 years, they were completely tapped out and could not afford the payments anymore.

Then, in February 1996, my parents were served with foreclosure papers. They were distraught about losing their home, the only thing they had left to their names. They were so frightened, they refused to open the mail. That is when they called me and told me the whole story.

I contacted literally dozens of legal services organizations to help my parents with the foreclosure. We wrote letters to the banking department and consumer affairs. No one would help. Finally, we found a lawyer who agreed to represent my parents in the foreclosure action. The case is still pending, but at least the foreclosure action was stopped, and my parents have not lost their home yet.

This whole ordeal has been a nightmare for my parents. Although my mother was not in perfect health, I am convinced that the whole ordeal contributed greatly to her death in December 1996. She started smoking again. They received foreclosure papers in February 1996, and my mother died later that year, in December. My parents were so traumatized that they were afraid to even open the mail. They would hold the mail and call me to open it for them.

We can only hope that something can be done to stop these predatory lending practices. Since this happened to my parents, I have learned that the same thing has occurred to many elderly people by the same lenders. It is clear to me that they purposely select the elderly to prey upon.

Thank you.

The CHAIRMAN. Thank you, Ms. Arthur.

I would ask staff to start the clock, and we will each have 5-minute rounds. I will begin.

Ms. Ferguson, first and most importantly, did anyone ever tell you that by entering into a loan that you could lose your home?

Ms. FERGUSON. No, they did not, not until December 1995. A lady from the mortgage company called and told my sister that she would send packing boxes out there if she did not receive the one late payment soon.

25

The CHAIRMAN. You and I come from a generation brought up in a time when a handshake, not having a bunch of lawyers around, established the trust needed to do business. How did the lenders you dealt with manufacture this sense of trust with you? I sense you trusted them very much.

Ms. FERGUSON. They all just acted like they were on my side and interested in my well-being and wanted to keep everything from being a strain on me. The mortgage company said they could help me out with any problem I had. They also sent Christmas cards to me and my sister. They came out to my house and said they were going to make things easier for me, that they were there to help people that needed help people who needed help. I trusted them.

Greg called my sister "trouble" because she was a little hesitant about signing. He said, "We treat you like one happy family." It sounded like they were honest, good people, and I trusted them. The mortgage company sent me a personal letter with my personal I.D. card to show that I was a special customer.

The CHAIRMAN. From your testimony, it sounds as if experiences that you have related to us have been very traumatic. Would you tell us what impact this has had on your physical and emotional well-being?

Ms. FERGUSON. I was already having problems with hypertension, pressure, and the doctor told me not to get emotionally stressed out. After 1996, when the mortgage company went up on my note instead of giving me the contract that they promised me, I worried all the time, and my health started going bad. I had headaches and dizzy spells.

In June 1996, I found out that my sister was added to the title and my deed, and I got very upset and depressed, and I did not know what to do. I came to legal counsel to take care of my deed. They looked at my papers and told me that I had mortgage problems. I was already paying high payments, and if anything bad happened to my house, I did not know how I would pay for it. I worried because I did not know how I got myself into this.

The CHAIRMAN. Thank you very much.

Ms. Arthur, your parents' bad experience started with a knock on the door from a home improvement person who wanted to sell windows. Did they get their windows?

Ms. ARTHUR. They got their windows, but they did not work for long.

The CHAIRMAN. They also had some work done on their kitchen and bathroom. How did that turn out?

Ms. ARTHUR. It was all substandard, fell apart a year later; everything basically fell apart.

The CHAIRMAN. If you can speak for your parents, were they satisfied with the work?

Ms. ARTHUR. No, they were never satisfied.

The CHAIRMAN. How did you learn about your parents' financial difficulties?

Ms. ARTHUR. After they had been foreclosed upon, they decided to tell us the whole story. We knew there was something going on, but we did not know quite what.

The CHAIRMAN. Why do you think it took so long for them to tell you what was happening to them?

Ms. ARTHUR. They were extremely embarrassed. They thought they could fix it themselves, and they just wanted it to go away. They did not want anyone to find out.

The CHAIRMAN. As I asked Ms. Ferguson, I would appreciate it if you would tell us what impact this traumatic experience has had on your parents' physical health and emotional well-being.

Ms. ARTHUR. It totally ruined their quality of life. My dad is very ill, and my mom passed away. Before she died, my mom would sit at the window; she was afraid to come out, because she thought someone would be sitting on the stoop, waiting for money. It just totally ruined her life.

The CHAIRMAN. Obviously, we are very sorry to hear about the death of your mother. Your parents were married for over 40 years. You say your father is not very well, and that stems from this as well?

Ms. ARTHUR. He is a diabetic, and he has suffered greatly because of this.

The CHAIRMAN. I thank both of you.

Before I call on Senator Breaux, I did not recognize Mr. Swindell, who is an attorney for the Fergusons. We thank you very much for coming and for helping her with her testimony.

Mr. SWINDELL. You are very welcome, Senator.

The CHAIRMAN. Senator Breaux.

Senator BREAUX. Ms. Ferguson, it is just exhausting to hear your story. You have had to live it, and it is exhausting for me just to listen to all the things that you have been through. There is an old saying back where I come from that sort of applies to your situation, and that is that "The further you went, the behinder you got." You just never could get out of it.

I think it is clear that many of these equity predators are really not making loans to have people pay them back. I do not think they want people to pay the loans back. What they are looking for is the house and the home.

Ms. Arthur, I think your situation with your parents is very clear. I was looking at the notes and the loan application filled out by the person who dealt with your parents, and it said, "Elderly couple, both on Social Security. Finding it hard to scrape up payments each month." And yet they made them a loan of $99,000. They knew they would never be able to pay that back, but they had a house that looked pretty tempting for the people making that kind of a loan.

The note here says they have boarders. Did they have boarders in the house?

Ms. ARTHUR. Eventually, they had to, to be able to make the payments.

Senator BREAUX. But at the time of the loan application, did they have people paying them?

Ms. ARTHUR. They had no boarders. They were fine at the time.

Senator BREAUX. Well, I just find all of this truly amazing. It is very hard for Congress to legislate decency. I just cannot understand how someone could go home at night after doing this all day long and sit down and think about what they did for the day and be able to continue to live with themselves. It seems to me that

27

these situations are unfortunately becoming more and more common.

Seventeen percent interest rates, 19 percent interest rates, 31 percent interest rates, $7,000 fees on relatively small loans—if they do it for someone who has a law degree and an accounting degree, that is one thing, but to do it to people like Mrs. Ferguson here and your parents is really an example of the very worst in society.

I am glad we are having the hearing, Mr. Chairman. I am not sure what approach we need to take from here. Like I said, it is very difficult to legislate decency, but I think that an informed public and the work of the Federal Trade Commission as we will hear, informing citizens, and through associations like AARP and others that are trying to inform their members—we do not need anymore situations like Ms. Ferguson's. Ms. Ferguson, we are glad you are still here and still fighting them and not giving up. Do not do that.

Thank you, Mr. Chairman.

The CHAIRMAN. Senator Breaux, I want to assure you that the purpose of these hearings is to expose the problem and for all of us to find out if anything at all needs to be done, but at the very least, I can already conclude that the public needs to know more about equity predators preying on people who, in a sense, do not have a prayer—at least after they get done, they do not.

Senator Collins.

Senator COLLINS. Thank you, Mr. Chairman.

I want to start by thanking Ms. Arthur and Ms. Ferguson for coming forward today with your truly heart-wrenching, terrible stories. My hope is that by your willingness to talk about your families' experiences and your own experience in the case of Ms. Ferguson, that others who might be trapped in the same kind of situation can avoid what happened to you.

Ms. Arthur, I want to ask you a couple of questions. I was struck as I listened to you that one of the most tragic things about your parents' situation is that it seems like it could have been nipped in the bud if they had sought out advice or help when they first discovered that their monthly payment was over $1,100 a month rather than the $43 that they were expecting. I think you testified in response to a question from Senator Grassley that they were very embarrassed about it, and that is why they kept it to themselves.

Do you think that we could do more as a society to educate people like your parents about financial matters, to give them more financial counseling so that they would have had a place to go to run this by someone or to get some help?

Ms. ARTHUR. To begin with, they never knew that they were signing a mortgage. They thought it was just formality papers to have work done on the house. So I do not think that that would have helped them, but I think it would definitely help others.

Senator COLLINS. One of the other parts of your testimony that struck me and disappointed me is that you said you went to some legal services organizations, and you were seeking out someone who would help you. I am stunned that nobody referred the case to law enforcement officials, because in your parents' case, it seems to be outright fraud; it truly does.

28

Now, in the audience today is the head of the Consumer Protection Bureau of the FTC, who is a very fine person, and I know she does a good job. I hope that she will review both of these cases to see if there are violations in the Truth-in-Lending Act which the FTC is responsible for, or other Federal laws.

It distresses me that no one at first gave you any help. Did you tell people the full story and the forgery part of the application and the other information and, as you said, that your parents had no idea that they were actually getting a mortgage?

Ms. ARTHUR. I told them, but by then, it was years later. I think if it had been at the onset of it, people would have been more interested, but by then, they were, like, too bad.

Senator COLLINS. Did you ever find out the connection, Ms. Arthur, between the home improvement company and the mortgage company?

Ms. ARTHUR. The home improvement company gets a finder's fee from the mortgage company. That is the connection.

Senator COLLINS. That is very helpful for us to know, because perhaps that is an area where there should be some additional regulation or some sort of standards put in place.

Ms. Ferguson, let me ask you a couple of questions as well. I notice that from 1991 to 1996, you went from having loans on your home of less than $20,000 to having a loan of more than $85,000, and during that period, if I counted right, I believe you had five new loans. Now, you testified that some of the money from the first loan was used for home improvement purposes. Could you tell us what the rest of the new loans were used for? In other words, did you actually get new money that you could use to buy things, or did the new loans just replace the old loans?

Ms. FERGUSON. All the money I got together I believe was less than $25,000. I got, like, $3,000 and $2,000. It was not a big lump sum, not from these people, Lenders B and C.

The CHAIRMAN. I think you need to emphasize that. She got just $25,000 out of an $85,000 loan.

Mr. SWINDELL. Senator, just to clarify, she took out a succession of five loans, and I believe in the first one, she received around $6,000 on a $15,000 loan. As the loan amounts increased to $25,000, $54,000, $67,000 and $85,000, she received less and less cash each time. So it is not as if she actually got $25,000 from one $85,000 loan; but she got only $25,000 from a succession of five loans. I think that that is a much different situation.

The CHAIRMAN. Yes.

Senator COLLINS. So she got less cash and deeper in debt each time.

Mr. SWINDELL. Exactly.

Senator COLLINS. Thank you.

I see my time has expired——

The CHAIRMAN. Do you have another question?

Senator COLLINS. Thank you, Mr. Chairman. I have just one more that I would like to ask Ms. Ferguson.

Ms. Ferguson, were you told certain things by the mortgage company about certain incentives—what were you told or offered, or what promises were made to you that led you to agree to these loans? The reason I am asking this is because I want others to be

on alert for similar false promises. So if we could hear what you were told, maybe we can help some others.

Ms. FERGUSON. They promised to lower the monthly payments and the interest rates. They did not do what they promised. The note on the house went up each time.

Senator COLLINS. So it sounds to me like you got a lot of promises that turned out to be outright lies.

Thank you, Mr. Chairman.

The CHAIRMAN. Thank you.

Our staff who was present at the taping of Gael Carter followed up with two questions to her that I would like to have her respond to, once again by video, from her hospital bed.

Ms. DiSANTO. I just want to thank you for appearing before the committee. We have two main questions that we would like to hear your answers to.

If you had known how much money in up-front finance charges or points that you were paying on each loan, do you think that you would have continued with these loans?

Ms. CARTER. No, ma'am.

Ms. DiSANTO. My last question is: From your testimony, it is apparent that this experience has been very traumatic for you and your family. What impact has it had on your physical and emotional well-being?

Ms. CARTER. It has had an awful lot on my physical well-being, because I worried myself sick that they were going to figure out a way, after I got an attorney, to take my house away from me. I just got sicker and sicker, and I was up in the hospital for 3½ months, paralyzed for months, was in a wheelchair. I just cannot do anything I used to do anymore.

Ms. DiSANTO. Ms. Carter, I want to thank you on behalf of the Committee on Aging, on behalf of the Senators, and on behalf of the public for sharing with us this experience.

Thank you very much.

Ms. CARTER. Thank you.

The CHAIRMAN. We are done with this panel now, and once again I thank each of you for participating, and Ms. Carter from the hospital bed as well.

And Mr. Swindell, I acknowledge you as well, and I forgot to say that you are doing your work pro bono. We want to thank you for going the extra mile to help Ms. Ferguson.

Mr. SWINDELL. Well, I believe we need to increase our protection for the elderly in this area, so I am very happy to be a part of this hearing.

The CHAIRMAN. Thank you all for coming.

Senator BREAUX. Mr. Chairman, could I ask Mr. Swindell one question?

The CHAIRMAN. Of course.

Senator BREAUX. You have seen this case. What is not in the law that should be in the law to provide more protection for people like Ms. Ferguson? Is there something we can do legislatively that would make it easier for people like Ms. Ferguson?

Mr. SWINDELL. Well, I think what you have seen here is that the creditors take advantage of people who are not very sophisticated borrowers and who need assistance. I know that we have inves-

tigated the possibility of a reverse mortgage to get Ms. Ferguson out of this situation, and we have learned that in order to obtain a reverse mortgage, borrowers must go through credit counseling with an independent individual. I think that if it is possible to provide some sort of assistance to elderly Americans wherein they would be required to go through some sort of credit counseling with an independent individual, like in the reverse mortgage situation, that would be very helpful. If we require it in a reverse mortgage situation, why do we not require it in a regular mortgage situation where there is just as much opportunity for lenders to take advantage?

Senator BREAUX. Well, the committee thanks you very much for your contribution.

Mr. SWINDELL. Thank you.

Ms. ARTHUR. Can I make one quick comment?

The CHAIRMAN. Please do.

Ms. ARTHUR. My parents' attorney, Lynn Skully, who is here with me, is also working pro bono.

The CHAIRMAN. We should recognize that yes. Would you stand, please? Thank you very much. Thank you for giving us that information as well, Ms. Arthur.

Our second panel will consist of one person, a former employee of the subprime lending industry. He is here today to give us an insight and perspective on these predatory lending institutions.

"Mr. Dough," as we will call him, is prepared to discuss several aspects of the operation and activities of the subprime lender that employed him for several years. While he is no longer employed with that lender, he has asked for anonymity in speaking with us at this hearing since he still works in the industry.

At this point, I would ask that all cameras be turned away from our witness as he comes out so that his face will not be shown on television. I would appreciate that, both during the time he is at the witness table as well as that time as he comes out.

We are now prepared for our witness, Mr. Dough, to come out and to be at the table.

Senator BREAUX. I think it is interesting, Mr. Chairman, that you have spelled his last name, "D-o-u-g-h."

The CHAIRMAN. We now have Mr. Dough here in front of us, and we would ask that he give whatever testimony he wants to give, and then I will have questions, and I assume Senator Breaux will have questions.

Please proceed, Mr. Dough.

### STATEMENT OF "JIM DOUGH," FORMER EMPLOYEE OF A PREDATORY LENDER

Mr. DOUGH. Certainly. Good afternoon.

Thank you for inviting me to share my experience as a finance company employee. I have worked for finance companies for more than 7 years, and my testimony is based on my experience as an employee of three of this country's largest finance companies. Because I still work in the finance industry and fear retaliation, I do not wish to reveal my identity; however, everything I say today will be true.

During my employment with finance companies, I have served as a finance officer, assistant branch manager and branch manager. I have worked at several different branches and under the supervision of many different managers and supervisors. I was responsible for supervising branch employees, making arrangements with retail dealers for installment loans, contacting prospective and current customers, making loans, servicing loans, and collecting loan payments from delinquent customers.

Finance companies try to do business with blue-collar workers, people who have not gone to college, older people who are on fixed incomes, non English-speaking people, and people who have significant equity in their homes. In fact, my perfect customer would be an uneducated widow who is on a fixed income, hopefully from her deceased husband's pension and Social Security, who has her house paid off, is living off of credit cards, but having a difficult time keeping up with her payments and who must make a car payment in addition to her credit card payments.

The finance companies I have worked for use three primary methods to obtain new customers. First, they often send guaranteed loan vouchers to potential customers. These vouchers, also known as "live checks", permit someone to obtain a loan between $500 and $3,500 simply by either stopping in at the nearest branch or signing the back of the check and depositing it at a bank.

Second, finance companies often run different types of promotions using the mail to seek business from new customers. Sometimes the companies offer contests and prizes to entice new customers to take out loans.

Third, finance companies obtain many of their customers by participating in retail sales installment loans. The finance companies arrange to do installment financing with local retail dealers. When a retail customer wants to finance the purchase of a stereo, for example, the finance company, rather than the retail dealer, actually makes the loan and gains a new customer.

When a finance company obtains a new customer through one of the methods I have just described, it receives information about the customer's credit history, employment, income, home ownership and debts. As soon as the finance company makes that retail loan, for example, a branch employee reviews information about the customer, works up a financial plan and contacts the customer.

Although we would tell customers that we were calling to see if they got their merchandise, the real purpose of the call was to solicit the customer into converting the retail installment loan into a more profitable personal loan or home equity loan.

Going into the call, since you already have all the information on the customer, you can go ahead and work out a payment plan, payment options, bill consolidation plans, or home equity plans. We call this the "up-sell", and our goal was always to up-sell to the biggest loan possible. The conversion of a retail installment loan, live check or other small loan into a personal or home equity loan is also known as a "flip."

To flip one of these small loans into a personal or home equity loan, we were trained to sell the monthly "savings"—that is, how much less per month the customer would be paying off if we flipped the loan. In reality, the "savings" that we were trained to sell to

32

the customers were just an illusion. The uneducated customer would jump for the "savings," thinking that he would have more money to buy other things. What the customer would not figure out, and what we would not tell him, is that he would be paying for a longer period of time and, in the end, would pay a whole lot more.

Finance companies require branch employees to make contact every 3 months with customers to prevent payoffs and up-sell to bigger loans. At some of my branches, we tried to call every one of our real estate customers at least once a month. The purpose of these contacts was to slip as many loans as possible. Our tactic was to try to gain the trust and confidence of the customer.

We typically began a telephone solicitation by asking if there were new events in the customer's life that called for additional money. We were trained that we should always ask the customer if he or she needed more money. For our home equity customers, we stressed that the interest on the loan was tax-deductible. Because the terms of those loans did not usually exceed 15 years, we told customers that they could retire earlier, because their house would be paid off sooner. For our debt consolidation customers, we stressed that they could take the money that they were saving in their monthly payments and invest it in a mutual fund.

The term "flipping" is commonly used by finance companies. In my experience in the industry, flipping was a common practice. We were instructed and expected to flip as many loans as possible. One of my supervisors imposed a daily requirement that each branch employee obtain at least two applications from present borrowers to refinance their loans. In other words, each branch employee was supposed to try to flip at least two loans per day.

When I served as a branch manager, increasing the number of refinance loans was a frequent topic at branch manager, district and statewide meetings. Among the things we were taught at these meetings was to target blue-collar workers for loan flips. We were also told to target present customers who were delinquent on their loan payments. Delinquent customers made good flipping candidates, because we could put additional pressure on them. We were instructed to tell those customers that they could either bring their account balance current or refinance their loan. We knew that these customers would almost always agree to refinance, because they did not have the money to pay on their current loan and did not want the finance company to institute foreclosure or collection proceedings.

We were also told to target personal loan customers whose terms had less than 6 months remaining and customers who owed less than 50 percent of the original principal balance on their loans. I recall one of my supervisors saying that there is a point in each loan when the customer starts to pay a significant portion of principal instead of mostly interest. We were supposed to try to get the customer to refinance at that point in the loan term.

Flipping loans allows finance companies to charge customers points, that is, a percentage of the amount borrowed, on each real estate loan conversion or renewal. The practice is to charge the maximum number of points legally permissible for each loan and each flip, regardless of how recently the prior loan that was being

33

refinanced had been made. The finance companies I worked for had no limits on how frequently a loan could be flipped, and were not required to rebate any point income on loans that were flipped.

"Packing" is taking insurance products—as many as you can—putting them on the loan and then trying to cover them up or gloss over them. Packing is shoving as much insurance onto the customer as possible without the customer's knowledge or without the customer's understanding.

We attempted to pack insurance during our very first pitch to a new customer. For example, we were trained to tell a new retail installment customer that we had reviewed the customer's financial situation and could offer the customer a debt consolidation loan that would save the customer money by reducing the customer's monthly payments to creditors. The sales pitch would be substantially similar to the following: "Mr. Smith, in reviewing your loan application, I see that you have a lot of credit card payments. What if I could save you $550 a month through consolidating your debt into one loan?"

I was taught that the most effective way to sell insurance was to always include insurance products in this quote without telling the customer that my monthly quote included insurance. I was taught that I should always include as many insurance products as possible in the monthly payment quote so long as I could quote a figure that would be less than the customer's current outstanding debt obligation.

Using that method, if the customer did not express interest in my initial quote, I could eliminate one insurance product without telling the customer that I was doing this, and give a quote for an even larger monthly savings.

For example, if the customer rejected my pitch to save him $550 a month, I would eliminate one insurance product and respond: "Suppose I could save you $600 a month?" Usually, the more naive the customer, the more insurance I would pack on the loan before I made the initial monthly payment quote. This tactic was very effective with immigrants and non-English-speaking people.

Do not be fooled by training manuals. The manuals are written for regulators and auditors, but finance company employees are trained to ignore the manuals if they expect to make their profit quotas and keep their jobs. For example, even though my training manuals discussed quoting a monthly payment both with and without insurance, I was trained by my supervisors that unless my conversation was being audited, I should ignore the manuals and always quote the monthly payment on a proposed loan with insurance, unless the customer specifically asked what the cost would be without insurance.

The tactic we used at all the finance companies I worked for was, "If the customers do not ask, do not tell." I heard this phrase often from many of my managers and supervisors.

The "do not ask, do not tell," policy was successful because customers were not aware until closing, if at all, that the loan included insurance. Once the customer indicated that we could schedule a closing regarding the loan proposed in the telephone solicitation, we merely presented the loan documents with insurance included, even though insurance had not been discussed previously.

34

Through their training and experience, finance company employees know that customers are often desperate for the money and usually will not object to the insurance once the loan reaches closing. If customers objected to the insurance at closing, we would add more pressure by telling them that if they wanted the loan without insurance, it would be necessary to redo their loan documents, and the closing would need to be rescheduled for a later date. That was a half-truth. We could redo the loan documents in only a few minutes. It was not really necessary to reschedule the closing for a later date, but we knew that customers would be more likely to cave in and accept the insurance if they thought they could not get the money that day. In my experience, this was usually enough to persuade the customer to go through with the closing and take the insurance.

When insurance was to be included with the loan, our computer programs automatically calculated the maximum amount of insurance as provided by State law. The amount of insurance coverage on the loan was never arrived at through negotiation with a customer.

Insurance sales are very important to finance companies. My supervisors often used phrases like "Insurance drives profits". One of my supervisors said that insurance was more important to our company's profitability than its spread on interest rates.

Because insurance sales are so important to the bottom line, finance companies require that their employees meet goals and quotas regarding insurance. Insurance sales are tracked by dollar volume, penetration rate and premium-to-volume ratios. For example, one of my employers required that its branches maintain an 80 percent penetration rate for credit life. That is, employees were expected to sell credit life insurance in at least 8 out of every 10 loans. My employers made it clear that I would not keep my job unless I fulfilled my insurance sales quotas.

Finance companies also provide additional rewards for employees who meet or exceed their insurance sales quotas. All of my finance company employers had a quarterly bonus system. Part of my bonus depended on whether my branch met its insurance sales quotas. All of my finance company employers also ran quarterly insurance sales contests. We would be eligible for contest awards if we exceeded quotas regarding insurance penetration and insurance sales volume.

I am glad that I no longer work for a finance company. If they want to keep their jobs, finance company employees must flip and pack loans. They are under enormous pressure to meet quotas regarding loan volume, repeat business and insurance sales. In fact, the pressure to produce loan volume and insurance sales is so great that on many occasions, I have seen finance company employees commit forgery on a massive scale. These employees have forged everything from insurance forms, RESPA documents, income verification forms, and even entire loan files.

These practices have always disturbed me, and I hope that something can be done to make finance company customers more aware of these practices so that they can keep from becoming victims of flipping and packing schemes.

35

The CHAIRMAN. Mr. Dough, we appreciate very much your taking the time to come here and give us the inside scoop on how this system of fleecing elderly people out of the equity in their home works.

In your testimony, you discussed the types of customers targeted by finance companies. Why do they target blue-collar workers?

Mr. DOUGH. Our entire sale is built on confusion. Blue-collar workers tend to be less educated. I know I am being very stereotypical, but they are the more unsophisticated. They can be confused in the loan closings, and they look to us as professionals—they look to us as not only loan professionals, but as professionals who can handle their bill and their incomes as total financial representatives. That is not it. The majority of us are not college-educated. We start doing this 2 days after we are hired on in these companies. We do not have the formal training that they expect us to have. So they are more trusting toward us.

The CHAIRMAN. You also targeted people on fixed incomes. Why? And can I ask whether, by targeting people on fixed incomes, you are aware that finance companies are targeting a large segment of our elderly population?

Mr. DOUGH. I am very aware that we are targeting the elderly, and the reason why it is successful for finance companies to target these people is because they have less of a choice in where they go for the loan product. It is much easier, if you have a full-time job and disposable income, to get a loan from your local bank; whereas we can save them $100 a month and close the loan within a week. That is all they are looking for.

When you are talking about fixed incomes, you are talking about minimal incomes, also.

The CHAIRMAN. Yes. And you also targeted people with equity in their homes. Why?

Mr. DOUGH. Again, a couple of different reasons. You want as much equity as possible so you can get the biggest loan. The more equity, the more fees, the more points you can charge, the more bills you can pay off, and the more times you can flip that customer.

The CHAIRMAN. People having problems making ends meet with their present debt obligations are another group that was targeted. Why would you want to lend money to people who are already having a hard time keeping up with their debts?

Mr. DOUGH. Desperation. Those people are desperate. They will sign at whatever rate you give them and however many points you give them.

The CHAIRMAN. Can you describe for us the role of the corporate office—in other words, do they put pressure on individual employees and branch offices? If so, what kind of pressure, and what form does that pressure take?

Mr. DOUGH. The pressure directly on the employees from above? Many times in my years with finance companies, I have been told: Either you do it this way, or you find another job. The big one is: If you cannot do it, we will find somebody who will. And this is a constant, everyday thing, where if your numbers are not where home office or upper management wants them to be, then you are done, you are fired.

36

The CHAIRMAN. You mentioned that at times, documents are forged. Could you describe for us what types of documents are forged, and why they are forged?

Mr. DOUGH. All different types of documents are forged, from W–2's and pay stubs so you can get a loan approved, to RESPA forms and loan papers. You do that so you can get by the auditor, or you can even forge entire loan packages; insurance questionnaires—if you know somebody is not going to qualify for insurance, but you need the insurance to meet your quota, you do not ask them the questionnaire. You go through and do it after the loan.

The CHAIRMAN. The forgery also involved signing people's names?

Mr. DOUGH. Yes.

The CHAIRMAN. You did that?

Mr. DOUGH. Yes.

The CHAIRMAN. That obviously is illegal, where a lot of the other practices might be unethical and immoral, but not necessarily illegal.

Mr. DOUGH. Yes, sir.

The CHAIRMAN. Did you know at the time that you were breaking the law by forging the name?

Mr. DOUGH. Yes.

The CHAIRMAN. Did corporate headquarters and corporate leaders and people higher up in the chain of command order you to forge documents, or was that your own practice to meet their goals without their knowledge of that?

Mr. DOUGH. The forgeries that I saw in the offices where I worked were either orders from their direct supervisor, or they were doing it to protect themselves against auditors.

The CHAIRMAN. But there were some instances in which they were ordered by supervisors or people higher up in the corporate command to do that?

Mr. DOUGH. Certainly.

The CHAIRMAN. Do you think that that was an ethic that came from the very highest ranks of corporate headquarters, or from lower and middle ranks?

Mr. DOUGH. I do not think it was actually ever said to have your people forge documents to get loans done, but creative financing is done. They tell you just get the job done; do it. I have not heard it passed down from upper management to forge documents, just from local supervisors. But they let you know what they want you to do.

The CHAIRMAN. I have just a couple more questions. If you could describe for us the atmosphere that you were trying to create during a loan settlement, I think it would be helpful.

Mr. DOUGH. Sure. The first thing you do is instill trust between yourself and your customer. You have already talked to them on the telephone, so if you were good, you got names of children, if they had any pets, what kind of car they drove, so that when they came in, you could talk to them on a personal level. This created the atmosphere that you were there for them, that you were their personal financial person and that you were there to look out for their money. From there, you just went on with the closing.

37

The CHAIRMAN. My last question is one of summation. Could you describe the perfect borrower for the subprime market in which you were employed?

Mr. DOUGH. Sure. As I said in my previous statement, it would be somebody who was elderly, hopefully, a minority, less-educated. I am looking for somebody on a fixed income who is living off of credit cards. I want somebody who has a car payment and somebody who owns his or her house free and clear would be perfect.

The CHAIRMAN. Thank you very much.

Senator Breaux.

Senator BREAUX. Let me start by thanking the witness for being here, because only through testimony such as yours can we find out the nature and extent of the problem. Hopefully, your testimony will be very positive for future activities in the sense of trying to find a way to eliminate the practice that you have so carefully outlined to the committee.

I have just got to ask you a question. Are you still doing this?

Mr. DOUGH. No. I am out of the finance companies.

Senator BREAUX. How many finance companies did you work for, approximately?

Mr. DOUGH. Three.

Senator BREAUX. I do not want their names, but I am trying to find out the category. Are these the "instant credit," immediate finance companies, with "instant money" on a signature, that you see advertised sometimes, or were any of them—because I do not know who you worked for—were any of them what you would term a more reputable company? Or were they all fly-by-night finance companies?

Mr. DOUGH. All three were major finance companies.

Senator BREAUX. That you would not put into the category of fly-by-night, signature-alone, finance companies.

Mr. DOUGH. They work as fly-by-night companies, but all three have been there for years and will be there for years.

Senator BREAUX. And they were not limited to one locale or location, but were really—I guess you said—national in scope?

Mr. DOUGH. We are talking about thousands of branches nationwide, and in some instances, worldwide.

Senator BREAUX. Now let me ask you a couple of questions about your testimony. I noticed on page 3, you talked about flipping the loans, and that you would show a customer how, by flipping the loan, they could get a lower monthly payment; but that what the customer would not figure out, and you would not tell him, is that he would be paying for a much longer period of time, and obviously, in the end, would pay a much larger amount back to the finance company.

Is it not required by Federal regulation or State regulation that that information be clearly presented to the customer—that if you keep your loan, here is what you pay and what you finish with, and if you refinance with us, here is how long it is going to take you, and here is how much you are going to pay—in simple English?

Mr. DOUGH. It is written in simple English, and it is on all the loan documents, but I can get around any figure on any loan sheet.

Senator BREAUX. In other words, as long as you felt that you presented that person with this detailed explanation which nobody

38

reads, you did not feel that you were legally required to explain it to them in language they could understand?

Mr. DOUGH. Exactly. The majority of customers are looking at one thing—that is monthly payment—and if that is what I quoted them on the phone, then they are perfectly happy when they leave.

Senator BREAUX. Now, on flipping loans, you were able to charge points to the customer each time the loan was flipped. Are there statutory limits on how many points you can charge?

Mr. DOUGH. I would guess that in each area, it would be different, but there is a limit on how much I was allowed to charge, yes.

Senator BREAUX. But there was no limit on how many times you could charge points?

Mr. DOUGH. If there was, there were ways to get around it.

Senator BREAUX. And by flipping the loan and making another loan, you could charge more points each time you made a new loan.

Mr. DOUGH. Right; and the way you flip the loan, in the different systems with the different companies, there was always a way to collect all your points on the previous loan and get all of your points on the next, even if it is only a month later.

Senator BREAUX. On the packing question, requiring them to buy credit life and life insurance and other insurance in order to get the loan, is there any requirement in the law that would spell out whether insurance was needed, and if so, how much is necessary, or is it pretty much an open-ended situation?

Mr. DOUGH. There are requirements saying that you must tell the customer, with and without insurance, the loan payments, the total of the loan. In the paperwork, it shows that it is optional, and you have the questionnaire, but again, that is just like all the other figures. The customers believe what I tell them.

Senator BREAUX. Was it a common practice, in other words, to insinuate to the customer that you would not make the loan without insurance?

Mr. DOUGH. Yes, you would insinuate that. You would tell them the importance of having the insurance on there.

Senator BREAUX. Was that part of a disclosure form that was given to the customer that was lost in the pages and pages of information?

Mr. DOUGH. Yes, it gets lost, but if a customer is backing out of the insurance, then you just delay the loan until he agrees to take it. There are laws saying that I have to disclose the information. There is no law saying in what time period I have to do a loan.

Senator BREAUX. I said in the beginning that I think you are being very helpful to this committee and to the Congress by laying out some practices which apparently, Mr. Chairman, are far too common and are not just among what I would call fly-by-night loan companies, but are practices that are also engaged in by reputable companies. I think you have said very clearly that the majority of people involved in financing and refinancing and equity financing are good, solid companies, and we are certainly not intending by this testimony to suggest that the majority or any percentage of the industry are bad actors. But apparently, there are some very significant abuses, and that is what we are trying to get at.

39

The interesting question I have—and maybe we cannot answer it right now—is that I have heard this witness say that he engaged in forgery. Now, that, by any stretch of the imagination, is a criminal offense.

The CHAIRMAN. It is a violation of the law, and it could be prosecuted, yes.

Senator BREAUX. I just want to note that for the record. I mean, you have been very helpful to this committee, but in doing so, you have also acknowledged that some of the things you were doing were clearly in violation of the criminal statutes of this Nation, and that raises some points that I think need to be further considered.

But I do thank the witness for his participation.

The CHAIRMAN. And I thank the witness. I do not have any further questions. Senator Collins may have some that will be submitted to you in writing, and if she does, we would appreciate your responding in writing.

I would ask now, before the witness leaves, that the cameras once again be turned to the side. You can now come and get the witness, please.

The CHAIRMAN. Our final panel features leading experts, including a law professor who specializes in consumer protection issues; also, the director of the Bureau of Consumer Protection at the Federal Trade Commission, and the director of the Home Defense Program of the Atlanta Legal Aid Society.

Mr. Gene Marsh, our first witness, is a professor of law at the University of Alabama. He has written and lectured extensively on the subjects of subprime lending markets, lender liability based on marketing practices, credit insurance, and the practice of flipping. He has served as an expert witness in consumer finance litigation cases nationwide. I welcome him.

Our next witness is Ms. Jodie Bernstein. Ms. Bernstein is director of the Bureau of Consumer Protection at the Federal Trade Commission. She will talk generally about the predatory lending practices and the role of the Federal Trade Commission and what role that agency plays in enforcing existing legislation addressing equity predators.

Mr. William Brennan, our third witness, has been a staff attorney at the Atlanta Legal Aid Society for 29 years, specializing in housing and consumer issues. For the past 10 years, he has been director of the Home Defense Program. This program provides referrals and legal representation to homeowners who have been victimized by home equity loan scams. He assists individual homeowners who have been targeted by local and national companies with abusive predatory mortgage lending practices.

Professor Marsh.

## STATEMENT OF GENE A. MARSH, PROFESSOR OF LAW, UNIVERSITY OF ALABAMA LAW SCHOOL, TUSCALOOSA, ALABAMA

Mr. MARSH. Thank you. You have heard extensive testimony on the practices of loan flipping and packing, so I will try to avoid getting on top of that and will be very brief.

I have studied the industry in general beyond just the one or two companies that are being described here in the subprime market

and have paid particular notice to the fact that so many of these loans, particularly mortgage loans, have a great deal of dead weight in them. The dead weight is due to the dollars that are being piled onto the loan through the flipping of the loans and the packing of insurance products. This is also particularly common in the types of mortgage loans that you are describing that target the elderly.

Finance companies flip loans largely because of the way the credit math works—that is, early on in any loan, they make more money in the principal and interest balance. Later, as the loan matures, as we all know in our own lives with mortgage loans and car loans, we start to "make hay" against the principal balance. So the newer the loan is, the better it is for the lender, and that is just the way the credit math works.

In the industry, flipping is normally done through the dangling of a few dollars in front of a borrower who may have made one or two, or perhaps has a history of payments, and it is quite an inducement to say—and you have heard described these sort of "instant check" loans where someone receives a check, and if they cash it, they may think they are getting a few additional dollars that they may need for Christmas or whatever, when in fact what is happening is that the old loan balance is really being restarted.

As has been pointed out by other people who have testified, the higher our educational level and so on, the more likely we know what is going to happen to us when we renew and refinance loans. In fact, many people are going through refinancings now in their mortgage loans because of terms that are favorable.

In the subprime market, you have a particularly aggressive strategy of loan flipping that is geared largely, I think, from the inside out—that is, a designed practice from the industry and then also, you face people who often just do not understand what is coming at them and the ramifications. Not only because of perhaps their educational level, but because of the fairly slick practices that are used in making flipping work.

There are actually employee incentive plans related to flipping throughout this industry. Sometimes the base pay for people who are managers and loan officers is fairly low, and sometimes the returns for them if they have a good month, so to speak, are quite good. And in the bonus system in some of the finance companies that I have studied, loan volume is double-counted. That is, if you have old money that is turned over, that old money is calculated, again, in the flip toward whatever the monthly loan volume was, and that becomes a part of the bonus system for employees.

You mentioned that you were surprised, as I think all of us are, to find out that sometimes the strategy is that if you have a borrower who is struggling, that sometimes the loan is renewed. That is hard to imagine, but it is also fairly common. That is, I have studied cases where the employees have said that as they come to the end of the month, and they are looking at their bonus system, and they are afraid of getting a demerit based on loan delinquencies, that they would actually want to make the loan look current by going out and re-upping the loan, or restarting the loan. Normally, as one of the folks testified, the focus of the borrower is quite often on the monthly payment and not on the long-term rami-

fications, so in deposition testimony in other places, employees have mentioned that renewing loans that are in default is a common strategy. That, by itself—some people would ask, well, what is wrong with that. Well, I think what is wrong with that is not just the fact that the loan is being restarted, but that you have people who are already on the fringe, in some trouble, and they get more debt piled on them. In many cases, because of the packing of insurance, a lot of that new debt is really dead weight; that is, it is not money that you are going to see, it is money that is going into credit insurance products.

I have provided some passages on credit math, but rather than bore you with that, I will just leave it for your study. It is an important part of this, but I think you can read it, and some of the other written testimony includes discussion of it.

One thing I would point out is that the subprime market is very aggressive in pitching flipping—that is, in seasonal pitches, "instant checks," and so on—far more than what you or I would face if we borrowed money from a bank for a car loan or a home mortgage loan. You do not really expect to hear much from the bank or from the mortgage lender again; you just keep making your payments, and your car gets paid off, and you move on. But in this industry, you will hear as frequently as once a month from folks every time you receive a statement.

I have a brief excerpt from a training video that is used and then a couple of exhibits to share with you, and then I will be finished.

Mr. BREAUX. Who is this training video from?

Mr. MARSH. It is one of the finance companies in the industry. It is actually a longer video—it is about a 30-minute video—but it has been edited down to about 2 minutes.

["Keys to Success" videotape shown.]

Mr. MARSH. I do not think you will see that at the Academy Awards. [Laughter.]

There are four points there, and they appear to be fairly subtle. I will make them quickly. One is that you hear a description that we are in the business of selling money. That is true enough, and I think that that is something that is cultural, and people kind of get used to it, and you have to get used to that; that is what lenders do. But on the other hand, they also sell a lot of things that people do not need, that is, the credit insurance products, and they go about it in a way that no one needs, and that is flipping.

You saw the excerpt on the idea that it is common and believable and okay to handle a delinquent account by renewing it, and I think we have talked enough about that.

As far as the fellow who needs the roofing work done, notice that they said, "Come on in, and we will have $1,984 additional available for you." Usually, what happens is that not only do you get the check for $1,984, but the old loan is restarted, and that is something that I think is lost on people.

Then, finally, you saw the one on the fellow needing $1,000 to pay taxes. On top of that $1,000, you saw the pitch that, Golly, we forgot to sell credit insurance once again. So it is just sort of a constant push to sell the credit insurance products.

I have two exhibits here, and I will also have two more put up, and then I will be finished. The document on the left is from a fi-

42

nance company document that is used in training, and it specifically points out that there is a certain point in every loan where the credit math shifts and starts to work to the advantage of the borrower and the disadvantage of the customer, and that is the point at which you should target the loan for renewal. You can see the description, and I recommend your study of it, but it is very vivid in the way it describes how the principal and interest breakdown occurs. It also has the credit life and credit insurance penetration rates noted at the bottom of that same document.

The other one, to the right, is from a training tape which basically describes the process of keeping people in debt—"Renewed loan approvals take us right to collection again"—so you see this continuing cycle is at the very heart of the business.

Then, if I could quickly get the other two up, credit life insurance is supposed to be a voluntary product. It is "take it or leave it." In fact what happens in the industry is that it is often put in front of you with really almost no chance of taking it off. One of the quotes in the training materials that comes from one of their employees reads: "I reassure the customer about the benefits of the insurance. They especially like it when they realize that it is already included with the payment, and it has already been quoted." Well, that is a problem, that is a serious problem, and I think these folks here would agree.

Then, the one on the right I think is also very vivid, and that is that although the company advertises itself as one that takes care of you and is here to help you and so on, the employees get this clip that says: "Do not shoot yourself in the foot by addressing objections, concerns or questions you think the customer might have." And all I would say is that when you contrast that with, basically, the pitch that the borrowers are getting, it is really day and night.

Thank you very much.

The CHAIRMAN. Thank you, Professor Marsh.

[The prepared statement of Mr. Marsh follows:]

43

United States Senate Special Committee on Aging

Monday, March 16, 1998

Testimony of Professor Gene A. Marsh

The University of Alabama School of Law

I am a professor at the University of Alabama School of Law. In the School of Law I teach courses on contracts, payment systems and business organizations. I also teach a seminar on consumer protection. I have published and lectured in a number of areas of lender liability, consumer finance, sub-prime lending, secured transactions, payment systems and banking law. I served as the reporter for the revision of Articles 3 and 4 of the Uniform Commercial Code in Alabama. In 1996 I served on Governor Fob James' Mini-Code Task Force and have been involved in drafting revisions to Alabama's consumer finance laws. In national and state continuing legal education programs I have spoken on such subjects as the Alabama Mini-Code, federal Truth in Lending, the sub-prime credit market, lender liability based on marketing practices, credit insurance and the practice of flipping.

I have served as a consulting and testifying expert for lenders, credit sellers and borrowers in consumer finance litigation. I have worked for public utilities, retailers and financial institutions in reviewing and revising their deposit agreements, installment sales contracts and extended service agreements. I have conducted several compliance seminars for the Alabama Bankers Association. I serve on the Board of Advisors for a national consumer finance publication.

-2-

In the course of my work I have studied pleadings, exhibits, loan files, operating manuals,

training manuals, training videos, depositions and other documents used in consumer loans and

installment sales.  I have studied materials in cases involving over 30 consumer finance

companies and other mortgage lenders, many of which operate in the sub-prime market.  I

have written and lectured extensively on the subjects of sub-prime credit markets, flipping and

abuse in the sale of credit insurance products.  Loan flipping and abusive credit insurance sales

practices are particularly common in sub-prime credit markets.

**A.** *Why Finance Companies 'Flip' (Renew) Loans*—Lawyers representing consumer debtors

with finance company loans are often surprised to find that new loans are made and existing

loans refinanced several times each year.  Although we live in a world of "easy credit terms"

and are surrounded by examples of the improvident use of credit, consumer finance company

lending practices often surprise even the most hardened advocates of E-Z credit.  These

lending practices are particularly noteworthy when one considers that many of their borrowers

started out as credit risks, having come to the finance company after being bounced by a bank

or other depositary institution.  In other words, these are people who are in the sub-prime

credit market.

Finance companies frequently will contact existing customers, offering a few hundred

additional dollars.  Some training manuals urge the employees to make solicitations every time

the customer comes in to make a payment.  If the debtor bites at the apple, the existing loan

will be "paid off" and a new loan will start, but with a great deal of the balance being "old

-3-

money." That is, after rebates (most likely credits on the account) for unearned interest and

insurance premiums, the new amount financed will be comprised of the unpaid principal

balance from the old loan, the few hundred additional dollars given to the debtor in the new

loan, and new credit insurance products (credit life, credit property, nonfiling, credit

disability, etc.) that were sold and financed by the creditor. Where a mortgage loan is

involved, the debtor's equity declines at an alarming rate, while the debt load mounts.

These frequent loan renewals are rabidly marketed through telephone and mail solicitations.

Most of us would stop dealing with a bank or other lender that solicited us for new money

nearly every time we made a car payment. However, finance companies are not timid in

offering new money to debtors. The mechanics and incentives in establishing the flipping

system are described below. The system is a product of several forces at work, including the

compensation system for finance company employees, state law which favors creditors in the

amounts rebated for unearned interest and insurance premiums, very slick (and at times

deceptive) marketing practices, and some borrowers who have no credit discipline. The

problems are magnified when a borrower is poorly educated and even illiterate. Many finance

company borrowers come to the table with little formal education.

All of us are familiar with the advantages, disadvantages, and the reality of refinancing home

mortgages, and even car loans. However, most people are surprised by the system that has

been implemented by the consumer finance company lending industry, where debtors often

send in regular payments, but make little progress against loan principal. The system

46

-4-

resembles the nightmare where one is running hard but making little progress against the tiger that is about to pounce. Finance company loan renewals establish a pattern which makes people indentured servants, working hard but never making progress against debts.

The flipping system also magnifies the harm done in the sale of consumer credit insurance products that are so prevalent in finance company lending. Consumer credit insurance, which is generally a bad bargain by any measure, is especially costly where the rebates for unearned insurance premiums are credited under the Rule of 78ths. The use of the Rule of 78ths works to the creditor's advantage when loans are renewed early in the term.

**B.** *Employee Incentives and Marketing Strategies in Loan Renewals*—Commercial banks have never been known for paying overly generous salaries to consumer lending officers who are in the trenches. Finance companies pay even less, and sometimes a great deal less. Additional financial incentives are sometimes offered in a bonus point system that is based on loan volume, with point subtractions for loans made that are late or delinquent. The bonus system may be based on individual branch performance.

In some companies, loan volume is double-counted. That is, monthly loan volume is measured without regard to whether the most recent loan includes a large block that is merely a renewal of an earlier loan. In depositions, some employees have reported that they renew loans in order to increase their loan volume. This is close to the system of "churning" accounts in the

-5-

securities industry. Some employees have stated that as the end of the month approaches, the pressure to turn loan volume increases and the "quality" of new loans diminishes.

Deposition testimony also includes frank admissions that some loans are renewed in order to remedy the problem of loan delinquency. Thus, a loan looks current for the bonus system, even though the borrower has been having trouble making payments before the loan renewal. Not only testimony, but also training films include passages encouraging renewals for existing delinquent accounts, particularly if new collateral or a co-signer can be added to the loan. The same training video offers advice to employees, encouraging them to use loan renewals to cure delinquent accounts. The pressure to sell credit insurance products is also magnified in such a system because the insurance premiums are financed, thus raising loan volume.

Training manuals and video training tapes also include passages encouraging employees to use expressions such as "line of credit" in soliciting renewals. However, a complete refinancing of an existing loan and a restarting of the clock on the old money is hardly what you get in a true line of credit. A true line of credit--even a home equity loan with an established line--allows for draws without much in the way of transactions costs. However, it is the operation of the Rule of 78ths, new prepaid finance charges, and the other transactions cost that are so expensive for borrowers whose loans are flipped by finance companies.

Other passages in lending manuals include directives that "all efforts are devoted toward motivating individuals to make contact with our office." One manual states that "the bulk of

48

-6-

our business is repeat business," and that "renewals are SOLD, NOT BOUGHT." Another

noteworthy passage is one that reminds lenders that "the alert employee will map out an

effective game plan," and "sell eligible applicants to his maximum worth or high credit."

However, a study of loan documents and admissions by employees suggests that high credit

limits are sometimes exceeded in order to make a delinquent account look current. As is often

the case in commercial and corporate loans, some of the loans become problems because the

lender ignores internal directives on approval ratios.

In fairness to lenders, it is a fact of life that financial institutions are in the business of selling

money and sales volume is critical in any business. In many ways, selling money is no

different than selling shirts. However, the lender-borrower relationship has never been viewed

as a place where all bets are off relating to disclosures, sales practices, and complications after

the sale is made. Thus, the exceptionally aggressive lending practices of finance companies

will not be viewed simply as the sale of the next shirt. When it comes to consumer lending,

the dynamic changes, and people expect more than the law of the jungle to prevail.

**C.** *Add-On Interest and the Rule of 78ths*—The most common methods utilized in the

calculation of interest in consumer finance loans are the add-on and actuarial methods.

Actuarial Interest is calculated by applying a periodic interest rate to the outstanding balance of

the loan principal for each period for the term of the loan. This is the method that is used to

amortize real estate mortgage loans. In order to calculate actuarial interest and payments for

-7-

installment transactions, one generally must resort to formulas or tables which are widely
available.

Computing interest by the add-on method is easy and is the method most commonly utilized by
consumer finance companies in Alabama.  Add-on interest is a method for calculating
precomputed interest, where the consumer agrees to pay the total of payments, which includes
both principal and the full amount of precomputed interest.  Thus, if a consumer agreed to
borrow $1,000 at twenty percent interest, to be paid over a twenty-four month period, the
calculation for payments would be as follows:

    (1) $1,000 x .20 x 2 yrs. = $400 interest

    (2) $1,000 principal $400 interest = $1,400/24 mos. = $58.33/mo.

With the add-on system, interest is calculated as though the borrower had full use of the
principal for the full period of the loan, but because some principal is being repaid with each
installment, the debtor pays a fixed amount of interest on a diminishing principal.  Thus, the
add-on method understates the true simple interest rate and the real cost of the loan.

It is the actuarial method—not the add-on method—that most closely approximates and will in
some cases match (if there are no prepaid finance charges or other complications) the annual
percentage rate (APR) that most of us know under the mandates of TILA.  Because TILA
requires a common method for reporting the true interest rate on loans based on an annual

**50**

-8-

percentage rate (APR), the add-on rates dramatically understate the effective "simple" or actuarial rate on a loan.

Because interest on add-on loans is precomputed, the lender must have some system in place to rebate or credit the account for unearned interest in the event the loan is paid off early or refinanced. The most common method for rebating unearned interest charges (and unearned credit insurance premiums) is under the Rule of 78ths, or the Sum of the Digits Method. The Alabama Code follows a federal mandate requiring the use of some method other than the Rule of 78ths for loans with terms longer than sixty-one months. However, because most consumer finance companies make loans with maturities of five years or less, the Rule of 78ths is widely used to rebate unearned interest and unearned insurance premiums in Alabama.

Although the Rule of 78ths is easy to use, it carries a disadvantage for the borrower. The method used by the Rule of 78ths weighs the early months too heavily and the latter months too lightly in calculating interest earned by the creditor. Thus, if a loan is prepaid (or started over, in the case of a refinancing), the creditor would be credited with more interest earned (and not rebated) than if the interest calculation were made on the actuarial method.

It is readily established mathematically and accepted beyond dispute that the higher the APR for a given indebtedness, the greater is the error in the Rule of 78ths in calculating interest earned by the creditor at certain points in the loan, when compared to the actuarial method. Further, with many consumer loans, the point at which there will be the greatest divergence

-9-

(error) between the Rule of 78ths and the actuarial method is roughly one-third of the way

through the loan term. At any point in the loan, the difference between an actuarial rebate and

a Rule of 78ths rebate on any given precomputed loan will vary with loan size, the interest rate

on the loan, the loan term, and the time of prepayment.

**D.** *Observations on Flipping*—With regard to both car loans and home mortgages, most of the

early payments are largely interest and little is principal. It is only later in the loan that a

borrower starts to make serious progress against the principal. Conversely, most of the

interest income for lenders is made early in the loan. In depositions, finance company

employees and executives readily admit that the companies make more money on "new" loans

and that old loans are not profitable. This is no great revelation and holds true whether interest

is calculated on an actuarial basis or in a precomputed, add-on arrangement. There is no real

"fault" or devious practice here. It is merely mathematics at work.

Many borrowers can grasp the ramifications of restarting an old loan (such as home mortgage

refinancing) and know the costs and benefits of doing so. These borrowers can read and write.

They also do not receive solicitations for "new money" every time they make a payment or

receive a monthly statement. Additionally, they are not met with pitches for credit insurance

products at every turn.

The same cannot be said for consumer finance company borrowers, many of whom do not

bring much formal education to the table. Among the many consumer finance company loan

52

-10-

documents and depositions I have studied over the past several years, only a few borrowers

were college graduates and many were people who did not finish high school. Others could

not read or write. The data on educational levels, dropout rates and illiteracy among some

states makes none of this a surprise. When some of these borrowers are matched against very

polished, rehearsed, and high pressure promotional practices, with use of terms such as "line

of credit" and representations regarding the value (and even the necessity) of credit insurance

products, it is no contest in the negotiation process.

Many finance companies include advertisements for more money in each monthly statement

they send to the borrower. Seasonal pitches are common, offering a few hundred additional

dollars for Christmas money or a summer vacation. Other pitches included on the monthly

statement will congratulate the borrower for making a few timely payments, and offer several

hundred more dollars if the debtor will visit the office. However, rather than making a new

and second small loan, which is the impression created by the advertising, the creditor will

restart the clock on the old money in a consolidation.

When pressed on why the finance company could not make a second, small loan, particularly

when the loan request was triggered by the lender's solicitation, the standard answer is "it's

company policy." No further explanation is offered.

Accounting firms hired to work in consumer finance litigation have developed excellent models

to compare the costs to the borrower of the refinancing (flipping) system that is in place and

**53**

-11-

the costs to the borrower if payments on the old loan were allowed to continue, while a new, second small loan was made. The differences in costs are dramatic in most cases and have not been refuted. Even if the APR on the renewal loan is lower than the APR on the old loan, the actual out of pocket costs for the new refinanced loan may be greater than those that would be paid if a second small loan were made available, while payments on the old loan were continued.

The extra costs to the borrower of the system in place are in part the result of the operation of the Rule of 78ths (as it is applied to interest and unearned credit insurance premiums). In order to induce the borrower to take on more debt, some finance companies extend the loan maturity to a new term. Thus, what was once an initial loan with a twenty-four-or thirty-month maturity will often turn into a new loan at forty-eight or even sixty months. Although the debtor may take this arrangement because the monthly payment stays the same, the mountain of interest builds, particularly in a precomputed, add-on loan scenario. And because the creditor will most likely make a new pitch for a loan renewal (and a few hundred more dollars) several months down the road, the principal amount remains largely undiminished or grows.

To see an illiterate borrower who has had a loan "renewed" five, six, or even eight times in two years, and who is sometimes sold as many as three or four credit insurance products (credit life, credit property, credit disability, "involuntary unemployment insurance," and nonfiling may appear individually or all together in one loan), is enough to make most

**54**

-12-

traditional lenders shake their heads. And in some cases, because of the dismal credit record of the borrower before the first loan was made, the expression "throwing good money after bad" appears to be unknown in selected consumer finance company branches, where loan volume dictates incentives and policies.

The frequency of loan renewals in consumer finance company lending is not merely the result of borrowers who voluntarily go to the well too many times. This practice is designed and encouraged by finance companies, without question. The Committee has been provided with exhibits and excerpts from an industry training tape which describe borrowers as "targets" for loan renewal and the packing of insurance products.

E. *Packing of Insurance Products*—On the matter of the packing of insurance products, one large national company promotes a system which essentially requires the customer to refuse credit insurance and other add-on products, rather than providing a clear explanation and meaningful choice for the customer. Factors considered by the FTC and other regulators (as well as in case law) examining coerced credit insurance sales include the creditor's penetration rate, the profits and financial incentives in making the sale, and the practice of including insurance in loan payment quotes or on loan documents provided to the consumer prior to offering a choice on credit insurance products.

Material provided to the Committee includes employee testimonials relating to credit insurance. One quote reads, "They especially like the insurance when they realize that it is

**55**

-13-

already included with the payment that they have already been quoted." Another entry in that exhibit under a section on "Handling Concerns" reads "Don't 'shoot yourself in the foot' by addressing objections, concerns or questions you 'think' the customer 'might' have." In all the marketing literature I have reviewed, this is one of the most callous statements I have encountered and is contrary to the literature being sent to customers which suggests that the company cares for the customer.

In one document provided to consumers, the company promises "to recommend only those products and services that fit your needs" and "to explain our loan documents and financial products in non-technical terms that YOU can understand." At the same time, employees are being told not to address concerns you think the customer might have. The depositions of former employees and other documents show that it is a common practice among lenders in the sub-prime market to include credit insurance products in the quotes and documents, and to remove those products from the final deal only when the customer objects or has reached a ceiling on debt load or loan-to-value indicators.

**F.  *The Sub-Prime Credit Market*—**Although there is no universally accepted industry standard for credit grades, most lenders use categories such as "A," "A-," "B," "C," "D" and "F." Consumers with "A" ratings generally have no late mortgage payments and no credit card payments over 30 days delinquent in the last year. At the other end, consumers with "F" ratings are currently in bankruptcy or foreclosure. Although the term "sub-prime" lending means different things to different people, most lenders use the term when referring to "B," "C"

**56**

-14-

and "D" credit. Consumers with "D" credit ratings are generally described as experiencing

problems that are severe.

In recent years there has been a considerable boom in sub-prime lending activity involving

automobiles, home mortgages and even credit cards. In the auto industry there were

approximately 25 sub-prime lenders in 1991. Today there are more than 150. Mortgage

lenders are also vying to make loans to people with shaky credit and sub-prime mortgage loans

are being bundled and securitized. According to one industry publication, the securitization of

sub-prime mortgages increased by 50% from 1996-1997.

And even in the sale of consumer products such as satellite television reception equipment,

private label credit card issuers have established separate programs to identify and market

credit cards to customers who were previously turned down. In some cases the credit card

issuers created the programs in response to dealer complaints that too many customers were

refused credit in an initial application. As one would expect, the risks inherent in sub-prime

lending are reflected in higher interest rates. Sub-prime borrowers are described in industry

material as borrowers who often do not shop around or haggle over terms. Sub-prime

borrowers may be relegated to finding credit at any price.

Lending to sub-prime borrowers was once considered the province of small loan companies,

finance companies and "fringe banks." However, the sub-prime market is now also served by

large mortgage companies, national banks and credit subsidiaries of automobile manufacturers.

57

-15-

Several of the largest national banks provide financing for auto purchasers with impaired credit records, buying used-car loans at a discount from face value. Purchasing the contracts at a discount is also a common practice in sub-prime mortgage lending and even in the acquisition of credit card paper.

Not all sub-prime lenders engage in predatory lending practices and responsible lenders should not be criticized for setting their interest rates at a level that reflects the risk represented by the borrower's credit history. However, the practice of loan flipping and the packing of credit insurance products are common in the sub-prime market, particularly to those people in the "D" range. Some employees have testified in depositions that the more unsophisticated and desperate the borrower, the more likely the company would flip and pack loans. Employees have also testified that in offers for debt consolidation loans, borrowers who were the most desperate were offered additional cash in order to hook the loan. A common outcome among the most predatory lenders in the sub-prime market is that those borrowers who can least afford credit insurance products receive the strongest pitch for the purchase of those products. Those borrowers also are targeted for frequent loan renewals with the lender dangling a few additional dollars as the bait for the loan flip.

Through additional testimony and the other industry material provided, the Committee can get a feel for the predatory lending practices that exist in some parts of the sub-prime market. I will be happy to answer any questions you might have or provide additional material as you study the sub-prime market.

58

The CHAIRMAN. Ms. Bernstein.

### STATEMENT OF JODIE BERNSTEIN, DIRECTOR, BUREAU OF CONSUMER PROTECTION, FEDERAL TRADE COMMISSION, WASHINGTON, DC.

Ms. BERNSTEIN. Thank you, Mr. Chairman, Senator Breaux and Senator Collins. I also thank you for holding this hearing and for the opportunity for me to appear on behalf of the Commission on this very important—critically important—subject.

I must say, having heard these really heart-wrenching stories from the previous witnesses, that it is really hard to fathom, as Senator Breaux said, that there can be people who are so greedy and so callous that they can engage in such work every day. And for Senator Collins—and I know she has had to leave—you can be sure that we will follow up on each of these witnesses' stories and investigate them further.

Like Professor Marsh, I know you have heard a good deal about what is happening in this market and the abuses, so I will make a few points just briefly that are largely based on what the Commission has found in connection with this subprime lending market. Some will be general, some rather more specific, along with some detail about our enforcement efforts and our education efforts.

As has been noted earlier, the subprime mortgage lending market has grown dramatically, and there seem to be a number of reasons why this is occurring. It has really been in the last 3 or 4 years that this has occurred.

First of all, I guess it is obvious that it is very highly profitable. Rates can range as high as 20 to 24 percent. The demand for borrowers has increased enormously; that may have to do with the increasing level of debt among American consumers. Finally, the secondary market opportunities seem to be growing a great deal, infusing a good deal more capital into this market than occurred before.

So, a dramatic set of changes have been produced by this quickly growing market, and a number of large corporations, nationwide corporations, have now entered this market.

We all agree, of course, that it is critically important for consumers to be able to have home loans that they previously could not have had before because they had limited access to credit in the past, and we all want that market to operate cleanly and effectively. But these predatory and abusive practices seem to have proliferated so much that, obviously, I think many steps will need to be taken in order to see to it that the market does not operate in that way.

It is just critically important that consumers be able to trust, as they go about obtaining a loan that the lenders are going to be treating them fairly and honestly.

The reported abusive lending practices on our records cover a wide range. The three that the Commission has found, as others have here today, the most harmful—and I will not detail them because they have already been detailed—are stripping, flipping, and packing.

I would say only one thing in regard to equity stripping, which does result in the most injury to consumers, that it almost seems as if a loan that is based on equity in a property rather than on income to repay the loan has got to be designed to fail, designed to seize the equity.

The others have been described; Professor Marsh described the packing. We have already addressed that in enforcement efforts at the Commission, and we intend to continue to do that. And flipping obviously just continues to escalate the borrowers' debt over and over again in ways they cannot possibly deal with and increases the prospect of losing the equity.

All of those—stripping, flipping, and packing—are practices that occur before the loan is closed. To add insult to injury—and not much has been said about this—after the loan is closed, consumers may be subject to what is called "loan servicing practices", that is, practices that extract additional moneys not owed under the loan terms or that inhibit refinancing options with another, perhaps legitimate, lender. They may add fees and charges that are not owed to the monthly payment demands—you just get a notice saying you owe more than we said you owed before.

The complexities of loan terms are such that it is really very difficult for an individual borrower to be able to know exactly what the payment demands are and whether they are accurate or not.

So a lender may fail to provide full or accurate payoff information to consumers—we have experience with that—and that makes it difficult for borrowers to refinance with another lender.

You also heard about forgeries earlier today, and of course, it has been acknowledged that that is a criminal offense. The other practices are and can be subject to civil enforcement which the FTC enforces, namely, Truth-in-Lending, the Equal Credit Opportunity Act, HOEPA, and Section 5 of the FTC Act.

I will briefly summarize here so as not to use up the time, but the Commission brought a major lawsuit in January of this year, filed a complaint in District Court against Capital City Mortgage Corporation, a DC. area mortgage lender, and its owner. Almost all of the abuses that have been described were incorporated into that complaint, and it is in litigation at the moment.

Last year, we also settled a case against The Money Tree, a consumer finance lender, and its president. That case involved allegations that the company required consumers to purchase credit-related insurance and other extras with their loans without disclosing to consumers the true cost of the credit.

In addition to our enforcement efforts, we are also working with State and local agencies in order to be sure that we are all fully enforcing the law and have issued today a new consumer fact statement called "Borrowers Beware," which describes the practices we have talked about and also much more detail about what these loans are and are not, and how to avoid getting into problems with them.

We also have an FTC help line, FTC–HELP, which we urge consumers to call to tell us what their problems are so we can follow up on them; that is how we hear about them. And we have a web page, www.ftc.gov, which consumers hopefully will use to tell us

60

their problems, their experiences, and in many instances, I hope we will be able to be of some additional help to them.

Thank you.

The CHAIRMAN. Thank you, Ms. Bernstein.

[The prepared statement of Ms. Bernstein follows:]

## PREPARED STATEMENT OF THE
## FEDERAL TRADE COMMISSION

before the

## SENATE SPECIAL COMMITTEE ON AGING

on

Home Equity Lending Abuses in the Subprime Mortgage Industry

March 16, 1998

## I.   INTRODUCTION

Mr. Chairman and members of the Committee:  I am Jodie Bernstein, Director of the Bureau of Consumer Protection of the Federal Trade Commission.[*]  I appreciate the opportunity to appear before you today on behalf of the Commission to discuss the serious problem of abusive lending practices in the subprime mortgage lending industry.  These comments do not address those lenders within the subprime mortgage industry who play by the rules and provide an important source of capital to various segments of borrowers.  I will discuss the recent growth of this industry, abusive lending practices that reportedly are occurring in the industry, and the Commission's recent activities in this area.  First, however, let me briefly speak about the Commission's role in enforcing laws that bear on these problems.

The Commission has wide-ranging responsibilities concerning nearly all segments of the economy.  As part of its mandate to protect consumers, the Commission enforces the Federal Trade Commission Act ("FTC Act"), which broadly prohibits unfair or deceptive acts or practices.[1]  The Commission also enforces a number of laws specifically governing lending practices, including the Truth in Lending Act ("TILA"),[2] which requires disclosures and establishes certain substantive requirements in connection with consumer credit transactions, and the Equal Credit Opportunity Act ("ECOA"),[3] which prohibits discrimination against applicants for credit on the basis of age, race, sex, or other prohibited factors.  The Commission has jurisdiction over most non-bank lenders.[4]  In addition to our enforcement duties, the Commission

---

[*]       The views expressed in this statement represent the views of the Commission. Responses to any questions you have are my own, however, and do not necessarily reflect the Commission's views or the views of any individual Commissioner.

also satisfies many requests for information about credit issues and consumer credit laws from consumers, industry, state law enforcement agencies, and the media.[5]

We increasingly are hearing reports of problems in the home equity loan business, and the Commission is working in a number of ways to address them.  Commission strategies include law enforcement activities, often coordinated with other law enforcement officials, and consumer education.  It is crucial that as many consumers as possible have access to capital, but, at the same time, this access must not be hindered by deceptive or other unlawful lending practices.

## II.     THE SUBPRIME MORTGAGE INDUSTRY

Subprime lending refers to the extension of credit to higher-risk borrowers, a practice also commonly referred to as "B/C" or "nonconforming" credit.[6]  Loans to subprime borrowers serve communities that may have been underserved by other lenders in the past.  In recent years, subprime mortgage lending has grown dramatically, with over 90% of all subprime mortgage loans made in or after 1993.[7]  By the end of 1996, the total value of outstanding subprime mortgage loans exceeded $350 billion.[8]  In 1997 alone, subprime lenders originated over $125 billion in home equity loans.[9]  Subprime loans have become a significant and growing part of the home equity market.  Subprime originations constituted 11.5% of the total home equity lending market in 1996; by the first half of 1997, they had grown to 15.5% of this market.[10]  At the same time, the composition of companies involved in the subprime market is evolving.  One of the dramatic changes in this market has been the growth in subprime mortgage lending by large corporations that operate nationwide.[11]

**64**

The subprime mortgage market has flourished because such lending has been profitable, demand from borrowers has increased, and secondary market opportunities are growing.  Lenders typically price subprime loans to consumers at rates of interest and fees higher than conventional loans.[12]  Higher rates and points can be appropriate where greater credit risks are involved, as is often the case with subprime loans.[13]  Critics assert, however, that the interest rates and fees charged by some subprime lenders are excessive, and much higher than necessary to cover increased risks, particularly since these loans are secured by the value of a home.[14]  Some attribute lenders' high rates on first mortgages in part to federal deregulation of certain state interest rate ceilings in 1980.[15]

The relatively high profit margins in the subprime mortgage industry have fueled demand in the secondary market from investors seeking higher-yielding securitized assets, especially in an environment of generally low interest rates.[16]  In 1996, the subprime mortgage sector issued over $38 billion in securities, the largest increase in securitizations for any lending industry sector in that year.[17]  The secondary market's expansion has, in turn, helped to sustain growth in the industry by enabling lenders to raise funds on the open market to expand their subprime lending activities.[18]  Freddie Mac, one of the primary government-sponsored enterprises involved in the purchase of mortgages, recently announced plans to enter the secondary market in subprime loans by purchasing significant numbers of "A minus" subprime mortgages by 1998 and the higher-risk "B and C" loans by 1999.[19]

The market for subprime loans is expected to continue growing.  Credit card delinquencies are rising and personal bankruptcies are at record levels, which negatively affect borrowers' credit histories, pushing more consumers into higher risk categories.  Meanwhile,

consumer spending continues to be strong.[20]  Together, these factors increase the market for

subprime loans.  In addition,  more borrowers generally may be seeking home equity loans due to

the change in the tax code limiting allowable interest deductions to those on a first mortgage.


## III.    THE PROBLEM OF ABUSIVE LENDING PRACTICES

The enormous growth of the subprime mortgage industry has enabled many consumers to

obtain home loans who previously would have had much more limited access to the credit

market.[21]  Questions increasingly are being raised, however, about certain lending practices, often

referred to as predatory lending, that reportedly are occurring in the subprime mortgage market

and about their effect on the most vulnerable consumers.[22]  These abusive lending practices often

involve lower-income and minority borrowers.[23]  Elderly homeowners, in particular, are frequent

targets of some subprime home equity lenders, because they often have substantial equity in their

homes, yet have reduced incomes.[24]  In many cases, those living in lower-income and minority

neighborhoods -- where traditional banking services continue to be in short supply -- tend to turn

to subprime lenders regardless of their credit history.[25]  While subprime lenders point out that

they are expanding access to credit to individuals who otherwise would be shut out of the market

and consumers whose credit histories make them too risky for conventional loans, such lenders

are in a position to take advantage of the consumers in the weakest bargaining position.

It is critically important for all consumers, especially those who live in lower-income

communities, to have access to capital.  Access that is based on deceptive mortgage lending,

however, is false access.  Deceptive lending practices hide from consumers essential information

they need to make decisions about their single greatest asset -- their home -- and the equity they

have spent years building.[26]  Deceptive lending practices are particularly devastating because these loans usually are sought at a time of great need, when borrowers are most susceptible to practices that can strip them of substantial sums of money and, ultimately, their homes.

Reported abusive lending practices in the subprime mortgage market cover a wide range. We will mention here a few highlighted in recent reports.  While the reported practices are quite varied, there are common traits.  They generally aim either to extract excessive fees and costs from the borrower or to obtain outright the equity in the borrower's home.

Among the most harmful of these reported practices is "equity-stripping."  This often begins with a loan that is based on equity in a property rather than on a borrower's ability to repay the loan -- a practice known as "asset-based lending."[27]  As a general rule, loans made to individuals who do not have the income to repay such loans usually are designed to fail; they frequently result in the lender acquiring the borrower's home equity.  The borrower is likely to default, and then ultimately lose her home through foreclosure or by signing over the deed to the lender in lieu of foreclosure.  Such a scheme is particularly damaging because these vulnerable borrowers often have no significant assets except the equity in their homes.[28]

Another practice of serious concern is "packing," the practice of adding credit insurance or other "extras" to increase the lender's profit on a loan.[29]  Lenders often stand to make significant profits from credit insurance, and therefore have strong incentives to induce consumers to buy it as part of the loan.[30]  At the same time, observers have questioned the value to consumers who obtain the insurance in conjunction with their loans, given the high premium cost and comparatively low claims rate.[31]

Typically, the insurance or other extra is included automatically as part of the loan package presented to the borrower at closing, and the premium is financed as part of the loan. The lender often fails to provide the borrower with prior notice about the insurance product [32] and then rushes the borrower through the closing. Sometimes, the lender represents that the insurance "comes with the loan," perhaps implying that it is free. Other times, the lender simply may include the insurance in the loan closing papers with no explanation. In such a case, the borrower may not understand that the insurance is included or exactly what extra costs this product adds to the loan. Even if the borrower understands and questions the inclusion of the insurance in the loan, subprime borrowers are not in a position to negotiate loan terms. They often need to close the loan quickly, due to high debt and limited financial resources. Therefore, they generally will not challenge the loan at closing if they believe or are told that any changes may cause a problem or delay in getting the loan.

Lenders are permitted to require the purchase of credit insurance with a loan, as long as they include the price of the premium in the finance charge and annual percentage rate. In some instances, however, the lender effectively requires the purchase of credit insurance with the loan, but fails to include the premium in disclosures of the finance charge and annual percentage rate, as mandated under the Truth in Lending Act.[33] When the lender excludes the required insurance premium from the borrower's disclosures, the cost of credit may appear significantly lower than the true cost of the credit. As a result, the consumer cannot make an informed decision about the cost of the loan.[34]

Another practice that has recently received attention is some subprime mortgage lenders engaging in "flipping," the practice of inducing[35] a consumer to refinance a loan, repeatedly,

often within a short time frame, charging high points and fees each time.[36]  This causes the

borrower's debt to steadily increase.  Although a consumer's debt may be on the rise anyway if

she borrows money in connection with the refinancing, in some cases, the amount of cash

received may be smaller than the additional costs and fees charged for the refinancing.  While a

consumer's option to refinance is an integral part of a functioning mortgage market, subprime

lenders engaged in "flipping" may misrepresent to the borrower the terms and ultimate benefits

of the transaction, or induce the borrower to take on more debt than she can handle.  By taking

advantage of its unequal relationship with a particularly vulnerable consumer, an unscrupulous

lender can compromise a borrower's ability to make an informed choice about financing

options.[37]

Another reported abuse in the subprime mortgage industry is the targeting of consumers

by home improvement contractors who are effectively working as agent. of lenders.[38]  One

alleged abuse involves contractors who may obtain the borrower's consent for a loan with high

rates and fees through the use of deception or coercion.  For example, the contractor and

homeowner may agree on a price for certain work.  The contractor, after beginning work on the

home, may then present the homeowner with loan documents from the lender indicating higher

rates and fees than those that were agreed upon.  The consumer is then pressured to sign the

papers as drafted -- especially when faced with the untenable prospect of leaving the

improvements unfinished.  In another reported scenario, the contractor may receive the loan

proceeds directly or indirectly from the lender without providing any services to the homeowner,

or without providing services commensurate with the amount of the payment.  Nevertheless, the

lender may still demand full payment from the homeowner.

Abusive practices by home improvement contractors and their affiliated lenders[39] are particularly problematic because the targeted homeowners often start out with no mortgage at all or a market-rate first mortgage that they later are induced to refinance. Because of the home improvement scheme, however, a homeowner with an affordable mortgage or no mortgage, and who is seeking aluminum siding or new windows, may suddenly find herself with a high-cost home equity loan.[40]

After a loan is closed, consumers may be subject to loan servicing practices that extract monies not owed under the loan terms or that inhibit refinancing options with another lender.[41] A lender may provide inaccurate monthly-payment demands, adding fees and charges that are not owed. Because of the complexities of loan terms, it is difficult for the borrower to know whether the lender's payment demands are accurate. A lender also may fail to provide full or accurate pay-off information. Consequently, the borrower becomes tied to a lender without a means of escape.[42]

Some of these reported abusive lending practices may be illegal under various federal or state laws, including a number of laws enforced by the Commission. Depending on the particular facts, some of the practices may constitute deceptive or unfair practices in violation of Section 5 of the FTC Act or a comparable state statute. In addition, these practices may constitute violations of the TILA, as well as violations of the protections for high-rate and high-fee loans under the Home Ownership and Equity Protection Act ("HOEPA"), an amendment to the TILA that became effective in October 1995.[43] If a lender charges similarly-qualified borrowers higher prices based on age, race, and/or sex, such a practice would constitute pricing discrimination in

violation of the ECOA.[44]  Additionally, if a lender targets borrowers for abusive practices based on age, race and/or sex, such targeting, depending on the facts, also could violate the ECOA.

## IV.    THE COMMISSION'S RESPONSE

Given this background, the Commission is taking a variety of steps to address reported abuses in the subprime home equity market.  First, the Commission is increasing its enforcement activities to halt subprime lenders who are engaged in abusive lending practices.  At the same time, the Commission has been working with states to increase and coordinate enforcement efforts.  The Commission also is educating consumers in order to help them avoid potential home equity lending abuses.

In January 1998, the Commission filed a complaint in the United States District Court for the District of Columbia against Capital City Mortgage Corporation, a Washington, DC-area mortgage lender, and its owner, alleging numerous violations of a numb r of federal laws resulting in serious injury to borrowers, including the loss of their homes.[45]  The company allegedly made home equity loans to minority, elderly, and low-income borrowers at interest rates as high as 20-24 percent.  Borrowers often faced foreclosure on their properties, after which the company would buy the properties at auction for prices much lower 'han the appraised value of the properties.

The Commission's complaint alleges that the defendants engaged in deceptive and unfair practices against borrowers at the beginning, during, and at the end of the lending relationship, in violation of Section 5 of the FTC Act.  The complaint alleges that the defendants deceived borrowers about various loan terms; for example, by making representations that a loan was an

amortizing loan that would be paid off by making payments each month. In fact, the loan was an interest-only balloon loan with the entire loan principal amount due after all of the monthly payments were made. The complaint also alleges that the defendants deceived borrowers during the loan period with phony charges of inflated monthly payment amounts, overdue balances, arrears, service fees, and advances. In addition, the complaint alleges that the defendants deceived borrowers regarding amounts owed to pay off the loans. Further, the complaint alleges that the defendants violated the FTC Act by: withholding some loan proceeds while requiring a borrower to make monthly payments for the entire loan amount; foreclosing on borrowers who were in compliance with their loan terms; and failing to release the company's liens on title to borrowers' homes even after the loans were paid off. In addition to the Commission's allegations of violations of the FTC Act, the Commission also charged the defendants with violations of the TILA, the Fair Debt Collection Practices Act,[46] and the ECOA.[47]

In the area of loans sold with credit insurance, the Commission has a long enforcement history. Most recently, the Commission settled a case last year against The Money Tree, a Georgia-based consumer finance lender, and its president. The case involved, in part, allegations that the company required consumers to purchase credit-related insurance and other "extras" along with their loans, without disclosing to consumers the true cost of their credit. The settlement, in part, requires Money Tree to offer refunds of certain insurance premiums to customers whose loans were open at the time the settlement became final. It also mandates that the company approve borrowers' loan applications prior to any discussion with the borrower regarding credit insurance and requires that the company provide expanded disclosures.[48] In 1992, the Commission approved a consent agreement with Tower Loan of Mississippi settling

similar charges regarding its consumer loans.[49]  The Commission is using the knowledge it has

developed through the Money Tree and Tower Loan cases, as well as earlier enforcement

actions,[50] to investigate potential insurance problems in home equity lending.

In addition to its casework and ongoing investigations, the Commission is sharing its

knowledge and experience with other enforcement agencies and with consumers.  Last year, the

Bureau of Consumer Protection's Division of Credit Practices held joint law enforcement

sessions on home equity lending abuses with state regulators and law enforcers in six cities

around the country.  These training sessions were conducted to assist states in exercising their

relatively new enforcement authority under HOEPA[51] and to share information about recent

trends.

In the area of consumer education, the Commission has developed a brochure focusing on

consumer rights under HOEPA, for high-rate, high-fee loans covered by that law.  In conjunction

with the filing of the Capital City complaint, the Commission began distributing a Consumer

Alert, advising consumers on how to avoid home equity scams.  The Commission today is

releasing a new consumer education brochure with additional advice for consumers on home

equity abuses.


**V.    CONCLUSION**

The Commission recognizes that abuses in the home equity lending market are a serious

national problem.  Due to sharp growth in the subprime mortgage industry, it appears that the

abuses by subprime lenders are on the rise.  As a result of unfair and deceptive practices, and

other federal law violations by certain lenders, vulnerable borrowers -- including the elderly --

are facing the possibility of paying significant and unnecessary fees and, in some cases, losing their homes.  Using its enforcement authority, the Commission continues to work to protect consumers from these abuses.

74

**ENDNOTES**

1.   <u>See</u> 15 U.S.C. § 45(a).

2.   <u>See</u> 15 U.S.C. §§ 1601 et seq.

3.   <u>See</u> 15 U.S.C. § 1691.

4.   <u>See, e.g.</u>, 15 U.S.C. § 45(a); 15 U.S.C. § 1607.

5.   A number of the remarks in this testimony are based on the Commission's administrative and enforcement experience in the area of home equity lending, including consultations with individual consumers, consumer groups, and industry.

6.   Credit to "prime" borrowers, borrowers generally with good credit histories, is referred to as "A" credit. "A" mortgage loans are those that conform to the secondary market standards for purchase by the government-sponsored entities, Fannie Mae and Freddie Mac (although Freddie Mac now is purchasing "A minus" subprime loans).

7.   <u>See</u> Martin Wahl and Craig Focardi, *The Stampede*, <u>Mortgage Banking</u>, Oct. 1997, at 26, 31.  This figure stands in contrast with an increase of 61% in the prime mortgage market for approximately the same period.

8.   <u>See</u> Wahl and Focardi, <u>supra</u> note 7, at 31.

9.   <u>See</u> *Top 25 B & C Lenders in 1997,* <u>Inside B & C Lending</u>, Feb. 16, 1998, at 2.

10.   <u>See</u> Wahl & Focardi, <u>supra</u> note 7, at 29.  The number of mortgage brokers in this market skyrocketed from 500 in 1985 to 20,000 in 1996.  <u>See</u> *The Two Faces of B&C Lending,* <u>Am. Banker</u>, May 6, 1997, at 2A.

11.   <u>See</u> *Home Loan Leaders*, <u>Am. Banker</u>, Oct. 7, 1997, at 16A, 20A; Timothy L. O'Brien, *Lowering the Credit Fence*, <u>N.Y. Times</u>, Dec. 13, 1997, at B1; Adam Zagorin, *Sub-Prime Time*, <u>Time</u>, Nov. 4, 1996, at 67.

12.   <u>See</u> Paul Muolo, *Profits Put Sizzle in Subprime Lending*, <u>U.S. Banker</u>, Aug. 1997, at 62. Following a recent boom, earnings in the subprime home equity market generally dipped in the fourth quarter, although many companies' profits already are back on the rise.  <u>See</u> Heather Timmons, *Home Equity Sector Rises After Do-or-Die Quarter*, <u>Am. Banker</u>, Feb. 5, 1998, at 9.

13.   Many subprime lenders justify their rates and fees on this basis.

14.   <u>See</u> O'Brien, <u>supra</u> note 11, at B3.

15.   <u>See, e.g.</u>, Norma Paz Garcia, <u>Dirty Deeds:  Abuses and Fraudulent Practices in Los Angeles' Home Equity Market</u>, Consumers Union, October 1995, at 25; Mike Hudson, *Stealing*

14

*Home*, <u>Wash. Monthly</u>, June 1992, at 23, 26.  Congress removed federal interest rate ceilings and preempted many state usury laws on first lien mortgages with passage of the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C. § 1735f-7.

16.     <u>See</u> Wahl & Focardi, <u>supra</u> note 7, at 29.

17.     <u>See</u> *Record B & C Securitization Seen in 1996*, <u>Inside B & C Lending</u>, Feb. 17, 1997, at 4.

18.     <u>See</u> Wahl & Focardi, <u>supra</u> note 7, at 29.  Growth in subprime originations also has been facilitated somewhat by the increasing availability of warehouse lines of credit, which provide short-term funding to lenders for the purpose of loan financing.  <u>See</u> *Warehouse Lines of Credit: Limited for B & C Lenders?*, <u>Inside B & C Lending</u>, Feb. 17, 1997, at 9.

19.     <u>See</u> *Subprime Loans Supreme*, <u>ABA Banking J.</u>, Nov. 1997, at 77; *Freddie Mac Announces Aggressive Timetable for Full Involvement in Subprime Mortgage Business*, <u>Inside Mortgage Fin.</u>, Oct. 10, 1997, at 3.  In the letter-grade system for categorizing risk, which ranges from "A" through "D," borrowers who are the most creditworthy are "A"credit risks and those who present the worst credit risks are "D" credit risks.  The subprime market generally refers to loans below the "A" level, however the criteria for each credit category are not standardized across the industry and therefore differ among subprime lenders.

20.     <u>See</u> Kim Clark, *Why So Many Americans Are Going Bankrupt*, <u>Time</u>, Aug. 4, 1997, at 24; Thomas Goetz, *Loan Sharks, Inc.*, <u>Village Voice</u>, July 15, 1997, at 33, 54; Michael Markowitz, *U.S. Bankruptcies At Record Level*, <u>Bergen County Rec.</u>, Jan. 8, 1998, at A1; *Nothing Sub-Prime About These Profits*, <u>Business Week</u>, Sept. 4, 1995, at 98; *The Two Faces of B&C Lending*, <u>supra</u> note 10 at 2A.

21.     A full discussion of the entire subprime market is beyond the scope of this testimony.

22.     Attention to practices of subprime lenders also has increased due to lawsuits challenging lender payments to brokers under the Real Estate Settlement Procedures Act ("RESPA").  <u>See generally</u> <u>Culpepper v. Inland Mortgage</u>, 132 F.3d 692 (11th Cir. 1998); <u>Barbosa v. Target Mortgage Corp.</u>, 968 F. Supp. 1548 (S.D. Fla. 1997); <u>Mentecki v. Saxon Mortgage Inc.</u>, Civ. No. 96-1629-A, U.S. Dist. LEXIS 1197 (E.D. Va. January 10, 1997);  <u>see also</u> Carol M. Cropper, *Even With Mortgage Brokers, Let the Borrower Beware*, <u>N.Y. Times</u>, Sept. 8, 1996, § 3, at 8.

23.     <u>See</u> Complaint at 6, <u>F.T.C. v. Capital City Mortgage Corp.</u>, No. 1:98-CV-00237 (D.D.C. filed Jan. 29, 1998); Goetz, <u>supra</u> note 20, at 33; Anastasia Hendrix, *Oakland Widow:  They Stole My House*, <u>S.F. Examiner</u>, Apr. 13, 1997, at A-1; O'Brien, <u>supra</u> note 11, at B3; Kay Stewart & David Heath, *High-Cost Loans Trap Those Least Able To Afford It*, <u>Louisville Courier-Journal</u>, Feb. 16, 1997, at 16-17; Lucille Renwick, *Wolf at the Door*, <u>L.A. Times</u>, Mar. 14, 1993, at 16.

24.     For example, the Department of Justice announced a settlement in September 1996 with Long Beach Mortgage Company addressing allegations, *inter alia*, that the company

**76**

discriminated against the elderly, African Americans, Latinos, and women by charging higher rates than were offered to other similarly-qualified borrowers. The combination of these factors was alleged to be crucial. For example, African American females over the age of 55 were 2.6 times more likely than white males under age 56 to be charged fees and points that amounted to 6% or more of the loan amount. See Complaint, United States v. Long Beach Mortgage, Civ. No. 96-6159DT (CWX) (C.D. Cal. filed Sept. 5, 1996).

25.    See Goetz, supra note 20, at 34.

26.    Fifty-eight percent of seniors living below the federal poverty level own their own homes. Derived from U.S. Dept. of Commerce & U.S. Dept. of Housing and Urban Development, American Housing Survey of the United States, 1993. Thirty-nine percent of all families below the federal poverty level own their own homes. Derived from U.S. Dept. of Commerce & U.S. Dept. of Housing and Urban Development, American Housing Survey for Selected Metropolitan Areas, 1991-94.

27.    *Hearings Before the Federal Reserve Board on the Effect of Truth in Lending Act Provisions Enacted in 1994 on the Home Equity Loan Market*, June 17, 1997 (testimony of Elizabeth Renuart, National Consumer Law Center).

28.    While the TILA, as amended by the Home Ownership and Equity Protection Act, prohibits a pattern or practice of asset-based lending, this proscription only applies to the narrow set of high-rate and high-fee loans covered by the statute and does not apply at all to purchase-money loans. See 15 U.S.C. § 1639; 12 C.F.R. § 226.32. For a discussion of HOEPA's requirements, see infra note 43.

29.    See The Money Tree, No. C3735 (F.T.C. Apr. 28, 1997) (settling allegations that credit insurance and other "extras" were required but not included in finance charge and APR disclosures in violation of the TILA and, in certain instances, the FTC Act); Tower Loan of Mississippi, 115 F.T.C. 140 (1992) (same).

30.    The guidelines established by the National Association of Insurance Commissioners suggest that lenders and insurers may retain up to 40 cents on the dollar from premiums paid by borrowers, with 60% of premium payments paid out for claims. In most states, however, lenders and insurers retain more than 40% of premium monies; in some states, they keep up to 70% or 80% of the proceeds. See Jane Bryant Quinn, *Credit Life Insurance Often Overpriced*, Wash. Post, Feb. 9, 1997, at H2.

31.    See Mike Hudson, *Credit Insurance: Overpriced and Oversold*, N.Y. Times, July 3, 1994, at 8 (discussing overcharging for credit insurance policies). Concerns regarding the value and marketing of credit insurance date back to the 1970's. See Charles Hassell, *Credit Insurance Problems*, National Association of Attorneys General Consumer Protection Newsletter, May 15, 1975, Vol. 3, No. 5, at 11 (finding that lenders often do not disclose to borrowers material facts about policy provisions and exclusions); Phillip Stern, *Debt Insurance Charges*, Wash. Post,

16

Nov. 12, 1974, at A9 (asserting that purchasers of credit life insurance were overcharged a total of $615 million in 1973).

32.     This scenario is known as "bait and switch," because the closing papers differ from the loan package previously discussed with the borrower.

33.     <u>See</u> 12 C.F.R. § 226.4(b)(7). Typically, lenders can easily induce borrowers to sign a line in the thick package of complex loan closing papers indicating that the purchase of insurance is voluntary when, in fact, they have little choice if they want to close the loan at that time. Whether credit insurance is in fact required or optional is a factual question. <u>See</u> Federal Reserve Board, Official Staff Commentary to Regulation Z, § 226.4(d)(5).

34.     Lenders have incentives to omit required credit insurance premiums from the disclosures of the annual percentage rate and finance charge. First, the appearance of a lower rate may induce the borrower to follow through on the transaction. Second, the lower figure may cause the lender's annual percentage rate to appear to fall below state rate ceilings, which it may in actuality be exceeding.

35.     One method of inducing a borrower to refinance is by issuing a balloon note -- particularly one in which the borrower is paying only interest -- where the note comes due in a relatively short period of time. When the note comes due and the borrower owes a substantial lump sum -- sometimes equal to the entire principal of the original loan-- the borrower must again obtain a loan in order to finance the balloon payment that is due at that time.

36.     <u>See, e.g.</u>, Kay Stewart, *Widow Sold Her House To Pay Loan She d Hoped Would Ease Her Debts*, <u>Louisville Courier-Journal</u>, Feb. 16, 1997, at 16 (lender refinanced borrower's loan four times in nine months). Lenders in the consumer finance industry have long relied on refinancing, and sometimes repeated refinancing, as a source of business. <u>See</u> W. Artz & R. Neihengen, Jr., *Analysis of Finance Company Ratios in 1994,* 78 J. Commercial Lending 33, 37 (Sept. 1995) (showing that, from 1990 to 1992, companies refinanced existing loans to present borrowers in a range of 63% to 66.8% of the cases); <u>Report of the Presiding Officer on Proposed Trade Regulation Rule: Credit Practices</u>, Federal Trade Commission, Aug. 1978, at 43-44 (creditors self-reported refinancing loans for existing customers in a range of 35% to 75% of accounts, with an average of 56.5%).

37.     <u>See, e.g.</u>, <u>Emery v. Am. Gen. Fin.</u>, 71 F.3d 1343 (7th Cir. 1995) (noting that disclosures do not wholly protect a vulnerable borrower from misrepresentations in connection with loan refinancing and holding that flipping can present a civil cause of action under RICO).

38.     <u>See</u> Complaint, <u>Newton v. United Cos. Fin. Corp.</u>, Civ. No. 97-CV-5400 (E.D. Pa. filed Sept. 2, 1997) (class action suit on behalf of low-income borrowers who paid fees and charges of up to 50% of the cost of the home improvements); Complaint, <u>Harris v. Green Tree Fin. Corp.</u>, Civ. No. 97-CV-1128 (E.D. Pa. filed Feb. 14, 1997) (class action suit challenging deceptive home improvement loan contracts); <u>see also</u> Stuart L. Ditzen, *From Home Loans to Lawsuits*,

17

<u>Phila. Inquirer</u>, Dec. 17, 1997, at B1.

39.    Although a consumer targeted by a home improvement contractor often has no direct contact with the lender, the consumer generally still can bring an action against the lender. The contractor, pursuant to the Commission's Trade Regulation Rule on Preservation of Consumer Claims and Defenses, known as the Holder Rule, is obligated to include in the consumer's loan documents a provision stating, in part, that "any holder of [that] consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services . . . ." <u>See</u> 16 C.F.R. § 433.2. Therefore, depending on the facts of a particular case, the lender could be subject to any claims that the borrower could have brought against the contractor. If the contractor omits this language from the loan documents, the omission itself would constitute a violation of the Holder Rule.

40.    Lenders have several incentives to refinance a homeowner's existing mortgage rather than to merely originate a new loan for the home improvements. First, lenders generally seek to originate one combined loan rather than only a second mortgage for the smaller cost of the improvements. This allows the lenders to maximize fees that are obtained based on the loan principal. Second, lenders generally prefer the initial lien position because of the benefits that would accrue to them in the event of a borrower's bankruptcy. Third, under current federal law, state usury caps do not apply to first liens. <u>See</u> 12 U.S.C. § 1735f-7.

41.    <u>See</u> Complaint at 11-13, <u>F.T.C. v. Capital City Mortgage Corp.</u>, No. 1:98-CV-00237 (D.D.C. filed Jan. 29, 1998). See <u>infra</u> note 45 and accompanying text for a discussion of this case.

42.    A borrower also may be tied to a lender if the lender's appraisal intentionally and significantly overvalues the property because the borrower's loan-to-value ratio may be too high for refinancing. This is known as a "bumped appraisal."

43.    HOEPA prohibits various practices and requires that certain material disclosures be provided in advance for certain home equity loans. HOEPA applies only to loans where the APR exceeds the comparable Treasury security rate by more than 10 percentage points or where the total fees and points exceed the larger of $435 or 8 percent of the total loan amount. (The $435 figure is applicable to 1998 and is updated annually by the Federal Reserve Board.) If a loan meets this considerable threshold, a lender must provide several special disclosures of loan terms and conditions. In addition, the loan may not be based solely on equity and may not include, <u>inter alia</u>: negative amortization, most pre-payment penalties, balloon payments for loans with less than five-year terms, and default interest rates higher than pre-default rates. HOEPA does not apply to purchase money, reverse mortgage, or open-end mortgage loans. <u>See</u> 15 U.S.C. § 1639; 12 C.F.R. § 226.32.

44.    See <u>supra</u> note 24 for a discussion of the Department of Justice's settlement with Long Beach Mortgage.

45.    See Complaint, F.T.C. v. Capital City Mortgage Corp., No. 1:98-CV-00237 (D.D.C. filed Jan. 29, 1998).

46.    See 15 U.S.C. § 1692.

47.    See also Complaint, F.T.C. v. Nationwide Mortgage Corp., Civ. No. 85-0976 (D.D.C. filed Mar. 26, 1985); Complaint, F.T.C. v. R. A. Walker and Assoc., Civ. No. 83-2462 (D.D.C. filed October 5, 1983).  In Nationwide, the Commission alleged that Nationwide solicited consumers whose mortgages were in default and offered them one-year, interest-only loans with balloon payments of the entire loan balance due at the end of the year.  The complaint alleged that Nationwide's practices were deceptive and violated Section 5 of the FTC Act because Nationwide told consumers falsely that they would be able to obtain refinancing at the end of the year.  The complaint also alleged violations of the TILA based on Nationwide's alleged failure to disclose the balloon payment and the company's alleged practice of inducing some consumers to sign statements indicating their loans were for business purposes, which are exempt from TILA protections, when in fact they were consumer loans.  In R. A. Walker, the complaint alleged that Rita Walker solicited consumers whose mortgages were in default, persuaded them to transfer title to their property to Walker, and engaged in unfair and deceptive practices in violation of Section 5 by falsely claiming that the transfer of title was a temporary measure to avoid foreclosure and that Walker would obtain financing for the consumers that would allow them to remain in their homes.

48.    See The Money Tree, No. C3735 (F.T.C. Apr. 28, 1997).

49.    See Tower Loan of Mississippi, 115 F.T.C. 140 (1992).

50.    See, e.g, Commercial Credit Co., 82 F.T.C. 1841 (1973), order re opened and modified, 98 F.T.C. 783 (1981).

51.    States also have authority to enforce HOEPA.  See 15 U.S.C. § 1640 (e).

The CHAIRMAN. Mr. Brennan, thank you for being here.

## STATEMENT OF WILLIAM J. BRENNAN, JR., DIRECTOR, HOME DEFENSE PROGRAM, ATLANTA LEGAL AID SOCIETY, ATLANTA, GA

Mr. BRENNAN. Mr. Chairman, members of the committee, thank you for giving me the opportunity to address the committee on the issue of predatory mortgage lending practices targeted at elderly homeowners.

We are grateful that you are holding these hearings—and when I say this, I do not speak just for myself as a legal services attorney, but for nonprofit housing counselors, legal services attorneys around the country, private attorneys who represent homeowners targeted with predatory scams, and community activists who are addressing this issue. I think this is the first time there has been a concerted effort by the Congress to really look into these practices and see what is going on. We are most grateful for your interest and your willingness to shine the light of day on these sleazy practices that are especially harmful to elderly homeowners, who should be living out their lives in peace and quiet but instead are subjected to this kind of stress.

The CHAIRMAN. If we had followed your work over the last few years, we probably would have arrived here sooner.

Mr. BRENNAN. Thank you, Senator. Nonetheless, we are grateful that you are looking at it now.

As you said, Mr. Chairman, I have been a legal services lawyer for 29 years and have been doing this work for the past 10 years. I have been struck by the fact that this was not going on 7 or 8 years ago, or 10 years ago. What we were seeing then was people with finance company problems, but these were signature loans of under $3,000. It is when the finance companies and other high-cost mortgage lenders got into the subprime mortgage lending business that the trouble started.

On a daily basis, my associate, Karen Brown, who is here today and is another legal services attorney, two paralegals and a part-time secretary and I are inundated with cases of mostly elderly homeowners who come into our offices telling us that they are losing their homes.

I must say that I am really angry that I have to use this "Atlanta Foreclosure Report" daily to look up their names to see if they are being foreclosed on next month, because if they are being foreclosed on the first Tuesday of the next month, we have a serious problem, and we have got to stop everything and try to find a way to save their house.

The names of those large national companies that are listed in here as foreclosing month after month are frequent. The foreclosure rate of these companies is much higher than the foreclosure rate of conventional mortgage companies. So we are really in the business of trying to save houses, and this should not have to be.

Why is it happening? Having done this for so long, we start coming to conclusions. The fact that people have high equity in their homes is a major factor, caused by the fact that elderly people have paid their mortgages down and the fact that values of houses have increased.

81

The lack of enforcement of consumer protection laws, or the absence of consumer protection laws, are major factors. Another major factor is the redlining practices of some banks which create credit-starved communities where the predatory lenders can go and take advantage of people who do not have access to credit at reasonable rates.

Finally, we know the profits for these lenders are just enormous; they are incredibly high. And these profits are multiplied by the fact that many of these companies are bundling together their mortgages and selling them to investors as asset-backed securities on Wall Street.

I have said why we think it happens. Now let me describe for you our typical elderly client. We have elderly homeowners who, as I say, tend to have substantial equity in their homes, but they live on fixed incomes—Social Security or retirement benefits. Their homes may be in need of expensive repair. They have retired, so they have stopped fixing the roof. Or, I have so many clients who are widows. Their husbands used to do a lot of work around the house. Usually, it is a roof. I have had so many cases where people have been scammed because home improvement contractors working with predatory lenders approached them about roofing work.

We have homeowners who have fallen behind in their property taxes or have incurred substantial medical bills not covered by Medicare or Medicaid or health insurance. Again, we have widows who have suffered a loss of income after the death of their husbands, or vice versa.

A common characteristic of these victims is that they see a need for money. Sometimes it is real, or it is suggested by these lenders, and that, combined with a lack of financial sophistication, creates the problem. This situation is often exacerbated by diminished mental capacity as a result of Alzheimer's or other dementia-related diseases that some elderly homeowners suffer from.

I would like to briefly talk to you about how these things originate and use some demonstrative materials to show you. These companies market these loans in neighborhoods where financially vulnerable people live with signs on telephone poles, mailers, phone solicitation, door to door home improvement solicitations, and TV ads. Here are some of the kinds of signs that we see blanketing the neighborhoods where our lower-income elderly homeowners live.

They focus on poor credit, and they try to solicit people to "make that phone call." We have other signs here that set out the kinds of things that they are trying to get people to take notice of. One of them always catches my eye, and that is "Capital Truss Company." By the way, as a caveat, I must say that I do not know if these particular companies hook people up with abusive lenders, but these signs are typical of those used by mortgage brokers who do this. I do not know about these particular companies, but "Capital Truss Company" cannot even spell correctly. So many of these companies are brokers——

The CHAIRMAN. "T-r-u-s-s," instead of "T-r-u-s-t."

Mr. BRENNAN. Yes. "Truss" for a hernia, in other words. [Laughter.]

82

In any case, these are brokers that are aggressively marketing these products into the community, and many of them are fly-by-nights; all they need is a fax and a phone, and they are in business.

Let me show you these mailers. These are the kinds of mailers we see being mailed out all the time, Mr. Chairman. This is one company that uses an envelope which looks like a Government check.

The CHAIRMAN. Like a Social Security check.

Mr. BRENNAN. Yes, correct. It does not have a return address on the envelope. It says, "Department of Communications Electronic Mail Section." And when you pull it out, it looks like some kind of Government check, and it is an offer of $50,000 if you will just make the application and sign up for the equity mortgage loan.

Then, we see these kinds of mailings that look like urgent telegrams, but in fact——

The CHAIRMAN. It looks like mail that Congressmen get.

Mr. BRENNAN. Right; probably generated by a computer.

The CHAIRMAN. When an important bill is coming up, we will get mail that looks like that.

Mr. BRENNAN. Some of our unsophisticated homeowners—these mailings are designed to trigger their interest and make them pick up the phone and make the call, and that sucks them into the predatory mortgage loan. The result is devastation. The results of these high-cost mortgage loans wreak havoc in our clients' lives.

Our typical client is so much like Ms. Ferguson and the Jacksons and Gael Carter who was on the videotape. Those are my clients, the kind of people we see day in and day out and they are saddled with high-cost loans with high interest, insurance packing and the rest.

Here is an example of my client, Ms. McNab. After borrowing about $54,000, and after making monthly payments for 15 years, she will still owe 87 percent of the loan. After making total payments of $107,000 over 15 years, she will still owe $47,000. That is called a "balloon payment," and it is a device to indirectly enhance the profitability of these types of loans for the lenders.

The CHAIRMAN. Would she be better off borrowing on a credit card than this way?

Mr. BRENNAN. Probably. She would really be better off not borrowing at all, to tell you the truth.

The CHAIRMAN. Oh, I know, but as far as the interest is concerned.

Mr. BRENNAN. Correct. Most people think that loans amortize down to zero during the term of the loan, and she did not even know the balloon was in the loan. They fanned the papers at the closing and she signed them. Then she came to me—in fact, I just spoke with her yesterday. This same company is calling her up now and saying, "Hey, you have a balloon in your mortgage; you need a new loan." I ask myself "why did they make the bad loan to her in the first place? Why did they give her a bad balloon loan and then call her up and say, You are in a bad loan; let us get you into a better loan that will pay its way out over the term of the loan"?

Those are the kinds of practices we are seeing: balloons, flipping etc. The insurance packing is also incredible. So many of these

83

transactions start out as home improvement scams. The home improvement companies who solicit our clients work as bird dogs for the sub prime lenders; Their goal is not to do a decent home improvement job, but to sign somebody up for a high-cost mortgage.

To put all this in perspective, it might be useful to look at what middle-class and wealthy homeowners with good credit are able to get from a bank a home equity line of credit (a HELOC). Here are some ads from newspapers that show how these loans work. One is from Nations Bank and one is from the Bank of New York. HELOC's are loans with no closing costs, no points. The borrower can access the full amount of the loan based upon the equity in his or her house. They hand you a checkbook, and you can write a check for as much or as little as you want. There is no flipping, no successive refinancing with high costs.

Although some consumer advocates have a few problems with HELOC's compared with what we are seeing, these are good mortgage products. The interest is prime, one point below prime or one point above prime. What is really interesting is that there are no abuses no high interest, no high points in fact, there are no points, no flipping, no credit life insurance sold with these kinds of products, no balloon payments, no broker kickbacks, and no home improvement scams. So here is an alternative that puts what is happening to our clients in stark contrast to what is available to other types of customers.

We have a dual system for accessing credit. Elderly homeowners with fixed incomes are funnelled into the predatory system exemplified by those signs. Others are funnelled into very good mortgage loan products exemplified by these HELOC advertisements.

Why is that? The lenders say that the high risk justifies the high cost and these other abusive practices. I would invite you to look at the profits that these companies are posting. A very good bank can lend money and make profits at 5 to 7 percent. These companies are making profits 5 and 10 times that amount. If risk were the reason for the high cost and the other abuses, why aren't their profits similar to the banks lower profits? If they are suffering losses because they are lending to uncreditworthy people, why aren't their profits right about in line with the banks'? But they are not. Their profits are incredible. The CEO of one high-cost finance company mortgage lender in 1996 made 102 million in annual salary and compensation. These companies are immensely profitable, which is the bottom line reason for why this is going on.

I will briefly wrap up. What is really sad, Mr. Chairman, is that for so many of our elderly homeowners, there are reasonable alternatives available if they actually do need a mortgage loan. There are reverse mortgages, for example, that are very helpful to elderly people. They can access the equity out of their homes and they do not have to make a payment on the loan until after they die or if they vacate the house. There are also special programs that are arranged through nonprofit agencies like the Neighborhood Assistance Corporation of America in Boston. Bruce Marks, the director of NACA has investigated and criticized and demonstrated against predatory mortgage lenders for years, and he has worked out settlements with these institutions and with reputable banks for homebuyer programs and for refinancing homeowners out from

84

under predatory mortgage loans and into loans with reasonable rates.

One thing Mr. Marks asked me to mention which he has investigated but which is not in my area of expertise that I think perhaps the committee might be interested in, is that, as Professor Marsh pointed out, the accounting methods used by these companies may present great risks for investors who own their stock or buy securitized mortgages. I think this house of cards may tumble some day, and it will mean great losses for the investors who own stock in those companies.

In conclusion, Mr. Chairman, what is happening here is that the equity in the homes of these senior citizens is being accessed, all right, but it is not being accessed for the benefit of the homeowners. It is being accessed for the benefit of the lenders, that is, for the lenders to make unconscionable profits.

Again we are most grateful to the committee for taking the time to listen and to investigate the abuses occuring in the sub prime. We are hopeful that some positive result may come out of this.

Thank you.

[The prepared statement of Mr. Brennan follows:]

### Statement of William J. Brennan, Jr.,
### Director, Home Defense Program of the
### Atlanta Legal Aid Society, Inc.,
### Before the United States Senate
### Special Committee on Aging
### on March 16, 1998

Thank you for this opportunity to address the United States Senate Special Committee on Aging on the subject of predatory mortgage lending practices directed against the elderly. My name is William J. Brennan, Jr. For the past 29 years, I have been a staff attorney at the Atlanta Legal Aid Society, Inc. specializing in housing and consumer issues.

I have been the director of the Home Defense Program of the Atlanta Legal Aid Society for the past ten years. The Home Defense Program provides referrals and legal representation to homeowners who have been victimized by title conversion, home equity and home purchase scams. The Program is funded by the Atlanta Legal Aid Society and the DeKalb County, Georgia Community Development Department with HUD community development block grant funds.

On a daily basis, we assist individual homeowners who have been targeted by local and national companies with abusive, predatory mortgage lending practices. We provide them with legal advice. We evaluate their cases to determine whether legal claims exist. We settle some cases without litigation and litigate others. Most often, because of our limited resources, we assist homeowners in obtaining private attorneys to represent them in cases where the homeowners may have legal claims. Where appropriate, we also refer homeowners to local nonprofit housing counseling and other agencies which assist them in obtaining refinancing of their high cost mortgage loans through low-cost, conventional mortgage lenders or other special programs. Many senior citizen homeowners are referred for reverse mortgages. We also participate on a regular basis in a range of community education efforts aimed at warning homeowners against home equity theft scams, including abusive mortgage lending practices.

Home equity theft is the theft of the equity in the home or of the actual title to the home. The theft is accomplished through illegal practices and scams and also through otherwise legitimate business practices which are employed abusively and used for purposes other than those for which they were initially intended. There are two categories of home equity theft scams. The first are title conversion scams, which involve fraudulent representations made to homeowners resulting in the immediate loss of the title to the home. For example, foreclosure assistance fraud occurs when homeowners facing foreclosures are approached by "lenders" who offer to lend money to save the house from foreclosure but end up owning the home, evicting the homeowner, and accessing the equity in the homes with new mortgage loans for themselves. The second category is predatory mortgage lending.

Predatory mortgage lending consists of lenders who purposely target homeowners with substantial equity but less than perfect credit for high-cost, abusive mortgage loans. The lenders

86

employ a bogus theory of high risk to legitimize lending money at unconscionably high interest rates and engaging in other abusive practices which increase the revenue on the loans. The abusive practices include loan flipping, balloon payments, and the sale and financing of overpriced credit life and disability insurance (insurance packing). See Exhibit A for a list of the abusive practices and a description of each.

## Why does predatory mortgage lending occur?

First, high equity makes homes attractive for predatory lenders. High equity is generally the result of two factors: (1) the appreciation of property values; and (2) payment of mortgages, which over time results in the reduction of the principal balance on the mortgage loan.

Second, the absence of strong consumer protection laws and the lack of enforcement of existing laws permit these scams to flourish. For example, many states have no usury laws or have caps on interest rates which are set too high. The Georgia criminal usury statute allows mortgage interest rates of 60% per year. Many states, including Georgia, permit non-judicial foreclosure sales, which facilitate foreclosures and impede homeowners' efforts to raise defenses in court.

Third, redlining creates a credit-vacuum filled by predatory lenders. When some banks and other conventional lending institutions designate entire minority communities as bad financial risks and refuse to make them loans (redlining), high-cost finance companies target those same communities with overpriced loan products, knowing that the residents are a captive market with no access to reasonably-priced credit (reverse redlining). In this way, redlining produces reverse redlining as its logical complement. Therefore, it's not surprising to find that banks guilty of the former often profit from the latter, either by owning, lending money to or purchasing loans from finance companies which engage in predatory lending.

Fourth, greed is the primary driving force behind predatory mortgage lending. The yields and profits are incredibly high. The risk is minimal because the loans are secured by gilt-edged, gold standard collateral: homes and the equity in homes. The practice of bundling mortgages together to be sold to pension funds, mutual funds and other investors as asset-backed securities further increases the profitability of this business. A review of the profits of some of the predatory lenders will verify this.

## Types of Victims

The communities that fall prey to predatory mortgage lending predominantly consist of elderly, low and moderate income, and/or minority homeowners. Elderly homeowners, who tend to have substantial equity but live on fixed incomes (social security and retirement benefits), are perhaps the principal targets. Their homes may be in need of expensive repairs (often roofing work) or they may have fallen behind on their property taxes, incurred substantial medial bills not covered by Medicare, Medicaid or health insurance, or suffered a loss of income after the

2

87

death of a spouse. The common characteristics of these victims are a need for money (either real or suggested by the lender) combined with a lack of financial sophistication, often exacerbated by diminished mental capacity as a result of Alzheimer's and other dementia-related diseases.

Minority groups are disproportionately targeted by predatory lenders because their access to legitimate sources of loans and other financial services is disproportionately denied. As mentioned above, redlining produces credit-starved communities that will pay exorbitant prices for loans.

Low and moderate income homeowners are also targets when they have or appear to have less than perfect credit ratings. Conventional lenders tend to deny loans to these individuals and often steer them to predatory lenders.

**Historical Perspective**

The last 10-15 years have seen a tremendous increase in home equity lending in general. Initially, home equity lending targeted middle-class and wealthy homeowners with good credit ratings, substantial income, and significant home equity. Recently, the industry has expanded to encompass lower income and other communities formerly on the margins of the mortgage loan market; as this segment of the industry has demonstrated explosive growth, so have the predatory lending abuses described in Exhibit A.

In my practice as a legal services attorney over the last 29 years specializing in consumer and housing issues, I am struck by the fact that 15 years ago our typical homeowner clients did not have equity mortgages. A few had second mortgages, but in Georgia the terms of those mortgage loans were strictly regulated. There was a cap on interest rates for second mortgage loans, and if the lender violated the law the penalty was forfeiture of the remaining balance due on the mortgage. (That law has since been repealed). Our homeowner clients' involvement with finance companies was limited to signature loans in small amounts, usually $3,000 or less. Finance companies were not mortgage lenders at that time.

In the mid to late 1980's, these finance companies began making mortgage loans. Unfortunately, their mortgage lending operations were not subject to the state regulatory agencies which monitored their small, unsecured loan business. (Although later, many states enacted licensing laws to regulate mortgage lenders and brokers.) The growth of mortgage lending by finance companies and other subprime mortgage lenders over the last 10-15 years has been phenomenal. Additionally, banks, insurance companies, car manufacturers, a giant agribusiness corporation, and a host of other large corporations have entered the field of subprime mortgage lending. Moreover, new companies have been formed to take advantage of the lucrative profits generated by this business.

The growth of the home equity lending industry and the reasons therefor have been chronicled by Julia Patterson Forrester in an excellent law review article entitled, "Mortgaging

3

88

the American Dream: A Critical Evaluation of the Federal Government's Promotion of Home Equity Financing," 69 Tulane L. Rev. 373 (1994). Among other points, Professor Forrester explains how predatory mortgage lending practices have flourished within the context of the massive increase of equity lending.

My impression is that today, in the low and moderate income neighborhoods where our clients live, the penetration by subprime predatory mortgage lenders has been enormous. It appears that virtually every other house in these neighborhoods is burdened by a predatory mortgage loan. Nonprofit housing counseling agencies in our area report increases in predatory mortgage lending cases, especially among elderly homeowners. They refer many of these cases to my program. Additionally, legal services programs around the country report dramatic increases in these types of cases. Dozens of programs now have attorneys specializing in these cases. They are filing lawsuits against these companies on behalf of homeowners under various federal statutes including the Truth in Lending Act (TILA), the Real Estate Settlement Procedures Act (RESPA), and the Home Ownership and Equity Protection Act of 1994 (HOEPA). They also pursue claims under state Uniform Deceptive Acts and Practices (UDAP) statutes, and assert claims based on fraud or seek recission in equity based on unconscionability. Private attorneys around the country have also seen an influx of these cases and are filing lawsuits based on the same claims. The National Consumer Law Center, based in Boston, MA, now conducts foreclosure prevention workshops for legal services and private attorneys around the country. This excellent program teaches attorneys how to assist homeowners who have been victimized by predatory mortgage lenders (for information on this program, contact Elizabeth Renuart in the Washington, DC, NCLC office at 202-986-6060).

What we are all seeing is that the substantial equity in the homes in these neighborhoods which formerly constituted an element of wealth for these homeowners, albeit in small amounts, is now held hostage or owned outright by predatory lenders. Their abusive business practices have resulted in a substantial increase in foreclosures which divest homeowners of their property and make them homeless. The result is destabilization of what were formerly vibrant neighborhoods populated by owner-occupied homes and an increase in the need for government-funded social service agencies to address the social ills generated by this destabilization.

To put these abuses in perspective, consider the terms of home equity lines of credit (HELOCs) which banks offer to middle and upper income homeowners. While we have serious concerns about certain features of HELOCs, it is interesting to note that: they have no closing costs and no points; the annual interest rate is either slightly above prime, at prime, or below prime; they do not promote the sale of credit life insurance; they do not have balloon payments; and because the borrower can access additional equity without a new loan, these loans are not flipped. The dichotomy here is that a customer with good credit, middle to high income, and $30,000 in equity will qualify for one of these loans. In contrast, a lower income person with less than perfect credit who may be elderly and/or a minority with the same $30,000 equity is funneled into a predatory mortgage loan which has high interest and points, expensive credit life insurance, a balloon payment, and other abusive features. This loan is then frequently flipped

4

89

two or more times, resulting in additional, unnecessary costs to the homeowner. Since the collateral for both loans is 80% of the value of the home, the slightly higher risk in the second loan cannot justify its much higher cost.

The state of Texas will provide a fascinating microcosmic illustration of the evolution of the predatory mortgage lending industry. Until recently, because of a broad homestead exemption dating back to 1839, home equity lending was virtually nonexistent in Texas. However, an intensive 20-year campaign by the mortgage industry has culminated in a constitutional amendment which sets the stage for the proliferation of home equity lending. Substantive provisions protecting borrowers from many lending abuses were included in the constitutional change. Texas will now afford us a laboratory-like setting to observe whether these protections will effectively deter predatory mortgage lending abuses as equity lending rapidly expands throughout the state.

**Preferable Alternatives for Elderly Homeowners**

The best advice for elderly homeowners is not to get an equity loan at all. An equity loan can often trigger the slippery slide into foreclosure, particularly for elderly retired homeowners who are living on a reduced fixed income. Occasionally, there are good reasons for elderly homeowners to access the equity in their homes: a new roof, replacement of a furnace, or large medical bills. Under these circumstances, a predatory mortgage loan is the worst possible option. While a HELOC would be a better option, some homeowners may not qualify. The best option for senior homeowners is a reverse mortgage, sometimes called a home equity conversion mortgage (HECOM). Homeowners qualify for these loans based upon their age and equity. With a reverse mortgage, a homeowner can borrow a substantial part of the equity in his home and the loan does not have to be paid until he vacates his home or dies. Under this plan an elderly homeowner may choose to make payments to reduce the balance but is not under threat of foreclosure and eviction if he does not make these payments. However, recent news articles have reported that some mortgage brokers have gouged elderly homeowners by charging them thousands of dollars in brokers' fees simply for referring them to reverse mortgage lenders. To avoid this pitfall, seniors should contact their local housing counseling agencies for information about and referrals for reverse mortgages. These agencies are funded by HUD, the American Association of Retired Persons (AARP) and other entities to provide these types of services free of charge. Two relevant articles from the HUD publication "Counselor's Connection" are attached hereto as Exhibit B. Elderly homeowners already victimized by predatory mortgage lenders should seek legal advice from private attorneys or legal aid attorneys in their area.

**Illustrative Cases**

At this point, I would like to provide the stories of four victims of predatory mortgage lending abuses. Genie McNab is a seventy year old African-American woman. She is retired and lives alone on Social Security and retirement benefits. She has owned her home in Decatur, Georgia for twenty years. In November 1996, she obtained a 15-year mortgage loan from a large

5

**90**

national finance company in the amount of $54,300. The annual percentage rate is 12.85%. Under the terms of this loan, Ms. McNab will pay $596.49 per month until the year 2011 when she will be required to pay a final payment of $47,599.14. Thus, when she is 83 years old she will be saddled with a balloon payment that she will never be able to make. Moreover, although she paid a mortgage broker a $700 fee, supposedly to help her find this loan, the lender also paid the broker a $1,100 fee.

Beatrice Smith is a sixty-eight year old African-American woman. She is retired and lives alone on Social Security retirement benefits. She has owned her home in Atlanta, Georgia for 29 years. Over a period of six years, from 1987 to 1993, she was given six mortgage loans. The first loan was for $20,334.71. The last loan was for $34,790.50. The first four loans were made by a national finance company. The company was subsequently purchased by a major national bank. The bank's subsidiary made two additional loans to Ms. Smith. In all of the six loans, the lender sold Ms. Smith credit life insurance with premiums ranging from $2,339.43 in one transaction to $2,905.82 in another transaction. Ms. Smith was required to pay closing costs in each loan. For the six loans, the closing costs totaled $2,544.79. The interest charged on each loan ranged from 9.99 to 15.5004%. Instead of making one loan to Ms. Smith for the money she may have needed, these lenders made her an original loan and flipped her through five successive loans that were of decreasing benefit to her and of increasing benefit to them. They sold her expensive credit life insurance which was of no use to her but, once again, was of great financial benefit to the lenders, one of whom owned the insurance company while the other received large commissions for selling the policies. For the past one and a half years, Ms. Smith has been unable to afford the payments. For months, the lender subjected Mrs. Smith to a campaign of abusive debt collection tactics: minutes after the regional collection office would call her demanding payment and threatening foreclosure, the local branch office would repeat the process, upsetting her greatly. I called the company and insisted that they stop contacting her. The only reason she has not been foreclosed on and evicted from her home is because I wrote the lender and demanded the cancellation of her mortgage loan on grounds of unconscionability. Although the lender has not complied with my request, it has not pursued foreclosure. See Exhibit C (copy of a chart outlining Ms. Smith's loans).

Beatrice Yorke is an eighty-two year old African-American widow. She is retired and lives alone on Social Security retirement benefits. She has owned her home in Norcross, Georgia for thirty-six years. In the late 1980's and early 1990's, she obtained three loans from a subsidiary of a large northeastern bank. The first loan was a mortgage loan for $15,812.16 with an annual percentage rate of 16.86%. The second loan was a signature loan for $780 with an annual percentage rate of 42.64%. The third loan was a mortgage loan which refinanced the two existing loans. This loan was for $16,851.84 and carried an annual percentage rate of 15.54%. This lender was the subject of intense controversy in the early 1990's when allegations were made that it engaged in predatory mortgage lending practices in Georgia and dozens of other states. This company entered into settlements with the Georgia Attorney General and various plaintiffs in class action and individual lawsuits totaling over $100 million. This company eventually left the business of subprime mortgage lending. However, it sold most of its existing

91

mortgage loan portfolio to another large national finance company. Ms. Yorke has struggled to make payments to this company, but has been unable to do so for the last few months and is now facing foreclosure and eviction. We are working to find a way to stop this 82-year old woman from losing her home and being evicted.

Sanders Faust is a seventy-two year old African-American man who can neither read nor write. He is retired and lives alone on Social Security retirement benefits. He has owned his home in Decatur, Georgia for thirty-one years. There have been four mortgage loans on Mr. Faust's house since 1991. On September 1, 1991, he borrowed $16,499.99 from a finance company that is a subsidiary of a large corporation. On April 2, 1992, this company refinanced his loan for $22,234.79. On December 21, 1992, this same company refinanced his loan again for $25,831.91. These loans included credit life insurance premiums for $2,943.41 and $2,533.52. Finally, on September 13, 1995, he refinanced with a different company for $33,000. However, this other company promptly sold his loan to another subsidiary of the same corporation. The last loan carries an annual percentage rate of 16.185%. He has been unable to make the payments and we referred him to a private attorney for a Chapter 13 bankruptcy for the purpose of saving his home from foreclosure and preventing subsequent eviction. In the midst of this effort, the attorney has learned that the loan has been sold to another company.

These cases typify what we have been seeing in the Home Defense Program for the last 10 years: unconscionably high interest and points, balloon payments, loan flipping, insurance packing, abusive collection tactics, and so forth. Why are we seeing these cases? Predatory lenders say that the high cost of these mortgage loans is justified and required due to the high level of risk associated with borrowers with less than perfect credit. This explanation is bogus. These are not uncollateralized, signature loans. If they were, the argument about risk might be justified. Most predatory lenders lend up to only 80% of the value of the home, leaving the other 20% as a cushion to protect the lender in case of foreclosure. If the homeowner is able to make the payments, the revenue stream created by these loans is very profitable because of the high interest, points and other revenue enhancers. If in fact a default occurs, the lender forecloses, always buys the home at the foreclosure sale, and resells it for a substantial profit. The lender ultimately profits in either scenario, rendering the risk justification illusory.

The test of whether my assertions are correct involves determining whether these lenders' profit margins are in line with those of conventional lenders. In fact, a cursory inspection of industry trends suggests that the subprime mortgage lending market is enjoying spectacular growth and profitability. Even as these hearings proceed, the subprime finance company subsidiary of a major corporation is being sold off to stockholders for $25.8 billion. Within the last few weeks, another company was purchased by a large national bank for $2.1 billion. The CEO of yet another company received $102 million in total compensation for 1996 and $65 million in the previous year. In an article entitled "Loan Sharks, Inc.," Thomas Goetz reports that:

> (s)ubprime companies say their interest rates are so high to compensate for the

7

greater risk these borrowers bring. But a welcome side effect of high rates is the profits that traditional banks can't hope to match. According to *Forbes*, subprime consumer finance companies can enjoy returns up to six times greater than those of the best-run banks. Corporate America hasn't failed to notice. *Village Voice*, July 15, 1997 at 33.

What I know from first hand experience is that their success is very much founded upon business practices which makes the lives of my clients miserable. Subprime lenders assert that they provide a positive service to borrowers who could not obtain credit elsewhere, but my clients would emphatically disagree. They don't feel helped, they feel exploited. This is especially true for my elderly clients, like Ms. McNab, Ms. Smith, Ms. Yorke, and for Mr. Faust. At a time when they should be enjoying retirement after a life of hard work, they are at best struggling to make mortgage payments they cannot afford and at worst desperately trying to find ways to save their houses from foreclosure and themselves from being evicted - put out on the street.

**Conclusion**

Home ownership has always been an essential component of the American dream. To fulfill this dream, homeowners work hard to pay off their mortgages so that they may peacefully live out their retirement in a paid-for home. In countless cases this dream has been shattered by predatory mortgage lenders whose drive for exorbitant profits has undercut the well-earned security of elderly homeowners. This is a tragic story for many seniors. Some are saddled with loans they never needed and cannot afford, while others who legitimately needed money were sucked into the worst possible option - a predatory mortgage loan.

Respectfully submitted,

_____

William J. Brennan, Jr.

DATED: March 6, 1998.

93   .

## PREDATORY MORTGAGE LENDING ABUSES

The following is a catalogue of predatory mortgage lending abusive practices. We have divided the practices into abuses associated with the origination of the loan, servicing of the loan, and collection of the loan.

### I.   ORIGINATION OF LOAN.

1.   **Solicitations.** Predatory mortgage lenders engage in extensive marketing in targeted neighborhoods. They advertise through television commercials, direct mail, signs in neighborhoods, telephone solicitations, door to door solicitations, and flyers stuffed in mailboxes. Many of these companies deceptively tailor their solicitations to resemble social security or other U.S. government checks to prompt homeowners to open the envelopes and otherwise deceive them regarding their predatory intentions.

2.   **Home Improvement Scams.** Predatory mortgage lenders use local home improvement companies essentially as mortgage brokers to solicit business. These companies solicit homeowners for home improvement work. The company may originate a mortgage loan to finance the home improvements and then sell the mortgage to a predatory mortgage lender, or steer the homeowner directly to the predatory lender for financing of the home improvements. The home improvements are often grossly overpriced, and the work is shoddy and incomplete. In some cases, the contractor begins the work before the three-day cooling off period has expired. In many cases, the contractor fails to obtain required permits, thereby making sure the work is not inspected for compliance with local codes.

3.   **Mortgage Brokers - Kickbacks.** Predatory mortgage lenders also originate loans through local mortgage brokers who act as bird dogs (finders) for the lenders. Many predatory mortgage lenders have downsized their operations by closing their retail outlets and shifting the origination of loans to these brokers. These brokers represent to the homeowners that they are working for the homeowners to help them obtain the best available mortgage loan. The homeowners usually pay a broker's fee. In fact, the brokers are working for predatory mortgage lenders and being paid kickbacks by lenders for referring the borrowers to the lenders. On loan closing documents, the industry employs euphemisms to describe these referral fees: yield spread premiums and service release fees. Also, unbeknownst to the borrower, his interest is raised to cover the fee. Within the industry, this is called bonus upselling or par-plus premium pricing.

**Exhibit A**

94

4.  **Steering to High Rate Lenders.** Some banks and mortgage companies steer customers to high rate lenders, including those customers who have good credit and would be eligible for a conventional loan from that bank or lender. In some cases, the customer is turned away before completing a loan application. In other cases, the loan application is wrongfully denied and the customer is referred to a high rate lender. The high rate lender is often an affiliate of the bank or mortgage company, and kickbacks or referral fees are paid as an incentive to steer the customer to the lender.

5.  **Lending to People Who Cannot Afford The Loans.** Some predatory mortgage lenders purposely structure the loans with monthly payments which they know the homeowner cannot afford with the idea that when the homeowner reaches the point of default, they will return to the lender to refinance which provides the lender additional points and fees. Other predatory mortgage lenders, whom we call hard lenders, purposely structure the loans with payments the homeowner cannot afford in order to trigger a foreclosure so that they may acquire the house and the valuable equity in the house at the foreclosure sale.

6.  **Falsified Loan Applications, Unverified Income.** In some cases, lenders knowingly make loans to homeowners who do not have sufficient income to repay the loan. Often, such lenders wish to sell the loan to an investor. To sell the loan, the lender must make the loan package have the appearance to the investor that the borrower has sufficient income. The lender has the borrower sign a blank loan application form. The lender then inserts false information on the form (for example, a job the borrower does not have), making the borrower appear to have higher income than he or she actually has.

7.  **Adding Co-signers.** This is done to create the false impression that together both borrowers have sufficient income to be able to pay off the loan, even though the lender is well aware that the co-signer has no intention of contributing to the repayment of the mortgage. Often, the lender requires the homeowner to transfer half ownership of the house to the co-signer. The homeowner has lost half the ownership of the home and is saddled with a loan she cannot afford to pay.

8.  **Incapacitated Homeowners.** Some predatory lenders make loans to homeowners who are clearly mentally incapacitated. They take advantage of the fact that the homeowner does not understand the nature of the transaction or the papers that she signs. Because of her incapacity, the homeowner does not understand she has a mortgage loan, does not make the payments, and is subject to foreclosure and subsequent eviction.

9.  **Forgeries.** Some predatory lenders forge loan documents. In an ABC Prime Time Live news segment that aired on April 23, 1997, a former employee of a

2

high cost mortgage lender reported that each of the lender's branch offices had a "designated forger" whose job it was to forge documents. In such cases, the unwary homeowners are saddled with loans they know nothing about.

10.   **High Annual Interest Rates.** The very purpose of engaging in predatory mortgage lending is to reap the benefit of high profits. Accordingly, these lenders always charge unconscionably high interest rates, even though their risk is minimal or non-existent. Such rates drastically increase the cost of borrowing for homeowners. Predatory mortgage lenders routinely charge Atlanta area borrowers rates ranging from 12% to 18%, while other lenders charge rates of 7.0% to 7.5%.

11.   **High Points.** Legitimate lenders charge points to borrowers who wish to buy down the interest rate on the loan. Predatory lenders charge high points but there is no corresponding reduction in the interest rate. These points are imposed through prepaid finance charges (or points or origination fees), they are usually 5 to 10% of the loan and may be as much as 20% of the loan. The borrower does not pay these points with cash at closing. Rather, the points are always financed as part of the loan. This increases the amount borrowed, which produces more annual interest to the lender.

12.   **Balloon Payments.** Predatory mortgage lenders frequently structure loans so that at the end of the loan period, the borrower still owes most of the principal amount borrowed. The last payment balloons to an amount often equal to 85% or so of the principal amount borrowed. Over the term of the loan, the borrower's payments are applied primarily to interest. The homeowner cannot afford to pay the balloon payment at the end of the term, and either loses the home through foreclosure or is forced to refinance with the same or another lender for an additional term at additional cost.

13.   **Negative Amortization.** This involves a system of repayment of a loan in which the loan does not amortize over the term. Instead, the amount of the monthly payment is insufficient to pay off accrued interest and the principal balance therefore increases each month. At the end of the loan term, the borrower owes more than the amount originally borrowed. A balloon payment at the end of the loan is often a feature of negative amortization.

14.   **Padded Closing Costs.** In this scheme, certain costs are increased above their true market value as a method of charging higher interest rates. Examples include charging document preparation of $350 or credit report fees of $150, both of which are many times the actual cost.

15.   **Inflated Appraisal Costs.** This is another padding scheme. In most mortgage

3

loan transactions, the lender requires that an appraisal be done. Most appraisals include a typical, detailed report of the condition of the house (interior and exterior) and prices of comparable houses in the area. Others are "drive-by" appraisals, done by someone driving by the homes. The former naturally cost more than the latter. In some cases, borrowers are charged a fee for an appraisal which should include the detailed report, when only a drive-by appraisal was done.

16.     **Padded Recording Fees.** Mortgage transactions usually require that documents be recorded at the local courthouse. State or local laws establish the fees for recording the documents. Mortgage lenders typically pass these costs on to the borrower. Predatory mortgage lenders often charge the borrowers a fee in excess of the actual amount required by law to record the documents.

17.     **Bogus Broker Fees.** In some cases, predatory lenders charge borrowers broker fees when the borrower never met or knew of the broker. This is another way such lenders increase the cost of the loan for the benefit of the lender.

18.     **Unbundling.** This is another way of padding costs by breaking out and itemizing charges which are duplicative or should be included under other charges. An example is where a lender imposes a loan origination fee, which should cover all costs of initiating the loan, but then imposes separate, additional charges for underwriting and loan preparation.

19.     **Credit insurance - Insurance Packing.** Predatory mortgage lenders market and sell credit insurance as part of their loans. This includes credit life insurance, credit disability insurance, and involuntary unemployment insurance. The premiums for this insurance are exorbitant. In some cases, lenders sell credit life insurance covering an amount which constitutes the total of payments over the life of the loan rather than the amount actually borrowed. The payout of claims is extremely low compared to the revenue from the premiums. The predatory mortgage lender often owns the insurance company, or receives a substantial commission for the sale of the insurance. In short, credit insurance becomes a profit center for the lender and provides little or no benefit to the borrower.

20.     **Excessive Prepayment Penalties.** Predatory mortgage lenders often impose exorbitant prepayment penalties. This is done in an effort to lock the borrower into the predatory loan for as long as possible by making it difficult for her to refinance the mortgage or sell the home. Another feature of this practice is that it provides back end interest for the lender if the borrower does prepay the loan.

21.     **Mandatory Arbitration Clauses.** By inserting pre-dispute, mandatory, binding arbitration clauses in contractual documents, some lenders attempt to obtain unfair

4

advantage of their borrowers by relegating them to a forum perceived to be more favorable to the lender than the court system. This perception exists because discovery is not a matter of right but is within the discretion of the arbitrator; the proceedings are private; arbitrators need not give reasons for their decisions or follow the law; a decision in one case will have no precedential value; judicial review is extemely limited; a lender will be a frequent user while the consumer is a one time participant; and injunctive relief and punitive damages will not be available.

22. **Flipping.** Flipping involves successive, repeated refinancing of the loan by rolling the balance of the existing loan into a new loan instead of simply making a separate, new loan for the new amount. Flipping always results in higher costs to the borrower. Because the existing balance of one loan is rolled into a new loan, the term of repayment is repeatedly extended through each refinancing. This results in more interest being paid than if the borrower had been allowed to pay off each loan separately. A powerful example of the exorbitant costs of flipping is the case of Bennett Roberts, who had eleven loans from a high cost mortgage lender within a period of four years. See, Wall Street Journal, April 23, 1997, at 1. Mr. Roberts was charged in excess of $29,000 in fees and charges, including ten points on every financing, plus interest, to borrow less than $26,000.

23. **Spurious Open End Mortgages.** In order to avoid making required disclosures to borrowers under the Truth in Lending Act, some lenders are making "open-end" mortgage loans. Although the loans are called "open end" loans, in fact they are not. Instead of creating a line of credit from which the borrower may withdraw cash when needed, the lender advances the full amount of the loan to the borrower at the outset. The loans are non-amortizing, meaning that the payments are interest only so that no credit will be replenished. Because the payments are applied only to interest, the balance is never reduced.

24. **Paying Off Low Interest Mortgages.** A predatory mortgage lender usually insists that its mortgage loan pay off the borrower's existing low cost, purchase money mortgage. The lender is able to increase the amount of the new mortgage loan by paying off the current mortgage and the homeowner is stuck with a high interest rate mortgage with a principal amount which is much higher than necessary.

25. **Shifting Unsecured Debt Into Mortgages.** Mortgage lenders badger homeowners with telephone and mail solicitations and other advertisements that tout the "benefits" of consolidating bills into a mortgage loan. The lender fails to inform the borrower that consolidating unsecured debt into a mortgage loan secured by the home is a bad idea. The loan balance is increased by paying off the unsecured debt, which necessarily increases closing costs (which are

calculated on a percentage basis), increases the monthly payments, and increases the risk that the homeowner will lose the home.

26. **Making Loans in Excess of 100% Loan to Value (LTV).** Recently, some lenders have been making loans to homeowners where the loan amount exceeds the fair market value of the home. This makes it very difficult for the homeowner to refinance the mortgage or to sell the house to pay off the loan, thereby locking the homeowner into a high cost loan. Additionally, if a homeowner goes into default and the lender forecloses on a loan, the foreclosure auction sale generates enough money to pay off the mortgage loan. Therefore, the borrower is not subject to a deficiency claim. However, where the loan is 125% LTV, a foreclosure sale may not generate enough to pay off the loan and the borrower would be subject to a deficiency claim.

## II. SERVICING OF LOAN

1. **Force Placed Insurance.** Lenders require homeowners to carry homeowner's insurance, with the lender named as a loss payee. Mortgage loan documents allow the lender to force place insurance when the homeowner fails to maintain the insurance, and to add the premium to the loan balance. Some predatory mortgage lenders force place insurance even when the homeowner has insurance and has provided proof of such insurance to the lender. Even when the homeowner has in fact failed to provide the insurance, the premiums for the force placed insurance are often exorbitant. Often the insurance carrier is a company affiliated with the lender. Furthermore, the cost of force placed insurance is frequently padded because it covers the lender for risks or losses in excess of what the lender may require under the terms of the mortgage loan.

2. **Daily Interest When Payments Are Made After Due Date.** Most mortgage loans have grace periods, during which a borrower may make the monthly payment after the due date and before the end of the grace period without incurring a "late charge." The late charge is often assessed as a small percent of the late payment. However, many lenders also charge daily interest based on the outstanding principal balance. While it may be proper for a lender to charge daily interest when the loan so provides, it is deceptive for a lender to charge daily interest when a borrower pays after the due date and before the grace period expires when the loan terms provide for a late charge only after the end of the grace period. Predatory lenders take advantage of this deceptive practice.

6

### III.   COLLECTION OF LOAN

1. **Abusive Collection Practices.** In order to maximize profits, predatory lenders either set the monthly payments at a level the borrower can barely sustain or structure the loan to trigger a default and a subsequent refinancing. Having structured the loans in this way, the lenders consciously decide to use aggressive, abusive collection tactics to ensure that the stream of income flows uninterrupted. (Because conventional lenders do not structure their loans in this manner, they do not employ abusive collection practices.) The collection departments of predatory lenders call the homeowners at all hours of the day and night, send late payment notices (in some cases, even when the lender has received timely payment or even before the grace period expires), send telegrams, and even send agents to hound homeowners in person. Some predatory lenders bounce homeowners back and forth between regional collection offices and local branch offices. One homeowner received numerous calls every day for several months, even after she had worked out a payment plan. These abusive collection tactics often involve threats to evict the homeowners immediately, even though lenders know they must first foreclose and follow the eviction procedures. The resulting emotional impact on homeowners, especially elderly homeowners, can be devastating. Being ordered out of a home one has owned and lived in for decades is an extremely traumatic experience.

2. **High Prepayment Penalties.** See description in I. 20 above. When a borrower is in default and must pay the full balance due, predatory lenders will often include the prepayment penalty in the calculation of the balance due.

3. **Flipping (Successive, Repeated Refinancing of Loan).** See description in I. 22 above. When a borrower is in default, predatory mortgage lenders often use this as an opportunity to flip the homeowner into a new loan, thereby incurring additional high costs and fees.

4. **Foreclosure Abuses.** These include (a) persuading borrowers to sign deeds in lieu of foreclosure in which they give up all rights to protections afforded under the foreclosure statute, (b) sales of the home at below market value, (c) sales without the homeowner/borrower being afforded an opportunity to cure the default, and (d) inadequate notice which is either not sent or backdated. There have even been cases of "whispered foreclosures", in which persons conducting foreclosure sales on courthouse steps have ducked around the corner to avoid bidders so that the lender was assured he would not be out-bid. Finally, foreclosure deeds have been filed in courthouse deed records without a public foreclosure sale.

7



U.S. Department of Housing and Urban Development

# Housing Counseling CLEARINGHOUSE

# COUNSELOR'S Connection

*"Counseling—a Key to Homeownership"*                    Summer 1997

# Seniors Seek Reverse Mortgage Information

An increasing number of lenders are offering reverse mortgages, but they are of no use if older homeowners are unaware of their availability and do not receive adequate housing counseling.

One very good way for older consumers to get information and determine if a reverse mortgage is for them, is to get housing counseling from a HUD-approved housing counseling agency.

"No single plan works best for all persons," says Ken Scholen, director of the National Center for Home Equity Conversion. "It depends on each borrower's circumstances." The center is an independent nonprofit organization established in 1981 to educate consumers about reverse mortgages and their alternatives.

Older homeowners can obtain a free referral to a local HUD-approved housing counseling

> "Reverse mortgages are an excellent way of allowing an older person or couple to unlock the accumulated cash value of their home without having to sell the home. This can make a dramatic difference in the lives of many senior citizens."
>
> — *Andrew Cuomo, HUD Secretary*

The AARP Foundation provides reverse mortgage training courses for housing counselors. The basic training, which is funded by HUD, focuses on the most widely available reverse mortgage—HUD's Home Equity Conversion Mortgage. The information counselors receive in the training course aids them in helping homeowners make informed decisions. Housing counselors can also provide the homeowner with information about local financial housing and social service programs such as home repair or property tax relief.

agency that provides reverse mortgage counseling by calling toll free 1–888–466–3487.

Housing counseling agencies seeking training for their staff members on reverse mortgages can call the Housing Counseling Clearinghouse (HCC) at 1–800–217–6970, check the calender of events on the HCC homepage at www.aspensys.com/HCC, or leave a message on AARP's reverse mortgage information request line directly at 202–434–6042. ◆

## AARP Foundation Offers Reverse Mortgage Counseling Grants

*In January, the AARP Foundation announced a new source of funding in FY '97 for housing counseling agencies providing reverse mortgage counseling. Only agencies that did not receive HUD housing counseling funding for FY '97 were eligible to apply for these grants, which were made possible by contributions from HUD and Fannie Mae to the AARP Home Equity Information Center.*

*Grants range from $1,000 to $12,000, based on prior reverse mortgage counseling volume. More than $123,000 in awards to 43 agencies were announced in February. The funds are to be drawn on a reimbursement basis of $50 per counseling certificate issued. Eligible agencies must have counseled at least 25 households on reverse mortgages in the past year and must demonstrate an ability to increase capacity. Agencies must also provide information on how they would reach older homeowners to let them know about the availability of reverse mortgage counseling services. ◆*



EXHIBIT B

## BEATRICE M. SMITH

| DATE OF LOAN | LENDER | AMOUNT FINANCED | MONTHLY PAYMENT | CLOSING COSTS | CREDIT LIFE PREMIUM | CASH OUT TO OR FOR BORROWER | LOAN TERM | ANNUAL PERCENT-AGE RATE |
|---|---|---|---|---|---|---|---|---|
| 10/12/93 | Company A | $34,790.50 | $417.33 | $286.58 | $2,790.71 | $0.00 | 180 mos | 11.9904% |
| 4/29/93 | Company A | $32,700.00 | $492.00 | $136.50 | $28.50 (monthly) | $1,525.52 | Open | 9.99-19% vrm/heloc· |
| 8/14/92 | Company B·· | $31,000.00 | $490.00 | $336.00 | $28.50 (monthly) | $1,849.46 | Open | 12-19% vrm/heloc* |
| 1/3/92 | Company B | $31,301.56 | $448.87 | $233.00 | $2,905.82 | $1,256.32 | 180 mos | 15.5004% |
| 11/25/91 | Company B | $29,231.16 | $419.18 | $506.50 | $2,831.35 | $8,928.10 | 180 mos | 15.5004% |
| 6/9/87 | Company B | $20,334.71 | $267.41 | $402.80 | $2,339.43 | $16,692.48 | 180 mos | 13.7500% |

·Variable Rate Mortgage/Home Equity Line of Credit
··The parent company of "Company B" purchased "Company A"

101

EXHIBIT C

Senator GRASSLEY. Thank you very much.

Professor Marsh, have you seen an increase over the years in the predatory lending practices that we have discussed today?

Mr. MARSH. I would agree completely with the discussion here, that when you go back not too far in time, you find this kind of incredibly aggressive behavior largely coming out of what people would call the Small Loan Act companies. But now, it has gone to the level where the loans are much larger in mortgage lending, and you find very similar practices and the same sharp tone and the same aggressive marketing.

The CHAIRMAN. Recent reports have indicated that these subprime loans are being securitized. What is the incentive for the recent surge in Wall Street's interest?

Mr. MARSH. Well, like the securitization of mortgages, or, say, first mortgages, this is an advantage to the industry. That is, they can package and sell these in bundles and get an influx of capital.

I also think a lot of people believe the returns have been particularly great. But there is also a cloud; there are some companies that have filed for bankruptcy, a few fairly prominent, particularly in the auto area. As was pointed out here, it remains a question how long some of these companies will last. Like any other industry, as soon as these kinds of profits get reported, you will get a lot of entry into the market, and that is why we have seen such an incredible growth in subprime lenders.

The CHAIRMAN. Ms. Bernstein, to the extent to which your agency might see trends and keep specific numbers, have you seen an increase over the years in the predatory lending practices that we are discussing here, and if so, could you quantify those for me to whatever extent you can?

Ms. BERNSTEIN. It is difficult to have exact numbers of what is happening in the market, Mr. Chairman, but our records display that the number of complaints we get, the number of reports about foreclosures and the number of episodes that are reported to us by the States have definitely increased. As I said earlier, it has only been in the last few years that this has happened, but we have seen a very definite increase in reports of abuses occurring in this market.

The CHAIRMAN. And the same question I asked Professor Marsh—is there any way you can tell us Wall Street's interest in this, and anything else you might have to say about the interest of the secondary market? And what is the incentive of the recent surge in Wall Street's interest?

Ms. BERNSTEIN. I think probably the answer to all of those questions, Mr. Chairman, is that they are making more money on it. The mortgage rates for primary mortgages have been, as you know, at a very desirable low. I do not want to characterize Wall Street's motives, but I think it is that these mortgages carry higher rates of interest, so when they are bundled up together and sold as a group, as Professor Marsh said, they initially look as if they are going to be far more profitable, and in fact they have been more profitable.

So the interest is just that; it is because they are more profitable than prime mortgages.

103

The CHAIRMAN. Referring to the unscrupulous practices that this committee hearing is meant to expose, because of the involvement of Wall Street in a perfectly legal way, of course, has it given some credibility to these bad practices, or covered them in some way?

Ms. BERNSTEIN. I do not know whether it has covered them, but I suppose the respectability of subprime mortgages, bundled up together and sold, and then an infusion of capital that comes back in and further encourages subprime lending really says in essence, without questioning or challenging it, that Wall Street's going to tolerate these kinds of practices if they produce these rates. So that silence in essence says that the market is tolerating these practices.

The CHAIRMAN. And a purpose of our hearing today—and Senator Breaux has referred to his as well—is to hopefully encourage legitimate businesses to get rid of the con artists and the practices that are being exposed here.

Ms. BERNSTEIN. Well, it does not help legitimate businesses to have these practices proliferating. It is not in their interest, because if they are lumped together, their reputations suffer, and therefore, the acceptance of legitimate and honest offers of credit will suffer as well.

The CHAIRMAN. I would like to ask Mr. Brennan a question now. You have discussed increased predatory activity within the subprime lending market, particularly in recent years. What is your judgment as to why the market has suddenly grown so much in the last few years?

Mr. BRENNAN. As I mentioned earlier, Mr. Chairman, a lot of it has to do with an awareness of these lenders that the equity in the homes of more low and moderate income and elderly people is in a way there for the taking. They began to realize that although for each individual homeowner, the equity they have in their homes may be a small amount, in the aggregate, it could be billions of dollars. And by using the equity in such a broad base in these people's homes, they can engage in predatory lending practices where the risk is reduced because the value of the home itself, the equity value, makes these risk-free, as far as I can see, or a very low-risk type of lending.

The CHAIRMAN. OK. Today you have heard examples of victims who have tried to keep up their monthly loan payments, but obviously could not, and oftentimes the home is foreclosed on. Arguably, these loans set the borrower up for failure. That is probably the plan. My last question is, knowing such failure is inevitable, do these lenders employ aggressive collection strategies in order to collect their payments?

Mr. BRENNAN. Absolutely, and that is one of the worst features that we are seeing of predatory lending. Conventional mortgage companies lend to people and set the payments up where they know they can pay, so the defaults are not great. Predatory mortgage lenders, as you said, Mr. Chairman, try to max people out; they try to make the monthly payment as much as the person can pay short of failing, because they want that income stream. That goes back to the issue of the profitability. They want the income stream. But so many of them are set up to fail, where people finally cannot make the payments. Knowing that, these lenders employ

104

around-the-clock collection teams that are calling people as soon as a payment is missed, harassing them, and threatening them. And that has just had a devastating impact on so many of our elderly clients, who sometimes have a spouse sick in bed, and they will say, "Get him out of bed and over to the phone. We want to talk to him about those payments." It just upsets people. They bounce them back and forth between the regional collection office and the local office in Atlanta. Ten minutes after getting one nasty call, my client gets another nasty call from the regional office. She says, "I just talked to your people here", and they say, "Well, we do not know anything about that. You have got to talk to me." It goes on and on, and that is to maximize the payments and keep the income flowing, and that is a feature that is just disgusting.

The CHAIRMAN. Senator Breaux.

Senator BREAUX. I thank the panel members.

Is credit life required by law, or is it just by policy of the lender?

Ms. BERNSTEIN. It is not required by law, and indeed, the law is that a lender can make having insurance a part of the loan package if it is disclosed that that is what they are doing and how much it costs.

Senator BREAUX. It has to be part of the premiums?

Ms. BERNSTEIN. Yes—but it is supposed to be disclosed as to what the cost of the insurance itself is.

Senator BREAUX. Let me make all of you a Senator for a day, and you have one sure chance to get a bill passed in this area, passed and signed into law. What would your suggestion be to solve this problem—as difficult, as I have said before, as it is to legislate common decency. I am not certain that more disclosure is the answer. Sometimes I think we have too much disclosure when they throw 20 pages of disclosure in front of you that is not written in English but in legalese and fine print that cannot be read without a magnifying glass. That is disclosure, but is it effective? I think the answer is that it is not very effective in many cases; people do not read it, and somebody is telling them, "Do not worry about it. Here is what it says," and they tell you what their opinion is of what it says, and that is not correct, because you did not get to read the fine print, and 99 percent of it is fine print.

So if you were Senator for a day, Dr. Marsh, what would you do to fix this?

Mr. MARSH. Let me say first that sometimes it sounds corny to say that better education is what you want to do, because when you hear some of this stuff, you want to go out with a hammer sometimes, or you want to prosecute or whatever. But I will say that I think what you are doing today is probably the most valuable thing you can do. That is when people hear this, and it spreads far and wide, it makes the sales harder the next time. I have seen employees testify to the fact that when an event like this occurs or a story is told, it makes their sale the next week harder. So this is a very important process——

Senator BREAUX. People ask questions.

Mr. MARSH [continuing]. And I congratulate you for it, and it is critically important. But when you say Senator for a day, I will tell you the one thing—and this is just my own call—would be to try to put an end to these sort of "instant check" loans which really

105

are disguised mortgage loans that Bill spoke of, where you get a check that looks like a Government check, and lo and behold, what it really is is a mortgage loan. You sign off, and even though the disclosures will come hard and heavy, from a flipping component, I think they are probably the most dangerous thing in the market.

Senator BREAUX. They are not illegal per se now?

Mr. BRENNAN. No, and understand in all of these things that we are talking about, we are talking about lenders who probably have not violated truth-in-lending. As you point out, they make the disclosures, they are smart enough to know what the point limits are in a State, and so on. But at some point, I think you have got to step in and stop making things too easy. I think these "instant check", "instant loan" deals, at least in my view, are the most dangerous.

Senator BREAUX. Ms. Bernstein, what would you do?

Ms. BERNSTEIN. Well, I am a believer in disclosure that is meaningful, Senator, but I also agree that part of the problem here is that the written disclosures have been modified by oral statements to the contrary, which are difficult.

We have had experience, though, with improving the way they are communicated, and perhaps by putting them in plainer English and making them just a few critical questions and answers, like "Do you want more debt? Think about whether you want more debt," et cetera. I think we could do that without more legislation, and hopefully, we will move in that direction. In regard to legislation, at least on the packing, if legislation could clearly separate the loan and its costs from the credit insurance and other extras, I think that would be useful.

Finally—and I really have not thought it through, but since I am Senator for a day, I will take advantage of the position you have awarded me—I wonder if it is possible to have those in the secondary market, who are really infusing huge amounts of capital into this market—have some responsibility for assessing whom they are dealing with and whether or not they are dealing with people who have engaged in these practices. It is pretty easy to look at a group of loans and know whether there is equity stripping in them or not. If there were some responsibility and some liability before they purchased those packages, I think that that would go a long way toward at least putting a break on the flow of capital into those markets. I probably could think of others as well.

The CHAIRMAN. Mr. Brennan.

Mr. BRENNAN. Thank you. I also appreciate the opportunity to legislate. As a longstanding consumer attorney, Senator Breaux, I completely agree with you that disclosures, especially disclosures alone, simply do not work. However, we are always in favor of increased disclosure—the more people know, the better—but it is prohibitions that work. And let me say that the tools that we use, day in and day out, when we find a case where we can file a lawsuit, where there is a claim, are the Truth-in-Lending Act, the Real Estate Settlement Procedures Act, and the Home Ownership and Equity Protection Act of 1994. These are all Federal statutes—TILA, RESPA, and HOEPA, we call them—and we think those laws need to be preserved and kept in place so we can continue to use them as tools to protect our clients.

106

As far as the abuses that we are seeing, we would recommend a Federal UDAP statute, a Federal Unfair and Deceptive Acts and Practices statute, which would be similar to consumer protection laws that are in place in most States that prohibit and make illegal certain types of unfair and deceptive practices. If we had that kind of law on the Federal level, it would be most helpful for us.

Senator BREAUX. I thank all of our Senators for a day, and I will tell you that you all have five receptions that you must go to tonight. [Laughter.]

Thank you very much.

The CHAIRMAN. Senator Breaux, would you like to make a closing statement?

Senator BREAUX. I just did. Thank you, Mr. Chairman.

The CHAIRMAN. OK. I thank each of you for participating. I think that without our witnesses, particularly the people who have been hurt by this process, this would not have been a meaningful hearing. But we also thank our experts on this last panel who have dealt with this over a long period of time.

Second, I want to address what I will do about the problems that have been explored here today. Obviously, I want to work very closely with Senator Breaux on these issues as well.

I want to send a letter to both the Department of Justice and the Federal Bureau of Investigation to alert them to this problem and request that they make an effort to direct a portion of their resources to address the issue of predatory lending practices. To the best of my knowledge, these two organizations are pretty unaware of the situation, so lenders who are engaging in questionable and illegal practices—beware.

Second, I want to send a detailed letter to each of our 50 Governors, alerting them to the problem of predatory lending practices and sharing with them the "Top Ten Tips for Consumers" and, most importantly, to let them know of the model program used in the State of California which I have already referred to.

Third, I am presently looking into legislation that would make counseling mandatory under certain circumstances to avoid some of the predatory practices that were shared with us here today. It is my belief that we cannot legislate ethics, morality and compassion, and Senator Breaux has made that clearer than I can. But what I can do in my position is ensure that individuals who are served by the subprime market are fully aware of this situation before they sign on the dotted line.

Fourth, I am calling upon the industry to reflect upon some of the practices that it has come to accept and to reevaluate and take action. A few bad apples are giving the whole industry a black eye.

Finally, and perhaps most importantly, I want to close this hearing with a set of tips for every American dealing with the subprime market.

First, investigate carefully all the possibilities open to you before you decide to obtain a loan. Check with the Better Business Bureau in your State to assess the lender's reputation in your area.

Second, beware of entering into a loan transaction with anyone who comes to your door or with anyone whom you did not contact first.

Third, never sign any documents which you do not understand or which put your home on the line without first talking to someone. Ask questions; do not sign anything until you receive an answer, and ask what the options are.

Fourth, take a friend with you to review the documents, and always understand the role of the broker. The broker usually receives a commission from the lender.

Fifth, never, never sign blank documents or documents with any blank spaces.

Sixth, do not give in to high pressure tactics. If the lender does not give you a copy of the loan papers to read well in advance of your signing, look for one who will.

Seventh, always be prepared to walk away, even if you need to return to the lender's office another day.

Eighth, always remember that you have 3 days to get out of the contract for any reason—if you are concerned, if you have questions, or if you are just plain bothered by the whole thing.

Ninth, you are legally entitled to receive disclosures regarding the terms and cost of your loan. If the lender fails to provide you with all of these disclosures, you may have up to 3 years to get out of a contract.

Tenth, if you feel that you have been victimized, do not be embarrassed. Take action. Contact an attorney or your local legal aid office immediately, and inform the appropriate law enforcement agencies, the attorney general's office within your State, or your local police department. Advise the appropriate regulatory agencies, the department of corporations, real estate, or consumer affairs in your State.

I hope we can continue to work together. We are trying to decide what to do, but in the meantime, empower yourselves as best you can to understand all of these problems, and take action to the extent to which you can control.

This hearing is adjourned, and I thank everybody for their participation.

[Whereupon, at 3:55 p.m., the committee was adjourned.]

# A P P E N D I X

---

## HELLO
## HOME EQUITY LENDER LEADERSHIP ORGANIZATION

*1701 K Street, N.W. ♦ Suite 400 ♦ Washington, D.C. 20006*
*Phone 202/530-0666     ♦     Fax 202/223-6861*

March 26, 1998

Hon. Charles Grassley              Hon. John Breaux
Chairman                           Ranking Minority Member
Special Committee on Aging
United States Senate
Washington, DC 20510

Dear Chairman Grassley:

I am writing regarding the Committee's investigation into alleged predatory lending
practices directed toward the elderly in home equity lending, described at the March 16, 1998
Committee hearing. The Home Equity Lender Leadership Organization, which I chair, is an
organization of major lenders and capital market firms with expertise in making home equity
credit available to those with an impaired credit history. I ask that this letter and the
attachment be made a part of the hearing record.

This letter has three purposes. First, we want to advise you in the strongest possible
terms that the home equity lending industry is not characterized by the sort of clear abuses
described at the hearing, that the industry honestly, ethically and competitively serves the
growing credit needs of an increasing number of average Americans. Second, we want to
provide some factual background on the industry lending record, and in particular about the
role that securitization and market discipline play in deterring the conduct your Committee
rightly condemns. Finally, we want to offer to join with you in promoting steps which can be
taken to deter or prosecute these abusive practices, steps which do not necessarily depend upon
the enactment of new laws but on education and utilization of existing legal standards.

**Home Equity Lending - Growing with an Expanding Consumer Economy**

It is clear that home equity lending has expanded at a rapid rate over the past decade.
That expansion has been driven by three factors. First, the collapse of the savings and loan
industry sharply curtailed availability of the traditional source of local credit. Many
homeowners had credit needs, driven by consumer purchases, home improvements, college

(109)

education costs and other typical consumer buying decisions.  In the tough bank regulatory environment accompanying the S & L meltdown, non-bank providers of home equity loans became a significant source of consumer credit as bank lenders backed away from such lending.  Businesses which could not find credit elsewhere may have had the Small Business Administration to turn to (SBA business lending has nearly tripled in 15 years), but individuals had to find new sources of credit.  Home equity has been an affordable answer for many borrowers.

A second and related point is that borrowers have become more savvy.  They realized that unsecured finance or credit card debt, which likely costs upwards of 20 percent, was unnecessary if a lender could have the loan secured by a residence.  That security allows the loan to be made at much lower rates to a person with an uneven credit history.  The industry's low delinquency rates (lower than comparable FHA/VA portfolios) prove that the borrower will responsibly repay a loan with more at risk.  From the borrower's perspective, a monthly payment on an 11 percent loan (the current average rate for securitized home equity loans) secured by a residence is vastly better than a monthly payment on a 20 percent unsecured finance company or credit card loan.

Finally, home equity lending has been able to expand to serve increasing borrower demand for consumer credit because of the ability of capital markets to provide liquidity to these lenders (and without any assistance or safety net provided by Federal agencies, government sponsored enterprises or taxpayers).  Capital markets link investors with capital with lenders who make loans to borrowers who regularly repay the loans.  This process has to be predictable for all parties.  The investors demand the vast majority of loans be repaid as projected, and interruptions to that process, whether because of borrower delinquency, dispute over loan terms, or even early prepayment, disadvantage the lender.

The important point is that home equity lending has grown because of changes in banking, because of growing consumer demand and smarter borrowing, and because of financial market ability to supply capital.  The market has not grown because lenders seek out inappropriate borrowers and provide them with loans with egregious terms.  We strongly object to an implicit subtext by some witnesses that rapid home equity lending growth is based on loans which are questionable, legally or economically.  And we likewise object to the suggestion that borrowing for debt consolidation is somehow unfair or improper.  It is in fact a highly rational economic decision made hundreds of times daily when the home equity lender can offer better credit terms than the borrower's current debt.

### Home Equity Subprime Lending - the Record

The questions the Committee raises are important.  But some press reports equate subprime lending with predatory lending.  That interpretation is not only absolutely wrong, but could only be made in total disregard of the record of who this industry really serves.

The Committee is, naturally, concerned about issues affecting the elderly.  But the

home equity lending industry is not focused on the elderly. The demographics of home equity borrowers are very consistent with the average American homeowner. In fact, the home equity borrower is somewhat more likely to be a middle aged married male than would be predicted given their participation in home ownership in this country. The specific situations described by the Committee witnesses are tragic. But there is no basis, looking at the demographic data on lending to credit impaired borrowers, to conclude that home equity lending is targeted toward the elderly, much less targeted with such questionable sales practices.

A 1997 report of the Hudson Institute, written by Dr. John Weicher, a former Assistant Secretary of HUD for Policy, analyzed demographic information as to the characteristics of borrowers, terms and repayment record of home equity loans to credit impaired individuals. [Executive summary enclosed as attachment "A"] The Hudson report describes a "subprime" home equity borrower as essentially looking like an average American. The medians for the credit impaired home equity borrower, compared to the average US homeowner show:

— Median income of $34,000, ($ 37,000 for all homeowners)
— Median age of 48 (51 for all homeowners)
— 16 percent of loans to over 65 homeowners (vs. 26 percent of homeowner population)
— 19 percent of borrowers are female head of household (vs. 23 percent of home owning population).

Another charge made to the Committee is that home equity loans are made at terms "designed to fail" and thus force the borrower into bankruptcy or foreclosure. This is not and cannot be true given the volume to which home equity lending has grown. The Hudson report states, and Wall Street investors endorse every day, the excellent portfolio record of home equity lenders. Loans current in repayment exceed 93 percent, a better record than FHA and VA loans. And for those loans which must go into foreclosure because of repeated lack of payment, the lender is in trouble. Lenders lose funds on 93 percent of their foreclosures. To suggest that the loan is made with the intention of causing default, and that then the lender profits from the foreclosure is simply not true, according to common sense and the record of the industry.

One major reason this cannot be true is that capital investors, upon whom the industry depends, do not reward lenders with bad portfolios. Most major lenders "securitize" their loans, pooling a number of loans together, for purchase by investors who contract to receive a specified interest rate return over a specified period of time. If loans default, the profit the lender expected to retain is subordinated to pay the investor. If loans are refinanced (flipped) the lender is in the same bad position. His investor's pool has lost the promised flow of income from a loan, and the lender's subordinated interest in the pool must make up the difference. If a loan is poorly closed, not in compliance with the Truth in Lending Act or other relevant regulations, and the borrower rescinds the loan, the lender must repurchase the loan from the investor.

This securitization process brings a real numbers-driven discipline to the home equity lending market. Loans must be made properly; they must be made legally; they must be made at competitive interest rates that do not invite rapid prepayment. The lender must reveal all the details of the portfolio to the investor, and if the lender's portfolio does not perform, he pays a price, in the form of higher interest rates and more capital subordination.

The capacity of the securitization market has enabled the growth of home equity lending, and that growth itself has brought more competitive options for borrowers. An increasing number of lenders in the subprime home equity market is driving down the interest rates available to all borrowers. In today's environment, the chances of a borrower, especially a subprime borrower, finding a better deal are excellent if he or she is willing to make some calls, shop for credit, and ask some questions.

**"Predatory Practices"**

Whether home equity lending is $100 million or the more than $100 billion annually in today's economy, there are undoubtedly some lenders who do not play by the rules. HELLO firmly believes that Federal and state enforcement authorities should investigate and prosecute instances of illegality. We congratulate the Federal Trade Commission, for example, for pursuing the case it has recently announced against alleged fraud in the home loan process.

The complaint is made, however, that some current practices are unfair, "predatory" but not illegal. The committee should be very aware that HELLO has been working, as have other lender organizations, to come up with proposals for new legal standards to address some of these issues. In particular, we very much share the concern of the Committee and consumer groups on loan "flipping." As explained above, lenders have financial incentives not to want to flip loans. A short-sighted answer favorable to lenders would be to forbid borrower refinancing within certain time frames. That would obviously be unfair to borrowers, who may want a lower rate or additional funds. HELLO has proposed, therefore, that the ability to refinance a loan within twelve months be unlimited, but that the ability to include points and closing fees in the new borrowing be limited in various ways. This would retain flexibility for the consumer and limit the incentive of new fees to the lender or broker. But it is a complicated issue, and any proposal is likely to have unintended consequences. We will continue to try to refine an acceptable proposal.

The Committee focused on "packing," adding extra fees, usually various life insurance premiums, to the loan. We support requirements that borrowers be fully advised of any proposed insurance premiums, and be clearly advised before closing whether the lender requires insurance, or that it is optional. If this is a problem, it can be solved with broad support from the lending community. But the borrower should shop the cost and need for any insurance, before deciding on a loan.

A number of mortgage lending industry associations, including HELLO, are meeting with consumer groups to come up with proposals for changes in the law to deal with some of

these problems.  However, it is important to note that not all the charges by the AARP and other consumer groups involve, in our opinion, either illegality, unfairness or bad practice. Where consumers will improve their economic situation by consolidating their debts with a home equity loan, this is to be encouraged.

Finally, as I hope this letter makes clear, a better understanding of the economic and business reasons for the growth of subprime home equity lending should lead to a better dialogue, and ultimately to minimizing bad practices when they do occur.  Some changes in the law may be appropriate.  But as Senator Breaux stated, the government cannot legislate all aspects of every situation.  Our association has adopted a Code of Ethics, reflecting its interest in setting high standards for lending.  We will continue to work with all groups who want to improve the mortgage and consumer credit process.  More intense shopping on the part of borrowers, taking advantage of competitive markets in loans, will greatly strengthen the borrower and minimize the response to the unscrupulous lender.

We appreciate the opportunity to inform the record of your hearing with this letter.

Sincerely,

James Moore
Chairman

114

# The Home Equity Lending Industry

**Refinancing Mortgages for Borrowers with Impaired Credit**

John C. Weicher



Hudson Institute

# Executive Summary

This monograph is the first systematic study of the home equity lending industry from a public policy perspective. As defined in this study, home equity lending is the process of refinancing mortgages for homeowners whose credit ratings do not meet the normal underwriting standards of prime lenders. There are two dimensions to this definition: the nature of the loan, and the credit standing of the borrower. Home equity loans are first liens on homes already owned by their occupants. They are not purchase money mortgages, second mortgages, or home equity lines of credit, although the term "home equity lending" has sometimes been applied to the latter two instruments. The borrowers are individuals with some history of credit problems.

Home equity lending is a rapidly growing and changing sector of the home mortgage market but is not very well known or understood outside the industry itself. It is so new that there are no standard measures of its size. It appears to account for 5 to 10 percent of total mortgage originations in the U.S. Ten years ago, it was perhaps one-half to one-tenth

its current size. Nor is there a standard descriptive terminology: the industry is variously called *subprime lending, B&C lending,* and *the nonconforming market,* as well as home equity lending. Similarly, the firms active in subprime lending are not readily identified in the public mind. They are best described as home equity lenders today, but in the past they have more often been termed finance companies.

Information for the study came from several sources: data provided by individual member firms of the Home Equity Lenders Leadership Organization (HELLO); aggregate information on subprime lending from the Mortgage Information Corporation (MIC), covering a large sample of prime and subprime lenders; the Mortgage Bankers Association of America (MBA); published reports of Wall Street analysts; securities prospectuses of HELLO member firms; and the trade press and general media. The data cover different firms, subjects, and time periods, and therefore are not always fully consistent. Nonetheless, they all present the same basic picture of home equity lending.

### The Process of Home Equity Lending

Credit standards in mortgage markets are effectively established by the two large government-sponsored enterprises (GSEs), the Federal National Mortgage Association (FNMA or Fannie Mae) and the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac). These firms buy or securitize loans that meet their underwriting standards, and these debts are known as *prime* or *agency* loans. Home

equity lenders specialize in *subprime* loans, those to borrowers with impaired credit. Such borrowers are typically seeking to refinance a current mortgage at a lower rate or to take cash out of home equity for purposes important to them.

The loans may be initiated in several ways. The most common method is through a correspondent, a lender with a warehouse line of credit provided by a bank or other financial institution, which then sells the loan to another lender. Alternatively, loans are purchased wholesale from mortgage brokers. Approximately one-sixth are originated in retail offices which establish direct contact with potential borrowers.

The loans are then usually packaged as securities and sold to investors through Wall Street firms, in the same manner as traditional mortgage-backed securities issued by the GSEs or other prime lenders.

In sharp contrast to the prime mortgage market, there are no generally accepted underwriting guidelines for subprime home equity lenders. Individual firms set their own guidelines. They typically take the same factors into consideration but set different criteria to qualify for a given credit grade. Hence, one firm's B loans may look like another's C loans. Underwriting appears to be an art rather than a science. For this reason, subprime loans cannot be treated as a standard commodity, again in contrast to loans in the prime market.

The industry is not dominated by one or a few firms. Most firms concentrate their operations within a particular geographical region, although most also have at least a few loans from nearly every state.

Many are expanding their geographic range of operations.

## The Growth of Home Equity Lending

Home equity lending today probably exceeds $100 billion annually. It has grown rapidly for several reasons. The failure of many savings and loan associations (S&Ls) in the late 1980s resulted in legislation that strengthened the market position of the GSEs, along with new regulations curtailing the ability of S&Ls to take risks. Also, the unprecedented peacetime inflation of 1965-1980 drove home prices up in both nominal and real terms, and they have remained generally high even though the inflation rate has been much lower since 1982. Many homeowners have therefore enjoyed increases in their home equity, but because their credit rating does not meet GSE standards, they have not been able to refinance in the prime mortgage market. As a result, home equity lending to subprime borrowers has increased at an extraordinary rate during the last five to ten years.

## Demographic and Economic Characteristics of Borrowers

In most respects, subprime home equity borrowers are similar to other homeowners. Their median income is approximately $34,000, slightly below the $37,000 median for all homeowners and almost exactly the same as the $34,000 median for all U.S. households. The difference between home equity borrowers and all homeowners arises because there have been few high-income borrowers in the

subprime home equity market. Otherwise, the income distributions are similar. Home equity borrowers are not concentrated among low-income homeowners.

Home equity borrowers tend to be slightly younger than all homeowners, even though it takes time to build up enough equity to borrow against. This pattern occurs because elderly homeowners are substantially underrepresented among home equity borrowers. The typical home equity borrower is forty-eight years old, compared to fifty-one for all homeowners. Single men are twice as common among subprime home equity borrowers as among all homeowners. Single women are somewhat underrepresented.

These data suggest that subprime home equity borrowers are basically the same sort of people as other homeowners and are able to make informed judgments about what is in their own best interests. They are not particularly concentrated among the elderly or families headed by a single woman, groups sometimes thought to be most vulnerable to predatory practices in housing-related transactions. Direct data on the education of subprime home equity borrowers are not available, but education tends to be correlated with income, and there is no evidence that subprime borrowers are concentrated among poor households. Thus there is no particular reason to think that subprime home equity borrowers are less well educated than all homeowners.

**Mortgage Rates and Terms**

Interest rates in the subprime home equity loan market are higher than the rates on prime loans,

because subprime lenders face higher servicing costs and assume more risk. Data from the Mortgage Information Corporation indicate that subprime loans carry an annual interest rate of approximately 11 percent, compared to 8 percent for prime mortgages.

For the same reason, interest rates vary among different credit grades within the subprime market: lenders charge higher rates on loans expected to be riskier. These rates tend to rise or fall together in response to conditions in the financial markets. Wall Street analysts estimate that the least risky loans run approximately 200 basis points above prime mortgages; the most risky, approximately 600 basis points. These spreads are not immutable; they vary from time to time and are likely to do so in the future.

HELLO member data also show that interest rates are higher on loans to borrowers with lower credit ratings. The spreads differ somewhat from the Wall Street estimate: HELLO members report a range of 500 basis points between their least risky and most risky loan, wider than the 400 basis point estimate of Wall Street analysis. HELLO data show that LTVs and loan amounts are both higher on higher-quality loans. The overall pattern is clear and not surprising: rates are higher, and terms less generous, on riskier loans.

Subprime rates typically lie between the rates on prime mortgages and those on credit card debt. Because even the highest interest rates on subprime home equity loans are lower than the interest rates charged on consumer credit cards, a homeowner who faces a high debt burden or unexpected costs may well find it in his or her best economic interests to

refinance a mortgage rather than to borrow directly or indirectly against a credit card.

Subprime mortgages have an average loan-to-value ratio (LTV) of 72 percent. The typical loan amount is approximately $60,000 to $65,000. The LTV is slightly lower than the median LTV for prime conventional mortgages—75 percent—and much lower than the median, 97 percent, for government-guaranteed loans (FHA and VA). The loan amount is well below the typical prime conventional loan of $85,000, and close to the typical government-guaranteed loan amount of $60,000. Subprime loans also tend to have shorter maturities, most commonly fifteen years, with an average of approximately twenty years; conventional prime and government-guaranteed mortgages typically have thirty-year terms.

## Origination and Servicing Costs

Origination costs appear to be substantially higher for subprime mortgages, in the range of 4 to 8 percent, compared with an average of 2 percent for prime mortgages. Servicing costs are approximately one-third higher for subprime loans, largely reflecting the need for more intensive staffing. The typical servicing employee can handle approximately half as many subprime loans as prime mortgages.

## Mortgage Delinquencies and Defaults

Most home equity borrowers, like other mortgagors, are current on their mortgage at any given time. Approximately 94 percent are current, compared to 97 percent of prime mortgagors and 92 percent of mortgagors with government-guaranteed

loans. Delinquency rates are thus higher for home equity loans than for prime mortgages, but somewhat lower than for government-guaranteed loans.

Default and foreclosure rates differ between prime and subprime lenders in much the same way as delinquencies. At a given time, fewer than 1 percent of all prime loans, fewer than 2 percent of all government-guaranteed loans, and approximately 3 percent of subprime loans are in foreclosure, according to data provided by MIC. Over the life of the loans, cumulative default rates are higher for home equity loans. Cumulative defaults run approximately 12 percent over the first six years for home equity loans, compared with 8 percent for FHA mortgages.

Mortgage terms and loan experience in the subprime market exemplify two facets of the same phenomenon of risk. Home equity lenders take greater risks than conventional prime lenders. They incur higher delinquencies and higher defaults. Because of the delinquencies, they incur higher servicing costs. For these reasons, they charge higher interest rates. They also attempt to manage risk in other ways, for example by offering lower LTV mortgages to protect themselves against the risk of loss.

Within the subprime market, the same pattern prevails. Delinquency and default rates rise with risk. They are systematically higher for subprime A or A-mortgages than for prime mortgages, higher for B than for A, higher for C than for B, and higher for D than for C. The greater the risk, as estimated by the lender when originating the loan, the greater the delinquency rate and the higher the foreclosure rate. What firms expect to happen does in fact happen.

Loans that are thought to be more risky when they are made, do turn out to be more risky.

**Real Estate Owned**

After home equity lenders take title to properties with defaulted loans, they attempt to sell the houses to recoup part of their losses on the loans. Data from HELLO members indicate that the holding period is approximately eight months, on average, longer than the average for defaulted FHA-insured properties to which HUD has taken title after paying a mortgage insurance claim.

Lenders incur substantial costs on their real estate owned (REO): the legal costs of foreclosure; continuing payment of interest on the mortgage-backed security even though the lender is no longer earning interest on the loan; maintenance; repairs; property taxes; and brokerage costs when the property is sold. On average, these costs add up to approximately 35 percent of the outstanding balance on the loan, and approximately 25 percent of the value of the house itself.

Home equity lenders incur losses on more than 93 percent of their REO. At the other end of the distribution, they get little or nothing back on some 30 percent of the properties. On average, they lose approximately 49 cents for each dollar of their investment in the property. By comparison, FHA loses approximately 34 cents per dollar on its insurance claims.

Thus it is clear that large subprime lenders do not make profits on their REO. Rather, the opposite is the case. Defaults are expensive for home equity

lenders. They lose approximately half of their invest-
ment in the property, including both the loan and the
costs of foreclosing and selling. In respect to both
holding period and loss, their experience is worse
than FHA's. It takes them longer to sell a property,
and they lose more money.

125

## FINKELSTEIN, THOMPSON & LOUGHRAN

THE FOUNDRY BUILDING
SUITE 601
1055 THOMAS JEFFERSON STREET, N.W.
WASHINGTON, D.C. 20007

TELEPHONE: (202) 337-8000
FACSIMILE: (202) 337-8090

April 27, 1998

Hon. Charles E. Grassley
Chairman, Senate Special Committee on Aging
Dirksen Senate Office Building, G 31
U.S. Senate
Washington, D.C. 20510-6400

> Re:   *Comments to Senate Special Committee on Aging Hearing Titled Equity*
> *Predators: Stripping, Flipping and Packing Their Way to Profits*

Dear Senator Grassley:

At the invitation of the Senate Special Committee on Aging, and as counsel for Gael
Carter, who appeared as a witness at your recent hearing, I am writing to submit my
comments on the Committee's investigation of the growing problem of predatory lending.
I applaud your efforts and those of the other members of the Committee in recognizing the
urgent need to address predatory lending abuses and in taking the first steps toward finding
solutions to the problem. As the Committee noted, predatory lenders frequently prey on
the elderly and the poor. There can be no doubt that while the hearing was an important
first step in the process of ameliorating the manipulative practices of predatory lenders,
much work remains to be done.

As the Committee recognized, predatory lending includes practices such as equity
stripping, flipping and packing. The victims of these practices are often either elderly or
poor, or both. The problem, however, does not end there. Lenders that engage in the type
of predatory activity addressed at the hearing do not discriminate amongst their victims.
Citizens of all walks of life in this country are in danger of becoming entangled in the web
of deceit spun by predatory lenders. While the elderly are easy marks for lenders who
employ these deceptive practices, uneducated and blue-collar workers are also frequently

**126**

FINKELSTEIN, THOMPSON & LOUGHRAN

Hon. Charles E. Grassley
April 27, 1998
Page 2

targeted. As revealed during testimony at the Committee's hearing, finance company employees are taught sophisticated methods for trapping unsuspecting borrowers in deceptive loan transactions. Further, these employees, often struggling to keep their jobs and pay their own bills, face aggressive company-imposed insurance sales and loan production quotas that simply cannot be met absent insurance packing and loan flipping. Unsuspecting borrowers, who may have less than perfect credit or who simply may not understand the complex language of loan documents, find themselves quickly mired in a quicksand of debt and sometimes even lose their homes as a result. While it is valuable to discuss the problem of these predatory lending tactics and bring them to the attention of the American public, changes that reach even more broadly must be implemented.

I, again, applaud the efforts of the Committee and thank them for their timely response to this growing problem. Further, I am encouraged by the progress that has been made against the practices of predatory lending and hope that, as a result of the Committee's efforts, more Americans now know about the dangers of predatory lending practices. Education is an invaluable tool in the fight against predatory lenders. In my opinion, however, education alone is not sufficient to protect the citizens of this country who are in the most danger of falling prey to these tactics. Despite the education campaign initiated by your Committee and assisted by the media, the perpetrators of these deceptive practices continue to conduct business in the same manner and, further, continue to make huge profits at the expense of unsuspecting borrowers. As the testimony at your Committee's hearing so glaringly demonstrated, customers of these companies can not operate on a level playing field with employees who are trained to use deceptive practices to pad the corporate bottom line at the expense of hapless borrowers. Legislation to prohibit these practices is essential to the effective protection of American citizens.

The following are some suggestions for legislative changes that I believe would make substantial progress toward eliminating the types of deceptive lending practices your Committee is investigating:

### *Legislation that would help eliminate loan flipping*

Loan flipping occurs for two primary reasons. First, predatory lenders flip loans because they receive a bonus on interest and insurance rebates through the use of a rebate formula known as the Rule of 78s. Second, some finance companies encourage their employees to flip their own customers' loans because they are not required to rebate loan

127

**FINKELSTEIN, THOMPSON & LOUGHRAN**

Hon. Charles E. Grassley
April 27, 1998
Page 3

origination fees (points) and other fees from the previous loan.  Each of these loan flipping
motives could be reduced or eliminated through legislation.

- **Eliminate the Rule of 78s.**  When loans are refinanced, lenders must rebate
  unearned interest and unearned credit insurance premiums.  Many subprime
  lenders accrue interest on loans of 61 months or less according to a rebate
  formula known as the Rule of 78s.  Subprime lenders also frequently use the
  Rule of 78s to compute insurance premiums, regardless of the loan term.
  Financial experts and consumer advocates uniformly criticize the Rule of
  78s because, unlike the actuarial or pro rata methods, the Rule of 78s front-
  loads so-called "earned" interest and insurance premiums into the earlier
  portion of the loan term.  For example, an internal finance company
  document uncovered in Mrs. Carter's case revealed that by using the Rule of
  78s, the finance company was able to accrue about one half of its interest
  income on personal loans after only one third of the loans' terms had
  expired.  Hence, when these loans are refinanced, the lender is able to keep
  more of the interest and insurance premium than would be the case if
  actuarial or pro rata methods were used.  Finance companies therefore
  instruct their employees to target loans for renewal (i.e., flip) after about a
  third of the loan term has expired.  Prohibiting use of the Rule of 78s would
  eliminate this motive for flipping loans.

- **Require that lenders rebate loan origination fees when loans are
  refinanced in less than six months.**  Finance companies often are not
  required to rebate loan origination fees when they refinance their customers'
  loans.  Therefore, every refinancing provides the finance company an
  opportunity to earn new income from origination fees or points.  For
  example, we uncovered internal finance company documents during Mrs.
  Carter's lawsuit that instruct company employees to refrain from rebating or
  waiving income from points and other loan origination fees when
  refinancing loans.  Employees of this company told us·that there were no
  rules requiring that points be waived or rebated, even if the loan were
  refinanced in as few as thirty days.  As this company charges customers up
  to 10 points on a loan, the more often the loan is refinanced, the more often
  the company can earn new income from these fees.  It should be no surprise
  that this encourages loan flipping.  Legislation that would prohibit lenders

128

**FINKELSTEIN, THOMPSON & LOUGHRAN**

Hon. Charles E. Grassley
April 27, 1998
Page 4

> from charging new loan origination fees or require rebates of such fees for
> loans that were refinanced within a short time after the previous loan
> (perhaps six months) would reduce or eliminate this motive for flipping
> loans.

### *Legislation that would eliminate abuses in the sale of credit insurance*

Much of the testimony presented to the Committee pertained to insurance packing.
As you no doubt know, finance companies earn enormous income from credit insurance
sales. While the benefit of this type of insurance to the consumer is debatable, there is no
question that the cost to consumers for credit insurance is outrageously high as compared
to the minuscule loss ratios experienced by insurers. Because credit insurance is so
profitable to finance companies, many employees try to pack it into loans by making the
customer believe that it is mandatory, or simply by slipping insurance documents into the
loan package even though the customer has never requested the insurance. The following
proposals would help eliminate credit insurance abuses:

- **Amend TILA to require that voluntary credit insurance cannot be sold
  unless there is a written disclosure comparing the amount of the monthly
  loan payment with insurance, and without insurance.** At the Committee's
  hearing, one witness vividly described some of the deceptive tactics used by
  finance company employees to pack credit insurance into loans. This
  witness testified that finance company employees are trained to always avoid
  comparing the cost of the monthly payment on a proposed loan with and
  without insurance. Rather than disclosing the comparative cost,
  unscrupulous finance company representatives simply add credit insurance
  to the loan (without telling the customer) and include the cost of that
  insurance in the monthly payment quote that is provided to the customer.
  Although the loan documents disclose the total cost of the insurance for the
  entire loan, the customer is never given the information that is most
  meaningful; that is, how much the cost of insurance adds to the monthly
  payment. Almost every finance company employee we interviewed said the
  same thing: customers care most about the cost of the monthly loan payment
  - almost nothing else matters. While the current TILA disclosures about
  insurance are helpful, the most *meaningful* disclosure is not presently
  required. If Congress were to amend TILA to add one more disclosure, that

**FINKELSTEIN, THOMPSON & LOUGHRAN**

Hon. Charles E. Grassley
April 27, 1998
Page 5

amendment should require lenders to compare the amount of the monthly loan payment both with and without insurance before they are permitted to sell credit insurance. While I concur with Senator Breaux that adding more disclosure requirements may not necessarily eliminate all lending abuses, I do suggest that the Committee consider requiring this type of disclosure. It is clear that the cost of monthly payments is foremost in the minds of the consumers, and disclosing the effect of insurance on the monthly payment would allow consumers to make meaningful choices about purchasing credit insurance.

- **Encourage the States to eliminate the sale of credit insurance based on the total of loan payments.** I am, of course, aware that the regulation of insurance is left to the States by virtue of the McCarran-Ferguson Act. Unfortunately, almost every state currently allows what may be the most abusive credit insurance practice of all - basing the amount of coverage on the total of loan payments rather than the principal balance and earned interest. For example, Mr. Raymond White, a client of ours who was present at the hearing and recognized by the Committee, took out a loan for $63,304. The finance company sold Mr. White joint credit life insurance, without his knowledge, in connection with his loan. Instead of basing the amount of coverage on the principal balance of his loan (and consequently the finance company's risk of loss), the lender based the amount of coverage, $100,000, on the total of White's loan payments over the life of the loan. Hence, even though Mr. White never would have owed more than $63,304 plus one month's interest, the finance company sold him an insurance policy with coverage of $100,000. Finance companies do not sell customers extra insurance for altruistic reasons. In Mr. White's case, the finance company was able to collect an additional $12,835 solely as a result of insuring him on the basis of the total of payments instead of the principal balance of the loan. I urge Congress to assist states in recognizing the abuses that result from the lack of legislation in this area and to encourage states to eliminate this practice.

- **Create a national deceptive practices act.** At the Committee's hearing, one of the experts suggested that Congress create a national deceptive practices act. I agree. The current patchwork of state laws addressing the

**FINKELSTEIN, THOMPSON & LOUGHRAN**

Hon. Charles E. Grassley
April 27, 1998
Page 6

subject has resulted in a haphazard approach towards eliminating the lending abuses explored by your Committee. While some state laws have effective enforcement mechanisms, others are wholly inadequate. A uniform national standard would help finance companies, consumers and regulators identify and avoid inappropriate conduct. A national deceptive practices act would also provide regulators and consumer advocates with a more uniform and effective remedy to curb lending abuses.

These are only a few suggestions for possible reform and certainly do not represent an exhaustive list of the possible remedies to the practice of predatory lending. These suggestions are intended to demonstrate that even beyond consumer education, there is more that can be done to address this problem. While we cannot legislate morality, it is our job to ensure that consumers are protected, to the fullest extent that the laws of this country will allow, from the deceptive, manipulative practices of predatory lenders.

Thank you, on behalf of myself and my clients, for the opportunity to submit my comments to the Committee. I recognize the challenges that face the Committee in finding solutions to the growing problem of predatory lending and appreciate the consideration given to the aforementioned suggestions.

Respectfully,

William P. Butterfield

cc:    Gael Carter
       Raymond and Jean White
       Richard Weiss, Esq.
       Steve Hubbard, Esq.
       Lynn Berry, Esq.
       Patricia Ryan, Esq.

131

GREGORY THOMPSON
ASSISTANT DISTRICT ATTORNEY

OFFICE OF
**THE DISTRICT ATTORNEY**
COUNTY OF SAN DIEGO

**PAUL J. PFINGST**
DISTRICT ATTORNEY

San Diego Branch Office
330 W. Broadway
San Diego, CA 92101
(619) 531-4040

February 3, 1998

Senator Charles E. Grassley
United States Senate
Chairman of Special Committee on Aging
Washington, DC  20510-5400

Dear Senator Grassley,

It is my great honor to assist you and the United States Senate in your inquiry into predatory
lending practices which target the aging community.

Here in San Diego, the District Attorney's Office has long been active in combating complex
real property crimes.

We pride ourselves as being on the cutting edge of real estate fraud prosecution in California.
In 1995, our office collaborated with the Los Angeles District Attorney's Office and the
California Association of Realtors to pass Senate Bill 537. This legislation authorized each
county in California to create, at their option, a Real Estate Fraud Prosecution Trust Fund.
Our mission is simple: to investigate, prosecute, and deter real estate fraud. Revenue to
support this program derives from a $2.00 surcharge on recording fees for certain real
property documents. In San Diego, these fees generate approximately $600,000.00 a year.
This funding has allowed the District Attorney to create a staff dedicated exclusively to
fighting real estate fraud.

Currently, the assessed value of all real property in San Diego exceeds 150 billion dollars, or
to be precise, $150,329,134,117. Thieves naturally find this real estate to be an attractive
target for their scams and fraud. In particular, they seek to exploit and victimize the aging
community. In San Diego it is fair to say that the majority of our victims of real estate fraud
are members of the aging community. Our victims represent people who have dedicated their
lives to working hard, to build up equity in their homes and to create a nest egg for their
retirement.

Hard money lenders commit much of the damage to the aging community in real estate fraud
in San Diego. Hard money lenders are typically mortgage brokers, licensed by the

Department of Real Estate. A hard money lender is the middle man between borrower and lender. Hard money lenders solicit borrowers or lenders and negotiate loans and collect money for borrowers or lenders on loans secured by deeds of trust on real property. The loans they broker usually involve other peoples' money. They arrange these loans, at high interest rates, to people with bad credit. They charge huge points or commissions that come out of the loan proceeds due to the borrower. This provides an incentive for a hard money lender to make as many loans as possible. Whether the loans prove to be bad or fraudulent is of little consequence to the hard money lender, who has already received his points or commissions at the outset.

The victim we most frequently encounter in San Diego is the aging investor who buys a loan from a hard money lender.

Of perhaps greater concern is the fact that many hard money lenders service their own loans; they collect the monthly payments from the borrowers and pay them to the investor. This loan servicing includes the final loan payoff, typically a balloon payment of tens of thousands of dollars. Frequently this payoff is done by way of a broker-exempt escrow in which there is no third party escrow and no supervision or regulatory agency overseeing the payoff. A common fraud scenario involves a broker taking this loan payment and diverting it to his or her own use. Hard money lenders then hide this theft by telling the victim the loan has been extended or rolled over. The hard money lender continues to service the loan as though it had been not paid back. This continues until the hard money lender runs out of money and winds up in state prison.

We have seen predatory practices in San Diego that target the aging community. We are currently investigating one predatory lending case involving a 75 year old woman. This woman is legally blind, cannot read even with prescription glasses and a magnifying glass, and had a leg amputated several years ago. This woman was solicited by a telemarketer for a refinance of her existing mortgage. The broker ultimately put her in a loan that cost her $3,000.00 in prepayment penalties, as well as points to the broker of another $2,000.00. She went from owing $78,000.00, to owing $91,000.00. The loan application listed her monthly income as $3,000.00, when in fact she receives approximately $850.00, primarily from social security. The loan benefited basically no one except the broker. The woman is now in default on this loan and faces foreclosure.

We received a referral involving this case from the Neighborhood Housing Association, a community group, and will likely subject the broker to civil litigation, involving unfair business practices. I must advise you that there appear to be no criminal statutes in California that directly forbid these predatory lending practices.

We encourage your inquiry for this reason. While there are an abundance of laws that allow us to effectively prosecute the predatory practices on the investor side of the equation, we have

133

Senator Grassley                            -3-                        February 3, 1998

been helpless on the borrower side of the equation involving the predatory lending practices.
There are no laws, no rules, no regulations to protect the vulnerable borrower, whether that
borrower is aging, a minority, a non-English speaker--people who can't get money elsewhere
and are sitting ducks for predatory lenders.

This is an important, serious problem. We welcome your attention to this very timely issue
which is of great concern to anyone involved in real estate.

I have enclosed a book of documents which I hope will assist you in your inquiry. They
include our legislative initiative creating the Real Estate Fraud Prosecution Trust Fund, several
sentencing memoranda and articles on notorious real estate frauds in San Diego, as well as
articles on real estate fraud from the perspective of a prosecutor. We believe that we have
created in California and in San Diego an effective system for prosecuting real estate fraud.

We interact effectively with all facets of the real estate industry, to effectively investigate and
prosecute real estate fraud, once it is discovered. However, greater attention should be placed
on the extreme damage a single proficient thief can commit in real estate fraud, particularly
where the victim is a member of the aging community.

I am available to testify as a witness, to provide additional information on our approach to real
estate fraud, and to suggest legislative and practical remedies.

                                        Sincerely,

                                        Jeffrey Brodrick
                                        Deputy District Attorney
                                        Real Estate Fraud Subdivision

JB:vjb

Attachments

134

## Senate Bill No. 537

———

Passed the Senate  September 12, 1995



*Secretary of the Senate*

———

Passed the Assembly  September 11, 1995



*Chief Clerk of the Assembly*

———

This bill was received by the Governor this __5th__ day
of __September,__ 1995, at __11:00__ o'clock __a.__ M.

*Private Secretary of the Governor*

135

SB 537                        — 2 —

## CHAPTER _____

An act to add Section 27388 to the Government Code, relating to recordation fees.

LEGISLATIVE COUNSEL'S DIGEST

SB 537, Hughes.   Recordation fees.

Existing law requires the county recorder, upon payment of proper fees and taxes, to accept for recordation any instrument, paper, or notice that is authorized or required by law to be recorded.

This bill would provide that in addition to other recording fees, upon the adoption of a resolution by the county board of supervisors, a fee of up to $2 shall be paid at the time of recording of every real estate instrument, as defined. The bill would require that the fees collected be placed in the Real Estate Fraud Prosecution Trust Fund to be distributed by the county chief administrative officer, as determined by a Real Estate Fraud Prosecution Trust Fund Committee, to district attorneys and local law enforcement agencies for the purpose of determining, investigating, and prosecuting real estate fraud crimes, as specified.

*The people of the State of California do enact as follows:*

SECTION 1. Section 27388 is added to the Government Code, to read:

27388.   (a) In addition to any other recording fees specified in this code, upon the adoption of a resolution by the county board of supervisors, a fee of up to two dollars ($2) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded within that county , except those expressly exempted from payment of recording fees. "Real estate instrument" is defined for the purpose of this section as a deed of trust, an assignment of deed of trust, a reconveyance, a request for notice, and a notice of default. "Real estate instrument" does not

136

— 3 —                    SB 537

include any deed, instrument, or writing subject to the imposition of a documentary transfer tax as defined in Section 11911 of the Revenue and Taxation Code, nor any document required to facilitate the transfer subject to the documentary transfer tax. The fees, after deduction of any actual and necessary administrative costs incurred by the county in carrying out this section, shall be paid quarterly to the county auditor or director of finance, to be placed in the Real Estate Fraud Prosecution Trust Fund.

(b) Money placed in the Real Estate Fraud Prosecution Trust Fund shall be expended to fund programs to enhance the capacity of local police and prosecutors to deter, investigate, and prosecute real estate fraud crimes. After deduction of the actual and necessary administrative costs referred to in subdivision (a), 60 percent of the funds shall be distributed to district attorneys subject to review pursuant to subdivision (d), and 40 percent of the funds shall be distributed to local law enforcement agencies within the county in accordance with subdivision (c). In those counties where the investigation of real estate fraud is done exclusively by the district attorney, after deduction of the actual and necessary administrative costs referred to in subdivision (a), 100 percent of the funds shall be distributed to the district attorney, subject to review pursuant to subdivision (d). The funds so distributed shall be expended for the exclusive purpose of deterring, investigating, and prosecuting real estate fraud crimes.

(c) The county auditor or director of finance shall distribute funds in the Real Estate Fraud Prosecution Trust Fund to eligible law enforcement agencies within the county pursuant to subdivision (b), as determined by a Real Estate Fraud Prosecution Trust Fund Committee composed of the district attorney, the county chief administrative officer, and the chief officer responsible for consumer protection within the county, each of whom may appoint representatives of their offices to serve on the committee. If a county lacks a chief officer responsible for consumer protection, the county board of supervisors

137

SB 537                        — 4 —

may appoint an appropriate representative to serve on
the committee. The committee shall establish and publish
deadlines and written procedures for local law
enforcement agencies within the county to apply for the
use of funds and shall review applications and make
determinations by majority vote as to the award of funds
using the following criteria:

(1)   Each law enforcement agency that seeks funds
shall submit a written application to the committee
setting forth in detail the agency's proposed use of the
funds.

(2)  In order to qualify for receipt of funds, each law
enforcement agency submitting an application shall
provide written evidence that the agency either:

(A) Has a unit, division, or section devoted to the
investigation or prosecution of real estate fraud, or both,
and the unit, division, or section has been in existence for
at least one year prior to the application date.

(B) Has on a regular basis, during the three years
immediately preceding the application date, accepted
for investigation or prosecution, or both, and assigned to
specific persons employed by the agency, cases of
suspected real estate fraud, and actively investigated and
prosecuted those cases.

(3)   The committee's determination to award funds to
a law enforcement agency shall be based on, but not be
limited to, (A)  the number of real estate fraud cases filed
in the prior year; (B) the number of real estate fraud
cases investigated in the prior year; (C) the number of
victims involved in the cases filed; and (D) the total
aggregated monetary loss suffered by victims, including
individuals, associations, institutions, or corporations, as a
result of the real estate fraud cases filed, and those under
active investigation by that law enforcement agency.

(4) Each law enforcement agency that, pursuant to
this section, has been awarded funds in the previous year,
upon reapplication for funds to the committee in each
successive year, in addition to any information the
committee may require in paragraph (3), shall be
required to submit a detailed accounting of funds

— 5 —                                SB 537

received and expended in the prior year. The accounting shall include (A) the amount of funds received and expended; (B) the uses to which those funds were put, including payment of salaries and expenses, purchase of equipment and supplies, and other expenditures by type; (C) the number of filed complaints, investigations, arrests, and convictions that resulted from the expenditure of the funds; and (D) other relevant information the committee may reasonably require.

(d) The county board of supervisors shall annually review the effectiveness of the district attorney in deterring, investigating, and prosecuting real estate fraud crimes based upon information provided by the district attorney in an annual report submitted to the board detailing both:

(1) Facts, based upon, but not limited to, (A) the number of real estate fraud cases filed in the prior year; (B) the number of real estate fraud cases investigated in the prior year; (C) the number of victims involved in the cases filed; (D) the number of convictions obtained in the prior year; and (E) the total aggregated monetary loss suffered by victims, including individuals, associations, institutions, corporations, and other relevant public entities, according to the number of cases filed, investigations, prosecutions, and convictions obtained.

(2) An accounting of funds received and expended in the prior year, which shall include (A) the amount of funds received and expended; (B) the uses to which those funds were put, including payment of salaries and expenses, purchase of equipment and supplies, and other expenditures by type; (C) the number of filed complaints, investigations, prosecutions, and convictions that resulted from the expenditure of funds; and (D) other relevant information provided at the discretion of the district attorney.

(e) The intent of the Legislature in enacting this section is to have an impact on real estate fraud involving the largest number of victims. To the extent possible, an emphasis should be placed on fraud against individuals whose residences are in danger of, or are in, foreclosure

SB ѕ37                    — 6 —

as defined under subdivision (b) of Section 1695.1 of the Civil Code. Case filing decisions continue to be in the discretion of the prosecutor.

(f) A district attorney's office or a local enforcement agency that has undertaken investigations and prosecutions that will continue into a subsequent program year may receive nonexpended funds from the previous fiscal year subsequent to the annual submission of information detailing the accounting of funds received and expended in the prior year.

(g) No money collected pursuant to this section shall be expended to offset a reduction in any other source of funds. Funds from the Real Estate Fraud Prosecution Trust Fund shall be used only in connection with criminal investigations or prosecutions involving recorded real estate documents.

140

OCT  - 4 1995

Approved _____, 1995


_____
                                    *Governor*



# COUNTY OF SAN DIEGO

CHIEF ADMINISTRATIVE·OFFICE

AGENDA ITEM

**BOARD OF SUPERVISORS**
GREG COX
First District

DIANNE JACOB
Second District

PAM SLATER
Third District

RON ROBERTS
Fourth District

BILL HORN
Fifth District

DATE:        April 16, 1996

TO:          Board of Supervisors

SUBJECT:     IMPLEMENTATION OF REAL ESTATE FRAUD PROSECUTION
             PROGRAM

## SUMMARY:

Issue:

Should the Board of Supervisors authorize the establishment of a Real Estate Fraud Prosecution Program in the office of the District Attorney? Governor Wilson signed into law Senate Bill 537 which authorized an increase in recording fees for certain real property documents by up to $2.00. The legislation which was crafted by the California Association of Realtors and the California District Attorneys Association will enhance the District Attorney's ability to deter, investigate and prosecute real estate fraud crimes in San Diego County.

### Recommendation

DISTRICT ATTORNEY:

1. Adopt a resolution requiring the Assessor/Recorder/County Clerk to implement section 27388 of the Government Code and begin collecting the $2 real estate fraud prevention fee to enhance the capacity of the District Attorney to deter, investigate and prosecute real estate fraud.

2. Establish appropriations of $51,371 in the District Attorney's budget for salaries and benefits ($26,763), services and supplies ($12,108 including $1,000 in travel) and fixed assets ($12,500), based on unanticipated real estate fraud revenue.

3. Approve the addition of 1 Deputy District Attorney V position, 1 District Attorney Investigator III position, 2 Real Estate Fraud Specialist positions, 1 Criminal Legal Secretary II position, and 1 Temporary Extra Help position, and authorize the Director of Human Resources to amend the Compensation Ordinance to reflect this approval.

**142**

SUBJECT: IMPLEMENTATION OF REAL ESTATE FRAUD PROSECUTION
PROGRAM

4. Establish a Real Estate Fraud Prosecution Trust Fund pursuant to SB 537.

5. Waive Board Policy B-29, Fees, Grants, Revenue Contracts–Departmental Responsibility for
full cost recovery.

Fiscal Impact

Funding of the Real Estate Fraud Unit will be from a $2.00 fee assessed on the recording of five
specific documents as listed below, commencing in May 1996. If approved, this request will result
in $51,371 current year cost and $55,142 current year revenue, $439,876 annual cost and
$479,738 annual revenue and will require the addition of .65 current year staff years, 5.7 annual
staff years. Direct costs are estimated to be 100% offset by revenues generated by the increase
in recording fees.

Alternatives:
Do not take action to implement collection of a real estate fraud fee and deprive the citizens of
San Diego enhanced deterrence, investigation and prosecution of real estate fraud crimes.

BACKGROUND
This letter was originally considered by your Board on February 20, 1996 (minute order no. 33).
At the Chief Administrative Officer's request, the item was continued until today. In the interim,
it was discovered that in calculating the program revenue, the Assessor/Recorder/County Clerk
had used a more expansive interpretation than intended by the legislation. Staff from the
Assessor/Recorder/County Clerk and my Office have since met to refine the revenue estimates.
The result is a reduced revenue projection. My Office has scaled back the program to fit within
the revenue available. This letter and the attached resolution have been amended to reflect those
changes.

---

Fraud in real estate transactions is a problem that is commonly ignored. It strikes at the heart of the
American dream, and in San Diego harms some of our most vulnerable members of society: the
elderly, members of the minority community, the middle class.    The victims often lose their life
savings, or their entire retirement funds, or the nest egg they saved for years for the house they
dreamed of building.  A single proficient thief can easily ruin two dozen victims, harming them so
profoundly so that they will never recover.  Restitution can and should be in the millions of dollars.

Senate Bill 537 enacted Government Code section 27388 to intensify efforts to combat real estate fraud
crimes.  Commencing on May 20, 1996, this legislation allows San Diego County to raise recording
fees on every deed of trust, assignment of deed of trust, reconveyance, request for notice, and notice
of default where a recording fee is required, by up to two dollars to enhance law enforcement efforts
to investigate, prosecute and deter these crimes.

The bill enjoyed the support of the Senior Citizens Legal Services, the California District Attorneys
Association, the California Association of Realtors, the California Escrow Association, Escrow Agents
Fidelity Corporation, California Mortgage Bankers Association, Mortgage Guaranty Insurance
Corporation, PMI Mortgage Insurance Company, Freddie Mac, the District Attorneys of Los Angeles,

143

SUBJECT: IMPLEMENTATION OF REAL ESTATE FRAUD PROSECUTION
PROGRAM

Orange, Ventura and Contra Costa Counties, the California Police Chiefs, Peace Officers and State
Sheriffs Associations. The program enjoys the support of the San Diego Association of Realtors, and
the local title industry.

This office strongly supported Senate Bill 537. We provided testimony in legislative hearings in
Sacramento, and worked with key industry figures, especially the California Association of Realtors.

In counties such as San Diego, where the District Attorney exclusively prosecutes real estate fraud,
the money is to be allocated one hundred percent to the District Attorney, to deter, investigate, and
prosecute real estate fraud. The legislation further provides for annual review of these expenditures
and the work of the District Attorney by the Board of Supervisors.

The Assessor/Recorder/County Clerk has determined this legislation will generate $55,142 in the last
six weeks of Fiscal Year 1995-96 and $479,738 in Fiscal Year 1996-97. These figures have decreased
significantly from 1994. As the real estate market revives in the future, we can anticipate these
revenues increasing. Senate Bill 537 allows for the deduction of any actual administrative costs
incurred by the County in carrying out this section. The Assessor/Recorder/County Clerk has agreed
to an administrative fee equal to 5% of the annual revenue generated from increased recording fees
associated with SB537. Based on the Clerk's collection estimates, the administrative fees for FY 1995-
96 will amount to $2,757 and $23,986 in FY 1996-97.

**This legislation provides significant revenues for law enforcement without burdening any industry
or segment of the population. The cost is minimal; the net effect is powerful.**

This funding is instrumental to our work in deterring, investigating and prosecuting real estate fraud
in San Diego. San Diego's active real estate market provides a few unscrupulous individuals the
opportunity to take advantage of the average unsophisticated buyer. We currently have pending 25 real
estate fraud investigations involving approximately 200 victims and an approximate theft or dollar loss
of ten million dollars. Due to the current staffing level, we have been unable to give these cases the
attention they deserve. In addition to effectively dealing with the current caseload, this funding will
allow us to educate the public and thus deter future criminal activity. While we are unable to project
the actual increase in caseload, we have confidence that the program will enable us to more
aggressively prosecute an increased number of cases, many of which we would otherwise not have the
resources to handle. Although neither the legislation nor the resolution require it, it is our intent to
treat this project as a three-year pilot program.

The responsibility for the investigation and prosecution of real estate fraud in San Diego rests with the
District Attorney. The office maintains a telephone line exclusively for citizens to phone in
complaints, and we receive over two hundred real estate related complaints a year. We currently have
the staff to handle only a fraction of these complaints. The overflow we refer to the Department of
Real Estate or to other agencies, or suggest civil remedies. We also receive referrals from local law
enforcement as well as the Department of Real Estate, and local civil attorneys retained by victims.

This office works a case from start to finish. Typically a deputy district attorney reviews the victim's
complaint at the outset and works with an investigator or investigative specialist. We interview
victims, draft search warrants, commission title research to verify what documents have been recorded

144

SUBJECT: IMPLEMENTATION OF REAL ESTATE FRAUD PROSECUTION
PROGRAM

or not recorded against a property and in what priority; and ultimately arrest and interview suspects.
These cases proceed at a very laborious pace: a single, highly complex case might take a year to fully
investigate. The cases demand from an investigator and prosecutor a working knowledge of
fundamental real estate law, customs, and protocols and frequently require research into specialized
areas of law.

In addition to prosecuting a greater volume of the work we have been doing, we plan to take a creative
approach to deterrence, and have set three initial goals: establishing educational and deterrence
programs; developing a case referral system; initiating a computer data base of real estate fraud cases.

### DETERRENCE / PUBLIC EDUCATION

We will work with both local law enforcement, the local real estate industry, and local news media
to produce educational programs to educate the community on how to avoid real estate fraud. In
particular, we are working with the Department of Real Estate to develop a specific educational,
outreach program, involving speeches and presentations to community groups, brochures, and a video
showing various fraud scenarios and how not to fall into them.

### CASE REFERRAL

We will meet with and educate local law enforcement agencies and the industry trade associations, such
as brokers, escrow companies, and title insurance companies, on what cases are suitable for our
prosecution efforts: what to look for, what information to request of victims who complain, so that
when the cases are forwarded to us for investigation and prosecution we will have a head start.

### REAL ESTATE FRAUD DATA BASE

We are in/the process of computerizing our data for real estate fraud cases. This data base will allow
us to track how many instances of real estate fraud occur in San Diego County, how many victims are
injured, what the dollar loss is, whether the case is suitable for criminal prosecution, and if not, for
some other remedy. This statistical data base will help establish budget priorities by assessing the
nature and extent of real estate fraud in San Diego.

The Real Estate Fraud Prosecution Trust Fund will currently fund one Deputy District Attorney, one
Investigator, two Real Estate Fraud Specialists, one Criminal Legal Secretary, one Law Clerk, expert
witness fees (primarily title research necessary to these cases), office space, and one-time start-up
equipment. The newly created Real Estate Fraud Specialist position will be used to work these very
complex cases and may well become a statewide model for real estate fraud enforcement. Training
for investigators and prosecutors will be a priority, as will be developing an educational/deterrence
program to protect citizens from becoming victims.

Respectfully submitted,

PAUL J. PEINGST
District Attorney

145

NO. 96-64            TUESDAY, APRIL 16, 199

### RESOLUTION AUTHORIZING RECORDING FEE
### AND AUTHORIZING DISTRIBUTION OF THE REAL
### ESTATE FRAUD PROSECUTION TRUST FUND
### TO THE DISTRICT ATTORNEY

On motion of Supervisor ___Jacob___, seconded by
Supervisor ___Slater___, the following resolution is
adopted:

WHEREAS, real estate fraud is a significant problem in San
Diego County, causing irreparable harm to hundreds of citizens,
resulting in the loss of millions of dollars a year to theft and
fraud, frequently causing the loss of the entire life savings or
retirement funds of many middle class and elderly citizens
engaged in buying homes or investing in second or otherwise
junior deeds of trusts secured by real estate. These crimes
include but are not limited to: persons forging and selling
forged deeds of trust; selling the same deed of trust over and
over; misrepresenting the priority of a deed of trust,
effectively leaving an investor with no security and no equity in
the underlying property to foreclose on; servicing loans and
diverting payoffs; rent skimming; selling fractionalized deeds of
trust that are not properly qualified by the Department of
Corporations; creative financing abuses; embezzling down payments
out of fraudulent or non-existent escrows from would-be home
buyers; and

WHEREAS, effective January 1, 1996, Government Code section
27388, a copy of which is attached hereto and incorporated
herein, authorizes a fee of up to two dollars ($2) to be imposed
on the recording of specified real estate instruments, papers,
and notices, provided the Board of Supervisors adopts a
resolution authorizing the fee; and

WHEREAS, Government Code section 27388 provides that the
fees, after deduction of actual and necessary administrative
costs incurred by the County in carrying out the section, are to
be paid quarterly to the auditor or director of finance, to be
placed in the Real Estate Fraud Prosecution Trust Fund; and

WHEREAS, in those counties where the investigation or real
estate fraud is done exclusively by the district attorney, all of
the funds placed in the Real Estate Fraud Prosecution Trust Fund
shall be distributed to the District Attorney in order to deter,
investigate and prosecute real estate fraud crimes, subject to
review as specified in subdivision (d) of Government Code section
27388; and

WHEREAS, it is desired that a $2 recording fee be imposed on
the following documents only: every deed of trust, assignment of
deed of trust, reconveyance, request for notice, and notice of
default, where a recording fee is required, and that all of the
funds in the Real Estate Fraud Prosecution Fund be distributed to
the District Attorney; NOW THEREFORE

4/16/96 (11)

146

IT IS HEREBY RESOLVED AND ORDERED that effective May 13, 1996, a recording fee of $2 shall be imposed in San Diego County on the following documents only: every deed of trust, assignment of deed of trust, reconveyance, request for notice, and notice of default, where a recording fee is required, as authorized by Government Code section 27388.

IT IS FURTHER RESOLVED AND ORDERED that the fees, after deduction of any actual and necessary administrative costs incurred in carrying out Government Code section 27388, shall be paid quarterly to the Auditor and Controller, to be placed in the Real Estate Fraud Prosecution Trust Fund.

IT IS FURTHER RESOLVED AND DETERMINED that investigation of real estate fraud is done exclusively by the District Attorney in San Diego County, and, in accordance with Government Code section 27388, 100 percent of the funds in the Real Estate Fraud Prosecution Trust Fund shall be distributed to the San Diego County District Attorney, subject to review as provided in subdivision (d) of Government Code section 27388.

IT IS FURTHER RESOLVED AND ORDERED that a copy of this resolution shall be transmitted to the District Attorney, the Assessor-Recorder-County Clerk, and the Auditor and Controller.

PASSED AND ADOPTED by the Board of Supervisors of the County of San Diego, State of California, this 16th day of April, 1996, Minute Order No. 11, by the following vote:

AYES:     Cox, Jacob, Slater, Roberts, Horn

- - -

STATE OF CALIFORNIA)ss
County of San Diego)

I hereby certify that the foregoing is a full, true, and correct copy of the Original Resolution which is now on file in my office.

THOMAS J. PASTUSZKA
Clerk of the Board of Directors

By _____
   Adair Gomez, Deputy

No. 96-64
4/16/96 (11)

2

147

| | |
|---|---|
| 1 | EDWIN L. MILLER, JR.<br>District Attorney |
| 2 | Jeffrey Brodrick<br>Deputy District Attorney |
| 3 | 7002 County Courthouse<br>San Diego, California 92101 |
| 4 | 531-3596 |
| 5 | Attorneys for Plaintiff |

F̶ ̶KENNETH E. MARTONE̶ D̶
Clerk of the Superior Court

JAN 1 5 1993

8            MUNICIPAL COURT OF THE STATE OF CALIFORNIA

9                FOR THE COUNTY OF SAN DIEGO

| | | |
|---|---|---|
| 10 | THE PEOPLE OF THE STATE OF CALIFORNIA, ) | No.  F152913/DA P21042 |
| 11 | Plaintiff, ) | STATEMENT IN AGGRAVATION |
| 12 | v.                      ) | PURSUANT TO PENAL CODE<br>SECTION 1170(b) AND JUDI- |
| 13 | RICHARD GILLELEN,        ) | CIAL COUNCIL RULE 437 |
| 14 | Defendant. ) | Date:  January 22, 1993<br>Time:  9:00 |
| 15 | | Dept:  M-18 |

16            Comes now the plaintiff, the People of the State of

17   California, by and through its attorneys, EDWIN L. MILLER, JR.,

18   District Attorney, and JEFFREY BRODRICK, Deputy District Attorney,

19   and respectfully submits the following Statement in Aggravation

20   relating to the above-named defendant, RICHARD GILLELEN.

21                        STATEMENT OF THE CASE

22            In a complaint filed on November 20, 1992, the defendant

23   was charged with 29 felony counts.

24            On this date, the defendant entered a plea of guilty to 9

25   counts of grand theft (PC 487.1) and admitted the great taking

26   allegation (PC 12022.6).  Defendant executed a waiver based on

27   People v. Harvey (1979) 25 Cal.3d 754, agreeing to allow the facts

28   / / / / /

1   underlying his prior history and the dismissed charges to be argued
2   against him.

3                           STATEMENT OF FACTS

4           Richard Gillelen was the sole owner and principal of El
5   Capitan Investment Company, a licensed real estate broker which was
6   doing business as All State Mortgage Company.  Defendant brokered
7   deeds of trust, locating investors, borrowers, and servicing the
8   loans.  Defendant typically charged ten points on each loan.

9           In June of 1992 the District Attorney's Office received
10  numerous complaints from investors that Gillelen had stolen their
11  money.  After interviewing these victims, the District Attorney's
12  Office executed a search warrant at defendant's business and home
13  and seized his records.  Defendant was interviewed.

14          Defendant confessed to approximately thirty thefts
15  totalling about $450,000.  He said, "Well, I guess I did steal the
16  money.  You know, there are no other words for it.  I didn't put it
17  in my pocket but I put it into other transactions.  I don't know
18  why other than it was probably benefitting me at the time to do
19  this."

20          Defendant said he stole the money both to cover other
21  investors' losses and to put money into his own investments.

22          On November 20, 1992, defendant pled guilty to nine
23  counts of grand theft and a great taking allegation.  He stipulated
24  to a minimum restitution of $461,700.

25          Since his guilty plea, defendant and his lawyer have met
26  on three occasions with the District Attorney and reviewed addi-
27  tional transactions.  Defendant acknowledged misappropriating
28  additional sums for a total taking of $1,351,500.  (See attached

1  | List of Principal Thefts). He said he converted payoffs or loan
2  | funds to his own use but said in many cases he replaced or substi-
3  | tuted the deeds he stole with good deeds after the fact. Defendant
4  | claims a setoff for restitution purposes .

5  | In his initial interview defendant was asked if he
6  | created any phony deeds by cutting and pasting documents; he denied
7  | this. Found in his records, however, was just such a document: a
8  | home-made cut and paste deed with a document number from the
9  | Recorder's Office taped to the top of a bogus deed. (See Court
10 | Exhibit 1)

11 | <u>PROBATION SHOULD BE DENIED</u>

12 | A review of the criteria affecting probation
13 | shows that the facts supporting a denial of probation outweigh the
14 | facts supporting a grant of probation:

15 | <u>Rule 414(a)(3)</u>. The vulnerability of the victim.

16 | Many of the victims were elderly and unsophisticated in
17 | business matters. They trusted the defendant wholeheartedly. They
18 | believed defendant when he lied to them about late interest pay-
19 | ments and never realized that the loans had long since been paid
20 | off. Defendant exploited this vulnerability to keep his scheme
21 | going and defraud more victims.

22 | <u>Rule 414(a)(5)</u>. The degree of monetary loss to the
23 | victim.

24 | Gillelen's thievery was massive. He stipulated to a
25 | minimum restitution of $461,700 at arraignment. He now agrees he
26 | stole $1,351,500. Some victims lost over $100,000. Some lost
27 | their life savings.

28 |

1           <u>Rule 414(a)(6)</u>.  Whether the defendant was an active or

2 passive participant.

3           Defendant ran the show.  He solicited investors, found

4 borrowers, sold the deeds and stole the money.  He forged signa-

5 tures and encouraged his escrow agent (sic) Betty Groves to falsely

6 notarize dozens of signatures.  He even stole $35,000 from Betty.

7           <u>Rule 414(a)(7)</u>.  Whether the crime was committed because

8 of an unusual circumstance, such as great provocation, which is

9 unlikely to recur.

10           There was no provocation whatsoever.  The thefts contin-

11 ued over a five year period.  Defendant has said repeatedly he

12 doesn't know why he committed these crimes.  By his own admission

13 he used the stolen money in part in his own investments.

14           <u>Rule 414(a)(8)</u>.  Whether the manner in which the crime

15 was carried out demonstrated criminal sophistication or profession-

16 alism on the part of the defendant.

17           Defendant used a variety of techniques to steal all this

18 money.  He caused escrow companies to pay him the principal sum of

19 a loan even when the note dictated that the lender be paid person-

20 ally.  He then filed fraudulent reconveyances that falsely stated

21 that the lender authorized the reconveyance when in fact the

22 lenders had no idea their loans had been paid off to Gillelen.

23           Gillelen created wholly fictitious deeds by cutting and

24 pasting.  He took money from lenders when there was no borrower.

25 He sold the same deed more than once.  He forged victims' signa-

26 tures on payoff checks.  He forged borrowers' signatures to create

27 what appeared to be valid deeds and assignments.

28           He told persuasive lies.

1      **Rule 414(a)(9)**.  Whether the defendant took advantage of

2      a position of trust or confidence to commit the crime.

3      Defendant was entrusted with the responsibility of

4      servicing the loans.  He took advantage of this position by treat-

5      ing loan payoffs as his own money when the occasion suited him.

6      Servicing the loans allowed the defendant to hide the status of the

7      loans from the victims.  Gillelen frequently pretended to service

8      loans long after the borrowers had fully paid off the principal.

9      He would continue to make monthly interest payments to deceive the

10     victims into believing the borrower had not paid off the principal.

11     He would also pretend the borrowers were having problems making

12     payments even after they had paid off the loans.

13     Gillelen violated Department of Real Estate (DRE) regula-

14     tions by failing to maintain the necessary trust accounts which

15     were a condition of his servicing loans.  DRE found that Gillelen's

16     escrow trust fund account balance was $39.98 in April of 1992; it

17     was underfunded by a minimum of $60,000.

18     Defendant also abused his position as an escrow by

19     soliciting loans, putting the lender into escrow, taking their

20     money and not funding the loan.

21     **Rule 414(b)**.  Facts relating to the defendant, including:

22     **Rule 414(b)(1)**.  Prior record of criminal conduct;

23     whether as an adult or a juvenile, including the recency and

24     frequency of prior crimes; and whether the prior record indicates

25     a pattern of regular or increasingly serious criminal conduct.

26     Defendant managed to conceal his crimes for many years;

27     for example, in count 3, he stole a $7,000 payoff from Barbara

28     Anderson in 1987 but told her enough lies about the borrower's

152

1   insolvency so that she did not discover the crime until 1992.  The

2   scope of this case is one of not merely regular but rampant crimi-

3   nal conduct lasting a minimum of five years.

4            Rule 414(b)(8).  The likelihood that if not imprisoned

5   the defendant will be a danger to others.

6            Defendant will always pose an economic danger to society

7   by virtue of his facility for lying and his propensity for decep-

8   tion.

9                          AGGRAVATION

10           An examination of the facts presently of record estab-

11  lishes that the circumstances in aggravation outweigh the circum-

12  stances in mitigation which are defined by Rule 423 of the

13  California Rules of Court.  The circumstances in aggravation are

14  as follows:

15           Rule 421(a).  Facts relating to the crime, whether or

16  not charged or chargeable as enhancements, including the fact that:

17           Rule 421(a)(4).  The defendant induced others to partici-

18  pate in the commission of the crime or occupied a position of

19  leadership or dominance of other participants in its commission.

20           Defendant induced his employee, Betty Groves, to falsely

21  notarize dozens of documents that were essential to his crime.

22           Rule 421(a)(6).  The defendant threatened witnesses,

23  unlawfully prevented or dissuaded witnesses from testifying, sub-

24  orned perjury, or in any other way illegally interfered with the

25  judicial process.

26           Defendant threatened to have one of the victims' son

27  killed.

28  / / / / /

1    <u>Rule 421(a)(8)</u>.  The manner in which the crime was

2 carried out indicates planning, sophistication, or professionalism.

3    Defendant used a variety of techniques to steal all this

4 money.  He caused escrow companies to pay him the principal sum of

5 a loan even when the note dictated that the lender be paid person-

6 ally.  He then filed fraudulent reconveyances that falsely stated

7 that the lender authorized the reconveyance when in fact the

8 lenders had no idea their loans had been paid off to Gillelen.

9    Gillelen created wholly fictitious deeds by cutting and

10 pasting.  He took money from lenders when there was no borrower.

11 he sold the same deed more than once.  He forged victims' signa-

12 tures on payoff checks.  He forged borrowers' signatures to create

13 what appeared to be valid deeds and assignments.

14    <u>Rule 421(a)(9)</u>.  The crime involved an attempted or

15 actual taking or damage of great monetary value.

16    Defendant stole over a million dollars.

17    <u>Rule 421(a)(11)</u>.  The defendant took advantage of a posi-

18 tion of trust or confidence to commit the offense.

19    Defendant was entrusted with the responsibility of

20 servicing the loans.  He took advantage of this position by treat-

21 ing loan payoffs as his own money when the occasion suited him.

22 Servicing the loans allowed the defendant to hide the status of the

23 loans from the victims.  Gillelen frequently pretended to service

24 loans long after the borrowers had fully paid off the principal.

25 He would continue to make monthly interest payments to deceive the

26 victims into believing the borrower had not paid off the principal.

27 He would also pretend the borrowers were having problems making

28 payments even after they had paid off the loans.

154

1          Gillelen violated Department of Real Estate (DRE) regula-
2    tions by failing to maintain the necessary trust accounts which
3    were a condition of his servicing loans.  DRE found that Gillelen's
4    escrow trust fund account balance was $39.98 in April of 1992; it
5    was underfunded by a minimum of $60,000.

6          Defendant also abused his position as an escrow by
7    soliciting loans, putting the lender into escrow, taking their
8    money and not funding the loan.

9          Most significantly, defendant abused the trust that his
10    many victims relied upon for him to do what said he would do with
11    their money.

12                      <u>CONSECUTIVE SENTENCING</u>

13          By examining the facts before the court in this case, the
14    court will see that they establish certain facts relating to the
15    crime that should be considered circumstances in support of the
16    decision to impose consecutive rather than concurrent sentences
17    pursuant to Judicial Council Rule 425(a).  These facts are as
18    follows:

19          <u>Rule 425(a)(1)</u>.  The crimes and their objectives were
20    predominantly independent of each other.

21          The commission of each theft allowed the defendant to
22    steal a separate, discrete, specific sum.

23          <u>Rule 425(a)(3)</u>.  The crimes were committed at different
24    times and separate places, rather than being committed so close in
25    time as to indicate a single period of aberrant behavior.

26          Defendant committed dozens of thefts over a five year
27    span.

28    / / / / /

155

| | |
|---|---|
| 1 | ### CONCLUSION AND REQUESTED SENTENCE |
| 2 | We will, and do hereby request, based on the record in |
| 3 | this case, this statement, and other argument, that the court |
| 4 | impose a total prison term of ten years. |
| 5 | Therefore, based on the above analysis and rules, and in |
| 6 | the face of overwhelming aggravating factors and the absence of |
| 7 | mitigating factors, it is the position of the People that a proper |
| 8 | sentence for this defendant is the term of ten years. |
| 9 | Dated: |

Respectfully submitted,

EDWIN L. MILLER, JR.
District Attorney

By:

JEFFREY BRODRICK
Deputy District Attorney

Attorneys for Plaintiff

156

1    EDWIN L. MILLER, JR.
      District Attorney
2    JEFFREY BRODRICK
      State Bar Number 118523
3    Deputy District Attorney
      101 W. Broadway, Ste. 700
4    San Diego, California 92101
      531-3596

5

      Attorneys for Plaintiff

6

7

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

              FOR THE COUNTY OF SAN DIEGO

10

   THE PEOPLE OF THE STATE OF CALIFORNIA, )  F 157751 / DA P31588
11                              )
                 Plaintiff, )  STATEMENT IN AGGRAVATION
12                              )  PURSUANT TO PENAL CODE
             v.               )  SECTION 1170(b) AND JUD-
13                              )  ICIAL COUNCIL RULE 437
   RICHARD PORTER STARK,           )
14                              )  Date:   January 5, 1993
                 Defendant. )  Time:   1:30
15 _____)  Dept:   M-17

16          Comes now the plaintiff, the People of the State of

17 California, by and through its attorneys, EDWIN L. MILLER, JR.,

18 District Attorney, and JEFFREY BRODRICK, Deputy District Attorney,

19 and respectfully submits the following Statement in Aggravation

20 relating to the above-named defendant, RICHARD PORTER STARK.

21                  STATEMENT OF THE CASE

22          In a complaint filed on June 22, 1993, the defendant was

23 charged with twenty-three counts, primarily grand theft, using false

24 statements in the sale of a security, and one count of residential

25 burglary. The offenses were alleged to have occurred between 1988

26 and 1991, against numerous victims.

27          On November 11, 1993, the defendant entered a plea of

28 guilty to nine counts of grand theft and a great taking allegation.

157

1   Pursuant to a plea agreement, defendant executed a waiver based on
2   People v. Harvey (1979) 25 Cal.3d 754, agreeing to allow the facts
3   underlying his prior history and the dismissed charges to be argued
4   against him.

5                           STATEMENT OF THE FACTS

6            Richard Stark was president of Trust Deed Counselors, Inc.
7   (TDC).  TDC was in the business of buying, selling, and servicing
8   deeds of trust.    He also served as chief executive officer,
9   secretary, chief financial officer, and officer.  In a document filed
10  with the Secretary of State, he described the business of TDC as that
11  of mortgage broker.

12           Richard Stark ran TDC.  He operated the business under the
13  broker's license of John Nelson, whom he paid two hundred dollars a
14  month.  Stark  made all the important business decisions, soliciting
15  investors and choosing investments for them.  He had a special list
16  of investors that he kept private from other TDC employees.

17           Previously, Stark worked for many years at Security Pacific
18  Bank as a vice-president.  He solicited many of his bank customers to
19  become investors at TDC.  Stark left Security Pacific in 1990.

20           Beginning in 1988, Stark conducted a series of transactions
21  in which he stole approximately $600,000 from his investors.
22  Typically he sold the same deed of trust more than once, without the
23  knowledge of his unsuspecting investors, who were unaware that the
24  deeds they were buying from Stark had already been sold or assigned
25  by Stark to other parties.    Stark also unlawfully fractionalized
26  deeds of trust and sold them in percentages.  He failed to disclose
27  to his investors that the interests he was selling had already been
28  sold.

1    Stark committed four series of thefts: California RV Park

2 IV; DA Counts; Whirleybird Tavern; and Paul Neilsen.

3    **CALIFORNIA RV PARK IV**

4    On approximately September 12, 1988, Trust Deed Counselors

5 loaned California RV Park IV $125,000, secured by a deed of trust.

6 On September 30, 1988, Richard Stark assigned this deed of trust to

7 Grossmont Bank and provided to Grossmont Bank the original deed of

8 trust, note, and assignment.   The originals were logged in by the

9 bank on October 6, 1988.

10    At the same time, Stark fractionalized the California RV

11 Park IV deed of trust and sold it in pieces to five investors: Joseph

12 and  Josephine  Pecoraro  ($35,000);  Lindsey  and  Irene  Pickens

13 ($15,000); Salvatore and Santina Pecoraro ($25,000); Thomas and Mary

14 Anne Cannon ($20,000) and Salvatore and Rosella Cafiero ($30,000).

15 Stark did not tell any of these investors that he had already

16 assigned the entire California RV Park IV deed of trust to Grossmont

17 Bank and that he had no legitimate interest to convey to them.

18    Stark arranged to have monthly payments made to the

19 investors through National Land Services, a loan servicing company

20 originally affiliated with TDC. He told neither the borrower nor the

21 investors that he had assigned their deed of trust to Grossmont Bank

22 and had in fact given to the bank all original documents reflecting

23 this assignment: the original deed of trust, note, and assignment.

24 The investors were unaware of Stark's theft until October 13, 1992,

25 when they were notified by National Land Services that Stark "had

26 pledged the note to Grossmont Bank within days of assigning the note

27 to you."

28 */ / / / /*

**DA COUNTS**

In late June, 1990, Stark loaned George Coladonato of DA Counts $200,000, secured by a deed of trust. On June 27, 1990 Stark sold this deed of trust to Frank Pecoraro for $200,000. Stark did not give Pecoraro any documents until July, 1991 when Pecoraro's attorney demanded the document file. The documents turned over included an assignment to Pecoraro of the DA Counts deed of trust. The assignment was dated June 27, 1990, notarized August 27, 1990. It was never recorded.

At the very same time Stark sold the entire DA Counts deed of trust to Frank Pecoraro. Stark <u>again</u> sold the same DA Counts deed of trust, this time in pieces, to six victims: Lorraine Keim ($25,000); Brian Bartindale ($5,500); Gaylord C. Swaim ($20,000); Howard and Pauline Brown ($63,500); James Dickinson ($20,000); and Paul Neilsen ($45,000). Stark did not tell any of these six victims that he had no interest in the DA Counts deed of trust to convey to them; nor did he tell them he had already assigned the entire DA Counts deed of trust to Frank Pecoraro.

Raymond Burg, Senior Corporations Counsel of the Department of Corporation, reviewed the California RV Parks IV and DA Counts transactions and concluded that Stark sold securities by means of written or oral communications which included untrue statements of material facts or omitted to state material facts, in violation of Corporations Code section 25401.

**WHIRLEYBIRD TAVERN**

On approximately September 28, 1990, Stark loaned $150,000 to Areanne Reynolds, secured by a deed of trust on the Whirleybird

/ / / / /

1   Tavern.  On September 28, 1990 Stark sold this loan and assigned the

2   deed of trust to Governor Financial.

3         On October 26, 1990, Stark called James Dickinson and told

4   him he had a deed of trust for $150,000 on the Whirleybird Tavern for

5   Dickinson to invest in.  That same day Stark went to Dickinson's

6   house, entered, and took from Dickinson a check for $150,000 which

7   Stark said would be used to purchase the Whirleybird deed of trust.

8   Stark did not tell Dickinson he had sold the deed of trust a month

9   earlier.  Stark told Dickinson the proper documents would be

10  recorded.  Dickinson called Stark repeatedly to get copies of his

11  recorded documents.  Stark told a number of lies and ultimately wrote

12  a letter for Dickinson in which he falsely stated that an assignment

13  "was recorded in the County of San Diego assigning our interest in

14  the property described below to James and Gerta Dickinson."  Stark

15  himself made monthly payments on the deed for fourteen months then

16  stopped.

17      **PAUL NEILSEN**

18        Stark told Paul Neilsen he had three deeds of trust for him

19  to invest in, and on September 20, 1991 Neilsen gave Stark three

20  checks for the three deeds of trust: $45,000, $35,000, and $30,000.

21  Neilsen received three payments from National Land Services.  He

22  requested from Stark but never received documentation showing his

23  money was invested as promised.

24                 II

25           DEFENDANT SHOULD

          BE SENTENCED TO PRISON

26

27        Having the sentencing objectives in mind, the court must

28  determine whether the defendant should be granted probation.  Rule

161

1    414 presents the criteria the court should consider in determining

2    whether to grant or deny probation. Under Rule 414, the court must

3    decide whether any statutory provisions exist limiting or prohibiting

4    the grant of probation. The following rules apply:

5            Rule 414(a). Facts relating to the crime, including:

6            Rule 414(a)(1). The nature, seriousness, and circum-

7    stances of the crime as compared to other instances of the same

8    crime. Defendant stole a minimum of $600,000. He stole from the

9    most vulnerable of victims: the elderly, the unsophisticated, victims

10   who knew Stark for years and year and considered him family.

11           Rule 414(a)(3). The vulnerability of the victim. Virtu-

12   ally all the victims were unsophisticated investors. They met Stark

13   through his bank, Security Pacific. Stark became their personal

14   banker. The victims took trips with Stark. They cooked meals for

15   him. They placed their total trust in Stark. They didn't know what

16   documents they should receive or that they should have recorded

17   copies of the assignments of the deeds of trusts.

18           Rule 414(a)(5). The degree of monetary loss to the victim.

19   Stark stole $200,000 from Frank Pecoraro in one fell swoop; he went

20   to James Dickinson's house and stole $150,000.   For many of the

21   victims, the money stolen by Stark represented their retirement

22   savings.

23           Rule 414(a)(6). Whether the defendant was an active or

24   passive participant. Stark ran the show at Trust Deed Counselors.

25   He made all the decisions. He personally committed these thefts.

26           Rule 414(a)(7). Whether the crime was committed because of

27   an unusual circumstance, such as great provocation, which is unlikely

28   / / / / /

1   to recur.  Stark committed dozens of fraudulent acts over a period of

2   three years.  Greed was the provocation.

3        Rule 414(a)(8).  Whether the manner in which the crime was

4   carried out demonstrated criminal sophistication or professionalism

5   on the part of the defendant.  Stark used his superior knowledge of

6   financing to carry out his thefts.  He used his charm to make it

7   happen.

8        Rule 414(a)(9).  Whether the defendant took advantage of a

9   position of trust or confidence to commit the crime.  Stark exploited

10   the trust he had developed over many years in order to steal from his

11   unsuspecting victims.

12        Rule 414(b).  Facts relating to the defendant, including:

13        Rule 414(b)(1).  Prior record of criminal conduct; whether

14   as an adult or a juvenile, including the recency and frequency of

15   prior crimes; and whether the prior record indicates

16   a pattern of regular or increasingly serious criminal conduct.  While

17   employed at Security Pacific Bank, Stark defrauded at least one bank

18   customer.  A lawsuit against the bank was filed; Stark retired.

19                 III

20             AGGRAVATION

21       An examination of the facts presently of record establishes

22   that the circumstances in aggravation outweigh the circumstances in

23   mitigation which are defined by Rule 423 of the

24   California Rules of Court.  The circumstances in aggravation are

25   as follows:

26        Rule 421(a).  Facts relating to the crime, whether or

27   not charged or chargeable as enhancements, including the fact that:

28   / / / / /

163

1          Rule 421(a)(3). The victim was particularly vulnerable.
2    The victims were elderly, unsophisticated investors whom Stark
3    exploited and manipulated.

4          Rule 421(a)(8). The manner in which the crime was carried
5    out indicates planning, sophistication, or professionalism. The
6    timing of the sales of the deeds of trusts shows that Stark knew he
7    could sell a deed of trust twice before anyone had recorded it and
8    gave notice to others.

9          Rule 421(a)(9). The crime involved an attempted or actual
10   taking or damage of great monetary value. Restitution exceeds two
11   million dollars.

12         Rule 421(a)(11). The defendant took advantage of a posi-
13   tion of trust or confidence to commit the offense. Stark was the
14   personal banker for the victims.

15         Rule 421(b). Facts relating to the defendant, including
16   the fact that:

17         Rule 414(b)(8). The likelihood that if not imprisoned, the
18   defendant will be a danger to others. Defendant represents a an
19   economic danger to the public.

20                            IV

21               CONSECUTIVE SENTENCING

22         By examining the facts before the court in this case, the
23   court will see that they establish certain facts relating to the
24   crime that should be considered circumstances in support of the
25   decision to impose consecutive rather than concurrent sentences
26   pursuant to Judicial Council Rule 425(a). These facts are as
27   follows:

28   / / / / /

164

1          **Rule 425(a)(1)**.   The crimes and their objectives were
2     predominantly independent of each other.   Each crime represented a
3     separate theft and separate gain to the defendant.

4          **Rule 425(a)(3)**.   The crimes were committed at different
5     times and separate places, rather than being committed so close in
6     time as to indicate a single period of aberrant behavior.   The crimes
7     took place over a three year period.

8          **Rule 425(b)**.   Any circumstances in aggravation or mitiga-
9     tion.

10                    **CONCLUSION AND REQUESTED SENTENCE**

11          We will, and do hereby request, based on the record in this
12     case, this statement, and other argument, that the court impose a
13     total prison term of ten years.

14          Therefore, based on the above analysis and rules, and in
15     the face of overwhelming aggravating factors and the absence of
16     mitigating factors, it is the position of the People that a proper
17     sentence for this defendant is the upper term of ten years in prison
18     to be served consecutively.

19          Dated:   December 27, 1993

20                                        Respectfully submitted,

21                                        EDWIN L. MILLER, JR.
22                                        District Attorney

23                        By:

24                                        JEFFREY BRODRICK
25                                        Deputy District Attorney

26                                        Attorneys for Plaintiff

27

28

**165**

MAY 23 1996

1   PAUL J. PFINGST
    District Attorney
2   JEFFREY BRODRICK
    State Bar No. 118523
3   Deputy District Attorney
    PAUL KALIVAS
4   Certified Law Clerk
    330 W. Broadway, Suite 1020
5   San Diego, California 92101
    531-3596
6

    Attorneys for Plaintiff
7

8

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10             FOR THE COUNTY OF SAN DIEGO

11   THE PEOPLE OF THE STATE OF CALIFORNIA,)    SC NO. SCD 118151
                                  )    DA NO. P   072403
12                   Plaintiff,)
                                  )    **STATEMENT IN AGGRAVATION**
13   v.                               )    **PURSUANT TO PENAL CODE**
                                  )    **SECTION 1170(b) AND**
14   CHARLES JOSEPH SALAS,            )    **JUDICIAL COUNCIL**
                                  )    **RULE 437**
15                                   )
                   Defendant. )   DATE:   May 29, 1996
16                                   )   TIME:    8:30
        ─────────────────────────────── )   DEPT:   S-8
17

18        Comes now the plaintiff, the People of the State of

19   California, by and through its attorneys, PAUL J. PFINGST,

20   District Attorney, and JEFFREY BRODRICK, Deputy District Attorney,

21   and respectfully submits the following Statement in Aggravation

22   relating to the above-named defendant, CHARLES JOSEPH SALAS.

23                  <u>**STATEMENT OF THE CASE**</u>

24        In an information filed on 1/12/96, the defendant was

25   charged with 22 counts of Grand Theft, in violation of Penal Code

26   section 487(a). It was further alleged that victims' losses

27   exceeded two and one half million dollars ($2.5MM), within the

28   meaning of Penal Code section 12022.6(d). The offenses occurred

1 | between 1990 and 1995, against many victims.

2 |        On 4/10/96, the defendant entered a plea of guilty to

3 | all charges.  Pursuant to a plea agreement, the defendant executed

4 | a waiver based on <u>People</u> v. <u>Harvey</u> (1979) 25 Cal.3d 754, agreeing

5 | to allow the facts underlying his prior history and the dismissed

6 | charges to be argued against him.

7 | **STATEMENT OF THE FACTS**

8 |        CHARLES SALAS and Patricia Meyer were equal owners (50%

9 | share each) in Four Seasons Financial Services, Inc. (FSFS), and

10 | Four Seasons Mortgage Services, Inc. (FSMS).  SALAS was the CEO of

11 | both corporations and Meyer was the vice president of FSFS, and

12 | president of FSMS.  SALAS and Meyer shared responsibility for all

13 | of the Four Seasons' business transactions.

14 |        Four Seasons was a "hard-money" lender.  They provided

15 | high-interest rate loans to borrowers, who pledged real estate in

16 | the form of deeds of trust as collateral.  The loans were

17 | fractionalized and sold to investors.  Four Seasons eventually put

18 | together limited partnerships to finance real estate investment

19 | projects in Calexico, Murrieta Hot Springs and Laughlin, Nevada.

20 |        According to the Four Seasons Company Profile,

21 | management was guided by a "conservative philosophy, stressing

22 | security over yield."  The profile promised transactions that were

23 | "simple, clean, easy, low risk, short term, and quickly funded in

24 | a market [Four Seasons] understood."  SALAS commented, "It is very

25 | important for an investor to see the property and documentation

26 | backing the trust deed before investing."  SALAS claimed, "the

27 | loyalty of investors is the strongest endorsement . . . [Four

28 | Seasons] could receive."  This philosophy was quickly abandoned

167

1  when the defendant wanted more money and decided to steal from his
2  investors.

3          Motivated by greed, SALAS ventured into real estate
4  speculation for which he was totally ill-equipped, lacking both
5  experience and expertise.  SALAS projected his CM Ranch
6  development project would yield eighty million dollars ($80MM) in
7  profits.  Defendant published glossy brochures depicting man made
8  lakes in the middle of the desert.  This farfetched scheme was
9  never grounded in common sense or appropriate to the community of
10 Calexico, which has a population of 20,000 people and a median
11 income of $18,000.

12          The defendant diverted pay-off funds, oversold
13 partnerships, and obtained investment funds under false pretenses.
14 SALAS exploited the relationship of trust and confidence Four
15 Seasons enjoyed with its investors.  When the partnership money
16 could not fund the costs associated with SALAS' speculative
17 development, he stole more money from investors to cover checks he
18 was writing.  Defendant diverted money from various unrelated
19 trust deed payoffs without investors' knowledge or consent.  The
20 money went into the Calexico project to help SALAS realize his
21 hopes of making an eighty million dollar ($80MM) profit.
22 Investors believed they were making secured investments, but SALAS
23 stole the payoffs and used the funds to make unsecured
24 investments.  The defendant accounted for loans involved in the
25 diversion scheme as "affected" loans.  Meyer wrote false extension
26 letters to investors in order to keep the truth from them and to
27 mislead them.  Meyer selected the victims.  She made interest
28 payments to the investors who inquired most often about the status

1   of their investment.  SALAS gambled on making money in Calexico;
2   using other people's money.
3        The public image of Four Seasons was very important to
4   SALAS.  He preferred to divert investor funds than let it be known
5   that Four Seasons was having financial difficulties.  According to
6   investors, SALAS enjoyed a lavish business lifestyle while
7   courting investors who later became victims.  This extravagance
8   included limousine rides, frequent private plane rides to Calexico
9   from San Diego, and parties costing tens of thousands of dollars,
10  which included prostitutes provided by SALAS.  Reports detailing
11  CM Ranch project costs list airplane expenses exceeding $41,000.
12       CHARLES SALAS was motivated by greed.  For the privilege
13  of stealing from his investors, SALAS paid himself an annual
14  salary of $150,000 plus bonus.  Meyer received $100,000 a year
15  plus bonus.  SALAS took life savings, retirement savings, pension
16  money, and trust money.  He stole from scores of investors and
17  promised them safe, secure investments and lofty profits.
18  Although most of the money went into the Calexico speculation, a
19  Department of Real Estate audit revealed one check for $120,000 to
20  the defendant that has not been explained.  Meyer described one
21  transaction with Mexican investors in which more than one million
22  dollars ($1MM) cash was delivered in shoe boxes.
23       The investors collectively lost more than four million
24  dollars ($4MM).  Many were elderly victims who lost their life
25  savings and will never recover.  The defendant has recently filed
26  for bankruptcy and failed to provide the court with the necessary
27  documents.
28  / / / /

1  ## ARGUMENT

2  ### I

3  **DEFENDANT IS NOT DESERVING OF PROBATION
AND SHOULD BE SENTENCED TO PRISON**

4

5        Having the sentencing objectives in mind, the court must

6  determine whether the defendant should be granted probation.  Rule

7  414 presents the criteria the court should consider in determining

8  whether to grant or deny probation.  Under Rule 414(a), the court

9  must decide whether any statutory provisions exist limiting or

10  prohibiting the grant of probation.  The following rules apply:

11        <u>Rule 414(a)</u>.  Facts relating to the crime, including:

12        <u>Rule 414(a)(1)</u>.  The nature, seriousness, and

13  circumstances of the crime as compared to other instances of the

14  same crime.  Defendant stole over four million dollars ($4MM) from

15  the most vulnerable of people.  Many of the victims were elderly

16  people who entrusted the defendant with their life savings.  SALAS

17  used the money to support his lavish lifestyle.

18        <u>Rule 414(a)(3)</u>.  The vulnerability of the victim.  Most

19  of the victims became friends of the defendant.  Some were elderly

20  and unsophisticated in financial matters.  Many were turned on to

21  Four Seasons by family or friends.  The defendant exploited the

22  naivety of the victims for his personal profit.

23        <u>Rule 414(a)(4)</u>.  Whether the defendant inflicted

24  physical or emotional injury.  The victims have suffered both

25  financially and emotionally.  They have to cope with the loss of

26  retirement savings.  Some victims have lost family money and have

27  had to confront the humiliation and shame of being involved in

28  this loss.  Many victims reported that they have suffered poor

1  health as a result of the crimes.  Some have suffered severe
2  depression, ulcers, and loss of sleep.  The defendant stole
3  victims' peace of mind, happiness, and security for their future.
4        Rule 414(a)(5).  The degree of monetary loss to the
5  victim.  Based solely on the twenty-two counts charged in the
6  information, the victims lost more than four million dollars
7  ($4MM).  Some elderly victims lost their life savings and will
8  never recover.  Victims who lost their pension or retirement
9  savings now face an uncertain future.
10        Rule 414(a)(6).  Whether the defendant was an active or
11  passive participant.  SALAS and Meyer shared ownership in Four
12  Seasons and responsibility for all business transactions.  SALAS
13  was the ringleader.  He made the initial decision to steal money,
14  and orchestrated dozens of thefts for the next four years.
15        Rule 414(a)(7).  Whether the crime was committed because
16  of an unusual circumstance, such as great provocation, which is
17  unlikely to recur.  There was no provocation.  The crime was
18  committed because of the defendant's greed for huge profits and
19  appetite for an extravagant lifestyle, supported with money he
20  stole from old people's retirement funds.  The defendant preyed on
21  unsuspecting clients who placed their trust, confidence, and
22  substantial savings in the defendant's hands.
23        Rule 414(a)(8).  Whether the manner in which the crime
24  was carried out demonstrated criminal sophistication or
25  professionalism on the part of the defendant.  Defendant printed
26  slick brochures to induce investors into his scam.  He maintained
27  detailed records of the loans involved in the diversion and
28  managed to keep victims at bay for more than four years.

1       **Rule 414(a)(9)**. Whether the defendant took advantage of

2 a position of trust and confidence to commit the crime. Many of

3 the victims believed they were friends of the defendant. The best

4 example of how much trust the victims placed in the defendant is

5 demonstrated by the tremendous amount of money victims invested

6 with Four Seasons, including retirement, pension, and life

7 savings.

8       **Rule 414(b)**. Facts relating to the defendant,

9 including:

10       **Rule 414(b)(4)**. Ability to comply with reasonable terms

11 of probation as indicated by the defendant's age, education,

12 health, mental faculties, history of alcohol or other substance

13 abuse, family background and ties, employment and military service

14 history, and other relevant factors. Defendant has filed for

15 bankruptcy and has no reasonable ability to pay restitution.

16       **Rule 414(b)(8)**. The likelihood that if not imprisoned,

17 the defendant will be a danger to others. Defendant poses a

18 profound economic risk to society.

19                                     **II**

20                          **AGGRAVATION**

21       An examination of the facts presently of record

22 establishes that the circumstances in aggravation outweigh the

23 circumstances in mitigation as defined by the California Rules of

24 Court, Rule 423(a). The circumstances in aggravation are as

25 follows:

26       **Rule 421(a)**. Facts relating to the crime, whether or

27 not charged or chargeable as enhancements, including the fact

28 that:

172

1        Rule 421(a)(3). The victims were particularly
2   vulnerable. Many of the victims were elderly. They lacked
3   financial expertise and trusted the defendant. The defendant
4   exploited his friendships and the inherent vulnerability of those
5   relationships.
6        Rule 421(a)(4). The defendant induced others to
7   participate in the crime or occupied a position of leadership or
8   dominance of other participants in its commission. SALAS was the
9   mastermind and made the initial decision to begin stealing from
10  investors.
11       Rule 421(a)(8). The manner in which the crime was
12  carried out indicates planning, sophistication, or
13  professionalism. See above.
14       Rule 421(a)(9). The crime involved an attempted or
15  actual taking or damage of great monetary value. SALAS stole more
16  than $4,000,000. See above.
17       Rule 421(a)(11). The defendant took advantage of a
18  position of trust or confidence to commit the offense. The
19  defendant gained investors' confidence and then used it against
20  them to cheat them of their life savings.
21                               III
22                       CONSECUTIVE SENTENCING
23       By examining the facts before the court in this case,
24  the court will see that they establish certain facts relating to
25  the crime that should be considered circumstances in support of
26  the decision to impose consecutive rather than concurrent
27  sentences pursuant to Judicial Council Rule 425(a). These facts
28  are as follows:

1          <u>Rule 425(a)(1)</u>.  The crimes and their objectives were
2     predominantly independent of each other.  Each theft gave the
3     defendant separate, discrete amounts of money.
4          <u>Rule 425(a)(3)</u>.  The crimes were committed at different
5     times and separate places, rather than being committed so closely
6     in time and place as to indicate a single period of aberrant
7     behavior.  The crimes occurred over the course of four years.
8          <u>Rule 425(b)</u>.  Any circumstances in aggravation or
9     mitigation.

10                    <u>**CONCLUSION AND REQUESTED SENTENCE**</u>

11          We will, and do hereby request, based on the record in
12     this case, this statement, and other argument, that the court
13     impose a total prison term of twelve (12) years for the defendant.
14          The People request a proper sentence for the defendant
15     is the maximum term of twelve (12) years in prison to be served
16     consecutively.
17          Dated:  May 23, 1996

18                              Respectfully submitted,

19                              PAUL J. PFINGST
20                              District Attorney

21                         By _____
22                              JEFFREY BRODRICK
                               Deputy District Attorney

23                              Attorneys for Plaintiff
24
25
26
27
28

174

1 | PAUL J. PFINGST
District Attorney
2 | JEFFREY BRODRICK, State Bar #118523
Deputy District Attorney
3 | 101 W. Broadway, Suite 700          F  KENNETH E. MARTONE  D
San Diego, California 92101          Clerk of the Superior Court
4 | 531-3596                                SEP 0 6 1995
5 | Attorneys for Plaintiff
                                         By: _____ , Deputy
6

7

8 |            MUNICIPAL COURT OF THE STATE OF CALIFORNIA

9 |                 FOR THE COUNTY OF SAN DIEGO

10 | THE PEOPLE OF THE STATE OF CALIFORNIA, )   No. CD113284/DA P63158
                                          )
11 |                            Plaintiff, )   STATEMENT IN AGGRAVATION
                                          )   PURSUANT  TO  PENAL  CODE
12 |             v.                        )   SECTION 1170(b) AND JUDI-
                                          )   CIAL COUNCIL RULE 437
13 | SYLVAN STEWART COOPER,                )
                                          )   Date:  September 8, 1995
14 |                            Defendant. )   Time:  1:30 PM
    _____)   Dept:  M-12
15

16 |          Comes now the plaintiff, the People of the State of

17 | California, by and through its attorneys, PAUL J. PFINGST, District

18 | Attorney, and JEFFREY BRODRICK, Deputy District Attorney, and

19 | respectfully submits the following Statement in Aggravation relating

20 | to the above-named defendant, SYLVAN STEWART COOPER.

21 |                      STATEMENT OF THE CASE

22 |          In a complaint filed on 6/5/95, the defendant was charged

23 | with seven counts of Grand Theft.  The offenses were alleged to have

24 | occurred between 1991 and 1994, against victims Vanthong Phrakonkham,

25 | Hubert Price, Johnny and Jack Favale, and Dr. Leland Fitzgerald.

26 |          On 7/6/95, the defendant entered a plea of no contest to

27 | all charges.  Pursuant to a plea agreement, he executed a waiver

28 | based on People v. Harvey (1979) 25 Cal.3d 754, agreeing to allow the

1   facts underlying his prior history and any dismissed charges to be

2   argued against him. He further agreed to allow uncharged victims to

3   be considered for purposes of restitution.

4                 **STATEMENT OF THE FACTS**

5         Sylvan Cooper stole over half a million dollars. He stole

6   this money from a variety of victims, including Vanthong Phrakonkham,

7   John and Jack Favale, Leo Bodin, Leland Fitzgerald, Hubert Price, and

8   Beverly Holt. One of the victims, Mr. Phrakonkham, was a Laotian

9   immigrant who spoke little English and lost his life savings to the

10   defendant. Another victim, Leo Bodin, is eighty years old and lost

11   a large part of his retirement savings to the defendant. Another

12   victim, Beverly Holt, is a single woman in her sixties with a severe

13   hearing loss and no way to make up the fifty thousand dollars she

14   lost to the defendant.

15         Cooper stole this half a million dollars in a variety of

16   ways: by false pretense, by trick or device, by embezzlement.

17   Cooper held a consumer finance license from the Dept. of

18   Corporations. This license allowed him to loan his own money but not

19   to broker loans to third parties, unless they were institutional

20   investors such as a bank or city or other public entity or political

21   subdivision. Notwithstanding that he had no license to do so, Cooper

22   routinely sold loans to his many victims, in violation of Financial

23   Code section 24476/24653. He told his victims that their investments

24   were protected by deeds of trust, but never recorded assignments in

25   the victims' names. This allowed Cooper to steal the victims' money

26   by collecting payoffs from borrowers and not turning the money over

27   to the victims. To accomplish these thefts, Cooper caused fraudulent

28   reconveyances to be filed, in violation of Penal Code 115, falsely

1   stating that the debt owed to the holder of the beneficial interest
2   under the deed of trust had been satisfied.  In fact, the victims to
3   whom Cooper sold these loans were NEVER paid.  Cooper's thefts and
4   the victims' losses had nothing to do with an economic downturn.
5   Foreclosures had nothing to do with the victims' losses.   Cooper
6   stole PAYOFFS -- loans that were paid in full by the borrowers.  In
7   the Phrakonkham matter, Cooper converted the victim's deed of trust
8   to his own use, by foreclosing, then trading the victim's property
9   for an apartment building.  Cooper himself valued the victim's deed
10  of trust at $190,000 in this transaction.

11          During the several years that Cooper stole this half a
12  million dollars, he constructed an ocean-view home in La Jolla.  He
13  put Vanthong Phrakonkham into bankruptcy and stole the retirement
14  money of the elderly and infirm.

15          **VICTIM:  VANTHONG PHRAKONKHAM  LOSS:  $240,000**

16          Cooper  stole  $240,000  from  Vanthong  Phrakonkham.   He
17  committed this grand theft by trick or device and embezzlement.  The
18  victim was an immigrant from Laos and spoke little English.  Cooper
19  made a loan to Phrakonkham and told him to bring the original deed of
20  trust Phrakonkham held on a piece of land he had previously sold in
21  Riverside.   Cooper told Phrakonkham to leave the original deed of
22  trust with him so he could make copies of it.  After signing numerous
23  loan  documents  and  receiving  his  money  from  Cooper,  Phrakonkham
24  learned that he had unwittingly assigned the deed of trust to Cooper
25  as collateral for his loan.  Cooper loaned Phrakonkham $14,500; the
26  deed of trust he tricked Phrakonkham into signing over to him as
27  collateral had $190,600 owed on it.  Cooper told Phrakonkham not to
28  worry about the deed of trust, that the assignment was just a

177

1  formality, and when he was paid back he would assign the deed of
2  trust back to Phrakonkham.

3          Unfortunately, Cooper did just the opposite. Without
4  Phrakonkham's knowledge or approval, Cooper foreclosed on
5  Phrakonkham's deed of trust and converted it to his own use, trading
6  the underlying property for another deed of trust on a sixteen unit
7  apartment building located in downtown San Diego at 2350 Third
8  Avenue.

9          The monthly rental roll for the complex showed that the
10 complex generated $8,745 a month in rent, far exceeding the monthly
11 payments on the deed of trust, and the property taxes. During the
12 past three years, Cooper never paid a penny of these profits over to
13 Phrakonkham.

14          Phrakonkham called Cooper over a hundred times trying to
15 speak to him about the deed of trust that Cooper had tricked him out
16 of and now converted to his own use. Cooper did not reply. Finally
17 Phrakonkham waited one morning for Cooper at his office and told him
18 he wanted his Riverside property back and had the money to pay back
19 Cooper. Cooper said everything was okay and he would get back to
20 Phrakonkham. He didn't.

21          Phrakonkham retained Attorney Jerry Schaefer. Schaefer
22 discovered that Cooper foreclosed on the property and took title by
23 way of trustee's deed upon sale on June 8, 1992. On this date,
24 Cooper traded the Riverside property for an existing note and deed of
25 trust on an apartment building at 2350 Third Avenue, San Diego. The
26 note and deed of trust had an existing value of $190,000, according
27 to the purchase/sale agreement between Cooper and the buyer. Cooper
28 ultimately took title to this apartment building by way of a grant

1   deed from Avenue Associates, which issued him the deed in

2   consideration of, and in full cancellation of the debt secured by the

3   deed of trust Cooper traded the land for.   Cooper now owns the

4   apartment building under his business, Desert View Financial.  Desert

5   View Financial took title on August 20, 1992.  Phrakonkham and his

6   wife lost their trust deed note on the Riverside property and with it

7   all their life savings.

8   In December 1992, Attorney Schaefer sued Sylvan and Irene

9   Cooper in the Superior Court in San Diego County (Case No. N58231) on

10  Phrakonkham's behalf.  In March 1994, Judge J. Morgan Lester ruled in

11  favor of Phrakonkham. The judge awarded Phrakonkham $190,600 for his

12  losses on the $205,100 trust deed.   The judge further ruled that

13  Cooper should pay him the interest earned on his losses.   And the

14  judge ordered Cooper to pay for Phrakonkham's attorney fees.

15  Furthermore, Judge Lester declared the $22,000 loan note to

16  Phrakonkham from Cooper void.   Finally, Judge Lester awarded

17  Phrakonkham $500,000 in punitive damages.  Judge Lester commented:

18              "It's apparent to the court that a gross fraud
                was perpetrated upon the plaintiff by Sylvan
19              Cooper; the type of activity which, if appraised
                by the Fraud Division of the District Attorney's
20              Office, would easily lead to a state prison
                sentence."

21 .
                "He took advantage of someone who did not speak
22              English well, and then went and took the
                property away from [Phrakonkham], which was only
23              given to him to hold as security."

24              **VICTIM: AMERICAN SAVINGS BANK**

25  After Cooper took possession of the apartment complex at

26  2350 Third Avenue, San Diego, that he acquired by stealing

27  Phrakonkham's deed of trust, Cooper collected and skimmed the rents,

28  in violation of his deed of trust. The lender and beneficiary of the

1   deed of trust on the property, American Savings Bank, successfully
2   sought appointment of a receiver on June 2, 1995.  The bank alleged
3   that Cooper collected the rents from the property, yet failed to make
4   his monthly installment payment due the bank.  Judge Gamer issued a
5   preliminary injunction that forbid defendant from collecting rent on
6   the property.  Cooper had failed to pay his mortgage from February 1,
7   1995.

8                  **VICTIM:  HUBERT PRICE  LOSS:  $25,000**

9               Cooper stole $20,00 from Hubert Price on September 23,
10  1992.  He did so by collecting a payoff on a loan he had sold to
11  Price without telling the borrower he had sold the loan and without
12  turning the money over to Price.

13              Hector   Arteaga   borrowed   $25,000   from   Cooper   in
14  approximately July, 1991, secured by a deed of trust on Arteaga's
15  condominium in La Jolla.  Unbeknownst to Arteaga, Cooper sold the
16  loan to Hubert Price for $25,000.  When the note was due, Arteaga
17  went to Cooper and asked him if he could pay Cooper $20,000 plus the
18  monthly interest on the remaining balance.  He asked if Cooper would
19  mind if Arteaga paid him the remaining $5,000 in a couple of months.
20  Cooper said, "Sure, no problem.  What are friends for?"  On September
21  23, 1992, Arteaga paid Cooper $20,000 as a partial paydown of
22  principal.

23              In 1994, Arteaga got a call from Hubert Price, who told
24  Arteaga that Arteaga owed him money.  Arteaga didn't know who Price
25  was, but Price told him about buying Arteaga's loan from Cooper.
26  Arteaga explained to Price that he had already paid most of the money
27  to Cooper.  Price showed Arteaga papers which showed that one month
28  / / / /

180

1  after Arteaga got the loan from Cooper, Cooper assigned the note to
2  Price.  Arteaga had no idea that Cooper assigned the note to Price.
3          Cooper did not give Price any of the $20,000 of the
4  principal that Arteaga paid off on September 23, 1992.   Price
5  continued to receive monthly payments from Cooper until April of
6  1994; but never received any of his $25,000 from Cooper.

7                  **VICTIM:  JOHNNY FAVALE  LOSS:  $22,500**

8          Cooper stole $22,500 from Johnny Favale by false pretense
9  and embezzlement.

10         Johnny Favale works with his father as a tow truck driver.
11 He had received some money as a result of an accident and was looking
12 for some type of investment.  Leo Bodin, an old family friend and
13 another victim of Cooper, told Favale of Cooper and arranged a
14 meeting.  Favale was impressed with Cooper and his presentation.
15 Cooper said:

16              "I will be tied in this with you.  I will take
                care of you.  I will show you the ropes.  You
17              will make a lot of money, then you can go out on
                your own."
18

19         Favale had a sense of comfort in that Cooper was going to
20 "be with him" on this investment.

21         Favale gave Cooper a check for $30,000 on March 5, 1991.
22 The money was for two deeds, one for $10,000 and one for $20,000.

23         On January 18, 1991, Cooper had lent $15,000 to Joe and
24 Aracel Hernandez, owners of 648 Sea Vale Street, Chula Vista.  Cooper
25 wrote Favale and told him that $10,000 of his money was invested in
26 the Hernandez deed of trust on Sea Vale, and that $20,000 of his
27 money was invested in a deed of trust secured by Phrakonkham's
28 property.

181

1    In fact, Cooper never recorded anything in Favale's name.

2  Contrary to the lies he told Favale when he took his $30,000,

3  Favale's investments were never secured by deeds of trust.  This

4  deception allowed Cooper to steal payoffs from borrowers who were

5  unaware Cooper had sold their loans.  When the Hernandez deed of

6  trust paid off, Cooper gave Favale $7,500 but stole $2,500.  Cooper

7  never assigned Favale an interest in the Phrakonkham deed of trust

8  and in fact this deed of trust was ordered reconveyed by Judge Lester

9  after he made a finding that Cooper had committed fraud.

10    Tom Best, President of Secured Equity Management, Inc., was

11 the trustee on the Hernandez Sea Vale property.  Best recorded the

12 reconveyance of the trust deed for Cooper on February 26, 1992.  Best

13 stated that he would not have recorded a reconveyance if he was aware

14 of an existing assignment by the beneficiary on the property.

15    Favale has made many efforts to contact Cooper in an effort

16 to recover his money.  Cooper refused to return his calls.  Favale is

17 now out the remaining $22,500.

18             **VICTIM:  JACK FAVALE  LOSS:  $10,000**

19    Cooper also stole $10,000 from Jack Favale, Johnny's

20 father.  Jack Favale was present at the initial meeting with Cooper

21 and his son Johnny and Bodin, and he was also impressed with the

22 presentation by Cooper.  Jack gave Cooper $10,000.  Cooper sent

23 Favale a letter telling him his $10,000 was going into a deed of

24 trust on 1215 Via La Ranchita, San Marcos.  This was a lie.  Cooper

25 never gave Favale any interest in this deed of trust.  Cooper

26 assigned this deed of trust to another party.

27 / / / /

28 / / / /

182

1    Jack Favale received interest payments for a short period

2    of time. He never received any of his principal. Jack is still out

3    his original $10,000 investment.

4    <u>VICTIM:  DR. LELAND FITZGERALD  LOSS:  $164,000</u>

5    Cooper stole approximately $164,000 from Dr. Leland

6    Fitzgerald. He did so by collecting payoffs on deeds of trust he had

7    sold Fitzgerald and keeping those payoffs for his own benefit.   He

8    also took Fitzgerald's money by false pretense and tricked him into

9    making investments without telling him of the precarious financial

10   situation of the borrower.

11   A dentist, Fitzgerald began to invest in deeds of trust

12   through Cooper, in 1989. Fitzgerald had no experience in real estate

13   and relied upon Cooper's advice. In 1991, Fitzgerald told Cooper he

14   did not want to invest in any more trust deeds.   Despite this

15   instruction, Cooper refused to return Fitzgerald's money. Fitzgerald

16   sent a letter to Cooper telling him not to reinvest any of his money

17   in trust deeds. The letter was dated September 3, 1991. Fitzgerald

18   wrote:

19           "Please, when any of my notes come due, do NOT
             reinvest the money. Please send or I will pick
20           up the check.   I do not desire to invest in
             Trust Deeds anymore."
21

22   Cooper continued to take payoffs of deeds of trust owed to

23   Fitzgerald and gave him assignments of deeds of trust instead of the

24   money owed to Fitzgerald and requested by him.   Cooper took the

25   proceeds of three deeds of trust and converted the money to his own

26   uses.  Ultimately he told Fitzgerald he was giving him a deed of

27   trust for $125,000 on some property he owned on Nautilus Street in La

28   / / / /

1   Jolla.  This deed of trust was nothing more than a worthless piece of
2   paper; there was no equity in the house to cover it.
3           Cooper came to Fitzgerald after work one day and said,
4   "Look, here's what I'm going to do, I'm giving you this deed of
5   trust."  Fitzgerald said he didn't know if he wanted to do this.  He
6   talked to his wife and they agreed they didn't want the deed of
7   trust.  He called Cooper to tell him, but Cooper wouldn't return his
8   phone calls.  He wrote Cooper a letter and told him he didn't want
9   the deed of trust.  Cooper sent three checks on this deed of trust.
10  At first Fitzgerald didn't cash them because he didn't want to
11  authorize the deed of trust.  He then cashed the three checks and
12  wrote Cooper that he was not accepting the deed of trust.  The
13  payments stopped.
14          Six months or so later, the bank (who held a deed of trust
15  senior to Fitzgerald) foreclosed on the Nautilus Street property,
16  wiping out Fitzgerald's deed of trust.  Fitzgerald said he did not
17  foreclose on the Nautilus property because his lawyer told him not
18  to, and because there was no equity in the property.
19                      **435 ROUS STREET, SAN DIEGO**
20          On or about March 26, 1990, Fitzgerald invested $45,000 in
21  a deed of trust on 4235 Rous Street, San Diego.  He sent Fitzgerald
22  an original assignment transferring the interest in the deed of trust
23  from Cooper to Fitzgerald.  He never told Fitzgerald to record this
24  assignment.  The deed of trust was paid off on September 25, 1991.
25  Lynn Matella of United Title stated that the escrow file showed that
26  Cooper was paid $45,813.81.
27  / / / /
28  / / / /

184

1            Despite Fitzgerald's letter of September 3, 1991, telling

2    Cooper not to reinvest, Cooper sent Fitzgerald an assignment of

3    another deed of trust on 713 Third Street, Ramona.

4                  **713 THIRD STREET, RAMONA**

5            Without permission, Cooper gave Fitzgerald an assignment of

6    this deed of trust in lieu of paying him the $45,813.81 on Rous

7    Street. He wrote Fitzgerald a letter and stated he was assigning him

8    a percentage of this deed of trust and keeping $15,000 for legal

9    fees. The borrower on Third Street was Robinson. The deed of trust

10    was paid off on March 15, 1993.

11            On May 2, 1995, Marina Romeri, Escrow Manager, Coronado

12    Financial Services stated that Coronado Financial Services paid off

13    the existing loans on the property at 713 Third Street, Ramona, as a

14    result of a purchase by Shepard, Inc. A check in the amount of

15    $39,524.21 was issued to Sylvan and Irene Cooper on a draft from

16    Pacific Commercial Bank on March 15, 1993. This money belonged to

17    Fitzgerald; but Cooper kept it for himself.

18           **16780 HIGHLAND VALLEY ROAD, RAMONA**

19            Fitzgerald had previously invested $40,000 in a deed of

20    trust on 3620 Quimby Street, San Diego. The borrower was Fischer.

21    The deed of trust paid off on or about September 24, 1990. On this

22    date, Cooper wrote Fitzgerald stating, "the Fischer account funds

23    were transferred to a new 2nd Trust Deed, Brechbill in the sum of

24    $43,500." According to his letter, he sent Fitzgerald an original

25    assignment of deed of trust from Donald Brechbill to Sylvan and Irene

26    Cooper. The borrower was Edwin and Sarah Youngman.

27    / / / /

28    / / / /

1          The Brechbill deed of trust was paid off on July 23, 1992,
2  through escrow.  A check for $40,395.75 was drawn on the Bank of
3  America and delivered by Fed Ex to Cooper on July 23, 1992.  The deed
4  of trust was reconveyed on September 22, 1992, by Donald Stevens.
5  The reconveyance filed by Donald Stevens stated, "having been
6  requested in writing by holder of the obligations secured by said
7  deed of trust."   The holder of this obligation was in fact
8  Fitzgerald, and he had made no such written request for a
9  reconveyance because he was never paid off.  Stevens stated he would
10  not have paid Cooper this money had he known that Cooper had assigned
11  his interest in the deed of trust to Fitzgerald.  Cooper did not pay
12  this money to Fitzgerald.

13            **4742 ORCHARD AVE., SAN DIEGO**

14          In June of 1989, Fitzgerald invested $27,913 in 60 percent
15  of a deed of trust on 4742 Orchard Ave, San Diego.  The deed of trust
16  was owned by Richard Morss, who assigned his interest to Cooper.  The
17  borrowers were the Hardistys.  On June 14, 1989, Cooper sent
18  Fitzgerald a letter saying he was including the original assignment
19  from Cooper to Fitzgerald.  Cooper never recorded the assignment to
20  Fitzgerald.  He never instructed Fitzgerald to record it.

21          The Hardistys paid off this deed of trust through escrow on
22  February 26, 1993.  Cooper received a check for $40,090.54.  He never
23  paid any of this money to Fitzgerald.  Fitzgerald still believed he
24  had an interest in this deed of trust, and on June 9, 1994,
25  Fitzgerald recorded the assignment of the deed of trust from Cooper
26  to himself.  He wrote a letter to the Hardistys on July 22, 1994,
27  demanding that they pay off the loan.  He was unaware that the deed
28  / / / /

1  of trust had been reconveyed over a year earlier and that Cooper had
2  taken the proceeds.

3  ### 1363 TORREY PINES ROAD, LA JOLLA

4  Fitzgerald invested in this deed of trust on January 17,
5  1991 for $55,000. Cooper didn't tell Fitzgerald that the Marks were
6  approximately $40,000 in default on a senior deed of trust; a notice
7  of default was filed on January 30, 1991 by California Real
8  Securities, Cooper's corporation. Per the notice of default, the
9  Marks owed Cooper $37,000 as of December 23, 1990. Cooper did not
10 tell Fitzgerald. Had he known that the Marks owed Cooper this money,
11 Fitzgerald would not have invested his money. Cooper then
12 subordinated Fitzgerald's deed of trust on May 31, 1991 without
13 asking approval of Fitzgerald.

14 Ultimately, Cooper took title to the property via trustee's
15 deed upon sale on December 23, 1991 based on a full credit bid on
16 Fitzgerald's deed of trust. Cooper sold the property on December 30,
17 1991 to Lauren Anderson. Fitzgerald received none of this money.

18 Cooper stole Fitzgerald's $55,000 by negative fraud: he
19 concealed the fact that the Marks were already in default on $40,000
20 when he tricked Fitzgerald into investing $55,000. Essentially, what
21 Cooper did was to trick Fitzgerald into buying Cooper's bad loan.

22 ### VICTIM: LEO BODIN LOSS: $70,000

23 Cooper stole over $70,000 from Leo Bodin. Cooper obtained
24 the money by telling Bodin a series of lies. He told Bodin his
25 investments would be secured by a deed of trust. In fact, Cooper
26 never recorded assignments to Bodin in all but one transaction,
27 leaving Bodin without any protection against Cooper's greed and
28 thefts. When the borrowers paid off three of the deeds of trust

187

1   Bodin thought he owned, Cooper collected the payoffs and used them
2   for his own purposes.  Cooper never told the borrowers that he had
3   sold their loan to Bodin and the money was Bodin's.  Cooper recorded
4   fraudulent reconveyances to accomplish his theft, in violation of
5   Penal Code section 115.  In one transaction, Cooper took $7,000 from
6   Bodin for the Terry Schaefer deed of trust, in January of 1991.
7   Cooper never recorded an assignment to Bodin and instead assigned the
8   deed of trust to Martin Enterprises.  The deed of trust paid off in
9   1993 and Bodin never received his money.  In January of 1991, Cooper
10   took $22,000 from Bodin for the Honda deed of trust.  He assured
11   Bodin there was sufficient equity in the property to protect Bodin in
12   the event of foreclosure.  There wasn't.  Cooper didn't record an
13   assignment of the deed of trust to Bodin.  The property was
14   foreclosed on in November of 1992. Bodin's investment was wiped out.

15       In December of 1991 Cooper took $15,000 from Bodin for the
16   Beaumon deed of trust.  He committed negative fraud by failing to
17   tell Bodin that Beaumon was going through bankruptcy.  Had Bodin
18   known this vital information, he would not have given Cooper his
19   money.  Cooper never recorded an assignment to Bodin -- until
20   September of 1994 -- almost three years later.  Beaumon defaulted on
21   Bodin's loan four months ago.  Bodin didn't foreclose because he
22   couldn't carry the first, which was also in default.

23       Cooper stole $70,000 from Bodin.  These thefts profoundly
24   affected Bodin's health and severely impacted his retirement
25   possibilities.

26            **VICTIM: BEVERLY HOLT  LOSS: $50,000**

27       Defendant stole $50,000 from Beverly Holt.  He did so in
28   the same fashion he stole money from virtually every other victim.

1   He promised her an investment secured by a deed of trust.  Instead he

2   took her $50,000 and gave her an unsigned assignment of a deed of

3   trust which could not be recorded.  When the deed of trust paid off

4   in January of 1993, defendant collected and kept Beverly Holt's

5   $50,000.  He never told the borrower he had assigned $50,000 of the

6   loan to Beverly Holt.  Cooper has continued to pay Holt interest as

7   though the principal owed on the loan was still outstanding.

8        Beverly Holt is in her sixties.  She suffers from an

9   extreme hearing disability and has no way to make up the money Cooper

10   stole from her.

11                **ARGUMENT**

12                  I

13        **DEFENDANT IS NOT DESERVING**
            **OF PROBATION AND SHOULD**

14        **BE SENTENCED TO PRISON.**

15        Having the sentencing objectives in mind, the court must

16   determine whether the defendant should be granted probation.

17   Rule 414 presents the criteria the court should consider in deter-

18   mining whether to grant or deny probation.  Under Rule 414, the court

19   must decide whether any statutory provisions exist limiting or

20   prohibiting the grant of probation.  The following rules apply:

21        <u>Rule 414(a)</u>.  Facts relating to the crime, including:

22        <u>Rule 414(a)(1)</u>.  The nature, seriousness, and circum-

23   stances of the crime as compared to other instances of the same

24   crime.  Defendant stole over half a million dollars from the most

25   vulnerable of people:  from an immigrant, from the elderly.

26        <u>Rule 414(a)(3)</u>.  The vulnerability of the victim.  Mr.

27   Phrakonkham spoke little English.  He saved for many years to acquire

28   his property in Riverside, and lost his life savings to Cooper.  All

1   of the victims were inexperienced in real estate investments. Cooper
2   exploited this inexperience.   One of the victims, Leo Bodin, is
3   eighty years old.

4         Rule 414(a)(4).   Whether the defendant inflicted physical
5   or emotional injury. The victims have suffered both financially and
6   emotionally.

7         Rule 414(a)(5).   The degree of monetary loss to the victim.
8   Defendant stole over one half million dollars, in some cases the
9   victim's entire life savings.

10         Rule 414(a)(6).   Whether the defendant was an active or
11   passive participant. Defendant was the mastermind and profiteer, the
12   only participant.

13         Rule 414(a)(7).   Whether the crime was committed because of
14   an unusual circumstance, such as great provocation, which is unlikely
15   to recur.   There was no provocation.   Defendant was motivated by his
16   own greed.   The thefts went on for at least three years.

17         Rule 414(a)(8).   Whether the manner in which the crime was
18   carried out demonstrated criminal sophistication or professionalism
19   on the part of the defendant.   Defendant committed grand theft by
20   trick or device, by false pretense, by embezzlement.   According to
21   his secretary, Davita Counsel, Cooper kept two sets of files so that
22   when auditors came from the Dept. of Corporations they would not
23   learn that Cooper had been violating his consumer finance lender
24   license by brokering loans to unqualified third parties.   Cooper set
25   up all his thefts by not recording assignments to the victims.   This
26   gave Cooper the power to divert payoffs and steal the victim's money.
27   / / / /
28   / / / /

1        Rule 414(a)(9). Whether the defendant took advantage of a

2   position of trust or confidence to commit the crime. The victims all

3   trusted Cooper and relied upon his expertise in real estate.  Cooper

4   exploited this trust by stealing hundreds of thousands of dollars.

5        Rule 414(b). Facts relating to the defendant, including:

6        Rule 414(b)(1). Prior record of criminal conduct; whether

7   as an adult or a juvenile, including the recency and frequency of

8   prior crimes; and whether the prior record indicates a pattern of

9   regular or increasingly serious criminal conduct.  Defendant's

10   conduct shows an ongoing pattern of decisive criminality.

11        Rule 414(b)(4). Ability to comply with reasonable terms of

12   probation as indicated by the defendant's age, education, health,

13   mental faculties, history of alcohol or other substance abuse, family

14   background and ties, employment and military service history, and

15   other relevant factors. Defendant has no ability to pay restitution.

16        Rule 414(b)(8). The likelihood that if not imprisoned the

17   defendant will be a danger to others.  Defendant poses a profound

18   economic risk to society.

19               II

20           **AGGRAVATION**

21        An examination of the facts presently of record establishes

22   that the circumstances in aggravation outweigh the circumstances in

23   mitigation which are defined by Rule 423 of the California Rules of

24   Court.  The circumstances in aggravation are as follows:

25        Rule 421(a). Facts relating to the crime, whether or

26   not charged or chargeable as enhancements, including the fact that:

27        Rule 421(a)(3). The victim was particularly vulnerable.

28   The victims were elderly and unsophisticated.

1    <u>Rule 421(a)(8)</u>. The manner in which the crime was carried
2    out indicates planning, sophistication, or professionalism.   See
3    above.

4    <u>Rule 421(a)(9)</u>. The crime involved an attempted or actual
5    taking or damage of great monetary value.   Over half a million
6    dollars.

7    <u>Rule 421(a)(11)</u>. The defendant took advantage of a posi-
8    tion of trust or confidence to commit the offense.   Defendant
9    exploited his expertise in real estate to defraud the many victims.

10                                III

11                      **CONSECUTIVE SENTENCING**

12    By examining the facts before the court in this case, the
13    court will see that they establish certain facts relating to the
14    crime that should be considered circumstances in support of the
15    decision to impose consecutive rather than concurrent sentences
16    pursuant to Judicial Council Rule 425(a).   These facts are as
17    follows:

18    <u>Rule 425(a)(1)</u>. The crimes and their objectives were
19    predominantly independent of each other.   Each theft had its own
20    objective and reward:  more money for the defendant.

21    <u>Rule 425(a)(3)</u>. The crimes were committed at different
22    times and separate places, rather than being committed so close in
23    time as to indicate a single period of aberrant behavior.   The thefts
24    took place over several years.

25    <u>Rule 425(b)</u>. Any circumstances in aggravation or mitiga-
26    tion.   See above.

27    / / / /
28    / / / /

1     **CONCLUSION AND REQUESTED SENTENCE**

2          We will, and do hereby request, based on the record in this

3     case, this statement, and other argument, that the court impose a

4     total prison term of 9 years, and that restitution be set at

5     $581,500.

6          Therefore, based on the above analysis and rules, and in

7     the face of overwhelming aggravating factors and the absence of

8     mitigating factors, it is the position of the People that a proper

9     sentence for this defendant is the maximum term of 9 years in prison

10    to be served consecutively.

11         Dated:  September 6, 1995

12                          Respectfully submitted,

13                          PAUL J. PFINGST
                            District Attorney
14

15              By:

16                          JEFFREY BRODRICK
                            Deputy District Attorney

17                          Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

**DISTRICT ATTORNEY'S OFFICE**
**SAN DIEGO COUNTY**
**BUREAU OF INVESTIGATION**

**FRAUD DIVISION**

CASE NO: _92 H 0760_

DATE: July 17, 1995                     INVESTIGATOR  James Martin

DEF.   COOPER, Sylvan                   C.W.  People

---

**RESTITUTION**

The victims in this case are listed below with the amount of
their losses.

| | |
|---|---:|
| FAVALE, Jack | $ 10,000 |
| FAVALE, John | 22,500 |
| BODIN, Leo | 70,000 |
| FITZGERALD, Leland | 164,000 |
| HOLT, Beverly | 50,000 |
| PHRAKONHAM, Van | 240,000 |
| PRICE, Hubert | 25,000 |
| TOTAL | $581,500 |

San Diego Union-Tribune Archive Document



# The San Diego Union-Tribune.

(Page C-1 )

# Ten-year prison term for trust-deed lender

**ANNE KRUEGER**
Staff Writer

**23-Jan-1993 Saturday**

A 54-year-old La Jolla man who admitted that he fraudulently operated his trust-deed lending company was sentenced yesterday to 10 years in prison and ordered to pay more than $2 million in restitution.

Municipal Court Judge Frank A. Brown ordered Richard L. Gillelen to pay the restitution even though he acknowledged that Gillelen's 31 victims will probably never get their money back from him.

"I can't fix it," Brown told Gillelen's victims who packed his courtroom. "I can't give you back your money. I can punish him, but that still won't fix it."

Gillelen, who had been charged with 29 counts of grand theft and filing false instruments, pleaded guilty in November to nine charges of grand theft. His Old Town-based business, All State Mortgage Co., also known as El Capitan Investment Co., loaned money to borrowers who pledged their property as collateral. Investors provided the money for the loan and, in turn, got a trust deed on the real estate.

Gillelen admitted that he took money from some trust deeds to pay off other investors to cover up his losses. Deputy District Attorney Jeff Brodrick said Gillelen forged signatures on trust deeds and used money from investors to buy an expensive condominium and make his own investments that then failed.

In an emotional hearing, people who had done business with Gillelen -- many of them elderly or infirm -- told how they had been financially ruined.

One woman told Brown she had lost $71,000 with Gillelen and will now have to sell her home because she no longer has any money to live on. Nelson

San Diego Union-Tribune Archive Document                    Page 2 of 2

Solomon, 81, said he lost $52,000 that he and his wife had planned to use for nursing-home care.

Brown said other victims included a 79-year-old blind woman and Gillelen's stepmother. Attorneys who are representing many of the victims in civil suits against Gillelen also attended the hearing.

Gillelen's attorney, Robert Rose, told Brown that Gillelen tried to pay. back some of his investors and that Gillelen's home is now owned by a man who invested with him. He asked that Gillelen be shown leniency because he admitted his guilt in an early stage of the court proceedings.

"I'm sorry that it happened," Gillelen said in court. "I have no money. I didn't take it. I didn't keep it."

Brown ordered that any wages Gillelen earns in prison go toward his restitution, and he gave Gillelen the maximum possible sentence under the terms of his plea bargain.

"These people are going to be miserable," Brown said, referring to Gillelen's victims. "I want to make him as miserable as I can make him."

Copyright Union-Tribune Publishing Co.



# The San Diego Union-Tribune.

(Page I-I )

## Stark returns to town, under probe for TDC

**Don Bauder**
**10-Jan-1993 Sunday**

### Richard P. Stark

Former banker **Richard** P. Stark has returned to San Diego as quietly as he departed.

His real estate trust deed activities are now being probed by both the U.S. Attorney's Office and the district attorney's fraud unit.

Irate investors who have lost at least $4 million want to talk with him.

His former company is in Chapter 7 bankruptcy. He did not show up for the first three trustee-creditor meetings. If he doesn't show up for the next session Jan. 25, "we will go to the bench warrant to force him to appear," says Harold Taxel, trustee in the bankruptcy of Stark's trust deed operation, Trust Deed Counselors (TDC).

Taxel and lawyers looking into the case believe Stark was -- among other things -- putting more debt on property than it was worth; putting multiple trust deeds on the same property; selling trust deeds without recording them properly; selling the same loan more than once; and putting new investors in line ahead of old investors without the old investors' permission.

Stark retired in 1986 after 32 years with the former Security Pacific Bank. He had been manager of the Clairemont branch, and made many friends -- some of whom he put into trust deed investments yielding 14 to 16 percent, according to lawyers and investigators trying to piece together the picture.

Prominent in the community

In 1985, he served as jury foreman in the second conspiracy and perjury

trial of former Mayor Roger Hedgecock, whose conviction was later overturned.

Trust Deed Counselors went into Chapter 7 in August 1992. On Oct. 28, Stark's wife, Alice K. Stark -- who had worked for Trust Deed Counselors -- reported him missing to the police.

John Doucette of the adult missing-persons detail says he started working on the case, but Alice Stark didn't return his phone calls. Then around Thanksgiving, Alice Stark called and said her husband had been found, and asked that the case be canceled, he says.

"He returned home around Thanksgiving time," says his daughter, Linda Axelson. "He is planning on attending the bankruptcy hearing," but hasn't wanted to talk about the company's collapse. "When somebody is distraught enough to disappear, and has normally been a responsible human being, we don't want to push him over the edge," says Axelson.

She refused to reveal his whereabouts. She said she would ask him if he would be interviewed by The San Diego Union-Tribune, but he has not responded.

He has a lot of explaining to do.

"We're doing an investigation," says Jeffrey Brodrick, deputy DA in the fraud division.

"We're looking into it," says David Katz, assistant U.S. attorney.

Both Taxel and his lawyer, James P. Hill, say they have cooperated with the DA and U.S. attorney investigators.

Attorney Jay Stoffel has one civil case against Stark. His client lost $150,000, allegedly because of Stark's "duplicity of selling a promissory note twice," says Stoffel.

Now Stoffel is representing other people who lost money in Trust Deed Counselors. "There are problems with the documentation on numerous loans -- he didn't record assignments of deeds of trust or endorse the notes properly over to the purchaser," says Stoffel.

Now there is a dispute between investors claiming ownership of notes and the trustee who must assert ownership of the notes on technical legal grounds, says Stoffel.

"There are over-encumbrances of property, multiple trust deeds on the same piece of property, possibly sale of trust deeds without recordation," says

San Diego Union-Tribune Archive Document                                    Page 3 of 3

Taxel.

"The loans would be sold several times without the knowledge of the people.
Those are charges we have heard over and over again," says Hill.

Taxel says that more than $4 million seems to be missing, but he doesn't
know the number of investors. Hill spoke at one investor meeting attended
by more than 50 people.

"One of the things we are starting to do is to enforce the notes. Borrowers
may have taken advantage of the bankruptcy and not paid on the notes," says
Hill.

Many investors who lost money in Stark's operation are longtime friends.
Frank and Alice Pecoraro met Stark when he was at Security Pacific. The
Pecoraros and Starks became personal friends. But the income on the
Pecoraros' trust deeds stopped in May. At the time, they got a brusque
letter from Stark's attorney, telling them of the plan to file for
bankruptcy.

"We lost quite a bit," says Alice Pecoraro. "We knew the family. We feel
anger; that can sum it up. We had trust in this person."

Romney Hayden was once Stark's jeweler. Hayden had a 163-acre ranch in
Jamul -- his lifelong dream. In 1987, according to Hayden, Stark induced
him to take a 50 percent interest in an office building. They set up a
Stark/Hayden partnership. Stark told him that rents would rise 6 percent
and the building's valuation 15 percent each year.

Hayden says he believes he put up his ranch for collateral on a line of
credit from Security Pacific. "However, he (Stark) went out and sold trust
deeds on the property (the ranch) to 13 investors. I didn't know about it,"
says Hayden, who filed a breach-of-contract and fraud suit against Stark in
Superior Court in 1990.

"I don't ever remember signing this note that he says that I signed. I
suspect the signature is phony," says Hayden. "I have never gotten one
penny from that building," and Stark has never given him an accounting of
what happened, he says.

Hayden eventually lost the ranch to foreclosure and filed for bankruptcy.
"It was a case of non-disclosure. He doesn't tell anybody anything," says
Hayden.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document

Page 1 of 1



# The San Diego Union-Tribune.

(Page C-2 )

## Stark arrested after missing 4th meeting

### 29-Apr-1993 Thursday

Former banker **Richard** P. Stark, whose trust deed operation collapsed into
Chapter 7 bankruptcy last year, was arrested briefly Tuesday after failing
to show up for four consecutive trustee-creditor examinations.

After Stark, long-time branch manager with the former Security Pacific
Bank, missed a meeting March 17, bankruptcy trustee Harold Taxel got a
bench warrant to have him arrested, according to Michael MacKinnon, Taxel's
attorney.

Tuesday, the U.S. Marshal's Office took him into custody, and then released
him, according to MacKinnon. A hearing is scheduled Wednesday.

Stark, who disappeared for several weeks last fall, is being investigated
by both the U.S. Attorney's Office and the district attorney's fraud unit.
Investors are believed to have lost at least $4 million in his Trust Deed
Counselors operation.

Taxel said he believes Stark was putting more debt on properties than it
was worth, selling trust deeds without recording them properly and selling
the same loan more than once.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document                    Page 1 of 2



## The San Diego Union-Tribune.

(Page C-1 )

# Two missing bankruptcy figures return

**Don Bauder**
**30-Jun-1993 Wednesday**

Two prominent, once-missing San Diegans have returned to face harsh music.

Steven Allen Berkowitz, a collections/bankruptcy attorney and former
bankruptcy trustee, fled San Diego in mid-April and returned just days ago
. . . showing up to play basketball at the downtown YMCA, a former haunt.

Yesterday, at the request of the state bar, Superior Court assumed control
of his law practice. Berkowitz's earlier four-month disciplinary
suspension by the bar had ended April 10, just before he abruptly departed.

The U.S. Trustee's office, for whom he worked while he was a bankruptcy
trustee, has many questions for him. He had resigned his 135 trustee cases
before fleeing in April.

Meanwhile, former longtime banker **Richard** P. Stark was reported missing in
October, two months after his Trust Deed Counselors went into Chapter 7
bankruptcy.

He returned early this year, but continued to miss bankruptcy hearings, and
was arrested and briefly jailed April 27. He was released after posting
$50,000 bail.

Yesterday, he was back in the downtown county jail -- this time on $750,000
bail. The district attorney charged Stark with 23 counts of grand theft and
using false statements in the sale of securities, said Jeffrey Brodrick,
deputy DA in the fraud division.

His arraignment yesterday was continued until July 12. Stark had been with
the former Security Pacific Bank for 32 years before retiring in 1986.

In a declaration in support of an arrest warrant, DA investigator Barbara
J. Hall relayed numerous instances in which Stark sold the same trust deed
more than once without investors' knowledge, and also took money for trust

deeds that he never delivered.

Typical transactions

In one typical series of transactions, Hall related, Stark "sold this entire note and trust deed to Frank Pecoraro and then sold percentages of the trust deed to other investors (who) were unaware that Stark had already sold the trust deed. (Then) Stark also assigned it a third time to Grossmont Bank as collateral for a line of credit."

Because Berkowitz abandoned his practice, "the State Bar is requesting that this court assume jurisdiction over (the law practice). There is probable cause to believe that Mr. Berkowitz is incapable of maintaining his law practice," said the bar in its filing to the court.

The court will take possession of Berkowitz's records and suggest that clients seek other representation, according to the bar. It launched the action under a code justifying such action "for any reason, including but not limited to excessive use of alcohol or drugs, physical or mental illness, or other infirmity or other cause."

Berkowitz will have a chance to defend himself at a hearing July 23.

Patrick Boyl, assistant U.S. trustee, said his office, which has been reviewing Berkowitz's former cases, wants to talk with Berkowitz on a number of matters. Boyl wouldn't say whether his office has found any irregularities.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document



**The San Diego Union-Tribune.**

(Page C-1 )

# Trust-deed case jails ex-banker

**Don Bauder**
**06-Jul-1993 Tuesday**

**Richard** P. Stark looked and acted so much like a banker that he gained people's trust -- as well as their trust-deed investments.

But his trust-deed machine collapsed, wiping out the investors. Last week, Stark was charged with 23 counts of grand theft and making false statements in the sale of securities. He was sent to the downtown county jail on $750,000 bail.

Stark was indeed a banker. In 1986, he retired after 32 years with the former Security Pacific Bank.

But his Trust Deed Counselors (TDC) was in operation long before he left Security Pacific, his TDC victims did business with Security Pacific -- and now there are questions about the bank's role in the fiasco.

To prepare a declaration in support of Stark's arrest, investigator Barbara J. Hall of the District Attorney's Office talked to numerous Stark victims. "All of the investors I spoke with told me they knew of Stark's long history as a banker," said Hall in the declaration. "Because of Stark's business background, they trusted him to invest their monies in valid trust deeds."

Stark's victims got to know and trust him while he was an officer of Security Pacific's South Clairemont branch and, later, the North Clairemont branch, according to a lawsuit filed last Friday.

Complaint filed

Investors Frank and Alice Pecoraro filed a complaint against Stark and his wife, Alice -- and against Bank of America, which has absorbed Security Pacific.

Security Pacific "knew about Stark's improprieties with (Security Pacific)

customers at least as early as 1985 and deliberately concealed that information from its own customers," charges the suit, filed in Superior Court.

The bank learned of Stark's dubious dealings with one victim, hustled Stark into retirement, paid a huge settlement, "then took steps to make sure those wrongful activities were forever concealed from its own customers, solely in an attempt to avoid its liabilities for the acts of Stark and Security Pacific," alleges the suit.

Bank of America would not comment because it has not yet seen the suit.

"Security Pacific knew back in 1985 and 1986 that Stark was involved in improper activities with bank customers and Trust Deed Counselors," the Pecoraros' attorney, Michael L. Kirby, said in an interview.

However, the bank had reason to look the other way, according to the suit: While at Security Pacific, Stark conceived and implemented a broker referral program. "Trust Deed Counselors was referring loan brokers to Security Pacific," said Kirby. "In return, Security Pacific continued to allow Stark to operate TDC and to solicit Security Pacific customers to invest with TDC," the suit charges.

A list of offenses

The D.A. accuses Stark of many instances of selling the same trust deed more than once and taking money for trust deeds that he never delivered. The Pecoraro suit charges him with those offenses and several others, including not recording trust deeds, inflating market values, piling excessive debt on property and misleading investors on the status of their trust deeds.

While he was working at the bank, Stark repeatedly told investors they could make more with a TDC trust deed than they could make in a bank certificate of deposit, according to the suit. He sometimes communicated with TDC investors on Security Pacific stationery, says the suit.

In late 1985, a physician who had been stung in Stark's trust deeds complained to Security Pacific. The bank studied the matter and told the doctor that it did not find irregularities. But after the doctor sued, the bank paid him $155,765.20 -- an amount 600 percent larger than the loan the doctor had with the bank, according to the suit.

Then the loan to the doctor was wiped off the books in a deceitful way, according to the suit, "allowing Security Pacific to avoid disclosing to any bank auditors or examiners that it had completely written off a

San Diego Union-Tribune Archive Document

customer's loan due to the wrongful conduct" of Stark and bank management, according to the suit.

The settlement agreement between the bank and the doctor had a confidentiality clause mandating that the arrangement be kept secret, according to the suit.

As an outgrowth of the incident, the bank "insisted upon Stark retiring," says the suit. Because the information was hushed up, Stark's subsequent victims were denied knowledge that would have kept them from investing, alleges the suit.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document



# The San Diego Union-Tribune.

(Page C-2 )

## Ex-banker Stark admits grand theft | Pleads guilty to nine counts in multiple sale of trust deeds

**DONALD C. BAUDER**
Financial Editor

**02-Nov-1993 Tuesday**

**Richard** P. Stark, a former prominent banker who briefly disappeared a year ago when his trust deed operation collapsed, yesterday pleaded guilty to nine counts of grand theft.

He faces 10 years in prison, and the District Attorney's Office will ask for the maximum sentence, said Jeffrey Brodrick, a deputy district attorney in the fraud division.

Stark has been in custody since June 29. His sentencing will be Dec. 13 before Judge Charles Rogers in Municipal Court, where he entered his guilty pleas yesterday.

"Essentially, the charges involve his selling the same deed of trust more than once," Brodrick said. "A few days after assigning a deed of trust to a bank, he went over to one of his investors' houses and picked up a check for $150,000 for the deed of trust he had just assigned days earlier to somebody else."

The monetary size of that confessed misdeed expands the number of years in prison that he can receive, Brodrick said.

"We estimate that he stole more than $600,000 from mid-1988 to 1991," he added.

In 1986, Stark retired after 32 years -- much of it as a branch manager -- with the former Security Pacific Bank. While at the bank, he steered customers into his Trust Deed Counselors (TDC) trust deed operation, according to a civil suit. Investors were told they would make 14 percent to 16 percent interest on the trust deeds.

San Diego Union-Tribune Archive Document

Then came the San Diego real estate collapse. With his trust deed operation
in tatters, Stark disappeared in late October 1992, reappearing around
Thanksgiving. However, he continued to miss trustee-creditor examinations
related to TDC's Chapter 7 bankruptcy. Later, he was arrested.

In 1985, Stark served as jury foreman in the second conspiracy and perjury
trial of former Mayor Roger Hedgecock, whose conviction later was
overturned.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document



**The San Diego Union-Tribune.**

(Page C-1 )

## *Business Briefing*

# SAN DIEGO

Compiled from staff and wire reports

**06-Jan-1994 Thursday**

Heilig-Meyers Co. of Richmond, Va., completed its purchase for $55 million of 92 McMahan Furniture Co. stores in a previously announced deal. Another party purchased Carlsbad-based McMahan's accounts receivable for about $100 million and a third party bought real estate operations for 70 stores for $57 million.

**Richard P.** Stark, a one-time prominent banker whose Trust Deed Counselors trust deed operation collapsed in 1992, was sentenced yesterday to 10 years in state prison on nine counts of grand theft and ordered to pay $2.2 million restitution to investors. Many investors lost their life savings to Stark, said Jeffrey Brodrick, deputy district attorney.

Jack White & Co. said it agreed to offer brokerage services to clients of Shareholder Services Corp. Transfer of client accounts is expected to be completed by the end of the month. Shareholder Services Corp. employees will become employees of Jack White & Co.

John S. Goodreds of New York, former president of the Ottaway Newspapers division of Dow Jones & Co., was elected a director of Kendell Communications Inc. of El Cajon, publisher of The Daily Californian newspaper and Senior World Newsmagazine, a monthly publication.

Standard & Poor's Corp. raised its rating on Burnham Pacific Properties Inc.'s $42 million convertible debentures to BBB-from BB+ and gave the same rating to the company's recent $200 million shelf registration, citing BPP's improved capital structure and more focused acquisition strategy.

UCSD Healthcare Network said it has affiliated with Alvarado Hospital

San Diego Union-Tribune Archive Document                    Page 2 of 2

Medical Center and three physician groups, Encompass, Alvarado Associates and NOVA Healthcare. While remaining autonomous, Alvarado said it will work cooperatively with UCSD in purchasing partnerships, regional coordination of services and combined contracting with health plans.

Restaurant Enterprise Group (REG) of Irvine will seek bankruptcy court approval Friday of its plan to be purchased by three partners and merged with the Chi-Chi's Mexican restaurant chain. REG would pay about $205 million to buy Chi-Chi's from San Diego-based Foodmaker Inc., which would then join with Apollo Advisers L.P. and Green Equity Investors L.P. to buy the merged company out of bankruptcy.

John Moon, an executive with Copley News Service who had worked for the Copley corporation for 44 years, retired Dec. 31. He had worked as managing editor of the South Bay Daily Breeze and at other Copley properties before joining the news service in San Diego.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document



# The San Diego Union-Tribune.

(Page C-1 )

## *Don Bauder*

## Four Seasons Financial officers expected to admit guilt in fraud

**Don Bauder**
**18-Jan-1996 Thursday**

The district attorney's fraud unit yesterday charged Charles Joseph Salas and Patricia Ann Meyer, former top officers of defunct Four Seasons Financial Services, with 22 counts of grand theft.

The so-called "hard-money lending" company, which abruptly departed its Mission Valley office last May, fleeced investors of about $4 million, according to Jeffrey Brodrick, deputy D.A. in the fraud division.

Both Salas and Meyer pleaded not guilty yesterday before Judge Gale Kaneshiro in felony arraignment court. However, their lawyers say there will probably be guilty pleas when the prosecution and defense can agree on appropriate sentencings.

"He (Salas) will plead guilty," says Salas' attorney, Peter Hughes. But the prosecution wants a maximum sentence of 14 years. By contrast, Ponzi scheme perpetrator J. David "Jerry" Dominelli emerged from prison this week after spending 10 1/2 years in prison for a swindle 20 times as large, says Hughes.

Even more to the point, Gary Naiman of failed Pioneer Mortgage ran a hard-money lending/trust deed operation quite similar to Four Seasons. And Pioneer investors were shorn of $200 million. Naiman was sentenced to 6 1/2 years in prison last year, says Hughes.

When things fell at apart at Four Seasons, "Funds were diverted, but not to his (Salas') pockets," says Hughes. His client was trying to save the business -- not buy yachts, says Hughes.

Tom Warwick, attorney for Meyer, says, "There is no reason for the case to be tried. There will probably be a guilty plea." However, "There has been no meeting of the minds between prosecution and defendants."

Hard-money lenders such as Four Seasons lend money at extremely high rates to high-risk borrowers who pledge their assets as collateral. Pieces of the loans are then sold to investors, who make very high rates of return -- at least, until the whole thing comes asunder, as it normally does when real estate values turn south.

Like many other San Diego hard-money lenders who wound up in prison, Salas and Meyer of Four Seasons "oversold the loans -- took in more money than the value of the loans," says Brodrick.

Also, long after borrowers had paid off the loans, investors still did not receive their money, says Brodrick. And money was diverted to development projects, largely in Calexico, rather than to the projects investors believed they were putting money in.

"They were also maintaining their lifestyle," says Brodrick of Salas and Meyer, who had started with the firm as a clerk, but worked up to second in command.

Brodrick asked for $100,000 bail on Salas, but the judge allowed both defendants out without bail, provided they agree to searches of their premises. The next court hearing is March 1.

Audre's Casey out

At the requests of the boards, Thomas F. Casey has stepped down as president of software firm Audre Inc. and its parent, Audre Recognition Systems. Last November, he had stepped down as chief executive but had remained as president of the two related enterprises.

On an interim basis, James Fiebiger and Donald Lundell will share duties of president and chief executive of both concerns.

The Audre enterprise is in Chapter 11 bankruptcy because a court decided it and Casey are liable in an $11 million divorce suit won by Casey's ex-wife. (The ex-wife is receiving $8 million and a law firm $3 million.) Audre is fighting the decision.

Robert Ames, reorganization executive officer of the company, says Audre hopes that Casey will agree to be a consultant.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document



(Page C-1)

## *Don Bauder*

### Four Seasons hard-money lenders on way to doing some hard time

**Don Bauder**
**11-Apr-1996 Thursday**

Two more San Diego trust deed operators are headed to prison -- prompting the question of whether there is enough confinement capacity to house our hard-money lenders.

Yesterday in Superior Court, **Charles** Joseph Salas and Patricia Ann Meyer of defunct Four Seasons Financial Services pleaded guilty to 22 charges of grand theft. They will be sentenced by Judge David Danielsen on May 29.

All told, they fleeced three dozen investors of more than $2.5 million, according to Jeffrey Brodrick, deputy district attorney in the fraud division.

Four Seasons, which abruptly closed its lavish Mission Valley office about a year ago, both sold and serviced trust deeds as a so-called hard money lender. The company would lend money at a high rate to high-risk borrowers who would pledge assets as collateral. Investors would take pieces of the loans.

The company was also involved in limited partnerships in Calexico, Murrieta Hot Springs and other places. All told, the Four Seasons entities were about $20 million in size prior to their Chapter 7 bankruptcy last year.

As has been typical with San Diego hard-money lenders, the company diverted investors' funds without their knowledge, according to government charges. When loans became due, and were paid, Salas would divert the funds to his real estate projects instead of paying off his investors, says Brodrick. Salas and Meyer "would write them false letters showing false account balances," says Brodrick.

Much of the money went into Bravo Ranch near Calexico, which Salas never got off the ground. Other money was steered into his other projects there, some of which have been taken over by other developers, according to Brodrick.

Like other trust deed operators who are now in the hoosegow, Salas and Meyer -- as the operation got into deeper trouble -- would "put more loans on a property than it was worth," says Brodrick, "or sell the same loan more than once."

In January, Salas and Meyer had pleaded not guilty, but their lawyers had said they would change their pleas if Brodrick would stop asking for the maximum sentence for Salas. "I will not back down," Brodrick still says. The D.A.'s office will request that Salas get 12 years.

"He (Salas) is the heavyweight," says Brodrick. "She (Meyer, who rose through the ranks from a clerical position) was the lightweight. He gave the orders. She followed them. I anticipate we will ask for a lesser sentence for her."

Peter Hughes, attorney for Salas, says that he suggested in court that Salas might spend six to eight years behind bars. "The judge (Danielsen) said that was not an unrealistic target," says Hughes, cautioning that the judge did not commit himself to that range.

"There are scams that are scams from start to finish," says Hughes. The perpetrators are "living in Fairbanks Ranch, with yachts and Mercedes."

But Four Seasons was not such a caper, argues Hughes. Salas lived in a $340,000 Scripps Ranch home and had modest autos. "He was diverting money to make the thing (Four Seasons) go," insists Hughes. "Nothing was going into his pocket."

However, this columnist has reported that Four Seasons airplanes returned from business trips with suitcases full of cash. Hughes says that in two real estate deals, buyers paid for property in cash, and the money was placed in legitimate bank accounts.

Consumers: dry

Some think the sinking bond market is fretting that consumers are about to go off on another spending toot, pushing up the economy and interest rates.

Nah. The sudden lack of foreign buyers, and perhaps a whiff of inflation, are clobbering the bond market. The consumer just isn't likely to go on a spree any time soon.

San Diego Union-Tribune Archive Document

Economist Jack W. Lavery of Merrill Lynch points out that personal income is growing at its slowest rate since 1991, when the nation was in a recession. The credit card delinquency rate got to 3.34 percent in last year's fourth quarter, "matching the levels of the 1990-1991 recession," says Lavery. Auto loan delinquencies at finance companies are above their levels of the last recession, and personal bankruptcies are back to their recession highs.

Tony Riley of Springfield, N.J.-based A. Gary Shilling & Co. says that the ratio of consumer installment debt service to disposable income has passed its peak level following the 1980s spending binge. Adjusted for auto leasing -- an increasingly important substitute for auto loans -- the ratio is even worse.

A year ago, mortgage rates were falling. That set off a refinancing boom, notes Riley. But now rates are back up -- "ending that boom with a vengeance."

And homeowners equity -- the part of a home owned by the consumer, not the mortgage company -- is at record lows, says Riley. That inhibits future borrowing, too.

Copyright Union-Tribune Publishing Co.



# The San Diego Union-Tribune.

(Page I-1 )

## *Don Bauder*

## Clients hurt by La Jolla Trust Deeds

**Don Bauder**
**04-Sep-1994 Sunday**

Sylvan and Irene Cooper were once very visible in La Jolla society.

Now they are quite invisible -- particularly from people who invested in their trust deed operation.

Their company, La Jolla Trust Deeds, is in shambles. The office is closed. Sylvan Cooper is listed as head of Desert View Financial (the Coopers live on Desert View Drive in La Jolla), but that business can't be located. He recently did business on Market Street, but the phone has been disconnected.

Investor lawsuits are piling up heavily. People who have lost money in trust deeds can't get through to Sylvan Cooper.

"We have received a number of complaints, and we are actively investigating his operation," says Jeff Brodrick, deputy district attorney in the fraud division.

Aug. 12 through Aug. 14 may have been the low point for Sylvan Cooper. After refusing to show up for a debtor's examination, following a court decision in which a judge lashed him for committing a "heartless fraud," Cooper spent three days in the Vista jail.

His wife, Irene, "was crying her eyes out when he was in jail," recalls Vista attorney Jerry I. Schaefer.

Laotian investors

But Cooper's victims really deserve the sympathy. In this case, they are Laotian immigrants named Phrakonkham, Schaefer's clients. They had come to this country in 1979, eventually purchased land in Riverside County, and later agreed to carry back a $205,100 first deed of trust on the property.

Vanthong Phrakonkham went to borrow $14,000 from Cooper, and unknowingly signed papers that assigned the deed of trust to Cooper. After learning about it, he still trusted Cooper -- who kept assuring him that he would

## 215

San Diego Union-Tribune Archive Document          http: www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan

make everything straight. Subsequently. Phrakonkham learned that Cooper had long since sold the property.

Cooper did not return phone calls. Nearly penniless, the Laotian family went back to Kansas to work in a family restaurant.

On March 25, Schaefer spelled out the situation before Judge J. Morgan Lester in Superior Court in North County. Schaefer asked for Phrakonkham's original principal back, plus some costs. and $100.000 in punitive damages.

An enraged Lester upped the ante. Charging Cooper with gross fraud, Lester said, "He (Sylvan) Cooper) took advantage of someone who did not speak English well, induced him to sign documents that were not as represented, and then went and took the property. It is outrageous and unjustified behavior. He has destroyed the plaintiff, taken almost all his property."

Continued Lester, "The court grants punitive damages in the amount of $500,000 -- one half a million dollars punitive damages for some of the most outrageous fraud I have seen since I've been on the bench going on 16 years."

Schaefer said he believes Cooper has assets, including a trailer park, a duplex, a 16-unit apartment and two homes. However, after Cooper was jailed for missing a debtor's exam over the $742,000 he owes the Laotian family, Schaefer interviewed him: "He (Cooper) said he doesn't have any money, everything is gone, he doesn't have a job. He said he has no assets."

Cooper had missed depositions throughout the proceedings, and didn't file anything to protest the decision. His original lawyer, Michael T. Pines, successfully sought to be relieved from the case while it was in process.

In some of the lawsuits, Cooper has been representing himself.

Cooper's investors say he cannot be reached: "In my computer file I have 19 letters I wrote to him, and I have telephone bills for four months in which I called him practically every day, and he never answered a letter and never returned a phone call," says 80-year old Leo Bodin of Lemon Grove, who lost $60,000.

"I must have called him every day for almost a year; he never responded to mail or registered letters or answering machines. I went to his house, and he didn't open the door," says a La Jollan who lost around $170,000 and has sued.

"He convinced me it would be safe, because he only wrote secured trust deeds on properties in which there was high equity," says the sadder-but-wiser investor.

This come-on is typical for San Diego trust deed operators: Most claim that the underlying real estate is gilt-edged and the investor's principal is safe. Of course, with the real estate downspiral of the 1990s. trust deed operators like Cooper have been collapsing in scandal.

Like the others, Cooper paid his investors around 15 percent -- until the checks stopped coming in, of course.

To keep the operation afloat, Cooper had several juggling tricks -- none

216

new -- according to victims and their attorneys. "He loans money on second trust deeds, then sells the second trust deeds off" without informing the investor, says attorney Timothy Rutherford. representing two investors, one quite elderly. "He collects the money from the homeowner, but doesn't pay (the investor)."

In the case of Rutherford's clients, the assignment of trust deed was never recorded. That's also the complaint of others.

"Cooper takes the (investor's) money. puts it into an investment. gives you a copy of the assignment and deed of trust. and doesn't record the assignment," says attorney Bernie Porter. "So when the note gets paid off, Cooper gets the money, reinvests it someplace else without the investor's permission."

Says the La Jolla investor, "He (Cooper) took the trust deeds and apparently sold them, pocketed the money without my permission, and substituted another trust deed that was worthless."

Says attorney David Nugent, "It appears from our investigation that in a number of situations, he has failed to record an assignment of a trust deed."

Nugent said he is considering various options for his client, including putting Cooper into involuntary bankruptcy.

Several attorneys and victims said they were able to confirm that Cooper does not have a license from the California Department of Real Estate.

Copyright Union-Tribune Publishing Co.

217

San Diego Union-Tribune Archive Document

http: .www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan



## The San Diego Union-Tribune.

(Page C-1 )

## *Don Bauder*

# La Jolla Trust Deeds operator faces charges

**Don Bauder**
**21-Jun-1995 Wednesday**

Still another San Diego trust deed operator faces charges from the district
attorney's fraud unit.

**Sylvan** Cooper -- once prominent in La Jolla society -- has been charged
with seven counts of grand theft totaling $300.000, according to Jeff
Brodrick, deputy D.A. in the fraud division.

Along with his wife, Irene, Cooper ran La Jolla Trust Deeds. People would
borrow money at high interest rates. Investors then would buy portions of
the loan.

But when lenders paid off the loans, Cooper "was collecting the payoffs,
and rather than remitting them to the investors, he was using the money for
his own use," says Brodrick. This is typical conduct in trust deed scams.

Cooper has pleaded not guilty to all seven counts, according to his lawyer,
Tom Warwick.

According to the D.A.'s complaint, the investors' money was long overdue
-- sometimes by a matter of years -- but investors didn't complain,
because they trusted Cooper implicitly.

The collapse of Cooper's empire was first covered in this column last
September. That same month, aggrieved investors put Cooper and his wife
into bankruptcy. They are in Chapter 7.

But tragically, also in Chapter 7 is the family of Vanthong Phrarkonkham,
Laotian immigrants who owned Riverside land on which they agreed to carry
back a $205,100 first deed of trust.

They went to borrow $14,000 from Cooper. Unknowingly, they signed papers
that assigned that deed of trust to Cooper. They learned of the ruse -- but
continued to trust him. Finally, they learned that Cooper had long since
sold the property.

In a North County civil suit in which the Laotians won a big judgment,

### 218

Judge J. Morgan Lester heatedly said that Cooper had taken advantage of people who didn't speak English well. Lester called the episode "some of the most outrageous fraud I have seen."

The $190,000 allegedly stolen from the Laotian family is the largest part of the D.A.'s suit.

"Cooper destroyed the Phrarkonkhams' lives." says Jerry I. Schaefer, Vista-based lawyer for the family.

A preliminary hearing in the Cooper criminal case is set for June 28 in Municipal Court.

San Diego stocks zoom

This time, San Diego stocks are joining in the general up-orgy. Just in the last 30 days of trading, the index of local stocks compiled by San Diego Stock Report has zoomed by 13.5 percent. For the year, it's up 18.8 percent.

The weighted index of 40 of San Diego's most heavily capitalized stocks is now at 467.56. It was around 370 in early April, after dropping while the overall market climbed sharply. (Still, it was at 560 in October of 1993.)

"Everything just kicked in in one month," says Bud Leedom, publisher of the stock report. Qualcomm, which got critical new business commitments, soared above the $30 barrier. Takeover rumors spurred Callaway Golf, squeezing shorts. Cobra Golf moved up, too. Long-depressed biotechs started to move -- Advanced Tissue Sciences, for one. San Diego Gas & Electric hit a new 52-week high as interest rates went down and fears of California utility regulation ebbed. Pyxis moved up on continuing solid reports. ThermoLase shot up on good product news, and the company that still owns most of the stock, ThermoTrex, also benefited.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document                    http://www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan



## The San Diego Union-Tribune.

(Page C-1)

### *Don Bauder*

## A Wells Fargo takeover of Interstate hostile to jobs | Mega-banks good deal for shareholders

**Don Bauder**
**19-Oct-1995 Thursday**

Wells Fargo wants to pay an astonishing $10 billion for First Interstate Bancorp.

Who will pay if this deal goes through? Employees and customers of each institution, certainly. There will be waves of layoffs and more waves of customer complaints about service, if past bank mergers are any guide.

But customers and employees don't count any more. Only shareholders. And yesterday, analysts were saying that the deal would eventually go through, despite First Interstate's hesitation, because there is no other pending deal that would create such shareholder value for First Interstate.

Of course, the analysts were talking about very short-term shareholder value -- not long term -- because this deal could really strain Wells Fargo. At $133.50 a share, it's for more than three times First Interstate's 1994 book value per share. If you assume this year's book value per share will be a little under $50, then it's a mind-boggling 2.7 times book.

And this will be paid for a bank that already has downsized severely because of Wall Street pressure.

First Interstate revealed yesterday that it has been "exploring strategic alternatives." Translation: It has been entertaining other suitors. Certainly, it has been behaving as if it is for sale. That should be obvious: Wall Street's Kohlberg, Kravis & Roberts, architects of the 1980s madness, own 6.1 million of the 77.5 million shares.

Wells Fargo noted that the fabled Warren Buffett supports the deal. Buffett owns 13.3 percent of Wells Fargo's stock. Generally, Wall Street believes that if Buffett likes it, it must be a smart deal.

Keep in mind that Buffett bought his 19.9 percent stake in San Diego's PS Group for above $30 a share. Yesterday, PS Group closed at $10.75. Buffett is astute, but not infallible.

**220**

The argument for all the big bank mergers is that U.S. banks must get as big as their world competitors to compete in a global market.

But the really big banks are Japanese. And they are so laden with bad debts that the U.S. Federal Reserve is poised to provide them liquidity in case of an international crisis.

After the disastrous 1970s, regulators told U.S. savings & loans to expand rapidly to grow out of their problems. Thus, trying to grow swiftly, they abandoned standards of prudence -- and calamity hit.

So the conventional wisdom of the day is often misguided. Encouraging U.S. banks, stymied by a slow domestic market, to pay outrageous prices for acquisitions could backfire.

Amtel: trustee?

On Tuesday at 10 a.m. in Judge Louise Adler's bankruptcy court chambers, there will be a decision on whether to appoint a trustee for Amtel, the collapsed $57 million pay telephone investment program that is looking more . and more like a Ponzi scheme.

Attorneys Howard Finkelstein and William S. Lerach charge that it is a Ponzi scheme -- money from new investors went out to pay off early investors. They want a trustee.

"There is prima facie evidence of fraud. There should be an independent court-appointed trustee plus an examiner to investigate," Finkelstein says.

Amtel's chief executive, Randy S. Kuhlmann of Rancho Santa Fe, also served as chief financial officer. But when he was asked in a declaration if Amtel had ever made a profit, Kuhlmann's attorney objected on the ground that he lacked the competence to answer, Finkelstein says.

Already, it has been noted that Amtel, which did not have an outside auditor, did not follow generally accepted accounting principle. The Securities and Exchange Commission earlier charged that Amtel was losing money massively while it was touting its profitability.

Finkelstein notes in his brief that a former employee says a former Amtel financial official was paid $140,000 over three months to keep his mouth shut.

U.S. Trustee Harry A. Sherr wants a trustee. He cites "overwhelming evidence of fraud, dishonesty, incompetence and gross mismanagement." The SEC also wants a trustee.

Kuhlmann and his lawyer did not return calls.

Attorney Jeffry A. Davis, who represents Amtel investors, wants a new general manager, but not a trustee. Davis agrees there has been wrongdoing but would keep Kuhlmann on a new board.

Cooper sentenced

Sylvan Cooper, who owned La Jolla Trust Deeds. was sentenced to seven years

San Diego Union-Tribune Archive Document        http: .www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan

in local custody yesterday by Judge Bonnie Dumanis in Municipal Court. He
had earlier pleaded no contest to seven counts of grand theft.

Victims yesterday told the court how they had lost their life savings.

"He (Cooper) expressed no remorse." says Jeffrey Brodrick. deputy D.A. in
the fraud section, who thought the sentence was appropriate.

Copyright Union-Tribune Publishing Co.

San Diego Union-Tribune Archive Document          http:-www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan



## The San Diego Union-Tribune.

(Page C-2)

*Don Bauder*

# Euphoric investors wonder how much higher stocks, bonds can go

**Don Bauder**
**07-Jul-1995 Friday**

Will the Dow go to 6,000? 8,000?

Will the yield on the 30-year Treasury bond go to 6 percent? 5.5 percent?

Euphoric investors were debating the point yesterday. The Federal
Reserve's lowering of short-term rates sparked a continuation of this
year's fantastic stock and bond market rally. It's a fast-moving freight
train, fueled by Fed liquidity, and anyone who stands in front of it (short
sellers) may be mowed down as money pours into mutual funds and 401(k)
plans and is poured right back into financial assets.

The Dow Jones industrial average jumped 48.77 points yesterday to a record
4,664. Bonds also rallied, with the yield on the 30-year Treasury dipping
just below 6.5 percent.

If there is a recession this year -- and that's doubtful -- it might be
the first one in which equities zoom right ahead. Possibly, profits --
other than for consumer companies -- will no longer be stymied by
recessions. Give the credit to massive downsizing, stock buybacks and a Fed
and White House devoted to keeping bonds and equities surging forward.

Representing the consensus, Ed Williams of Clutinger, Williams & Verhoye
expects the yield on the 30-year Treasury to drop to 6.25 or 6 over the
next six to nine months. He likes bonds -- but loves stocks: "Stocks are
overbought now, and sometime we will get a correction, but from what level:
4,800? 5,000?" asks Williams, who is buying technology stocks.

But Alan Fine of RealSource takes a very contrarian position. Actually,
yields across the spectrum (short-term to 30 years) are headed up, he says.
It's been the trend since early June. The orgies of yesterday and perhaps
today will only be counter-blips. The 30-year bond will yield 7.75 in six
to nine months -- the same as last December -- he says, acknowledging that
he is in a tiny minority.

Same old story

Still another San Diego trust deed operator is on the criminal rolls.

La Jolla moneylender **Sylvan** Cooper pleaded no contest yesterday to seven counts of grand theft of about $400,000. Cooper will be sentenced at 1:30 p.m. Sept. 8 by Municipal Judge Bonnie Dumanis.

Says Jeffrey Brodrick, deputy district attorney in the fraud section, "We anticipate asking for a maximum (nine-year) prison sentence," as well as restitution to investors who have been wiped out. Most are elderly.

Prison time would cramp Cooper's lifestyle. During the post-1991 period in which Cooper was fleeing the public, he was building a La Jolla house on a view lot, says Brodrick. Cooper is now out on $25,000 bond and presumably living there.

However, the house has multiple liens against it because of a welter of lawsuits against Cooper, who is in Chapter 7 bankruptcy.

Cooper's was the same old story of the trust deed business: Borrowers paid their loans, but Cooper did not send the money on to investors, says Brodrick. "He also told victims he was putting their money into particular deeds of trust, but never did," says Brodrick.

Then Cooper took over a building downtown: "It appears he may have committed rent skimming by collecting rents and not paying the mortgage," says Brodrick, who also believes taxes were not paid.

As earlier revealed, Cooper fleeced a Laotian family of $190,000, forcing it into bankruptcy, according to Brodrick.

Upside down

San Diego County has 27,366 homeowners -- 4.7 percent of the total -- whose homes are worth less than the mortgage balance, according to Riverside-based TRW-REDI. That's slightly less than the Southern California average of 5.2 percent, which is swollen by San Bernardino and Riverside percentages above 10. In part, that's a function of first-time buyers in those counties putting down only 5 percent or so, says TRW's Nima Nattagh.

Copyright Union-Tribune Publishing Co.

224

San Diego Union-Tribune Archive Document                    http://www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan



## The San Diego Union-Tribune.

(Page C-1 )

## *DON BAUDER*

## 3 held in postal raid on Mail Boxes Etc. outlet

**DON BAUDER**
**16-Jan-1997 Thursday**

U.S. postal inspectors yesterday raided an El Cajon Mail Boxes Etc. outlet
and arrested a man and his two sons, who were charged with perpetrating a
scheme to use counterfeit postage stamps and postage meter impressions.

Postal investigators arrested Peter P. Chirimbes Jr., and his two sons,
Peter Chirimbes III and Jason Chirimbes. The elder Chirimbes ran for mayor
of El Cajon in June of 1994, and came in third.

Mary E. Schmidt, national public relations manager for San Diego-based Mail
Boxes Etc., said the company "had experienced problems before" with the El
Cajon outlet owned by the family, and is considering terminating it. She
would not say what problems the company has had with the Chirimbes
operation.

"Our centers are independently owned and operated; we have 3,200 around the
world, 2,700 in the U.S. and 60 in San Diego County," says Schmidt. "This
is an isolated incident" that runs counter to training the operators
receive, she says.

Postal inspectors say the Chirimbes family charged customers for U.S.
postage and then used counterfeit stamps and meter impressions on letters
and parcels.

Postal inspectors raided the office at 1093 E. Main St. and also the
residence of the senior Chirimbes. Four vehicles were seized, along with
records. The inspectors have retrieved more than 400 pieces of mail bearing
the allegedly counterfeit stamps.

Investigators say they caught the outlet in a sting of sorts. Inspectors
posed as customers and presented nine separate parcels and letters for
mailing through U.S. mail. All nine showed up with counterfeit stamps or
meter impressions.

Last year, nationally, the U.S. Postal Service lost more than $20 million
from such counterfeiting.

Cooper's lifestyle

Former real estate trust deed operator **Sylvan** Cooper, who was sentenced to seven years in local custody in late 1995, will have to remain in jail, Municipal Court Judge Bonnie Dumanis ruled yesterday.

However, she ruled that the District Attorney's Office had insufficient evidence to show that Cooper knowingly violated the law by receiving Social Security payments to which he was not entitled.

Jeffrey Brodrick, head of the D.A.'s real estate fraud subsection, noted that when Cooper was sentenced, he was told to pay $723,559.31 restitution to his victims at the rate of $749.00 per month. He was told to turn over life insurance proceeds, and has not done so. And he was supposed to use monthly Social Security checks to pay his victims.

However, the D.A.'s Office concluded that Cooper was pulling a fraud while in jail, using a false Social Security number and making sure the payments got to his wife. The Social Security Administration did not know **Sylvan** Cooper was in custody, according to Brodrick.

People in jail for the length of Cooper's sentence may not receive Social Security payments, said Brodrick. Social Security field representative Marie Floto said the Cooper case is being referred to a local office to suspend **Sylvan** Cooper's benefits. "This is also being looked at for possible fraud," she said.

**Sylvan** Cooper's attorney said his client suffers from prostate cancer and heart problems. However, "He has received virtually no medical treatment" at the Central Detention Facility, said attorney Thomas J. Warwick.

Also, Cooper's wife, who has moved in with her parents since her husband went to jail, has breast cancer, argued Warwick, asking that the court release **Sylvan** Cooper so he can care for his wife and her elderly mother.

Dumanis turned down that request, noting that Cooper had fleeced numerous people on his way to riches. Among other things, former socialite Cooper, who had pleaded no contest to seven grand theft charges, had fleeced a Laotian family of $190,000, driving the family into bankruptcy.

Copyright Union-Tribune Publishing Co.

226

# A Prosecutor's Perspective on Real Property Crimes (And Why Your Next Closing May Cost $2 More)

By Jeffrey Brodrick*
©1996, All Rights Reserved

## I. INTRODUCTION

Due diligence reveals prowlers on Blackacre. Query: What to do? The next time you unearth apparent real estate fraud, consider whether your client—and the public—might benefit from a referral to the District Attorney for possible criminal prosecution. The recent enactment of Senate Bill 537 has provided substantial financial resources for the prosecution of real estate fraud in California.

This article will discuss several criminal statutes that impact real estate fraud, how they are used by prosecutors to build a case, and how prosecutors collaborate with the civil bar. Finally, the article will explain how Senate Bill 537 provides potential funding for local prosecutors.

## II. AN OVERVIEW OF REAL PROPERTY CRIMES

Most real estate fraud cases generate charges based upon one of the four common law forms of theft, which are now codified in Penal Code section 487(a): (1) embezzlement, (2) theft by false pretense, (3) theft by trick or device, and (4) larceny.[1]

Embezzlement and theft by false pretense are the techniques most favored by practitioners of real estate fraud. A frequent embezzlement scheme involves the use of broker-exempt escrows,[2] in which a hard-money lender steals trust deed payoffs, but continues to make interest payments to the unwitting investor, who is advised the loan has been extended or rolled over into another property. The scam continues until the thief runs out of payoffs to "Ponzi." In brief, an embezzler has exploited a relationship of trust or confidence; accepted property entrusted to him; and with the intent to deprive, converted it to his own use or purpose.[3]

More common, however, is theft by false pretense, which a thief accomplishes by knowingly making material, false statements that are believed and relied upon by the victim and cause the victim to part with his money or property. Typical fact patterns involve a thief who pretends to own property he does not, lies about the priority of a deed of trust he is selling, or commits negative fraud by failing to disclose material information about the transaction. The false pretense or representation must be made with the specific intent to defraud.[4] Or, the thief falsely promises to a distressed homeowner that, upon receipt of a quitclaim to him of the property, he will cure all defaults and pay off the existing mortgage, thus salvaging the victim's credit. What the thief really intends to do is install a renter and skim the rent.[5]

In theft by trick or device, an individual, by fraud, artifice, or false promise, causes the victim to unwittingly surrender possession of property without intending to transfer ownership. A suspect might effectively steal title to a house by slipping a grant deed into a stack of documents he is having an elderly person sign, then use that indicia of ownership to refinance the property, effectively turning a legally worthless deed into cash.

Larceny rarely applies to real estate; given the requisite element that a suspect must take the property of another and *carry* such property away by obtaining physical possession and control of the property.

For a prosecutor, the beauty of a theft charge is that a jury need not agree on the particular form of theft the thief has accomplished; it needs only to agree that a theft occurred.[6]

Although theft is the most prevalent real estate crime, it does not occupy the field. Forgery often plays a role, in two fashions. The first involves knowingly signing the name of another without authority, with the specific intent to defraud.[7] The second involves uttering or publishing as true, a false or counterfeited instrument, such as a wholly fictitious deed of trust on a nonexistent property.[8]

Rarefied statutes such as Penal Code section 115 (Attempt to Record False or Forged Instrument) are useful in prosecuting a suspect who records a wild deed after conveying his interest in the property, leaving the victim with a deed that is outside the chain of title, and therefore providing no constructive notice or protection.[9] This section also applies when a hard-money lender diverts the payoff from a deed of trust out of escrow and, to do so, records a fraudulent reconveyance.

Foreclosure fraud might be prosecuted as both grand theft, under Penal Code section 487(a) and as an equity purchase fraud under Civil Code section 1695.8.[10] Such fraud is often staged in three acts: in the first, the equity purchaser approaches a distressed, "upside-down" equity seller and offers to take title to the property in exchange for curing the defaults and saving the equity seller's credit. Perhaps the equity purchaser will sweeten the deal by agreeing to carry back paper he has no intention of paying. By knowingly making these false promises, he commits fraud upon the equity seller. In the typical second act, the criminal commits grand theft by marketing the property to any number of unsophisticated victims—say, recent immigrants who lack any knowledge of escrow, let alone title insurance. The victim is told the house is owned free and clear by the suspect and/or that the suspect will act "as the bank." The victim pays a cash down payment; receives an unrecorded grant deed; moves in; pays monthly payments to the suspect; and is evicted several months later by the legitimate purchaser at the foreclosure that was looming when the scam started. Act three occurs during the several months in which the suspect is collecting and skimming rent.

Creative financing abuses—leveraged transactions where the buyer uses the seller's equity to buy the property—are the exotica of real estate fraud. This may become criminal when the buyer seeks to cash out this equity through refinancing or reselling the property just purchased, for example in a double escrow. Here, the thief conceals from the lender the fact that the seller has extended credit through a purchase money deed of trust. The lender funds the loan, unaware that the down payment "paid" by the buyer is in reality nothing more than a promissory note. Or the lender may be unaware that the buyer in the second half of the double escrow is a straw buyer who has been paid a fee, and has signed a loan application that includes pumped-up, falsified assets. These false statements to obtain a loan may constitute a violation of Financial Code section 5308.[11]

Finally, real estate fraud may be prosecuted as residential burglary even when the victim invites the thief in. The lack of forced entry is immaterial to the burglary; the elements of burglary; are satisfied upon proof of entry of an inhabited dwelling committed with the intent to steal or commit a felony.[12] Residential burglary appeals to prosecutors, at least from a charging perspective, because it radically increases the maximum prison exposure a defendant might face from twelve to twenty years.

Other obscure statutes apply and are helpful in providing probable cause for search warrants, even if they are not used in the actual criminal complaint.

## III. BENEFITS OF INTERACTION BETWEEN PROSECUTORS AND THE CIVIL BAR

Prosecutors and attorneys who represent defrauded victims, frequently interact with, and often can provide assistance to, one another. From the prosecutor's perspective, the civil real estate bar is an invaluable source of crime reporting and initial case investigation. Frequently, a civil cause of action includes all of the elements of a crime; virtually all the prosecutor has to do is draft a complaint. Indeed, a diligent criminal investigator will routinely search court records for judgments against a suspect in the course of building his criminal case.

On occasion a prosecutor can accomplish results that a private attorney cannot and vice-versa. For instance, prosecutors can seize records from a suspect's home or business pursuant to a search warrant.[13] Although the district attorney will not disclose the facts of an ongoing investigation until that investigation is completed, upon conclusion of the criminal case, a civil attorney may subpoena records from the district attorney.[14]

Civil attorneys nevertheless have their own discovery edge. Prosecutors require probable cause before they seize records. Assuming there is a reasonable basis to initiate a civil action, private attorneys have the power to discover information in the absence of probable cause. Civil discovery often will unearth evidence of criminal wrongdoing otherwise beyond the reach of the district attorney, which can ultimately form the basis of criminal charges.

Perhaps most important, the district attorney has the power to secure a civil restitution order, which is as valid as any monetary judgment a private litigant might obtain after enduring a costly trial. How? "The Victim's Bill of Rights," enacted June 8, 1982, pronounced that, "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer."[15] The restitution order in a criminal case is mandatory, unless the court finds clear and compelling reasons to not order restitution.[16]

The bad news, however, is that collecting upon this civil order is not the function of the district attorney except when the defendant violates a probation order to pay restitution and becomes subject to revocation of probation. Unfortunately, a victim of a criminal real estate fraud will, in most instances, not see any restitution; the criminal has long since squandered the victim's assets. Thus, actual restitution is the exception to the rule. If, however, the defendant is a real estate licensee, the victim may take his civil judgment and apply to the Real Estate Recovery Fund administered by the Department of Real Estate.[17] Recovery is limited by statute to $20,000 for any one transaction and $100,000 for any one licensee.[18]

Still, prompt reporting to either law enforcement or the district attorney generally increases the odds of the client obtaining restitution and helps prevent further victimization. The prosecutor reaps the benefit of learning of crimes that otherwise might not be brought to his attention, and the civil attorney reaps the benefit of whatever *de facto* leverage the district attorney may exert by filing charges.

## IV. SENATE BILL 537 LAYS GROUNDWORK FOR GENERATING FUNDS TO PROSECUTE REAL ESTATE FRAUD

Transactional lawyers, your next multimillion dollar closing may cost two dollars more. *Two* dollars?!!?

Blame it on Gil,[19] blame it on Paul,[20] blame it on the California Association of Realtors, on that excellent prosecutor from Los Angeles, Don Tamurura.

Blame it on Senate Bill 537.

On October 15, 1995, Governor Wilson signed Senate Bill 537 into law, adding Section 27388 to the Government Code. This section establishes a Real Estate Fraud Prosecution Trust Fund, which is to be used to deter, investigate, and prosecute real estate fraud.

This new statute provides that—in addition to other recording fees—upon the adoption of a resolution by the county board of supervisors, an additional fee of up to two dollars may be assessed for the recording of every "real estate instrument, notice or paper."[21] Without question, "real estate instrument" includes deeds of trust, assignments of deeds of trust, reconveyances, requests for notice, and notices of default, but not deeds, instruments, or writings subject to the documentary transfer tax. This leaves a grey area—some counties, such as San Diego, have chosen to interpret this statute as imposing the fee on only the five specifically identified instruments; other counties, such as Los Angeles, have imposed the fee on a myriad of documents, including notices and papers, and excluding only the transfer tax documents. In any event, San Diego County anticipates revenues from this fee to exceed half a million dollars a year; Los Angeles County expects over two million dollars a year.

These new fees are collected by the County Recorder. After administrative costs are deducted, the funds are paid quarterly to the County Auditor or Director of Finance and placed in the Real Estate Fraud Prosecution Trust Fund. The money is then allocated to the District Attorney, as well as to local law enforcement agencies, to deter, investigate, and prosecute real estate fraud. In San Diego, where real estate fraud is investigated exclusively by the district attorney, all of this revenue goes to that office.

How will the funds be used? In San Diego, for example, the district attorney hopes to establish a higher profile in the real estate industry to encourage real estate professionals to report fraud when they encounter it. Guidelines will be distributed to alert industry professionals regarding the types of cases that are suitable for prosecution and the documents and information needed by a district attorney to initiate an investigation. In this fashion, it will be possible to uncover frauds more quickly than in the past, so that additional crimes by the same criminal can be preempted.

Other possible uses for the Real Estate Fraud Prosecution Trust Funds include grants for educational and proactive efforts, involving cooperation with local community groups, title companies, realtors' associations, and bar associations. These efforts probably will include forums and speeches to teach people how to avoid becoming real estate fraud victims.[22]

All-in-all, publicity remains the best deterrent. A headline and article in the newspaper, highlighting the misdeeds of a local thief, invariably results in phone calls and cryptic, anonymous letters to the district attorney reporting similar scams by the same suspect or reports of somebody else doing "the exact same thing."

While prowlers will always plague Blackacre, collaboration between the civil bar and prosecutors can provide a remedy, particularly given the added resources of Senate Bill 537.

*Jeffrey Brodrick is a Deputy District Attorney in San Diego, in the Fraud Division. He is an Adjunct Professor at the University of San Diego School of Law and helped write Senate Bill 537. He is a graduate of Dartmouth College and Suffolk University Law School.*

#### Endnotes

1. Cal. Penal Code § 484; 1 Witkin & Epstein, Calif. Crim. Law (2d ed.), § 562; *see* CALJIC 14.00.

2. Mortgage brokers licensed by the Department of Real Estate to make, sell, or broker loans secured by deeds of trust may handle escrows without being separately licensed by the Department of Corporations. Cal. Fin. Code § 17006.

3. Cal. Penal Code §§ 487, 503, 506.

4. *People v. Randono*, 32 Cal.App.3d 164, 172 (1973).

5. Civil Code §§ 890, 891, and 892 define criminal rent skimming as five acts of using revenue received from the rental of residential property during the first 12 months after acquisition, without first applying the revenue to all mortgages and deeds of trust encumbering the property.

6. *People v. Vineberg*, 125 Cal.App.3d 127, 139 (1981).

7. CALJIC 15.00.

8. *People v. Prantil*, 169 Cal.App.3d 592, 605-06 (1985); *see* CALJIC 15.01.

9. *Far West Sav. and Loan Ass'n v. McLaughlin*, 201 Cal.App.3d 67 (1988).

10. Civil Code § 1695.1 defines "Equity Purchaser" as any person who acquires title to any residence in foreclosure, except a person who acquires title as follows: (1) for the purpose of using such property as a personal residence, (2) by a deed in lieu of foreclosure, (3) by a deed from a trustee acting under the power of sale in a deed of trust or mortgage at a foreclosure sale, (4) at any sale of property authorized by statute, (5) by order or judgment of any court, (6) from a spouse, blood relative, or blood relative of a spouse. An "Equity Seller," on the other hand, is the distressed seller of a property in foreclosure.

11. Cal. Fin. Code § 5102. Such transactions also may duplicate federal criminal statutes, which are beyond the scope of this article.

12. *People v. Barry*, 94 Cal. 481, 482 (1892); *People v. Salemme*, 2 Cal.App.4th 775, 781 (1992).

13. Cal. Penal Code § 1536.

14. Until conclusion of the criminal case, prosecutorial and law enforcement agency records are exempted from disclosure if it would endanger the successful completion of the investigation. Cal. Gov't. Code § 6254(f).

15. Cal. Const., Art. I, § 28(b).

16. Cal. Gov't. Code § 13967(c).

17. Bus. and Prof. Code § 10471(a).

18. *Id.* § 10474(c).

19. Garcetti, District Attorney of Los Angeles County.

20. Pfingst, District Attorney of San Diego County.

21. Must a county participate in this program and fee increase? No. Absent an enabling resolution or ordinance by the board of supervisors, recording fees in a county will remain at current levels.

22. One "Jaded Prosecutor" has seen the downside of such efforts: At a luncheon of senior citizens, he spotted several con artists he had previously prosecuted—the wolves, seeking sheep to be shorn. "I know you're out there," said the Jaded Prosecutor. "I can see your red eyes."

The International Law Section
of the State Bar of California

*presents*

# International Law Weekend

**August 2 – 3, 1996**
Pan Pacific Hotel
San Francisco, California

## "Coming to America"
Foreign Investment Into the 21st Century

### Keynote Speaker:



**Ambassador
Everett E. "Ted" Briggs**

*President, Council of America, New York*

*Former United States Ambassador to Panama, Guatemala, and Portugal*

### Topics:

Foreign Direct Investment:
Regulatory Issues, Financing,
Taxation, Immigration and
Employment Law, Real Estate

**For More Information, Please Contact
Carol Banks, State Bar of California
(415) 561-8380**

San Diego Union-Tribune Archive Document                 http://www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan



## The San Diego Union-Tribune.

(Page H-1 )

# New fee helps the law put the squeeze on real estate fraud

**Lori Weisberg**
STAFF WRITER

**02-Jun-1996 Sunday**

### Jeff Brodrick | Cynthia English

Cynthia English is not one to spend her money wantonly, especially
considering she has a developmentally disabled son who will forever be
financially dependent on her.

But here she is, out $65,000, swindled by a man she entrusted to invest her
retirement savings in what turned out to be a fraudulent second-trust-deed
scheme.

Her money was never recovered, but the man who stole it is now sitting in
jail, thanks to the efforts of the San Diego District Attorney's Office.

"I spent a lot of sleepless nights, a lot of worrying; I had a lot of
anger. As a single parent, I didn't know where to turn," said English, a
widow. "This was insurance money from my husband's death that I was saving
for my son, who is physically and mentally challenged and will need care
for the rest of his life. The money's gone and you can't get it back.

"But am I gratified (by the sentencing)? Definitely. All the lies and
deceit that went on, it's finally come to an end and justice is now
prevailing."

News of real estate fraud may not command the attention garnered by more
high-profile crimes, but it nonetheless is an all-too prevalent activity in
San Diego County, where victims have been bilked out of millions of
dollars, according to the District Attorney's Office.

Frustrated by a shortage of funds and staff, the office frequently has had
to turn away cases it simply lacked the resources to investigate and
prosecute.

Now, thanks to a new $2 recording fee levied on certain real estate
documents, the county will raise up to half a million dollars annually to
prosecute real estate fraud. The new fee went into effect last month.

Although the District Attorney's Office already prosecutes such fraud, the
new, state-authorized funding will help finance a special unit that will
deal exclusively with fraud. The money will help pay for an additional

San Diego Union-Tribune Archive Document          http: 'www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan

prosecutor, one investigator, two fraud specialists and a legal secretary.

The program was enacted as a three-year pilot project, to be reviewed annually by the county Board of Supervisors.

"Fraud in real estate transactions is a problem that ... strikes at the heart of the American dream, and in San Diego harms some of our most vulnerable members of society: the elderly, members of the minority community, the middle class," wrote District Attorney Paul Pfingst in a report to the Board of Supervisors seeking approval to begin assessing the new fee, which was established by state legislation.

"The victims often lose their life savings or their entire retirement funds ... . A single proficient thief can easily ruin two dozen victims, harming them so profoundly that they will never recover."

Pending are 25 investigations involving some 200 victims and losses totaling $10 million, according to Deputy District Attorney Jeff Brodrick, who oversees the real estate fraud program. Because of the complexity of many of the cases, it can take up a year to investigate just one scam, he pointed out.

"I've done lots of murder and gang cases, but these fraud cases are very emotional," said Brodrick, who does little to hide his contempt for those who perpetrate fraud. "The victims always come to court and make poignant statements about how it's devastated their lives, left them with a feeling of loss, shame and anger. But I think they're grateful that the system has in some fashion worked."

That certainly was the case with English, who never doubted the word of mortgage-company owner John Lewis when he offered to invest her $65,000 in a second trust deed that would yield monthly interest payments to her at a rate of 12 percent. Trouble was, he already had sold the same second trust deed to another investor.

For a year, English received the interest payments from Lewis, who used his own funds to make it appear he was legitimately servicing the trust deed. It was not until the note came due that the scam fell apart and it was discovered that Lewis had sold the same deed to two people.

"I got an original trust deed, but what I found out was that he had told the (borrowers) that he'd lost the original paperwork, and he had them re-sign everything again," English said. "He knew all the angles to be one step ahead of me, to keep me appeased."

According to Brodrick, the District Attorney's Office was instrumental in helping rewrite and lobby for the state legislation that authorizes counties to charge the additional $2 recording fees.

Specifically, the new fee applies to the recording of financing documents used to purchase a home, obtain a home-equity loan or refinance a home loan. Other financing documents trigger the fee as well, including assignments of trust deeds, reconveyances (when a trust deed is paid off), notices of default and requests for notice, which allow investors in second trust deeds to be notified if there later is a default on the property in which they invested.

San Diego Union-Tribune Archive Document                http:/www2.uniontrib.com/news/uta...Tribune+Library+Library++%28sylvan

It should be noted that the fee does not apply to transfer documents, as in the case of someone selling or conveying property to another person by way of a grant deed or quitclaim deed, explained Brodrick.

Passage of the special legislation required negotiations and compromise with both the state and local Realtor associations, he noted.

"Realtors typically do not want to support fee increases or anything that can be construed as a tax, so philosophically they were reluctant to begin with," he said. "But we worked really closely with them and got their support, which was invaluable to passage of the bill."

Initially there was a reluctance locally to support the legislation because of a poor experience with a fraud notification program initiated in Los Angeles that relied on a $7 recording fee to fund it. That program, however, dealt only with notifying people by mail if a grant deed or quitclaim had been filed on their property and did not involve prosecution of real estate fraud.

"They (the realty agents) were concerned that the $7 wasn't being used efficiently, but if the $2 goes just to prosecution, they feel that's a good use of the money," said Don Tamura, who heads the real estate fraud unit in Los Angeles County. "They're just as concerned as anyone else that bad people are prosecuted.

"There's always been a problem with real estate fraud because the crooks gravitate to where the money is. The problem is, in the past we've only been able to get a tiny tip of the iceberg, and now with this program I think we can get more of the iceberg."

There's no question that the real estate industry supports aggressive prosecution of fraud, because such nefarious activity reflects badly on everyone, even the most scrupulous in the industry, noted Walter Baczkowski, executive vice president of the San Diego Association of Realtors.

"Any way we can help prevent fraud is not only good for the consumer, but it's also good for the industry," he said. "On a transaction as big as buying a home, $2 is not that much to pay. I just bought a home and I certainly wouldn't mind paying the fee. It just helps keep confidence in the industry."

Typically, the kinds of cases most frequently prosecuted in San Diego involve what are known as hard-money lenders, who not only solicit investors but also service the loans secured by real estate in the form of a trust deed.

Because they have total control over all aspects of such transactions, it makes it easier to perpetrate fraud -- either by selling the same deed of trust to multiple investors, forging deeds of trust or simply misrepresenting to the investors the priority they have on the loans in which they've invested, explained Brodrick.

He cited one case he prosecuted in which a La Jolla lender defrauded unwitting investors of $700,000 by pocketing the payoffs on loans rather than passing the money on to the investors. Sylvan Cooper, who ran La Jolla

Trust Deeds, ultimately pleaded guilty to seven counts of grand theft and was sentenced to seven years in jail.

Suffering the biggest single loss was a family of Laotian immigrants who lost $200,000 on a piece of property that Cooper tricked them into signing over to him as collateral for a $14,000 loan he made to the family. Cooper effectively appropriated the property as his own and ultimately traded it for an apartment complex in downtown San Diego. explained Brodrick.

It is unlikely the family ever will recover any money from Cooper, despite a ruling in a civil suit that awarded the family $250,000 in actual damages and $500,000 in punitive damages. said Brodrick.

"Oftentimes the suspects in these cases are articulate, charming, outwardly wealthy, and they present the elements of stability." said Brodrick. "Sylvan Cooper, for example, lived in La Jolla and his wife was president of a theater organization. "The gentleman from Laos ultimately lost his life savings in a very cruel transaction."

In larger cases, a defendant can go to prison for up to 10 years and be forced to make restitution, although typically it is rare for victims to recover any money, Brodrick said.

In addition to investigating and prosecuting real estate fraud, the District Attorney's Office also plans to concentrate on deterrence through public education, presentations in the community. distribution of brochures and videos.

"We're hopeful that we can reduce real estate fraud with this program," said Brodrick, "and by creating a higher profile and taking a more aggressive approach, we should be able to deter more crimes."

How to contact DA's fraud office

If you suspect you are a victim of real estate fraud, you can contact the District Attorney's Real Estate Fraud Subdivision at 531-3552 or write to: Jeff Brodrick, Office of the District Attorney, Real Estate Fraud Subdivision, P.O. Box X-1011, San Diego, CA 92112.

Written complaints are preferable to phone calls.

Copyright Union-Tribune Publishing Co.

233

# Real Estate Fraud

*by Don M. Tamura & Jeffrey Brodrick*

**INTRODUCTION**

Senate Bill 537, sponsored by the Los Angeles District Attorney's office, was signed into law in 1995 and became effective January 1, 1996. The bill added $2 to the recording fee for real estate instruments. The money is designated to go to law enforcement and prosecutors for the investigation and prosecution of real estate fraud — crimes perpetrated upon the elderly, unsophisticated and most vulnerable members in our communities.

**REAL ESTATE FRAUD UNIT**

The problem of real estate fraud has loomed large in the last few years, partly due to the failure of financial institutions and the recession. Moreover, as lending by institutions has tightened, homeowners have had to turn to hard-money lenders as a source for money. This is particularly true in minority and low-income areas which are often the targets of unscrupulous con artists.

The Real Estate Fraud Unit of the Los Angeles County District Attorney's Office has prosecuted a variety of cases which might be placed under the rubric of "real estate fraud." In general, the cases break down into three areas:

**HOME EQUITY FRAUD**

A large number of cases prosecuted by the Real Estate Fraud Unit are related to home equity fraud. A typical victim of this type of crime is an elderly widow who has owned her home for some time. Often, this

victim is approached by an individual who convinces her to take out a home improvement loan. A loan is secured by the victim's real property and is usually larger than the victim can afford. When the victim cannot afford the payments the property goes into foreclosure, or another even larger loan is created. The criminal suspects continue to bleed the equity out of the home until foreclosure proceedings finally divest the victim of her home.

Sometimes a loan is taken out on the property without the knowledge of the victim. This scam is perpetrated by forging a grant deed, quitclaim deed or deed of trust. The holder of the forged deed uses it to obtain a loan or sells it on the secondary loan market. Either method results in the conversion of a homeowner's equity into cash.

**SECURITIES FRAUD TIED TO REAL ESTATE**

With interest rates falling in the last five years, many have turned to the second-trust-deed market to get a greater return on their money. Second deeds of trust when sold as securities promise a large rate of return in a short span of time. Perpetrators of this crime package small loans into larger loans and pass on payments from the borrowers of the large loans to the lenders of the small loans. The sellers of these securities are often relying on the equity of the secured real property to provide a cushion against defaults.

With the downturn in the real

estate market, however, the margin of equity that could support a small number of loan defaults disappeared. Many of the companies selling these securities turned into large-scale "Ponzi" schemes, using money from new investors to pay the interest on loans from old investors. Unfortunately, the perpetrators of the scheme can maintain it for a long period of time. When the company finally collapses, there is usually little, if any, money left for the victims.

**LENDER FRAUD**

Although a majority of lender-related fraud is handled by the Federal authorities, local prosecutorial agencies are taking an ever-increasing role in the investigation and filing of these cases. Lender fraud is a crime in which false information or manipulated data is used to induce a lender to make a loan. This can be accomplished in a variety of ways.

The easiest method is to falsify or create documentation to make it appear as though a borrower qualifies for a loan. Tax returns, verifications of deposits, verifications of employment or other employment documents are altered to submit with a loan package. Usually this scheme involves a loan broker, escrow agent or tax accountant, and in many cases involves all three working in concert. Lender fraud may also involve a "straw buyer" posing as a legitimate borrower, but there are cases in which borrowers are unaware of the forged documents.

Inflated appraisals can also be used to commit lender fraud. It is rare,

however, for a criminal case to be filed solely on the basis of an inflated appraisal. In most lender fraud cases, the loan application serves as the most important false token for a case of theft by false pretenses.

The key to prosecuting real estate fraud cases is preparation of the case prior to filing. By the time a defendant is arrested and arraigned, it is too late to gather the relevant evidence to prosecute. With this in mind, the Los Angeles District Attorney's Real Estate Fraud Unit relies on several important investigative tools to prosecute the foregoing schemes.

## SEARCH WARRANTS

The most important weapon in attacking real estate fraud is the search warrant. It is safe to say that a search warrant was used in almost all of the real estate fraud cases prosecuted by the Los Angeles District Attorney's Office. Besides the traditional targets of a search warrant, such as the suspect's home and business, a search warrant should include the locations involved in the real estate transaction.

In any real estate fraud case, it is imperative that the district attorney have complete records on the real estate transaction. This includes the lender file, the escrow file, and documents relating to the chain of title. All search warrants should be executed as promptly as possible. A right of real estate fraud operators will co-opt all segments of the real estate transaction chain. Therefore, execution of a search warrant must serve all escrow offices, title offices, real estate brokerage offices, and loan brokerage offices simultaneously in order to insure complete seizure of all relevant material.

The only exception to the aforementioned rule is a regulated banking institution. Banks usually need as much as ninety days to comply with a search warrant. It is advisable to prepare an extension for the judge's signature at the time the search warrant is signed. This puts the judge on notice that the return will be delayed and saves the serving officer the trouble of getting the extension at a later date.

The search warrant should also include probable cause for records kept on the suspect's company computer. Important data concerning the real estate transaction, as well as similar transactions, are often contained on the hard drive of the main computer platform. Moreover, computer records often contain scanned versions of original or altered real estate documents. Usually, seizure of the entire computer is necessary to download all data. Therefore, the affidavit of the search warrant should contain probable cause to take the entire computer system.

## ACCOUNTING

Once information has been produced pursuant to search warrant, an accounting tracing the flow of money is essential to an effective prosecution case. In many real estate fraud cases, money is "churned" through several accounts. A forensic account, particularly one employed by a law enforcement agency, can determine where and when money was converted to the personal use of the suspect. Converted money is often used to pay off legitimate debts and loan payments and does not always end up in the pocket of the suspect. Therefore, a careful examination of all business and personal accounts must be completed prior to filing.

A forensic accountant should also be able to serve as an expert witness at trial. White-collar crime cases are difficult to communicate to jurors. Few people have the financial expertise to be able to judge accounting evidence. An expert accounting witness can simplify the "paper trail" and make accounting evidence more understandable.

Charts and graphs should be used to assist the jury in tracing funds. A pie chart or graph will often crystallize the disposition of stolen funds in the minds of the jurors. These same charts should be used throughout the examination of the expert forensic accountant.

## COMPUTER RESOURCES

Fortunately, much of the information used in the real estate industry

can be found on computer databases which are accessible to the public. Several investigative agencies are hooked up to nationwide databases that provide information on property ownership, real estate transactions, and title documents. Much of this same information is also available in CD-ROM format and can be purchased for a nominal price. These sources allow investigators to trace the chain of title in a transaction, and find the recordation numbers for title documents.

The most important reason to use computer resources is that computers assist in focusing a growing investigation. Real estate fraud cases, as well as most white-collar crime cases, enlarge as an investigation progresses. Rather than waste resources on cases that will never be filed, let alone prosecuted, a computer database can be used as a screening mechanism. A computer database may show that a property has been sold numerous times. This is a stronger case than one reliant upon oral misrepresentations made to a buyer or seller.

Investment in at least one database will save substantial investigative time and pay significant dividends in real estate fraud prosecution. These databases will be more accessible and cheaper in the coming years. It is imperative that each District Attorney's Office in California use the money garnered from the Real Estate Fraud Prosecution Fund for access to computer databases.

In conclusion, thorough preparation of a case prior to filing is the key to success in a real estate fraud prosecution. The investigative tools noted above bring all prosecutorial agencies closer to meeting that goal. Fortunately, the passage of Senate Bill 537 has given local prosecutors a start toward effective and meaningful prosecution of real estate fraud cases in California

## HUNGRY REALTOR SNACKS ON EQUITY — THEN GOES TO JAIL

Early morning in the pricey foothills of Vista, a realtor stirs. He's hungry — there's that debt service on his $700,000 house. Realtor of the

## 235

Year and member of the Department of Real Estate's ethics committee, Manley B. is no ordinary realtor.

80-year-old Geraldine S. sips her ea in Encinitas. This morning she needs money to pay her nursing home costs, and her condo which is for sale is not moving.

Enter Manley B. touting creative financing. "You loan me the downpayment of $32,000, but we won't tell the bank." Somehow the downpayment jumps up to $64,000 and Manley walks out of escrow with title and possession of Geraldine's condo and $64,000 in cash!

Investigator Joe Maggio dives into the mind-boggling legerdemaine of creative financing. He begins with a brief, scholarly foray into the Corporations Code, the Finance Code and regulations of the Department of Real Estate.

As Joe glares at an investigative service request listing several steps to the investigation he is to conduct, he thinks — isn't there an old article cataloging creative financing abuses of the seventies floating around the office? Isn't the key the recording of the financing documents per the escrow instructions? Isn't creative financing just a leveraged buyout with the buyer financing his purchase of the property using the seller's equity?

Step one should be to talk with the victim. Geraldine is in a nursing home, so Joe relies on her friend and personal representative, who provides him with a stack of papers. Joe unravels the deal: Geraldine's condo was free and clear of debt. Manley agreed to buy it for $130,000 and paid $40,000 into escrow. To finance the $90,000 balance, he applied to World Savings for a loan. The loan was secured with a first deed of trust — conventional financing.

Manley didn't tell World Savings of the creative financing, or that he was taking out the equity as soon as their loan was funded and escrow closed. Instead of paying off the seller, the $90,000 would go to Manley and World Savings knew nothing of the $64,000 "second" deed of trust from anley to Geraldine. Manley made ken payments to Geraldine on the "second" deed of trust and a few

payments to World Savings — then went bankrupt. Manley "gave" Geraldine her condo back and she hired a lawyer to force a reaffirmation of the debt in bankruptcy court. After the downpayment, Manley netted $25,000 from his theft.

Manley got money out of escrow by having a $64,000 check issued to his underling, Bill Getty. The $64,000 became a "settlement charge" to Geraldine although she didn't know Getty. Now Joe wants to talk to Getty! Easy Joe, get your search warrants first!

Joe has a title company run a property profile. Geraldine's "second" deed of trust is recorded two days and 4,000 documents after the deed to Manley and the first deed of trust to World Savings. This recording chronology concealed from World that Manley had taken money out of escrow and over-encumbered the property — with no intention of paying back either loan.

Next Joe reviews the World Savings deed of trust. He had already agreed to put a "second" deed of trust on the property to secure Geraldine's downpayment loan to him when he promised not to further encumber the property by signing the World Savings deed of trust. He lied — violating Penal Code Section 115. Recording a False Document — probable cause for a search warrant or two.

Joe briefs a dozen investigators and investigative specialists and they fan out across North County — to a couple of escrow offices, a title company, Manley's office, his car and home. The escrow officer vehemently denies any wrongdoing. Joe is ordered to the next search warrant. The escrow officer insists the recording of the second was an accommodation to Manley and had nothing to do with the escrow. The escrow files are damaging to both Manley and the escrow company.

Joe and Investigator Ted Snoddy, go next to Manley's home. Ted has written out 200 questions for Manley. Several hours later, Manley admits "No way the bank would have given me money to buy the condo had they known the true financing arrange-

ments." He also admits he knew it would be hard to pay back the bank loan and Geraldine — because the combined debt was double what the condo would rent for.

The elements of theft by false pretense have been supplied. Manley deceived World Savings to get a loan, violating the Finance Code. By signing a promissory note he didn't intend to repay to Geraldine he made a false promise: a misrepresentation virtually impossible to prove, absent a confession.

Joe talks to Getty last. Getty simply signed the $64,000 check over to Manley without question, because he was told to — so much for money laundering.

Charged with grand theft, making false statements to obtain a loan and recording false documents, Manley pleads guilty to a couple of felonies and wants to give scuba lessons to the disadvantaged, in lieu of custody. Scuba? Judge Frank Brown, ex-cop, ex-prosecutor and savvy real estate entrepreneur, knows the score. "I think within all of us there is a bit of larceny," he tells Manley. "You're not dealing with someone here who doesn't know what you were doing."

No scuba lessons — Manley is sentenced to a year in custody and is allowed to serve his time in a private work furlough facility, so he can work and make payments to Geraldine. The condo is going into foreclosure, but payments to Geraldine are current and she remains in her nursing home. Joe exhales and readies himself for his next creative financing fraud — one of double escrows and straw buyers.

*Don M. Tamura is a Deputy District Attorney in Los Angeles County and Jeffrey Brodrick is a Deputy District Attorney in San Diego County. Both are heads of two well-established and successful real estate fraud prosecution departments. Tamura's portion of this article provides an overview of real estate fraud and Brodrick's portion explores the issue of real estate fraud with a "San Diego flavor."*

**PROSECUTOR'S BRIEF**

## REDACTED INTERVIEW OF 75 YEAR OLD VICTIM
## OF PREDATORY LENDING PRACTICES

I interviewed   Victim at her home on November 17, 1997, and she told me the following:

Victim is 75 years old.  Victim suffers from diabetes and high blood pressure.  She had a leg amputated a few years ago and has a prosthesis.  Victim uses either a wheelchair or a cane to walk.  Victim is legally blind and cannot read with her prescription glasses. Victim uses a large magnifying glass to try to read paperwork, but was unable to read any of her loan documents I asked her to review.

Victim received a refinance solicitation from the Loan Broker in late 1996.  Victim considered refinancing  because her existing loan had an adjustable rate and the payments were increasing.  Victim also wanted to paint her house and make minor repairs of about $1,500.00.

The Loan Broker's Agent visited Victim at her home to discuss the new loan. Victim told the Agent she received a total monthly income of $848.00, consisting of $671.00 from social security and $177.00 from her  pension.   Victim's daughter also lived in the house and occasionally paid rent, but Victim did not tell the Agent to include the occasional payments in her income.   Victim told the Agent she needed to keep her payments fairly low because of her limited income.

The Agent told Victim that her new loan would have an adjustable interest rate. Victim wanted a fixed rate loan and the Agent told her the Loan Broker would convert the adjustable rate loan to a fixed rate loan if Victim made her first three (3) payments on time.

The Agent brought the loan documents to Victim's home for her signature. Victim could not read the documents and signed each document presented after the Agent explained the contents.  I showed Victim the following loan documents:

**Loan Application-**  Victim said she never met the Loan Broker for a face to face interview.  She said the handwriting on the application was not hers, but she did sign the last page.   Victim said she did not date the application.  She could not read any of the

writing on the loan application, even using her magnifying glass.   Victim did not know why her monthly income was listed as $3,000.00.

**Payoff Statement-** Victim could not read the payoff statement.   She said the signature on the bottom of the document was hers.   She did not know what a prepayment penalty was and did not know she paid her old mortgage company $3,302.00 because she paid their loan off early.   Victim said the loan Agent did not tell her about the prepayment penalty or why she needed to sign the bottom of the payoff statement.   Victim could not read the statement "The undersigned borrower approves this demand and is aware there is a prepayment penalty as mentioned above."

**Addendum to RESPA-** Victim could not read the addendum.

**HUD1 Settlement Statement-** Victim did not receive a loan proceeds check for $1,163.56 when the $91,000.00 refinance closed.

Victim left San Diego shortly after signing the documents and called the loan Agent for her $1,500.00 loan proceeds when she returned.   Victim says she never received the loan proceeds from the Loan Broker.   Victim called the Broker's office many times and asked for the loan Agent,   but the Agent never answered her calls nor returned messages.

The Loan Broker never responded to Victim's requests to convert the loan to a fixed rate and   sold the loan to a Mortgage Company in January 1997, three weeks after they closed the loan.

Victim could not make her November 1997 payment because she needed to pay her homeowners insurance.   The loan is currently $1,694.59 in arrears according to the last Mortgage Company statement.

238

Written Comments to

## SENATE SPECIAL COMMITTEE ON AGING

to be included in the record of the hearing

## EQUITY PREDATORS: STRIPPING, FLIPPING, AND PACKING THEIR WAY TO PROFIT

March 16, 1998

Elizabeth Renuart
Margot Saunders
Attorneys
National Consumer Law Center
1629 K Street, N.W.
Washington, D.C. 20006
(202) 986-6060

**239**

Written Comments to
SENATE SPECIAL COMMITTEE ON AGING
to be included in the record of the hearing
**EQUITY PREDATORS: STRIPPING, FLIPPING, AND
PACKING THEIR WAY TO PROFIT**

March 16, 1998

Members of the Senate Special Committee on Aging, on behalf of our low-income clients, the **National Consumer Law Center**[1] thanks the Special Committee for this opportunity to provide comments on the issue of predatory lending. Our comments include specific recommendations for action to address the widespread problems caused by equity predators.

Fifty eight percent of older Americans who are below the federal poverty level[2] own their homes.[3] (Exhibit 1.) This reflects the declining income of a large portion of the homeowner population following retirement. As elderly people often have need for more income, yet have substantial equity in their homes, they are popular targets for home equity fraud scams.

*THE CAUSES*

Though home equity lending abuses are not new, the 1980s and 1990s witnessed a major upswing. In the past fifteen years, "equity-skimming," or "equity-theft" has become a major threat to many homeowners -- particularly to the elderly. A number of marketplace and policy factors have converged to contribute to this problem:

**Deregulation:** In tandem with the appreciation of real estate values, the deregulation of consumer lending in the 1980s left the door wide open for unscrupulous operators. Federal laws passed in 1980 and 1983 preempted both state usury ceilings on mortgage lending secured by first

---

1 The National Consumer Law Center is a nonprofit organization specializing in consumer credit issues on behalf of low-income people. We work with thousands of legal services, government and privates attorneys around the country, representing low-income and elderly individuals. who request our assistance with the analysis of credit transactions to determine appropriate claims and defenses their clients might have. As a result of our daily contact with these practicing attorneys we have seen examples of predatory lending to low-income people in almost every state in the union. It is from this vantage point--many years of dealing with the abusive transactions thrust upon the less sophisticated and less powerful in our communities--that we supply this testimony today. *Cost of Credit* (NCLC 1995), *Truth in Lending* (NCLC 1995) and *Unfair and Deceptive Acts and Practices* (NCLC 1997), are three of twelve practice treatises which NCLC publishes and annually supplements. These books as well as our newsletter, *NCLC Reports Consumer Credit & Usury Ed.*, describe the law currently applicable to all types of consumer loan transactions.

2 In 1996. the federal poverty level for a family of four was just $16,050.

3 Nationally, 39% of households below the federal poverty level own their homes. (Exhibit 2.) There are more than 5,000,000 low-income homeowners in the United States. The home ownership rate is particularly significant for low-income older Americans.

1

liens (whether purchase money or not),[4] as well as state limitations on risky "creative financing" options, such as negatively amortizing loans.[5]

Federal deregulation also set the stage for many states to remove rate caps and other limitations on other home lending -- including second mortgage lending. Whatever the overall merits of economic deregulation, it undeniably unleashed the greedy instincts of unscrupulous operators all over the country. In keeping with the conventional wisdom of free market theory, "the market" was supposed to take care of any problems. Unfortunately, there are market failures, and predatory home equity lending provides a good example of one. Even though interest rates have declined, these lenders have not lowered their rates, and for a number of reasons, competition and market forces do not operate according to theory on these loans.

**The rise in real estate values:** The inflation in real estate values in the 1980s created much new wealth -- the equity pool. While real estate values have remained stable in the 1990's (or declined in a few areas of the country), the equity acquired from the brisk rise in values in the 1980s continues to make aging homeowners a prime target of predatory lenders.

Since real-estate secured lending -- particularly owner-occupied residential real estate -- has historically been among the safest kind of lending, creditors of all stripes strove to develop or increase their portfolio of real-estate secured loans.[6] Legitimate lenders simply sought increasingly secure loans. The marginal lenders -- the equity skimmers -- looked to this new equity pool as something to enrich them.

In turn, the appreciated value of the property led to "asset-based lending" -- that is, loans made based on the value of the security, rather than on the borrower's ability to repay. This has been common in commercial lending, but is generally unsuitable for consumer loans. Most borrowers are simply wage-earners who look to their regular income to repay their debts. The amount of equity in the collateral is only relevant to the ability to repay a loan if the borrower intends to liquidate the collateral. In short, "asset-based lending" is a legitimate-sounding justification to ignore sound underwriting principles, and make unaffordable loans.

Equity skimmers generally write loans with repayment terms which borrowers could not hope to meet over the long haul: monthly payments which are 70% or more of monthly income[7] (or,

---

4  Depository Institutions Deregulation and Monetary Control Act of 1980, § 501 (DIDA), codified at 12 U.S.C. § 1735f-7a.

5  The Alternative Mortgage Transaction Parity Act of 1982 (AMTPA). 12 U.S.C. § 3800, *et seq.*

6  The portion of homeowners with home equity loans more than doubled between 1977 and 1988. In 1977, 5.4% of homeowners had such loans; in 1988, 11% (6.5 million families) had home equity loans. Canner & Luckett, "Home Equity Lending," 75 Fed. Reserve Bull. 333 (May, 1989).

7  *See e.g., Family Financial Services v. Spencer,* 677 A.2d 479 (Conn. App. 1996)(predatory second mortgage had a monthly payment of $733.33 where the borrower already had a first mortgage with a monthly payment of $1011.00 but monthly *income* of only $1126.67).

241

in one case we have seen, monthly payments more than monthly income[8]); or large balloon payments which the borrower has no realistic hope of making. The loans are made because the lender cannot lose: either the borrower will repay the loan at a high interest rate or be forced into refinancing into a new, profitable loan; or, too often, the lender will recoup the amount of the loan and costs through the foreclosure process.[9]  It is significant to note that the number of foreclosures in the United States has *tripled* since 1980.[10]

**The rise in the secondary mortgage market**:  Some high-rate mortgage lenders, particularly home improvement contractors, have historically operated by assigning installment contracts they write to other lenders, such as finance companies or banks.  But the 1980s added a new wrinkle -- bundling mortgage loans into large portfolios and selling them on the secondary mortgage market. This enabled mortgage companies specializing in home equity lending -- unregulated in many states -- to operate much more profitably.  Since there was a "back-end" income stream, they could operate with little capitalization base.  They could obtain a line of credit from a major bank; originate predatory loans, taking out very high up-front fees; then dump the loans onto the secondary market.

The secondary market structure is good for an equity-skimmer who originates the loans. This lender can charge enormous up-front fees, be careless about underwriting, and then pass the consequences along to the buyers on the secondary market.  If the loan defaults it is the new creditor's problem.  Buyers on the secondary market have found this is a profitable business scheme as well:  they save the expense of originating loans; and, in the rare case where the borrower has the wherewithal to hire a lawyer and allege the originator of the loan defrauded them, or engaged in usury or other violations of the law, the buyer of the loan on the secondary market can hide behind a holder in due course defense.[11] The result is that the loans must generally be repaid regardless of fraud or other legal problem in the inception of the loan.

**The securitization of home equity loans**:  The 1990s saw the phenomemonal growth in the use of asset-based securities to fund an ever-increasing supply of mortgage credit.  Asset-backed securities are debt or investment securities which are backed by receivables such as credit card, automobiles, or home equity loans.  They are similar to mortgage-back securities which are the

---

8  In this case, where default was absolutely predictable and inevitable as of the first payment on a 12-month balloon note, the contract provided for extremely high late charges plus a 42% default interest rate.  Thus, at the end of the 12 month term, the lender could claim a lien on the property that was approximately $50,000 greater than the original principal plus 22% interest provided for in the note.

·9  In fact, state laws on foreclosure almost universally allow foreclosing creditors to buy the property at a significant discount from fair market value and then to resell it at full value, pocketing the difference.

10  *See* Exhibit 3.

11  The holder in due course doctrine generally gives assignees or other subsequent holders of negotiable instruments (such as promissory notes) immunity against legal claims and defenses that the borrower may have had against the original creditor.  *See* discussion, *infra*.  Some also bought the loans with a recourse arrangement, whereby they would return non-performing loans to the originator, giving them yet further protection against risk -- at least until the originator went bankrupt.

3

**242**

foundation for the secondary mortgage market. Investors are repaid the principal amount of their investment plus interest. Sales of asset-backed securities generally increased from $65 billion in 1993 to $167 billion in 1996, an incredible leap of $102 billion in three years.[12] Securitization helps to fund equity lenders by creating new capital through the securitization process.

**Prime and "sub-prime" mortgage market:** The credit industry refers to "A" and "A-" borrowers (those with good credit histories) as "prime," and "B" and "C" borrowers (those with no credit history or poor credit history) as "subprime." "Subprime" homeowners are the hot new market of the 1990s.[13] The earnings of small-volume subprime mortgage lenders are matching or surpassing the earnings of conventional mortgage lenders with significantly greater loan volume.[14] The securitization of home equity loans is a driving force behind the subprime market popularity. A segment of the subprime market includes the predatory lenders which are the subject of this hearing.

One myth upon which some lenders thrive is that higher interest rates, points, and fees must be collected from riskier borrowers in order to cover the increased risk. Thus, some subprime lenders believe they can charge exorbitant rates, fees, and costs and excuse such behavior under the rubric of "high risk." While this has some validity in the non-mortgage market, mortgage lending can be essentially risk-free when the loan is secured by the home and the loan-to-value ratio is 80% or less. If a loan made on this basis goes to foreclosure, the lender will generally cover 100% of its losses because there is enough equity in the home to pay off the principal balance as well as any foreclosure costs. It is with this in mind that many predatory lenders require at least a 65-75% loan-to-value ratio to provide themselves with a *greater* cushion than the prime market. Since many predatory lenders also load the loan principal with credit insurance costs, the risk to the lender if something unexpected happens to the borrower is even further reduced. Predatory lenders create a "win/win" situation. They will make an enormous profit from the revenue stream created by the repayment of these loans and suffer no loss if default occurs.[15]

Further, the additional cost of a high rate mortgage can make a "high risk" loan a self-fulfilling prophecy because the higher costs become the fuel for failure. As has been recognized by the industry, higher ratios between monthly payments and income are one predictor of a higher risk of default. Many of the high cost loans provided to low income borrowers appear to have debt to income ratios designed to create default, or forced refinancing of the loan.

---

12 "The Asset-Backed Securities Market: The Effects of Weakened Consumer Loan Quality," FDIC Regional Outlook. Second Quarter 1997.

13 "Subprime Lender is the Place to Be." National Mortgage News, Sept. 22, 1997. Even the "D" market is being explored by some lenders. *See* "Countrywide Credit to Offer Mortgages to High-Risk Groups," The Wall Street Journal, Jan. 7, 1998.

14 *Id.*

15 *See generally* Julia Patterson Forrester, *Mortgaging the American Dream: A Critical Evaluation of the Federal Government's Promotion of Home Equity Financing*, 69 Tulane L. Rev. 373 (1994).

4

**"Tax Reform:"**  The amendment of the tax laws which retained the deductibility of interest only for home-secured loans added to the massive increase in home-equity debt. Many consumers and taxpayers are not well-equipped to calculate how the tax savings would weigh against the extra interest to be paid. Yet that is a sales pitch given by many creditors, and many homeowners listen to that siren-call.

**Cultural & Business Mores:**  Finally, these economic and legal changes happened in a context of shifting cultural attitudes. *See, e.g.* The business ethic was that "anything goes," and greed was no longer the subject of opprobrium, but rather viewed as an engine for growth. Unfortunately, home equity lending became one of the targets for the speculators.

### THE VICTIMS

The problem of mortgage scams and home improvement scams is not limited to certain regions. We have seen them from almost every state in the nation. But there are certain factors which make it worse in some areas:

- areas which had the greatest increase in real estate values tend to have more home equity lending problems;

- the more permissive the legal environment (i.e. the less regulation), the greater the problem.

Most poignantly, the more vulnerable the population, the greater the problem. Thus the less educated and less sophisticated are particularly victimized by these lenders; as are the elderly (who often have a lot of equity in their homes); and those whose other borrowing options are blocked, or who perceive themselves as having no options.[16]

### THE PERPETRATORS

When one looks at both the "sins of commission" and the "sins of omission," there is a great deal of culpability across the spectrum.

**"Tin Men:"**  Fraudulent home-improvement contractors, particularly the door-to-door operators, have long been a major source of complaint about abusive home-secured loans. They have been with us always, and probably always will. But as to whether they are isolated actors, or are commonplace, depends upon whether the ultimate sources of the financing -- and the regulatory environment -- encourage or discourage oppressive business practices.

In addition to needing a source of financing to run their business at the outset, these

---

16 This factor helps explain the disparate impact of predatory lending felt by minority borrowers and people living in minority neighborhoods. *See, e.g.* Kathleen Keest, "Second Mortgage Lending: Abuses and Regulation," (NCLC for the Rockefeller Family Fund 1991); "Nature Abhors a Vacuum: High-rate Lending in Redlined, Minority Neighborhoods." 9 NCLC Reports *Consumer Credit & Usury Ed.* (May/June 1991).

contractors must have an outlet for their credit sales, as generally they cannot afford to carry the credit accounts themselves. Thus, they will either arrange for lenders to make direct loans, with the proceeds to pay off the sales; or will write financing contracts themselves, to be immediately assigned by prearrangement to a lender. In some instances, it may be the ultimate financier who drives the operation, in essence using the contractor as a "bird-dog" to drum up mortgage business for it.[17]

These ultimate lenders can be mortgage companies (which may or may not be regulated by the state); often they are finance companies (which are regulated by the state); or banks (which are regulated by either the state or a federal agency, depending upon their charter.) It is the cooperation of the ultimate financing sources which keep a contractor in business. Thus the lender is in a position to help assure that legitimate value be given for the money, or to help compound the problem by trying to disassociate themselves from any complaints the borrower may have about the contractor or his work.[18] Unfortunately, many ultimate lenders, despite their heavy involvement in facilitating the transaction, choose the latter course.[19]

**Mortgage companies**: As was noted above, the 1980s witnessed the growth of second mortgage lending companies -- many of which received notoriety: Landbank Equity; First American Mortgage Company; Freedlander. In many states, these companies were not (and still are not) regulated. The earlier discussion about the secondary mortgage market explains how these companies generally operated.

The 1990s, however, saw a decrease in the frequency of second mortgage loans as many lenders began to see the benefits of being the first lienholder. Those benefits include:

1) To assure repayment in the event of a foreclosure, mortgage lenders want to be in first position relative to other lienholders;
2) First lien mortgages are not subject to usury and points restriction under most states' laws due to the federal preemption created by the Depository Institutions Deregulation and Monetary Control Act of 1980. Many states, however, still regulate second mortgage loans to varying degrees.
3) To assure first lien status, predatory mortgage lenders convince homeowners to refinance their current mortgages (whether or not the current mortgage is a less

---

17 This was the heart of the claim in *Baker v. Harper*, in which a mortgage company was ordered to pay $45 million to 5 families. See "Alabama Jury Orders Lender to Pay $45 Million in Fraudulent Lending Case," 57 BNA Banking Rept. 270 (Aug. 12, 1991).

18 *See, e.g.* "Spiking and Loan-Splitting in Home Improvement Contracts: Artful Dodges," 26 Clearinghouse Review 415 (Aug. 1992). Where the sale of home improvement goods and services is involved, the Federal Trade Commission's "holder rule" (16 C.F.R. § 433) provides that a related financier has vicarious liability for any claims or defenses the consumer has against the seller.

19 More and more frequently, the same principals direct both sides of the business. But they try to disguise the connection, so as to try to claim the borrower's obligation to pay is distinct from the contractor's obligation to perform its part of the contract.

expensive loan with better terms) and consolidate unsecured debt into a home-secured loan.[20]  This mightily increases the principal amount of the loan.  By doing so, the lenders earn more from charging points.  For example, 5 points on a $15,000 home improvement loan yields only $750; whereas, the same number of points will yield $2,500 on a $50,000 refinancing and home improvement loan.

The rush to be the first lienholder leads to an increase in some of the age old abuses: loan padding; frequent refinancings; and the refinancing of more favorable loans into less favorable ones.

As with the "tin men," it is frequently regulated lenders -- banks and thrifts -- which provide the wherewithal for these companies to survive.  Again, there are degrees of culpability among these "enablers."  Some may actually know what kind of operation the mortgage lenders are running.  Others simply choose to ignore the red flags in these transactions, and buy up the paper anyway.[21]  The more "the legitimate" lenders opt to purchase these kinds of loans with an "ostrich" approach to their investment, the easier it is for the predatory lenders to flourish.

**Finance companies:**[22]  Finance companies moved into home equity lending in a big way in the past 15 years.  Some of the finance companies have been particularly bad at "loan-padding:" -- inserting costly add-ons onto loans, making them much more expensive for borrowers.[23]  Finance companies are regulated (with varying degrees of success) by the states, but some are subsidiaries of banks, which, in turn, are regulated by either the states or a federal agency, depending upon their charter.

**The supporting cast:**  Mortgage brokers have played a major role in steering borrowers into bad loans.  As their fees are a percentage of the loans, there is a "reverse competition" effect which

---

20  The median amount of outstanding mortgage loans rose about 30% over the six-year period from 1989 to 1995.  Over the same period, the median value of a primary residence rose only 4.8%.  The much larger rise in the size of mortgage debt suggests that debt consolidation through refinancing is now the primary reason for home equity borrowing.  *See* "Family Finances in the U.S.: Recent Evidence from the Survey of Consumer Finances," Federal Reserve Bulletin, January 1997; "Trends in the Home-Equity Asset-Backed Market are Important to Banks," FDIC Regional Outlook, Third Quarter 1997.

21  Unlike the home improvement sales financing contracts, the FTC "holder" rule does not apply to straight loans, so these assignees can try to assert a holder-in-due course defense to claims the borrower may raise based on the originator's wrong-doing.

22  Finance companies, such as Beneficial, ITT Financial, and others, are what used to be thought of as "small loan" companies, though in many states today they can make relatively large, mortgage secured consumer loans.  It has been our experience that finance companies tend to keep the home equity loans they make (refinancing them frequently), rather than using the secondary market.

23  "Insurance-packing" is one of the more common means of loan padding favored by finance companies.  For a description of the practice, see National Consumer Law Center, Cost of Credit Chap. 8 (1995 and Supp.).  For a good example of how it can distort the price of credit to a borrower, see *Besta v. Beneficial Loan Co. of Iowa*, 855 F.2d 532 (8th Cir. 1988).  In that loan, insurance packing enabled the lender to skim an extra $3000 from what was really a $1400 loan.  In one loan seen at the Center, the very same scheme was used to skim an extra $23,000 from a loan.

encourages them to hook borrowers up with expensive, loan-padding lenders. Brokers are paid in either (or both) of two ways: directly by the borrower in the form of cash or by financing the broker fee as part of the loan; and/or by the lender in the form of a yield spread premium which is repaid by the borrower over the term of the loan in the form of a higher interest rate. The lender payments to brokers not only drive up the cost of mortgage loans, but also create reverse competition. The result is that brokers are provided incentives to steer borrowers to the lenders that pay brokers the *most* rather than to the lenders which give borrowers the most favorable terms.

Many of these brokers advertise as if they are market-rate lenders and do not disclose their true role -- or their commissions -- until loan closing. By that time many borrowers have lost their leverage to object or walk away. Loan brokers are not regulated in many states, and some regulation which does exist is token only.

**Banks and thrifts**: As the above discussion indicates, even if banks and thrifts are not directly engaging in predatory business practices, it often is their ultimate financial support which enables the predatory lenders to operate on the scale we have seen in recent years.

*PREDATORY MORTGAGE LENDING ABUSES*

These abuses are carefully chronicled in the written testimony of William J. Brennan, Jr. and will be only briefly described here:

- **Home improvement scams,** which are home loans stemming from unsolicited sellers of home improvements in which the work is generally overpriced, and rarely performed adequately;
- **Mortgage broker kickbacks** which result in higher priced loans than the borrowers qualify for with their lenders;
- **Steering to high rate lenders;**
- **Lending to people who cannot afford to repay;**
- **Falsified loan applications** such that the loan originator pads the borrower's income to make the loan qualify, yet which leads to unaffordable payments for the borrower;
- **Incapacitated homeowners;**
- **High interest rates** which are far more than are justified by the alleged additional risks and costs of providing credit to homeowners with lower credit scores;
- **Balloon payments terms** for which the borrower has no way to meet without refinancing the loan at excessive costs or losing the home;
- **Negative or non-amortizing loans,** such that even after making loan payments for years the borrowers end up owing *more than* was originally borrowed;
- **Padded closing costs,** which can often be fees for settlement services two or three times as high as are charged middle income homeowners;
- **Credit insurance packing** with high priced pre-paid term credit insurance which add thousand of dollars in unnecessary costs to loans for borrowers who could obtain more reasonably priced credit insurance if paid on monthly basis;
- **High and unfair prepayment penalties;**
- **Mandatory arbitration clauses,** which frequently require only the borrower to

8

submit to it and not the lender and which can force a homeowner to pay large sums for their concerns to be addressed by arbitrators who have no incentive to follow consumer protection laws, and whose decisions are not reviewable by any court;

- **Repeated refinancings** which have the effect of bleeding the homeowners equity from the home by *increasing* the amount borrowed exponentially in each refinancing without providing any benefit to the borrower;

- **Spurious open end loans** whereby the lender is allowed to avoid making the more comprehensive disclosures required by closed end credit, and thereby avoid any chance of the homeowner asserting the right of rescission, as well as completely avoiding the restrictions under the Home Ownership and Equity Protection Act, regardless of the cost of the loan;

- **Paying off low interest mortgages** such as purchase money loans with FHA with much higher interest rate loans;

- **Refinancing unsecured debt** for which the borrower could not lose the home, with high interest rate debt which must be paid to avoid foreclosure;

- **125% loan to value loans** which effectively prohibit borrowers from selling their homes or filing bankruptcy to escape unaffordable debt, without losing their home;

## *CONSEQUENCES OF HIGH COST MORTGAGES -- LOSS OF THOUSANDS OF HOMES*

It is significant that **foreclosures have increased by approximately 300% since 1980**. (Exhibit 3.) *These numbers do not include the thousands of homes which are turned over to lenders voluntarily (called deeds in lieu) or are sold for less then their value to avoid foreclosure.* The bottom line is that millions of Americans are losing their homes because of unaffordable home mortgages.

There are a number of reasons for this.   Data shows that most foreclosures are caused not by homeowner mismanagement, but rather by unexpected life events which are beyond the homeowner's control such as loss of job, illness, death or divorce.

Census data establishes that more than 1/3 of households in the lowest 40% of income range will experience a loss of income of at least 33% for one month in a given year.   Income disruptions obviously increase the likelihood of mortgage defaults especially since the same lower income households also have low savings rates and high debt to income ratios.   As family debt increases as a percentage of income,[24] families are increasingly vulnerable to the exigencies of unforeseen income decreases or increases in expenses.   Problems which would be manageable for a family whose housing costs constitute 20% of the monthly budget are unmanageable when those costs are 40% of the total household expenses.

Additionally, there has been a major expansion of home equity lending, thus creating an

---

24  The Federal Reserve Board concludes that one in nine families face debt payments that are higher than 40% of annual income.  The rate rises to one in six families among those earning less than $25,000 per year.  "Family Finances in the U.S.: Recent Evidence from the Survey of Consumer Finances" at 21, Table 14, *Federal Reserve Bulletin,* January 1997.  *See* Pearlstein, "Trendlines: The Fed's Knowledge of Wealth", *Washington Post,* p.  E1 (1/23/97).

additional pressure on the homeowner's budget. The median amount outstanding on mortgage debt for a typical family rose 30% between 1989 and 1995. Yet the number of foreclosures executed on American homes increased by 300% in the same time period.

For these reasons, the federal government cannot rely on the marketplace -- or self-regulation by the mortgage finance industry -- to police lending secured by the home. While Americans enjoy a strong home lending industry, the appropriate degree of regulation should not hamper legitimate lenders, while it will serve to protect the most vulnerable homeowners from losing their homes.

### *RECOMMENDATIONS*

The problem of predatory home equity lending has a multitude of sources, and the solutions will have to come on many fronts. We have developed a catalogue of recommendations to address both the overall problem and individual pieces of the overall pattern.

#### 1. Interest rate ceiling and limitations on other charges:

As a result of an anomalous mismatch between statutory usury ceilings and market rates in the late 1970s, the entire concept of rate caps became anathema to lenders and regulators. Consequently, we threw the baby out with the bath water.

In 1827, the Virginia Supreme court observed that "It has been a good deal the fashion of late, to decry the policy and justice of our laws regulating the rate of interest....It may be permitted to observe, however, that if the experience of the ages, and the general opinion of mankind, deserve weight in legislation, their voice is in favor of usury laws. They have prevailed in all civilized countries, and in all time."[25]

The experience of the "deregulation decade" simply proves the point. The heartbreak caused by the spiraling increase in abusive home loans and foreclosures proves that rate caps are needed to protect the trusting, the unsophisticated, the unwary, and the necessitous consumer from "the oppression of usurers and monied men, who are eager to take advantage of the distress of others"[26] now no less than 150 years ago. The 1970s problem of a mismatch between statutory cap and market rate is easily resolved by the imposition of a statutory ceiling which can float with a specified market-related index.

Furthermore, the usury ceiling should be combined with limitations on additional non-interest charges (points, brokers fees, closing costs, credit insurance, bogus escrows, etc), which will curb loan-padding. In the absence of a federal cap, the Depository Institutions Deregulation and

---

25 *Whitworth & Yancy v. Adams*. 5 Rand 333, 335, 26 Va. 333 (Va. 1827).

26 *Id.*

**10**

**249**

Monetary Control Act of 1980 (DIDA) should be amended to permit states to reintroduce rate caps on home equity loans should they choose.[27]

## 2. Regulate Loan Terms Based on Cost of Loan.

In 1994, Congress passed the Home Ownership and Equity Protection Act (HOEPA) to prevent some predatory lending practices after reviewing compelling testimony and evidence presented during a number of hearings that occurred in 1993 and 1994.[28] The new law created a special class of regulated closed-end loans made at high rates or with excessive costs and fees. Rather than cap interest rates, points, or other costs for those loans, the protections essentially prohibit or limit certain abusive loan terms and require additional disclosures. HOEPA's provisions are triggered if a loan has an APR of 10 points over the Treasury bill for the same term as the loan, or points equal to more 8% of the amount borrowed.

It was hoped that HOEPA would reverse the trend of the past decade which had made predatory home equity lending a growth industry and contributed to the loss of equity and homes for so many Americans. However, experience over the last two and a half years has shown that while HOEPA has made a start at addressing the problems, there are still yawning chasms of unprotected borrowers subject to the abuses of high cost home equity lenders.

*The 2 most significant problems with HOEPA:*

1)  HOEPA does not in any way *limit* what the lender can charge as up-front costs to the borrower. It is the excessive, combined fees -- in closing costs, credit insurance premiums, and points -- which deplete the equity in abusive loans. These excessive, combined fees are charged over and over, each time the loan is refinanced. And with each refinancing, the homeowner's equity is depleted by these charges because they are all financed in the loan. The effect of this situation is to *encourage* lenders to refinance high cost loans because they reap so much immediate reward at each closing. If the law limited the amount of points and closing costs that a lender could finance in high cost loans, this incentive to steal equity would be stopped cold.

2)  The interest rate trigger for HOEPA is too high, causing many abusive lenders who want to avoid HOEPA strictures to make high cost loans just under the trigger. The effect is that

---

27  It will be also necessary to assure that a state's law is not further subject to preemption by a sister state with less inclination toward consumer protection through the "exportation" doctrine as a result of recent interpretations of § 521 of DIDA. 12 U.S.C. § 1831d.   *Cf. Greenwood Trust v. Commonwealth of Massachusetts*, 971 F.2d 818 (1st Cir. 1992).

28  *Problems in Community Development Banking, Mortgage Lending Discrimination, Reverse Redlining, and Home Equity Lending, Hearings Before the Senate Committee on Banking, Housing and Urban Affairs*, 103d Cong., 1st Sess. (Feb. 3, 17, 24, 1993); *Hearing on S. 924 Home Ownership and Equity Protection Act , before the Senate Banking Committee*, 103d Cong., 1st Sess. (May 19, 1993); *The Home Equity Protection Act of 1993, Hearings on H.R. 3153 Before the House Committee on Banking, Finance and Urban Affairs*. 103d Cong., 2d Sess. (March 22, 1994).

there are no protections whatsoever against these very high cost loans which are just under the HOEPA triggers.

But, otherwise, HOEPA has some good ideas. It is based on the economic rationale that the higher the charges for the loan, the more regulation is necessary and appropriate. By passing HOEPA, Congress has already recognized two essential truths: that there are some loans for which the marketplace does not effectively apply restrictions; and government must step in to provide balance to the bargaining position between borrowers who either lack the sophistication to avoid bad loans or do not believe they have a choice if they want the credit.

The HOEPA structure is essentially good: apply prohibitions and restrictions to higher cost loans, and leave lower, more reasonably priced loans free from regulation. We propose to leave this basic structure in place while filling in the gaps.

First, rather than have only one set of triggers which determine whether a loan is either regulated or not, home loans should be regulated on a more graduated basis. Very high cost loans should have prohibitions similar to (or more stringent than) those applied to current HOEPA loans. Loans which are high cost, but not as expensive as those covered by HOEPA should also be regulated, but to a lesser extent. Lower cost loans -- such as those which are commonly offered to prime borrowers as well as to subprime borrowers by non-abusive lenders -- would not be regulated whatsoever.

The federal law would thus recognize three categories of home lending: Category 1 loans would have unregulated terms because the price of these loans was less than the trigger for Category 2 loans. Category 2 loans would be those overpriced loans which are priced at rates higher than provided by non-abusive lenders; these loans would be regulated to a limited extent. Category 3 loans would be those loans which fall into a very high price range and which, like current HOEPA loans, would be closely regulated. The effect of this two-tiered approach to determine the level of regulation would be to ensure that even those expensive loans which fell just under the trigger for HOEPA loans would still have some degree of regulation.

The exact numerical triggers which would determine whether a loan fell into the high cost or into the lower priced but still expensive category should be carefully determined. The interest rate triggers would be floating -- a certain amount over the Treasury bill for an equivalent term as the loan -- just as HOEPA is now. There should also be triggers based on the percentage of the loan charged in up-front costs, based on points, and all closing costs.

Additionally, a key, and essential new regulation which would apply to both categories 2 and 3 loans would be a limitation on the financing of points and closing costs. Lenders providing category 3 loans -- the most expensive -- would be prohibited from financing any points or closing costs. Lenders providing the less expensive, but still overpriced loans -- category 2 -- would be limited in the amount of points and closing costs that could be financed.

**Points and Fees Trigger.** Finally, the points and fees trigger should include all points, fees, and insurance charges. Under current HOEPA law, there are confusing rules to determine which fees

12

and insurance charges are included in the trigger for up-front costs. [29]

For example, this trigger does not include "reasonable" charges if they are not retained by the creditor and are not paid to a third party affiliated with the creditor. Fees for appraisals performed by unaffiliated third parties are not be counted if only the direct cost is passed on to the borrower. On the other hand, such a fee is counted if the cost is padded. Determining what is a "reasonable" for purposes of triggering coverage, however, is a difficult burden for consumers to meet. The closing costs trigger should include all points and all fees for closing costs.

**Credit Insurance.** Credit insurance is a big ticket item in each individual loan. [30] Nationally, consumers spend as much as $2.5 billion per year on credit insurance, often with little understanding of what they have bought. [31] This volume of business conceals overcharges of $900 million [32] to $1.2 billion, [33] where 40 to 50% of the premiums are paid to lenders as commissions. The marketplace has created reverse competition because credit insurance premiums are paid up front for term insurance policies which cover the whole or a significant portion of the loan term and lenders receive a commission based on the size of the credit insurance premium. Thus, lenders are rewarded for selling the *most expensive* forms of credit insurance, rather than the least costly to the consumer. Hence, unsophisticated consumers spend thousands of extra dollars for credit insurance which provides negligible value to them.

The remedy for the reverse competition established by the marketplace: only allow credit insurance to be sold when the premiums can be paid monthly, along with the loan payments, and the credit insurance can be canceled at any time. [34]

---

29  15 U.S.C. § 1602(aa)(1)(B).

30  For individual borrowers, the costs of a credit insurance policy are huge in relation to the loan amount. For example, a Georgia homeowner paid $2,200 for a credit life insurance policy sold to her in connection with a home-secured loan with a principal of $40,606.26. The cost of this insurance added over 5% to cost of the loan. Nevertheless, this loan is not covered by HOEPA because the credit insurance premiums are allowed to be excluded from the closing cost trigger in HOEPA under current law.

31  *Credit Life Insurance Hearing Before the Subcommittee on Antitrust, Monopoly and Business Rights of the Senate Committee on the Judiciary*, 96th Cong., 1st Sess. 48 (1979) (statement of Robert Sable).

32  *Id.* at 3.

33  *Id.* at 7 (testimony of James Hunt).  *Credit Life Insurance: The Nation's Worst Insurance Rip Off,* Statement of Consumer Federation of America and National Insurance Consumer Organization (June 4, 1990), updated (May 20, 1992 and July 25, 1995).

34  Allegations of coercion in the sale of what is suppose to be a "voluntary" product have been the subject of federal enforcement cases and private litigation.  *In re USLIFE Credit Corp. & USLIFE Corp.,* 91 FTC 984 (1978), *modified on other grounds* 92 FTC 353 (1978), rev'd 599 F.2d 1387 (5th Cir. 1979); *Lemelledo v. Beneficial Management,* 674 A.2d 582 (N.J. Super. Ct. App. Div. 1996).

13

### 3. Eliminate holder-in-due course status for assignees and purchasers of home equity loans.

Purchasers of negotiable instruments, such as promissory notes, have enjoyed the benefits of the holder in due course rule since the 1800s.[35]   The holder in due course doctrine protects assignees of a negotiable instruments from liability for the wrongdoing performed by the original lender or an assignee upstream, even though the borrower might be harmed.

Thus, regardless of any such wrongdoing, the consumer's obligation to pay the assignee downstream continues as long as the assignee purchased the loan without notice of the fraud or other misconduct.  In the mortgage context, the homeowner is left to pay the mortgage despite having perfectly valid claims and defenses arising out of the transaction.  Particular problems arise because some fly-by-night contractors or mortgage originators are insolvent, or they disappear (and reincorporate under a new name or file bankruptcy) at the first hint of litigation.

Since 1976, the Federal Trade Commission has limited the rule for the purchase of consumer goods or services.[36]  The purpose of the Rule is to give consumers the right to assert claims and defenses against creditors in situations where a seller provides or arranges financing and then fails to perform its obligations.   The Rule rightly shifts the risk of seller misconduct to creditors who could either absorb the costs of misconduct or return the costs to sellers.[37]

While the Rule created some protection for consumers in this context, it is  limited in several ways.  First, the consumer rights provided by the Rule depend upon seller compliance in placing a required notice in the loan document.  Second, recovery by the consumer for seller wrongdoing is limited to the amount paid under the consumer credit contract.  Third, there is no private right of action to enforce the Rule.

Recognizing the problems created for homeowners in the mortgage context, in 1994, Congress provided some protection for mortgage borrowers against the  misconduct of the original lender by creating assignee liability if the loan is a high rate loan as defined in HOEPA.[38]  However, the damages that a mortgage borrower can obtain against the assignee are limited to the sum of the total remaining indebtedness due on the loan plus the total paid by the consumer.

---

35   Morton J. Horwitz, The Transformation of American Law, 1780-1860, at 213-215.  A promissory note is an unconditional promise to pay a fixed amount of money, with or without interest, that is payable to order or to bearer, is payable upon demand or at a definite time, and does not state any other undertaking.  U.C.C. § 3-104(a), (e) (1990). The actual note or loan document signed by a borrower secured by a mortgage is ordinarily considered a negotiable instrument and bought and sold on the secondary mortgage market.  For a more in depth discussion of this doctrine, *see* Julia Patterson Forrester, *Constructing a New Theoretical Framework for Home Improvement Financing*, 75 Or. L. Rev. 1095, 1103-09 (1996).

36   16 C.F.R. § 433.

37   Forrester, *supra* note 35, at 1108.

38   15 U.S.C. § 1641(d).

14

If the holder in due course doctrine were eliminated for assignees and purchasers of home equity loans (and they were potentially liable for *all* of the claims and defenses which the borrower had against the originator), the industry will be forced to do engage in self-policing. If holders will clearly be liable for the claims the borrowers have against the originators, they will more carefully screen those with whom they do business. That, in turn, should help dry up the financial lifeline that has enabled the predatory mortgage companies to operate.

Some would argue that applying the limitation on the holder rule would reduce the amount of credit available to everyone, because creditors would be afraid to buy loans when they could be held liable for mistakes that were made by their predecessor in the credit chain. This is very unlikely. The protection provided by limiting the holder rule has applied to the automobile financing system for two decades. And, as one can see by perusing the classified section on "Cars for sale," the auto financing market is thriving. Applying the limitation of the holder rule to all assignees of a home loan would certainly not dry up the legitimate home equity lending market.

### 4. Federal Law Should Prohibit Unfair and Deceptive or Unconscionable Acts and Practices in the Making of a Home Loan.

Congress should flatly and unequivocally state that unfair, deceptive and unconscionable practices in the making of a home loan should be illegal. Although many states have laws prohibiting unfair acts and practices, too often these laws do not apply to loans secured by real estate, loans made by some types of lenders, or loans over a certain size.[39] Creating a laundry list of specific activities which are illegal or restricted would simply invite resolute lenders to transform their practices in ways to avoid falling into the definitions of specific prohibited acts. Instead there should be a broad prohibition.

The following are just a few examples of unfair and deceptive practices for which we have documentation:

- Some high rate lenders require homeowners to sign two loans, one which refinances debt, and the other, a smaller second mortgage, to finance the lender costs from the first loan. The APR on the first lien loan may be under the HOEPA APR trigger. But the APR on the second lien loan is a whopping 24%.

- Some lenders solicit borrowers with the promise that the borrowers can consolidate all of their debt into one payment which will cost less and save money over the term of the new mortgage. At settlement, when the borrower realizes that this claim is false, the lender or settlement agent for the lender promises that the loan will be refinanced on better terms in 6 months to a year. Further, borrowers are told, this is standard practice. Borrowers are induced to enter into the loan by these verbal statements. Many borrowers are not in a position at that point to refuse the bad deal

---

39 For a compilation and description of the state UDAP statutes, *see* The National Consumer Law Center, Unfair and Deceptive Acts and Practices App. A (4th ed. 1997).

15.

because they have paid appraisal, application or other fees or are in danger of losing their homes. Of course, the bad loan is never refinanced or, if it is, the same lender re-charges points and fees, thus gouging the borrower yet again.

- Some lenders will get homeowners to sign loan applications which inflate their incomes or add other information to the application unbeknownst to the homeowners in order to satisfy underwriting requirements. Frequently, the homeowners do not see these applications in their final form until settlement when they are asked to sign numerous documents in a rush. Or homeowners are asked to sign loan applications that are not completely filled in. The lender later adds additional information. This causes borrowers problems for two reasons: first, credit is extended when the borrower does not have the true ability to repay which leads to foreclosure; and second, the holder throws the "fraud" on the application back at the borrower later to defeat any complains that the borrower has against the loan.

### 5. Protections from Foreclosure.

Given the alarming increase in foreclosures over the past two decades, federal law must provide some additional protections to borrowers losing their homes to foreclosure. There are however, several things that the federal law can do to help save homes, which would not unduly interfere with the private mortgage market:

- **Increased support for housing counselors and mandatory notice regarding their availability.** Good housing counselors can facilitate loan workouts that preserve home ownership, prevent foreclosure, and reduce costs for lenders. Fannie Mae, Freddie Mac, and the FHA have implemented loss mitigation tools to avoid foreclosure and housing counselors are an essential part of that process. All mortgage lenders should be required to provide some support for housing counselors and notice of the availability of housing counselors should be required before any foreclosure can proceed.

- **Lenders should provide homeowners with the opportunity to pay off the arrearage and avoid foreclosure.** Although this seems obvious and in the best interest of both parties, this is not always done. Lenders should be required to give notice to defaulting homeowners of the amount past due and the amount needed to avoid foreclosure prior to the addition of fees. The notice should list the various workout options available. These options have been accepted by Fannie Mae, Freddie Mac, and the FHA as appropriate loss management tools in the industry. Lenders should also be required to attempt to avoid foreclosure through various loan workout mechanisms. Further, a lender should not be permitted to unreasonably reject a workout proposal.

In sum, at the least, three substantive requirements would apply to all foreclosures of all mortgages:

16

a.   Increased support for non-profit, independent housing counselors who can help homeowners navigate the loss mitigation rules that are now required of FHA, Fannie Mae and Freddie Mac lenders.

b.   A federal notice must be provided to the homeowner *before any foreclosure can proceed,* notifying the homeowner of the following:

     (1)   That housing counselors are available, how to reach them, and that the counselor may be able to help avoid a foreclosure by facilitating a workout;

     (2)   The actual amount in default, along with the sum of all interest and fees due, which must be paid to avoid a foreclosure;

     (3)   A list of possible workout options which might be considered.

c.   Lenders should be prohibited from proceeding with a foreclosure if a reasonable workout option has been rejected.

**Conclusion.**

As is evident from the testimony presented at the hearing and these comments, the ills that plague older Americans due to predatory mortgage lending have not abated since Congress last addressed them in 1994.   Given the stream of financing available due to the strength of the secondary mortgage market, the rise of securitization, and the profits to be made, the industry has no incentive (or desire) to police itself.  For these reasons, Congress must once again step in to help those vulnerable homeowners who have few or no choices in the lending marketplace.

17

**TABLE 4**

Homeowners and Homeownership Rates in the US by Selected Characteristics:  National Consumer Law Center, 1997

A Snapshot of Homeownership in the U.S.:  Low-Income Homeowners by Age



**256**

EXHIBIT 1

© 1997 National Consumer Law Center, Inc., All Rights Reserved

**TABLE 1**

Homeownership Rates in the US and for Selected Metropolitan Areas: National Consumer Law Center, 1997

**Low-Income Homeownership Rates Today**

On average in the U.S. , 39% of households with incomes below the poverty level own their own home.  In the chart below, notice that homeownership rates for very low-income households are higher in cities with high homeownership rates in general.



DATA SOURCE: American Housing Survey for Selected Metropolitan Areas, 1991-1994

257

EXHIBIT2

© 1997 National Consumer Law Center, Inc., All Rights Reserved

**TABLE 9**



Number of Foreclosures Pending at Year End, 1980 to 1995
One- to Four-Family Residential Nonfarm Mortgage Loans

DATA SOURCE: Statistical Abstract of the United States, 1996

258

EXHIBIT 3

© 1997 National Consumer Law Center, Inc., All Rights Reserved

**National Home Equity Mortgage Association**

1301 Pennsylvania Avenue, NW
Suite 500 • Washington DC 20004
(202) 347-1210
FAX: (202) 347-1171
http://www.nhema.org

**N H E M A**
.

March 16, 1998

Hon. Charles E. Grassley
Chairman
Senate Special Committee on Aging
Room SD-G31
U.S. Senate
Washington, DC 20510

Dear Chairman Grassley:

I am writing to you with regard to your hearing today concerning the predatory mortgage lending practices that some unscrupulous lenders and brokers are using to abuse senior citizens and other vulnerable consumers. I ask that this letter be made a part of the hearing record.

First, let me say that the National Home Equity Mortgage Association ("NHEMA"), which is the leading trade association for home equity lenders, finds the abusive practices----such as charging exorbitant loan fees, excessive loan flipping and stripping home equity from unwitting consumers----to be abhorrent. Many of these practices are patently illegal under existing federal and state consumer protection laws. We support your efforts to alert seniors to the dangers of dealing with such rogue lenders and to ensure that these laws are enforced more effectively. And, as explained further below, NHEMA has already called for new laws, regulations and penalties to further address such abusive practices and to help fill certain gaps that may exist under current law.

Although we condemn abusive and predatory lending practices, and are working actively to help curtail such abuses, we also must note our firm belief that these problems are being caused by only a small minority of lenders and mortgage originators. Just as there are a few bad priests and politicians, there are a few bad people in our industry[1]. But, as in other professions, the vast majority of home equity lenders and mortgage originators are honest and following ethical practices.

.

---

[1] NHEMA is aware that some critics have charged that hundreds of thousands of homeowners have been victimized at a cost of billions of dollars by unethical lenders and mortgage brokers, and that such parties contend that abusive practices are widespread and pervasive. We are not, however, aware of any independent objective, unbiased studies that confirm the alleged scope of the abuses referenced in such allegations and anecdotes. Based on their own experience and knowledge, industry experts are convinced that such claims of abuse are far overstated. Nonetheless, we do know that there is a small minority of unethical lenders and mortgage brokers, and we are working to stop their abusive practices as explained further herein.

1

This industry----which is often referred to "subprime lending" and "B and C" lending----evolved to fill the needs of borrowers who were turned down or left behind by more traditional lenders. Often, these unserved or under-served consumers were not able to obtain a conventional mortgage because their credit rating was somewhat lower than so-called "A" borrowers who qualify easily for lenders to sell off their mortgage loans into the secondary markets through Fannie Mae and Freddie Mac. Home equity lenders are often meeting the credit needs of families who are seeking to recover from unexpected life events like a divorce, a company layoff or high medical expenses. Or, the loan may be to provide needed credit for a child's education, or to add a room on the house of a growing family, or to pay off higher cost credit card debt.   Although these consumers may pose higher credit risks, they are still good customers, and they clearly have credit needs that NHEMA's members and other home equity lenders help meet.

Also, I want to point out that home equity lending is not itself predatory.  The vast majority of lenders in this business provide good mortgage products at fair prices.  And, as the industry has become increasingly competitive, even many "traditional" bankers now are entering this market to serve these higher risk borrowers.  Increased competition is lowering rates and costs and giving consumers far more product choice.

Today, the home equity  industry is very diverse and is comprised of an estimated 35,500 lenders, with the largest having no more than about 3% of the market.  The industry is served by around 5,000 banks, 2,000 thrifts, 23,000 mortgage brokers, 500 finance companies and 5,000 credit unions.  Home equity loan originators have jumped from $179 billion in 1992 to $268 billion in 1997, when over 4 million such loans were made.  Most equity loan rates range in the 8.5% to 14% range, depending on the risk and other underwriting factors involved in a particular case.

Given the size and breadth of our industry, it is not surprising that there are some unethical lenders.  Many believe that most of the abuses come from the sales practices of mortgage brokers, or in some cases by company loan officers, who engage in predatory practices for their personal economic gain.

NHEMA member companies have been actively participating in the ongoing process to reform the current home mortgage lending laws.  We have been working for much of the past year with other members of the so-called "Mortgage Reform Working Group" that is attempting to develop as much consensus on mortgage reform as possible among many diverse industry trade organizations and consumer groups.  We are also seeking to work cooperatively with government regulators from the Federal Reserve Board, HUD and the FTC on these issues.

NHEMA has also proposed a detailed legislative proposal, based on extensive work from its RESPA/TILA Reform Task Force.  NHEMA has recommended replacing many of the existing laws with new requirements that we believe would give consumers more meaningful disclosures and would also significantly control abusive lending practices that are being perpetrated on seniors and other borrowers by some unscrupulous lenders and mortgage brokers. (An article from NHEMA's Equity magazine describing our proposed reforms is attached for your information.)  NHEMA has

also been working on a new industry Code of Home Equity Lending Ethics, which we hope to promulgate soon.

Among other things, NHEMA has called for the following types of reforms to help protect against abusive lending practices:

- ✔ Increased consumer counseling and educational campaigns to help seniors and other borrowers better understand home equity lending issues and to warn them that some unethical lenders and brokers may be targeting them with predatory practices.
- ✔ Controlling loan flipping by limiting fees to brokers and loan officers when loans are refinanced within a 12 month period and/or by limiting the amount of costs that can be financed when a loan is refinanced within such a period.
- ✔ Requiring mandatory disclosure of whether or not mortgage brokers are representing borrowers and how brokers are compensated.
- ✔ Establishing federal minimum standards for licensing all mortgage originators.
- ✔ Creating a national clearinghouse to help ensure that regulators in all states can be aware of mortgage originators who have been found guilty of engaging in improper practices in another state.
- ✔ Bundling settlement services into a guaranteed cost package to help increase price competition and lower settlement service costs.
- ✔ Enactment of the "Homeowners Equity Recovery Act" ("HERA"), to delay transferring title in foreclosure actions to allow homeowners who are in default to have several months to try to sell their home, pay their outstanding indebtedness and retain any remaining equity.
- ✔ Tougher penalties for violations and enhanced enforcement.

Senator Grassley, in closing, I would summarize my comments by saying that while we agree that there are some unethical mortgage originators, and we join with you in condemning their predatory practices, we also believe that it is critical to note that most home equity mortgage lenders are reputable and do not intentionally engage in improper practices against seniors or other borrowers. Instead, the vast majority of home equity lenders are providing much needed credit at a reasonable, fair price to the consumers they serve, and they should not be unfairly branded as being guilty of practices in which they do not engage, and which they, like you and NHEMA, abhor.

Sincerely,

Jeffrey Zeltzer
Executive Director, NHEMA

cc:   Senate Aging Committee Members

3





**A WASHINGTON PERSPECTIVE**



# NHEMA's Efforts on RESPA/TILA Reform

*By Wright H. Andrews, Jr., Esq
Partner, Butera & Andrews
NHEMA's Washington Counsel*

● ● ● ● ● ● ● ● ● ● ● ● ● ●

*NHEMA has emerged as the leading voice for the home equity lending industry's interests in the ongoing Washington efforts to dramatically change the provisions of the federal Real Estate Settlement Procedures Act (RESPA) and the Trust-In-Lending Act (TILA). This article provides an overview of these Washington developments and highlights the recommendations developed by 'NHEMA's Task Force on RESPA/TILA Reform.*

**Mortgage Reform Working Group** — After countless lawsuits and years of complaints by virtually all parties concerned with the home buying/home mortgage process that RESPA/TILA provisions are fundamentally flawed, earlier this year Congressional leaders urged industry and consumer groups to work together to try to achieve consensus on how these laws should be changed. This led to representatives from NHEMA and from over twenty other industry and consumer organizations meeting regularly during the past eight months in an informal body called the Mortgage Reform Working Group (MRWG). MRWG participants have educated one another on the different aspects of the consumer home buying and lending process and their various organizations' views and concerns with current RESPA/TILA provisions. NHEMA and several of the other participants have come forward with specific reform proposals for the full MRWG to consider as it seeks to develop consensus recommendations.

**MRWG Participants** — Other industry participants in the MRWG effort, for example, include the: Mortgage Bankers Association, Consumer Bankers Association, American Bankers Association, National Association of Realtors, National Association of Mortgage Brokers, Consumer Mortgage Coalition, HELLO, RESPRO, Credit Union National Association, National Association of Federal Credit Unions, American Financial Services Association, American Land Title Association, Appraisal Institute, America's Community Bankers, National Association of Bar-Related Title Insurers and American Bar Association. Participating consumer organizations include: Consumers Union, Consumer Federation of America, AARP and the National Consumer Law Center.

**Scope of Reform** — Preliminary consensus has been reached on several important points. In particular, the group appears to agree that the RESPA/TILA statutes are so defective that limited piecemeal legislative fixes would be inadequate. Therefore, MRWG is seeking to craft proposals that would entirely replace current provisions with a new comprehensive federal home mortgage law.

**Reform Principles** — MRWG members have tentatively agreed that the following general principles should apply to any reform proposals:

**Timely and Adequate Information for Informed Decision Making** — Consumers should have timely and adequate information as needed to make informed decisions about the home buying and financing process.

**Simple, Clear and Effective** — Consumer protection laws should be as simple, clear and effective as possible so that all parties can understand their rights and obligations.

**Substantive Legal Protections Where Needed** — Consumers should have effective substantive protections, where needed, against fraud, deception and unfair practices.

**Tailored Laws and Remedies** — Consumer protection laws and remedies

should be tailored to the goals they are intended to achieve.

**Equal Application** — Consumer protection laws should apply equally to all parties performing a similar role in the transaction.

**Promote Competition** — Consumer protection laws should seek to promote, rather than restrict, competition among market participants.

**Perceived Problems** — General agreement also seems to exist on the nature of the major perceived problems associated with the existing laws and industry practices. However, various parties naturally differ on the magnitude of some of these problems, as well as how they should be addressed. In essence, the perceived problems include:

**Disclosures** — Current disclosures are often untimely, incomplete, unclear, confusing, misleading, too complex, burdensome, etc. Consumers generally do not or can not easily shop loan rates and closing costs. This lack of shopping frequently is caused by the lack of simple, meaningful disclosures and of a good comparative shopping tool (e.g., an early disclosure of the guaranteed loan rate and closing costs). Consumers also are often surprised and angered by unexpected costs at closings.

**Loan Origination & Pricing** — Some lenders and brokers engage in frequent loan flipping or churning whereby consumers' loans are refinanced repeatedly and the borrowers are charged repeated fees. Also, closing costs may involve excessive charges for certain settlement services (e.g., appraisal charges) and include "junk" fees. In addition, senior citizens and other vulnerable groups sometimes are targeted by certain predatory loan originators and given inappropriate loans that may lead to them losing their homes in foreclosure proceedings.

**Broker's Role & Compensation** — Consumers are frequently confused or misled regarding the role played by mortgage brokers. They mistakenly believe that the broker is representing their interest, and

(continued on page 14)

13

## RESPA/TILA Reform

(continued from page 13)

they do not know the amount and sources of all broker compensation.

**Referral Fees** — RESPA's restrictions on referral fees cause businesses serious legal uncertainties and may unduly limit the payment for referrals between certain parties.

**Section 32 High-Cost Mortgages** — The current provisions of Section 32 of RESPA need refinement.

**Consumer's Rights & Remedies** — The present rescission right is often used to unfairly penalize lenders who make minor, unintended technical mistakes. However, consumers have few other mechanisms for correcting errors and resolving disputes with lenders. Also, consumers may not be given adequate counseling, workout or forbearance options to avoid foreclosures. On the other hand, lenders feel that consumers file numerous costly lawsuits based on technical, unintended lender errors.

**Conflicting Laws** — Conflicts exist between certain RESPA and TILA requirements, and more significantly, due to many different state laws.

**NHEMA's Reform Proposals** — In order to ensure that NHEMA could fairly and effectively reflect its membership's view on these reform issues and be a constructive participant in this process, Laura Borrelli, NHEMA's President, formed a NHEMA Task Force on RESPA/TILA Reform. Member companies were invited to participate, and the Task Force held lengthy meetings in Philadelphia, New York and Washington to review perceived problems and possible legislative changes. After these initial meetings, the Task Force and its drafting subcommittee held three full days of meetings in Dallas on November 7 to 9. The Dallas meetings led to a specific set of proposals that have been further refined and endorsed by NHEMA's Executive Committee.

Key concepts in these proposals, which now are being considered by MRWG participants, along with the recommendations that have been made by other trade and consumer groups, can be summarized as follows.

### NHEMA's Proposals for Comprehensive RESPA/TILA Reform[1]

**I. SCOPE OF REFORM**

A. Broad, comprehensive RESPA/TILA reform should be pursued instead of seeking only limited, piecemeal legislative "fixes"

B. RESPA/TILA should be replaced by a new federal mortgage lending law

**II. DISCLOSURES** *(same disclosures for closed-end and open-end credit)*

**A. Pre-Qualification "Shopping" Disclosure**

1. Given after credit bureau report (obtained after borrower's authorization) but before formal application

2. Given by the originator who would be the party who was contacted by the borrower and asked for the shopping disclosure quotes (i.e., by the lender if the consumer made direct contact or by the broker if the consumer went through a broker)

3. The originator would pay the cost of the initial credit report

**4. Disclosure of Guaranteed Settlement Costs & Good Faith Estimate of Rate and Discount Points**

a. Guaranteed Settlement Costs

(1) Lender-approved, bundled settlement costs

(a) Items not included (escrow; per diem interest; hazard insurance; taxes; credit life insurance)

(2) Disclosed as guaranteed maximum cost based on particular loan type and amount

(3) Individual services not itemized

(4) Guarantee in writing and valid for minimum of 5 business days

(a) after date of in-person or electronic delivery to borrower, or

(b) from date of telephone pre-qualification request, in which case lender must have mailed disclosure guarantee within two business days of request

(5) This guarantee could include a "no-cost" loan with a guarantee of zero closing costs and an explanatory notice adding that because the rate includes settlement expenses it naturally may be higher than that quoted on loans where expenses are paid separately.

b. Good Faith Estimate (GFE) of Note Rate and Discount Points

(1) GFE given in writing concurrently with settlement cost guarantee and based expressly on particular loan type and amount and requirement of subsequent confirmation of home's value by acceptable certified appraisal and of title report, consumer's credit and income, etc. ***(Non-conforming lenders generally cannot give a firm rate guarantee until they have property appraisal, credit/income verification, title report, etc. — this information proves in 50%-70%+ of cases to be materially different than what borrower initially told lender and this means lender cannot know what is proper rate to quote until after getting this key underwriting information; it would be very misleading to consumers to offer a so-called "guaranteed rate" which was conditioned on all the initial information checking out because industry knows that the majority of the time the data proves to be so materially different that the rate/discount points will change; thus, it is far better to use the GFE approach and also give guaranteed settlement costs.)***

(2) Explanatory Notice to disclose to borrower that many consumers do not qualify for loan first sought because subsequent appraisal value and additional data turns out to be significantly different than consumer thought, but that if this occurs, often other loan options with different note rates and discount points may be available; also, as noted above, the notice would include an explanation that if a "no cost" loan was involved the rate may be higher because it includes settlement expenses.

(3) Consumer incurs no cost at this stage.

5. Pre-Qualification Shopping Disclosure includes:

a. Note rate

b. Total monthly payment (principal + interest)

c. Term (number of payments)

d. Type of loan

(1) Balloon payment feature, if any

(2) HELOCs

(3) Whether rate or payment can change

e. Loan amount

f. Discloses whether closing costs are financed or paid outside of closing

g. Closing costs, if applicable, as bundled amount, not separately itemized

h. Lender discount points, if any

i. Broker compensation, if any

j. Prepayment penalty, if any

k. Assumability

l. Notice that third-party credit counseling referrals are available

**6. APR, Amount Financed, Finance Charge disclosures are eliminated**

7. Legislative clarification required that the data gathered to provide a Pre-Qualification Shopping Disclosure is not deemed to be an application and therefore does not trigger HMDA reporting requirements

8. See footnote below regarding possible alternative shopping approach[2]

**B. Pre-Closing Disclosure Guarantees**

1. Discloses all items in pre-qualification shopping disclosure, plus servicing transfer notice and appraisal availability

2. Borrower has completed application for loan either in person, by phone or electronically

3. Lender has received and confirmed all required qualification data (credit/income, appraisal, income verification, title report, etc.)

4. Lender (not broker) then acts on application and if approved gives written pre-closing guarantee of rate, costs, etc.

---

1. Please direct any comments or questions to Jeffrey Zeltzer, NHEMA's Executive Director, at 202-347-1210, or Wright Andrews, NHEMA's Washington Counsel, at 202-347-6875.

2. Borrowers who nevertheless want a guaranteed rate for shopping purposes can obtain one, provided they adopt a different shopping approach whereby the borrower first provides the essential information lenders need to offer a guarantee of the rate and discount points.

A. The borrower would first obtain an appraisal from a certified appraiser, a title commitment, verification of income and debt, etc. and submit this information to the lender directly or indirectly through a broker.

5. Disclosure guarantees must be mailed a minimum of 5 days before closing

6. Lender may turn down borrower if not qualified for original loan applied for, but may make counteroffer(s) with same type guarantees, etc., depending on type/amount of loan offered, but guarantees/counteroffer(s) are firm and no longer conditioned on qualification and are valid for a minimum of 3 business days so borrower can shop

7. Borrower may cancel before closing and have copy of appraisal, etc., but lender may retain application fee for original loan if not qualified by borrower

8. Discloses all items in pre-qualification shopping disclosure, plus servicing transfer notice

## C. Closing

1. Borrower receives Closing Statement (same as pre-closing guaranteed disclosure) reflecting how funds are disbursed on borrower's behalf at closing

2. Notice of Right to Cancel for 3 business days (does not apply to purchase money mortgage)

   a. Borrower must notify lender of cancellation by telephone in timely manner utilizing an 800 number provided by the lender, but no refund required of application fee and/or appraisal fee

   b. Borrower can have copy of appraisal and title

3. If no cancellation, funds disbursed on fourth business day after closing

4. If a material change has occurred in borrower's status that adversely affects qualification (e.g., consumer becomes unemployed or incurs significant new debts) the lender has the right to terminate the transaction and may retain appraisal and/or appli-

---

*Footnote 2, continued from previous page*

1. The appraiser and the appraisal format would have to be acceptable to the lender, and the appraisal would have to have been done within a specified time period

2. The borrower (and/or their mortgage brokers if applicable) would submit this information to a lender(s)

   a. The lender(s) would review this information and the lender (or the broker if the broker had binding authority from the lender) would issue a guaranteed pre-closing disclosure

   b. Lender's guarantee would be subject to verification of all information to lender's satisfaction

   c. This alternative shopping approach would:
   (1) in most cases require the borrower to pay for an appraisal and title commitment and possibly other items at the outset of the process, but
   (2) most of these costs would be required at the later application stage anyway and this gives the consumer who wants to shop rates a viable, cost-effective way to do so, and
   (3) significantly cut down on the percentage of cases where the lender would have to tell the borrower that the appraisal and other data turned out so different than what the borrower had initially said that a different loan rate, etc. would be required (i.e., you would not have 50%-70% consumers who applied later being told the initial guarantee was meaningless because the information given initially was materially wrong).consumer who wants to shop rates a viable, cost-effective way to do so, and
   (3) significantly cut down on the percentage of cases where the lender would have to tell the borrower that the appraisal and other data turned out so different than what the borrower had initially said than a different loan rate, etc. would be required (i.e., you would not have 50%-70% consumers who applied later being told the initial guarantee was meaningless because the information given initially was materially wrong).

---

cation fee or can restructure offer and make new disclosures

5. Borrower-requested changes may be made at closing (e.g., borrower asks for additional funds) with written acknowledgment of borrower with no duty on lender to redisclose unless borrower requests it

6. Lender-initiated changes require disclosure

## III. CONSUMER REMEDIES/RIGHTS

### A. Borrower's Right to Cancel

1. Borrower's right to cancel would be valid for three business days after closing and would replace current right of rescission

   a. No waiver allowed

2. If borrower cancels, borrower can have copy of appraisal and title report, and lender may only retain fees for appraisal and/or application

3. Exclude purchase money transactions and refinances with no cash out

### B. Borrower's Right of Error Correction *(e.g. for mathematical errors affecting payment amount, per diem interest calculation, computer programming errors)*

1. If error found in consumer's favor, no recovery by lender as to past, but lender has option to correct as to future

2. If error discovered and confirmed during right-to-cancel period, lender must correct within two business days

3. If error discovered after right-to-cancel period expires:

   a. Borrower gives lender written notice of error in sufficient detail to permit lender to investigate
   (1) Notice must be given within 90-day period after closing
   (2) Correction not mandatory on amounts less than $100

   b. Lender has 60 days to act
   (1) Lender may correct error, including if appropriate, refunding overages with interest, or
   (2) Deny the error with written explanation

   c. Prevailing party entitled to costs and reasonable attorney's fees if litigation occurs

### C. Credit Counseling

1. Lender to offer borrower free referral to third-party consumer credit counseling

### D. Mandatory Arbitration

1. Court supervised mandatory arbitration of disputes

2. Arbitration would be conducted in county where property is located pursuant to existing rules and procedures of American Arbitration Association

3. Arbitration would not apply to foreclosure except foreclosure could be stayed if consumer's only recourse was arbitration

### E. Repeated Abusive Practices

1. Enforcement of existing laws on repeated abuses needs to be increased

2. Strict state licensing requirements should apply to all originators

3. States should toughen laws to regulate private lenders

---

4. National Clearinghouse should be established to list anyone whose lending/brokerage license has been permanently revoked in one state, and other states would have option to prohibit such parties from operating in such other states after hearing

### F. Foreclosure/Loss Mitigation

1. Workouts, forbearance and other loss mitigation tools continue to be employed and emphasized in good faith efforts to try to prevent foreclosure.

2. Notice of Third-Party Consumer Credit Counseling Availability must be given no later than 30 days prior to any formal commencement of foreclosure except where there is a default in a senior lien

   a. Notice must include a list of general options for workout and other loss mitigation procedures that may be available to the consumer

   b. Notice should specify that not all options may be available to all borrowers due to various state and federal laws

   c. Notice should state that consumer must take immediate action

   d. Notice would include a list of sources or agencies for third-party credit counseling

3. Protect borrower's equity and dignity by enacting a new "Homeowner's Equity Recovery Act" (HERA), which would apply at commencement of foreclosure procedures and give the borrower a tool to require:

   a. Lender must obtain a new full appraisal from certified appraiser prior to the time a foreclosure sale is completed.

   b. Borrower would receive a copy of appraisal and have 20 days to accept or reject and provide their own appraisal from a certified appraiser from an approved list.

   c. If Lender does not accept Borrower's proposed appraisal, then the two appraisers select a third appraiser from the approved list to determine the value

   d. If Borrower's outstanding indebtedness (current balance and interest, junior liens, etc.) is not more than 80% of the current appraised value, borrower has right to have a non-affiliated, licensed real estate broker list the property for an amount not to exceed the appraisal and to get a postponement of the foreclosure for 60 days to complete a sale

   e. Borrower would receive any profits from the sale after paying off indebtedness and costs

   f. If property is not sold within the 60-day period, lender may proceed with foreclosure while the property remains on the market, or the lender may extend the postponement period for such time as the lender deems appropriate

   g. Borrower must cooperate or lose rights under HERA

   h. Borrower may voluntarily waive HERA rights

   i. HERA does not apply if consumer is in bankruptcy or if property is not borrower's primary residence and owner-occupied at time of proceeding

4. Additional Points:

   a. NHEMA opposes expanding mandatory judicial foreclosure because:

(continued on page 54)   15

## RESPA/TILA Reform
(continued from page 15)

'(1) Costly to consumer and lender
(2) Places collateral at risk
(3) Too time consuming
(4) New foreclosure rules suggested herein will be adequate
b. Federal tax code (REMIC provisions) places limitations on types of compromise that a lender can offer
c. Need to address the strict requirements of Fannie and Freddie for the secondary market that require expedited foreclosures

### IV. ABUSIVE PRACTICES
**A. Loan Flipping/Churning**
1. In any loan rewritten within 12 months by an originator/lender, only bona fide third-party fees (e.g., appraisal, title, recording) may be charged
  a. No broker's fees
  b. No lender discount points

**B. Junk/Excessive Fees**
1. Bundled closing costs approach will cause competitive market pressures to control fees

**C. Target Marketing to Seniors and Other Protected Groups**
1. Proposed limitations on refinancing fees and foreclosures and the bundled-fee approach will limit abuses
2. Special Alert Notice in HUD pamphlets and elsewhere to advise all consumers some borrowers are being targeted and subjected to abusive practices by certain unscrupulous loan originators and that they should seek counseling and legal advice if they believe they are being targeted and subjected to abusive practices

### V. MORTGAGE BROKER COMPENSATION
**A.** Current HUD proposal defective, but endorse concept of broker contract

**B.** Contract should require:
1. Disclosure of broker's role/relationship with borrower (represent vs. do no represent)
2. Disclose all sources of broker compensation in the transaction
3. Disclose the amount of such compensation
4. Provide no limitation on amount of such compensation
5. Include a summary listing of borrower's rights

### VI. SECTION 8 — REFERRAL FEES
**A.** Lender-paid compensation to broker will be disclosed in broker contract and in pre-closing and closing disclosures and will not be considered a referral fee

**B.** Use FHA rule that settlement service provider(s) can be paid only once for the same service in a transaction, no duplication allowed

**C.** Volume discounting would be allowed

### VII. SECTION 32 — HIGH-COST MORTGAGES
**A.** Home equity lines of credit (HELOC) would be included
**B.** Current Section 32 disclosure would be incorporated and given to all borrowers
1. "If you default, you may lose your home"

**C.** Apply simplified test to determine if high-cost mortgage
1. Note rate 10% over prime rate (e.g., WSJ rate), or bundled costs exceeding 8% of note amount
2. ARM loans — interest rate calculation would be based on fully indexed rate

**D.** Apply to owner-occupied, 1-4 family, primary residence

**E.** If high-cost loan, the following would be disallowed:
1. Balloon payments due in less than five years, negative amortization loans and/or interest-only loans
2. Prepayment penalties
3. ARM loans with first adjustment in less than 36 months
4. Eliminate additional three-day cooling-off period in light of new disclosure scheme

**F.** Cure Provisions
1. Federal Reserve given discretion to define tolerances and cure provisions for errors

### VIII. STATE LAW PRE-EMPTION
**A.** Adopt the MBA proposals that the following types of state laws should be pre-empted:
1. Laws requiring disclosures of interest rate, fees and costs
2. Laws governing rate lock-ins and loan commitments
3. Laws restricting when fees can be collected prior to closing and the conditions that require a refund
4. Laws governing the process for declining a loan application
5. Laws governing the practices of mortgage brokers
6. Laws restricting business between affiliates

7. Laws prohibiting or restricting the charging of certain fees (e.g., prepayment)
8. Laws requiring that the lender give the consumer a choice of service providers
9. Laws requiring the lender to provide certain documents to the consumer, such as the appraisal
10. Laws relating to the servicing of mortgages, including restrictions on private mortgage insurance, interest on escrow, and fee limitations

**B.** Conclusion — The application of a standard set of laws and regulations for all closed-end mortgage loan transactions should allow all consumers to have the same mortgage process no matter what state they are in, to what institution they apply, and whether or not they use a mortgage broker or deal directly with the lender. Uniformity should also increase compliance for mortgage lenders since a myriad of state policies and procedures would be eliminated. Uniformity should reduce the cost to the lender and consumer since there will be significantly fewer documents to maintain and no further need to track and implement changes for each state.

Outlook — At this point, considerable uncertainty exists over the extent to which the MRWG will be able to take the various proposals being put forth by NHEMA and other

(continued on page 56)



## TOTAL SOLUTION DEVELOPMENT FOR THE MORTGAGE INDUSTRY

As a "AA" rated provider of mortgage services, Norwest Corporate Trust Services has the financial strength, market leadership, and unmatched array of services to satisfy the needs of the Mortgage Industry.

**MARKET LEADERSHIP NATIONWIDE**
- #1 in Bond Administration with over $80 billion serviced
- #1 in Third Party Mortgage Document Custody
- #1 in Master Servicing of MBS Transactions
- #1 in Non-agency REMIC tax preparation and reporting

**UNMATCHED ARRAY OF SERVICES**
- Master Servicing
- Securities Administration
- Tax and SEC Reporting
- Investor Reporting
- Mortgage Document Custody
- Assignment Services
- Trustee
- Registrar/Paying Agent

**MORTGAGE MARKETS SERVED**
- Single-Family Mortgages
- Multi-Family Mortgages
- Commercial Real Estate Loans
- Whole Loans
- B and C Mortgages
- Home Improvement Loans
- Home Equity Loans
- Resecuritizations
- Aggregation Programs

NORWEST MORTGAGE MARKETS GROUP
V.P. Business Development Manager  Patrick G. Bassett  (612) 667-6719
Vice President  Gale R. Rinditch  (612) 667-6433

Minnesota • New York • Texas • Wisconsin • Maryland • Arizona • New Mexico

### RESPA/TILA Reform
(continued from page 54)

groups, which naturally contain significant differences, and craft them into a single, comprehensive reform proposal to submit to Congress. While it seems likely that a high level of consensus can be achieved on some issues, serious differences will probably remain in some areas. Where such differences exist, parties can be expected to advocate their differing positions, and Congress will have to set the ultimate policies. For example, consumer groups have recommended that loan "suitability" standards be adopted to prevent loans from being made to consumers in certain circumstances. NHEMA and other industry groups have strongly opposed enactment of such new suitability tests, and this issue is likely to be fought out in Congress. In any case, it is certain that the Congressional Banking Committees will begin seriously considering RESPA/TILA reform in 1998, probably as early as March. And, many of the concepts embodied in the NHEMA proposals — and in the proposals that have been made by consumer organizations and other groups — are likely to emerge during the ensuing legislative debate as provisions in specific bills and/or amendments.

NHEMA and the home equity lending industry have a vital interest in the outcome of this upcoming legislative battle. NHEMA believes that while mortgage lenders' interests must be protected, it also is critically important that any new statutes that emerge from this process provide more meaningful disclosures for consumers and adequately protect consumers from abusive practices by unethical loan originators. The association will be working hard through its government affairs and public relations programs to see that NHEMA's views and recommendations are given careful consideration by Congress and to ensure that our industry's interests are understood and protected. Every NHEMA member company will be impacted by the new home mortgage law that comes out of this legislative process, and every company's active support and participation in the association's legislative efforts is needed and welcomed. ∎

*This brief summary of NHEMA's RESPA/TILA reform proposal is necessarily somewhat over-simplified and does not go into all aspects of these recommendations (e.g., changes in RESPA Section 8's referral fee provisions and Section 32's high-cost mortgage limitations). However, it should be adequate to give the reader a general idea of the types of concepts that are being suggested. Anyone wishing to obtain a copy of the entire NHEMA proposal should contact Jeffrey Zeltzer, NHEMA's Executive Director, at 202-347-1210, or Wright Andrews, NHEMA's Washington Counsel, at 202-347-6875.*

● ● ● ● ● ● ● ● ● ● ●

### What Price Forgery?
(continued from page 28)

encompasses the opinion of search and states the quality of the title being insured as well as the name of the insured.

Conclusion. Title insurance is a valid and important device for providing a universal system of title opinions upon which a stranger can rely. The existence of national insurers permits the standardization not only of policies but also of the application process. It can be fairly said that the growth of a universal title insuring community has been one of the ingredients in the dynamics of multi-state lending. We might gripe about premiums, we might question individual underwriting decisions, but from the investor's perspective, the title insurance policy is the glue cementing the collateral to the insured. ∎

● ● ● ● ● ● ● ●

### Commission's Findings
(continued from page 26)

could file up to 11 times in the space of 6 years. Furthermore, the exemption levels would be increased to permit a debtor to walk out of a bankruptcy with a net worth of $140,000. The Department of Justice points out that this is greater than the net worth of 75% of the American public. As a yardstick, bear in mind that the average American household has a net worth of $36,600.

If we put the NBRC's proposals in place and looked over the horizon, we could see many, many more bankruptcies. (Imagine 2 million bankruptcy filings per year by the year 2001!) The filing of bankruptcy would be easier and the debtor unquestionably comes out with more net worth than is possible with just earning money and saving it (the "old fashioned way"). In the end, the debtors get more relief than ever before because creditors have more barriers, more risks and fewer rights in bankruptcy than ever before. This translates to higher bankruptcy losses for all creditors, which in turn means higher price tags and higher interest rates for America.

**What Can You Do?**

Writing to your Congressperson and lobbying is definitely in order for all creditors at this point. The NBCR's plan will have a large negative impact on nearly every creditor's bottom line.

Asserting creditor rights is another form of action. It is time to participate in the bankruptcy process before all forms of creditor access to any rights in bankruptcy are forfeited.

To assist interested parties, the author has assembled a free "Guide for Writing to Your Congressperson." It is available by calling Robert Mitsch at (612) 292-9900. ∎

● ● ● ● ● ● ● ●

### HUD Trek VIII
(continued from page 22)

Corporation, that mortgage brokers must perform "certain" core services to receive a fee for taking an application. This advice has been adopted by all of the federal banking regulatory agencies. There is no excuse for HUD's failure to recognize its prior advice as an official proposal.

8. HUD Is Reviving Its Strategy of Computerized Loan Origination Services.

HUD wants to restart its Computerized Loan Origination (CLO) concept by providing software for brokers to display loan products from many different lenders on a computer screen. HUD believes that this service will allow consumers to shop for the best rates. This concept failed to catch on in most areas of the country when HUD proposed it in 1992, and the exception for payments to a CLO was withdrawn last year. Despite HUD's good intentions,

(continued on page 56)



**OMEGA SYSTEMS**
**FOR THE NEXT GENERATION OF PREDICTIVE DIALERS!**

A true 32 bit, Computer Assisted Dialing System, running on a PC Network. A simpler system to learn and operate for both the Telemarketing Manager and the Telemarketer. Campaigns that once took hours or days to set up or modify can now be done in minutes. The Multi-tasking capabilities let the agent stations allow for integration to third party software.

THE STATION MANAGER SCREEN

The Omega Predictive Dialer, Easier to use, Faster, More Expandable, More Adaptable.

Call today for a free information kit.

THE STATION SCREEN

Omega's "HOT-KEY" task matching feature allows the user to easily modify task between programs while the Dialer is running.

**OMEGA**
*"So Sophisticated, It's Simple!"*

**Simplicity**

**1-800-55-OMEGA**
**(916) 635-7590**
www.omega2010.com

3333 Sunrise Blvd., Suite J · Rancho Cordova, CA 95742

47 447    337

# SBA _Senior Benefit Association_

*Services and Savings for Senior Members*

## EQUITY PREDATORS

Senior Benefit Association is dedicated to fighting fraud against the elderly.  When our Association began in 1993, it was our goal to prevent telemarketing fraud by providing specific answers via a telemarketing fraud hotline as members received the calls.  In response to the growing needs of our members, we have evolved to fight additional kinds of fraud including, but not limited to, equity fraud.

The following scenario is a compilation of situations to demonstrate how thousands of the elderly, already victimized by telemarketing fraud, become vulnerable to equity predators.

It all begins with a single telephone call.  Martha (not her real name)  is a winner in a sweepstakes but has to buy a product for $798 to collect the prize.  When she tells the nice man she doesn't have the extra cash, he suggests she get a cash advance on her credit card and send a personal check. She is so excited that she has won something, she does exactly what the nice man told her to do.  She calls a bonded courier to pick up a check for $798 and she waits . . .

The prize comes, and now she is a "player".  Martha gets another phone call.  She is a winner again.  This time, she has to pay the processing, shipping and handling fees on the prize before they can release it.  Since she was disappointed from the first prize, she asks a question,  "What did I win?"  "Martha, $2,500 is a drop in the bucket compared to what you will be receiving" the nice man says.  She hesitates but borrows against her credit card, and sends him a cashiers check for $2,500.  And, she waits . . .

The prize comes, and now she is a "reload."  Martha gets another phone call.  This nice man knows that she has entered sweepstakes and has been promised large winnings, but has never gotten anything really big.  His company wants to correct that situation and he informs Martha that she has been selected out of millions of entrants to receive a cash award in the amount of $75,000 that will make up for all the other times she lost out.  However, Martha has to send a cashiers check in the amount of $7,500 to pay the taxes to IRS.  She tells the nice man she doesn't have that kind of money but he suggests that she liquidate some stock or cash in some CD's because after all, she was getting so much more in return.  Martha asks a question, "How do I know I can trust you?"  The nice man tells her, "Martha, I am a Christian!"  Martha follows his directions, cashes in her CD early and suffers a penalty.  She sends a cashiers check made out to the IRS agent and waits . . .

The cash award never comes, and now she is "hooked".  Martha gets another phone call.  The nice man is a bonding agent and the government has closed down many of these bad telemarketers and put them in jail.  The court has recovered $50,000 from them for Martha.  All she has to do is pay a 10% bonding fee and the money will be released to her.  He tells her that this is official government business and is confidential. She is not to discuss this with anyone.  She is so relieved that she is getting her money back, she arranges to borrow the money against some stock which she uses as collateral and rushes out to wire the $5,000 bonding fee to the CPA and she waits . . .

*205 E. OSBORN ROAD • PHOENIX, ARIZONA 85012 • 1-800-934-5414*

While Martha waits, she gets another phone call from the bonding agent.  He made a mistake.  The court has awarded punitive damages to Martha and she is going to get $100,000.  The 10% fee of $10,000 is due up front.  The nice man reminds her that this is still confidential and tells Martha to do whatever she has to in order to get the money and wire it to the CPA before the deadline.  Faced with the problem of no ready cash, Martha is forced to borrow from her annuity.  Martha is thrilled with this news and again, she wires the $10,000 to the CPA and she waits . . .

The recovery money never comes.  Now Martha is "broke".  She has maxed out her credit cards, cashed in her CD, borrowed against her stocks and her annuity all of which has raised her monthly expenses and at the same time substantially reduced her income.  In fact, Martha is forced to live on her social security.  She can't pay her credit card bills and she can't afford to buy her medications, pay her insurance and, of course, there is precious little left to buy her groceries.

- Martha sees an advertisement on television about an equity loan against her home.  She calls the 800 number and they send a nice man/woman who takes her application for a 15 year equity mortgage to consolidate her bills and reduce her monthly payments.  One slight problem, Martha's income has been reduced to the point that her debt to income ratio won't qualify for the loan.  Desperate, Martha remembers that sometime back, she loaned $13,000 to her son, who was supposed to pay it back at the rate of $300 a month.  The problem appears to be solved.  With her social security and the income from the  "Promissory Note", Martha could qualify.  Although her monthly bills are reduced, Martha has nothing left for any emergency requiring a substantial outlay of cash.
-
- Suppose the air conditioning unit breaks down in the middle of summer and the repair man says she needs a new unit at a cost of $3,500.  The money from her equity loan is gone and she doesn't have access to any more.  She can't borrow the money from her children because she will have to tell them why she doesn't have any money left.  *She will keep entering sweepstakes because they can't all be bad and she can't afford to take a chance that she will miss out on the real one.*
-
- Down the road, Martha finds out that she can't make the payments on her equity loan and falls seriously behind.  The lender refinances the 15 year equity mortgage, increasing the term to thirty years and raising the monthly payment from $489 to $532, paying off new debts from sweepstakes and other mounting bills she could not pay.
-
- Martha falls behind again.  Her son stopped paying the $300 note because she would just lose it anyway in a sweepstakes.  (He knows she has gotten involved in a few sweepstakes but he doesn't know to what degree, nor does he know about the equity loan.)  The lender sends her notices telling her that if she doesn't catch up her payments, they will foreclose on her home.  While Martha struggles to borrow from a sibling (not her son)  she is able to make a payment or two.  Finally Martha's house of cards comes tumbling down.  She can't make any more payments.

- 
- The equity lender posts a sign on her front gate for all the neighbors to see that her house will go up for public auction.  Martha scrambles for a place to live and a way to tell her son she has lost everything --- especially her dignity.

The equity lender claims they were justified in granting the loan because of the equity she had available from the property.  They were assured of getting repayment on the loan. They also claim that they could use the income from the "Promissory Note" to 'gross up' her income to qualify even though the note would run out in less than five years and was an unenforceable verbal contract between a mother and her son.  It has since been documented that the "Promissory Note" was not a contract between the mother and son and that the signature appearing on the document is not that of the son.

Martha had another option.  She could have qualified for a reverse mortgage, which would also have cleared her debts, and she would have had **no monthly mortgage payments**.  In addition, she **could not** have lost her home, as a reverse mortgage would allow her to borrow from herself.

However, the equity lender did not tell Martha about the reverse mortgage option.

Did the equity lender have an ethical or moral obligation to make this option known to Martha?   Does an equity lender, in the position of giving financial advice to its clients, bear any fiduciary responsibility? In this case, the equity lender got all the payments Martha made _and_ the house long before the five years was up because her son quit making his payments to his mother.

Consider that Martha, a widow, 78 years of age, her social security income under $800 per month and the $300 income from repayment of a loan from her son, an unenforceable note at best, would run out in less than five years. In five years Martha would be 83 years of age less the income from the note and not much more than $800 a month from her social security.  How was she to continue paying the mortgage payment?

### Is this equity fraud?  Senior Benefit Association believes it is!  Is this an isolated case?  Senior Benefit Association doesn't believe so.

Martha represents thousands upon thousands of seniors in similar situations.  Equity lenders advertise heavily on television.  It would appear that the marketing direction is to an audience that includes the senior citizen.  They use well known personalities (the type who represent the image of an era gone by --- clean cut sports figures of a pre-drug society and who appeal to the senior population) to attract consumers to their services.

What fiduciary responsibilities do equity lenders have?  What responsibilities should they have?   Does a lender become a financial counselor when advertising debt consolidation through an equity loan?

Senior Benefit Association would propose that new legislation be considered that requires anyone over the age of 62 receive specific counseling regarding real estate loans of any type before the loan is closed. This counseling process by a not-for-profit organization would be an appropriate vehicle for seniors to have all options, for example reverse mortgage where available, presented to them in a fair and unbiased manner. An offer of proof of this counseling should become a permanent part of the loan record. Lenders who fail to refer qualified borrowers for counseling should suffer appropriate penalties.

Senior Benefit Association recognizes that this kind of legislation does not resolve the problem(s) that make equity loans necessary, nor is it intended to do so.  It is our firm belief that this is only a symptom of an underlying problem of telemarketing fraud.


P.S.  Martha was formally evicted from her home as of mid December 1997 and given three days before the sheriff would have no choice but to enforce the eviction and lock her out of her home.  All this, less than two weeks before Christmas.  On December 30th, Opal Henson (her real name) was admitted to the Hospital.  I can personally attest that, through her panic stricken phone calls to me, her failing health was aggravated by the stress and anxiety of the process that caused the loss of her home.  On January 27, 1998 at 4:25 PM Opal Henson died.

SENIOR BENEFIT ASSOCIATION                              MARCH 1998


Leslie Richards
President

## PREPARED STATEMENT OF THE
## CONSUMER CREDIT INSURANCE ASSOCIATION

**SUBMITTED TO**
**THE U.S. SENATE SPECIAL COMMITTEE ON AGING**

**REGARDING**
**EQUITY PREDATORS:  STRIPPING, FLIPPING AND PACKING THEIR WAY TO PROFITS**
**MARCH 16, 1998**

**BY**
**WILLIAM F. BURFEIND**
**EXECUTIVE VICE PRESIDENT**

CONSUMER CREDIT INSURANCE ASSOCIATION

The Consumer Credit Insurance Association (CCIA) submits this statement for the hearing record at the invitation of committee staff.

CCIA is a national trade association of insurance companies engaged in the business of insuring consumer credit transactions.   Our members account for in excess of 80% of the national premium volume for consumer credit insurance.   Since 1951, the year of its' incorporation, CCIA has been dedicated to preserving and enhancing the availability, utility, and integrity of insurance and insurance-related products delivered through financial institutions or in connection with financial transactions..

Having reviewed the filed statements of hearing witnesses, we would concur that the exploitation of the elderly by lending practices known as stripping, flipping and packing is truly reprehensible.   Our interest is limited to the allegations of insurance packing.   According to the *Wall Street Journal* (March 17, 1998) report on the committee hearing, Senator Grassley emphasized that the hearing was aimed at "a few bad apples".   The CCIA concurs.

The sale of credit insurance is highly regulated by both federal and state law.   Regrettably, law and regulation operate much like door locks, i.e., they serve as deterrents for honest citizens but are only obstacles to the unscrupulous.

On May 29, 1968, then President Lyndon Johnson signed into law The Truth-in-Lending-Act (TILA), also known as Title I of the Consumer Credit Protection Act. TILA has been amended ten (10) times since then.

On July 1, 1969, the Federal Reserve Board adopted Regulation Z to implement TILA.   The purpose of Regulation Z is to promote the informed use of consumer credit by requiring disclosures about its terms and cost.   The regulation includes model forms and disclosures.   The Model Credit Insurance Disclosure Notice states that "credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you signed and agreed to pay the additional cost."  Its clear that the purchase of credit insurance is optional; there is an additional charge for the coverage which is separately stated for each coverage option; and, that the consumer must indicate that the election of coverage, if any, by written signature.   While this is a model disclosure, examination of actual credit or loan documents will reveal credit insurance disclosures substantially identical in form and content.   These disclosures are uniformly provided on the first page of the loan document and highlighted by bold border or distinctive type size or face for prominence.

The victims of the fraudulent practices investigated by the committee must be viewed as exceptions to the experience of the general population.   Numerous consumer studies conclude that consumers do understand that the purchase of credit insurance is optional.

2

CONSUMER CREDIT INSURANCE ASSOCIATION

Studies by the Federal Reserve Board[1] asked consumers whether taking credit insurance made a difference in obtaining a loan. Consumers with credit insurance on their loan concluded the purchase was irrelevant to the loan decision in overwhelming numbers; 80.3% in 1977 and 94.2% in 1995.

The Federal Reserve Board studies confirmed findings of earlier consumers studies. For example, the study by the College of Business Administration of Ohio University (1973) - the most exhaustive study of credit insurance - revealed that 90.10% of consumers with credit insurance knew they "were obtaining credit life insurance protection" and 91.97% "understood that there was a charge for credit life insurance in addition to the interest charge."

The most recent study (1994) by the Credit Research Center, Krannert Graduate School of Management at Purdue University[2] (since relocated to Georgetown University) concluded that the most common reason for buying credit life insurance, cited by 81% of survey respondents, was to ensure that debts would not be a financial burden to others. Further, borrower awareness of the credit insurance purchase appears to rise with the size of the loan to be insured (a corresponding rise in the premium). Of particular relevance to the committee focus on the elderly, this study found that individuals over the age of 45 are more likely to purchase credit life insurance, other things being equal. For those in need of additional financial security, this is a rational economic decision. Group rated credit life insurance becomes increasingly the least expensive insurance option as borrowers age.

Available evidence clearly support the conclusion that consumers recognize the purchase of credit insurance to be an option unrelated to creditor approval of the loan and that borrowers have rational economic motives for the decision, as opposed to being pressured or coerced at the point of sale.

CCIA has adopted a Consumer Bill of Rights to embrace the consumer protections provided in federal and state law. Our member companies subscribe to this statement and, as a matter policy, strive for its implementation. These consumer rights are as follows:

- **A credit insurance consumer has the right to expect truth in advertising as the guiding principle in any credit insurance promotional or sales materials.**

- **A credit insurance consumer has the right to receive a certificate or policy of insurance which includes a description of the policy provisions and disclosure of the premium charge.**

---

[1] Cyrak, Anthony W., and Glenn B. Canner. *Consumer Experiences with Credit Insurance: Some New Evidence.* Federal Reserve Board

Eisenbeis, Robert A., and Paul R. Schweitzer. *"Tie-ins Between the Granting of Credit and Sales of Insurance by Bank Holding Companies and Other Lenders."* Staff study 101. Board of Governors of the Federal Reserve System. October, 1978.

2Barron, John M., Ph.D., and Michael E. Statten, Ph.D. *Monograph No. 30 Credit Insurance: Rhetoric and Reality.* Krannert Graduate School of Management: Purdue University. 1994

CONSUMER CREDIT INSURANCE ASSOCIATION

- A credit insurance consumer has the right to no less than a 10-day "free look" during which the insurance may be canceled at no cost.

- A credit insurance consumer has the right to know when the purchase of credit insurance is optional and is not required as a condition to obtain the loan.

- A credit consumer, when he or she is required to purchase insurance in connection with a loan, has the right to purchase the insurance from the insurance company of his or her choice.

- A credit insurance consumer has the right to expect that the insurer, as a general business practice, will attempt in good faith to offer prompt and fair settlement of claims submitted in which liability has become reasonable clear.

Credit insurance is purchased in connection with a loan transaction and assures the consumer of loan repayment in the event of death or disability. For many, credit insurance is an efficient and economical way to provide additional financial security.

The credit insurance option is usually presented after the loan has been approved. A federally required disclosure statement is prominently displayed on the face of the loan document and clearly states that purchase of credit insurance is optional, not a condition of credit. The premium is fully disclosed and separately stated for each coverage option. The consumer indicates in writing the option of choice, including the option of declining.

Numerous consumer studies have repeatedly and overwhelmingly demonstrated that credit insurance buyers are aware of the coverage, knew there was a separate premium charge, did not feel coerced to purchase it and would buy it again.

The members of CCIA are committed to maintaining the integrity and availability of credit insurance products responsive to the needs of consumers. We would be pleased to work with The Senate Special Committee On Aging to assure that these objectives are met with regard to the elderly. We thank the committee for the opportunity to submit these comments for the record.

#   #   #

4





## Consumer Credit Insurance – What is it?

## Where is consumer credit insurance sold?

## How many kinds of consumer credit insurance are there?

○ *Credit life insurance,*

○ *Credit accident and health insurance,*

○ *Credit property insurance,*

○ *Credit involuntary unemployment insurance,*

## How does credit insurance differ from other types of insurance?

○ *No medical exam requirement*

○ *Age not a factor*

○ *No minimum purchase requirement*

○ *No pre-payment requirement*

credit insurance is financed, as part of the credit card or installment loan payment.

## How do I decide if I need consumer credit insurance?

There are several questions you can ask yourself in determining whether consumer credit insurance is right for you and your family.

### Would there be surviving dependents?

[illegible text]

### Is the loan amount small enough that the monthly payments could be handled easily without insurance?

[illegible text]

### Do you currently have adequate savings and/or insurance to cover your needs?

[illegible text]



ISBN 0-16-057106-5

9 780160 571060

90000