IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA, by Attorney General Josh Shapiro, DISTRICT OF COLUMBIA, through the Office of the Attorney General, MATTHEW J. PLATKIN, Acting Attorney General of the State of New Jersey, STATE OF OREGON, ex rel. Ellen F. Rosenblum, in her official capacity as Attorney General, and STATE OF WASHINGTON,** | **CIVIL ACTION** |
| **Plaintiffs,** | **NO.  22-3253** |
| **v.** | |
| **MARINER FINANCE, LLC,** **Defendant.** | |

<u>**MEMORANDUM**</u>

**J. HODGE, K.**                                             **January 12, 2024**

Plaintiffs, the Commonwealth of Pennsylvania, State of New Jersey, State of Oregon, State of Washington, and the District of Columbia (collectively, the "Plaintiffs"), through their respective attorneys general, bring the present multistate enforcement action under the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5301 *et seq*., and state consumer protection laws alleging that Defendant Mariner Finance, LLC ("Mariner" or "Defendant") engages in deceptive and predatory lending practices.  (ECF No. 13 at 4.)   Presently before the Court is Defendant's Motion to Dismiss in which Defendant claims that Plaintiff's multi-state enforcement action raises grave constitutional concerns and is contrary to the CFPA's text and legislative history.  (ECF No. 27.)  For the reasons discussed below, the Court denies Defendant's Motion.

## I.      BACKGROUND

Defendant Mariner Finance, LLC is a state licensed and regulated "subprime installment lender." (ECF Nos. 13 at 4; 47-1 at 4.)  Though it is a Maryland limited liability corporation with a principal place of business there, Mariner operates in 28 states by providing financial products to consumers and giving them access to credit including to those consumers residing in Pennsylvania, New Jersey, Washington, Oregon, and the District of Columbia.  (ECF Nos. 13 at 4, 6, 15, 18, 19, 23, 25, 32, 37; 47-1 at 4.)  "Mariner offers loans of between $1,000 and $25,000, with terms between 12 and 60 months. Mariner charges high interest rates that range from 18.99% to 35.99%. For Mariner's 'direct' branch loans, the average APR is around 28%, and the average loan size is about $3,650." (ECF Nos. 13 at ¶ 57; 47-1 at 4.)  Plaintiffs are a group of states and localities who have brought this suit seeking to enforce the CFPA on behalf of their respective citizens who are consumers of Mariner's products, alleging that Defendant engages in predatory lending practices in violation of Federal and State consumer protection laws.  (ECF No. 13 at 9-10.)

The Complaint asserts that Mariner targets the most vulnerable borrowers, low-and-moderate income consumers, with a variety of aggressive and unlawful tactics.  (*Id.* at 6.)  According to Plaintiffs, Defendant's unlawful practices include: (1) causing consumers, without their consent (or over their objections) to pay for add-on products to their loans, such as insurance, described as of "little or no economic benefit" to them, which are then difficult to cancel, or even detect prior to inadvertent payment; (2) inducing consumers to enter into high-interest loans by mailing "live checks," that can be intercepted and cashed by others, thereby creating an unreasonable risk of identity fraud; and (3) "loan flipping" tactics that induce consumers to refinance when "it is often more expensive" for them to do so.  (*Id.* at 6-11, 72-73.)

Plaintiffs allege that, in addition to subprime loans, Mariner also offers borrowers various insurance options, which it deceptively "adds-on" to consumers' loans.  (ECF Nos. 13 at 9-10.) According to the Complaint, Mariner sells "two categories of add-on products: (A) credit insurance products," such as life insurance, disability insurance, and involuntary unemployment insurance; "and (B) so-called 'non-credit' or 'ancillary products,'" such as accidental death and dismemberment insurance and auto club insurance.  (*Id.*at 12-13.)  Plaintiffs allege that Mariner's policies require that all add-on products be offered "every time" to "every customer," and "[i]n many cases, Mariner employees 'offer' these products by including them in the loan without any prior consent from the consumer[,]" creating a covert opt-out-only products scheme.  (*Id.* at 8, 29.) Although add-on charges commonly add hundreds or thousands of dollars to the loan, according to the Plaintiffs, Mariner employees often make no oral mention of them or falsely tell consumers the optional add-ons are required.  (*Id.* at 22.)  According to the Complaint, the vast majority of consumers "(1) did not know they had add-on products attached to their loan, (2) did not know one or more add-on products were optional, and/or (3) did not know that one or more add-on products cost additional money."  (*Id.*at 23.)   According to Plaintiffs, Defendant retains a "substantial portion of the premium charge for each insurance add-on as a sales commission— essentially a kickback to Mariner—ranging from 21% to 75% of the net written premium amount depending on the add-on and the state in which the loan is made."  (*Id.* at 8.)  Offering these "credit insurance" products is subject to licensing and regulation under state insurance law and is expressly recognized in the federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq. *See, e.g.*, 12 C.F.R. § 1026.4(d) (describing certain requirements for "[p]remiums for credit life, accident, health, or loss-of-income insurance.")  Thus, Plaintiff states that Defendant's practices

surrounding these add-on products and its failure to properly disclose the commission earned violates state and federal law.

Plaintiffs also allege that Mariner targets vulnerable potential customers, including those who have been identified as having a credit score of 629 or less who "often already have significant credit card, installment loan, and/or student loan debt." (ECF No. 13 at 6.) After identifying ideal potential customers, Mariner "mails unsolicited 'live checks'" to consumers that merely require endorsement and deposit to trigger a loan transaction. (*Id.* at 7.) "After a consumer cashes a 'live check', Mariner immediately begins soliciting the consumer by phone, email, and other methods to come into the branch and borrow additional money by refinancing the loan." *Id.* The Amended Complaint asserts that vulnerable consumers become further entrenched through Mariner's "loan flipping" scheme. (*Id.* at 7.) Specifically, "if a borrower falls behind on payments, the first option Mariner offers the consumer is . . . .  an offer to refinance the loan and borrow additional cash." (*Id.*)  Mariner employees are trained "to reach out to consumers as soon as they miss a loan payment and to use a missed payment as an opportunity to induce consumers to refinance existing loans," thereby perpetuating this "cycle of debt." (*Id.* at 7, 11.) In doing so, they fail to mention that refinancing is nearly always more costly than simply making a late payment and/or obtaining a second loan. (*Id.* at 63.) Plaintiffs allege that Mariner's conduct quickly becomes untenable for many customers, especially considering it "typically requires the consumer to borrow at least $500 more in a refinancing." (*Id.* at 11.)  Plaintiffs estimate that "[n]ationwide, Mariner has charged consumers hundreds of millions of dollars in fees and interest for hidden and unwanted add-on products." (*Id.* at 24.)

Plaintiffs allege that the claims presented arose in part from actions undertaken by Jeffrey Chepkevich, one of Mariner's Vice Presidents of Branch Operations, who oversees and directs

Mariner's business operations in Pennsylvania, New Jersey, Oregon, and Washington.  (ECF Nos. 13 at ¶¶ 129, 140-41, 187, 196, 201; 34 at 24.)  According to Plaintiffs, Mr. Chepkevich is located in Pennsylvania, and his actions while in Pennsylvania allegedly violated New Jersey and Washington state consumer protection laws.  (*See* 13 at ¶¶ 129, 140-41, 187, 196, 201; 34 at 24; 34-1.)  (*Id.*)

Plaintiffs[1] commenced this lawsuit on August 16, 2022, following a multi-state investigation of Defendant, seeking injunctive and other relief. (ECF Nos. 1, 13.)  Approximately one month prior to filing this lawsuit, Plaintiffs provided notice to the Consumer Financial Protection Bureau (the "Bureau") of its intent to file this lawsuit pursuant to the CFPA.[2]  (*See* ECF No. 13 at 13.)  Plaintiffs filed an Amended Complaint September 6, 2022, setting forth allegations detailing Mariner's predatory practices and policies.  (ECF No. 13.)  On October 25, 2022, Mariner filed the present Motion to Dismiss ("MTD" or "Motion").[3]  This Court held oral arguments on Defendant's Motion on October 11, 2023.  (ECF No. 54.)

## II.     STANDARD OF REVIEW

To survive a Federal Rule of Civil Procedure 12(b) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[1]     In addition to Pennsylvania, the District of Columbia, Oregon, Washington, and New Jersey, the State of Utah was originally joined as a Plaintiff in this action, but filed a notice of voluntary dismissal on October 17, 2022 and the Court issued an Order dismissing Utah from the case the same day.  (ECF Nos. 25-26.)

[2]     The CFPA, which prohibits "unfair, deceptive or abusive acts or practices," delegates to state attorneys general the authority to bring Federal civil enforcement actions to enforce the Act and to "secure remedies" available under the Act , subject to a requirement that an attorney general provide prior notice to the Consumer Financial Protection Bureau (CFPB).  12 U.S.C. § 5552(a)(1), (b)(1).

[3]     This case was reassigned to this Court on February 3, 2023.  (ECF No. 45.)

face.'" *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Tombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory recitation of the elements of a cause of action is not sufficient.  *Phillips v. Cty of Allegheny*, 515 F. 3d 224, 233 (3d Cir. 2008).  Rather, the plaintiff must allege facts necessary to make out each element.  *Id.* (quoting *Twombly*, 550 U.S. at 563 n. 8).  In other words, the complaint must contain facts which, if proven later, support a conclusion that a cause of action can be established.  Defendant moves for dismissal under Rules 12(b)(3) and 12(b)(6).

Federal Rule of Civil Procedure 12(b)(3) provides that a motion to dismiss may be made on the basis of improper venue.  Fed. R. Civ. P. 12(b)(3); *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 158 (1976) (applying statutory venue provision and affirming dismissal for improper venue).  The purpose of venue, in most instances, "is to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Cottman Transmissions Systems, Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994) (internal quotation omitted).  "Because improper venue is an affirmative defense, the burden of proving lack of proper venue remains—at all times—with the defendant." G*reat Western Min. & Mineral Co. v. ADR Options, Inc.*, 434 F. App'x 83, 86 (3d Cir. 2011); *Myers v. American Dental Ass'n*, 695 F.2d 716, 724 (3d Cir. 1982). A motion to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) requires the Court accept as true the pleading's allegations.  *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002).  When venue is defective, 28 U.S.C. § 1406(a) authorizes the court to either "dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

In considering a motion to dismiss under Rule 12(b)(6), the Court first separates the factual and legal elements of a claim, accepting the well-pleaded facts as true and disregarding legal conclusions. *Fowler v. UPMC Shadyside*, 578 F. 3d 203, 210-11 (3d Cir. 2009). Then, the Court determines whether the alleged facts make out a plausible claim for relief. *Id*. (quoting *Iqbal*, 556 U.S. at 679). All well-pleaded allegations in the complaint must be accepted as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in the plaintiffs' favor. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d. Cir. 2009).

## III.    DISCUSSION

Defendant seeks dismissal of Plaintiffs' lawsuit because of what it argues is "an extreme instance of government overreach" of states and localities seeking to enforce the CFPA as if "collectively, they are the federal agency [the Bureau] created by the act with sole authority to engage in such nationwide enforcement." (ECF No. 27-2 at 9.) First, Defendant claims that the Plaintiffs' enforcement authority is unconstitutional under the Tenth Amendment. Second, Defendant argues that the entire CFPA cannot be enforced because the Bureau is receiving unconstitutional funding, thereby inferring that the Bureau itself is also unconstitutional. In turn, Defendant further argues that Plaintiffs cannot comply with their statutory obligations to give this executive agency notice in order to bring their claims. Third, Defendant's position is that, statutorily, Plaintiffs cannot proceed collectively in a single lawsuit in this District.[4] According to

---

[4]     Defendant also claims that Plaintiffs may not seek civil penalties under the CFPA or enforce this statute on a "nationwide" basis. (ECF No. 27-2 at 9.) It is not clear at this juncture that Plaintiffs attempt to do so. The Plaintiffs' Amended Complaint does not indicate whether they attempt to enforce the statute on a nationwide basis for conduct not related to citizens of their states and localities, or that they simply seek whatever relief is deemed appropriate under the relevant statutes and law. (ECF No. 13 at 78, 88, 98, 101-102, 104.) Discovery has yet to begin in this matter and Plaintiffs have not moved for preliminary injunctive relief at this time. Nonetheless, Defendant has articulated its concern that the scope of the remedies will impact the breadth of discovery. (ECF No. 58 at 17.) The question at this stage of the proceedings is whether

Defendant, only Pennsylvania can bring its case before this Court, while New Jersey, Oregon, Washington, and the District of Columbia must sue individually in the federal or state court in their home states.  Defendant also takes issue with Plaintiffs' authority to assert claims under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*., arguing that the provision which gives states concurrent enforcement authority under the CFPA, only gave the states additional authority to enforce UDAAP[5] violations, and did not alter states' authority under 18 pre-existing federal consumer protection laws.

### A.    States' Concurrent Enforcement Authority under the Consumer Financial Protection Act[6]

In July of 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ( "Act" or "Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (12 U.S.C. § 5301 *et seq*.) was signed into law.  Title X of the Dodd-Frank Act contains the Consumer Financial Protection Act ("CFPA") which prohibits "any covered person or service provider" from:

> (A) offer[ing] or provid[ing] to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or
> (B) engag[ing] in any unfair, deceptive, or abusive act or practice.

12 U.S.C.§ 5536(a)(1).  "Federal consumer financial law" is defined as:

> the provisions of this title, the enumerated consumer laws, the laws for which authorities are transferred under subtitles F and H, and any rule or order prescribed by the Bureau under this title, an enumerated consumer law, or pursuant to the authorities transferred under subtitles F and H.

---

venue is proper and if Plaintiffs' Amended Complaint contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Iqbal*, 566 U.S. at 678 (2009).  The Court finds that consideration of the scope and extent of remedies is premature at this time.

[5]    The prohibition of "unfair, deceptive, or abusive act or practice" within 12 U.S.C.§ 5536(a)(1) is often referred to as "UDAAP."

[6]    The Court has opted to address the Defendants' arguments in a different order than presented in Defendant's briefing.

12 U.S.C.§ 5481 (14).  Under the term "enumerated consumer law" is a list of 18 federal laws that predated the enactment of the CFPA, including the Truth in Lending Act ("TILA"), which is the statutory basis for two of the fifteen claims (Count V and Count VI) set forth in Plaintiffs' Amended Complaint.  Within 12 U.S.C.§ 5536(a)(1) is also a prohibition for "unfair, deceptive, or abusive act or practice" often referred to as "UDAAP."  Thus, the CFPA prohibits practices not in conformity with the 18 pre-existing "enumerated consumer laws," UDAAP, all the provisions of the "Title"—meaning the entirety of the CFPA as set forth in Title X, and regulations issued by the Bureau.  The "'covered persons'" subject to these prohibitions are generally entities and persons involved in "offering or providing a consumer financial product or service," such as extending consumer credit or providing consumers check-cashing services.  12 U.S.C. 5481(5), (6)(A), (15).

This legislation provided "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 176, 111th Cong., 2d Sess. 2 (2010).  Its overarching purpose was to "promote the financial stability of the United States" through the establishment of measures designed to improve accountability, resiliency, and transparency in the financial system.  *Id*.  As Congress found, the 2008 crisis had resulted from "the failure of the federal banking and other regulators to address significant consumer protection issues detrimental to both consumers and the safety and soundness of the banking system." *Id.* at 9.  Congress sought to remedy that in part by creating a new regime of state and federal concurrent enforcement authority to serve as a bulwark against future financial crises and prevent the type of predatory practices that led to the Great Recession.  *Id.* at 2.

First, the Act established the Consumer Financial Protection Bureau ("Bureau") to ensure "that all consumers have access to markets for consumer financial products and services and that

markets for [such] products and services are fair, transparent, and competitive."  12 U.S.C. § 5511(a).  Prior to the CFPA, disparate federal statutes had authorized a collection of federal banking agencies to protect consumers from predatory lending practices and risky financial products.  This multiagency scheme had been saddled with "conflicting regulatory missions, fragmentation, and regulatory arbitrage" where consumer protection had "fail[ed] to get the attention or focus it need[ed]."  S. Rep. No. 111-176, at 10, 15 (recounting the "spectacular failure of the [federal] prudential regulators").  The Dodd-Frank Act changed that by transferring to the Bureau much of the authority to regulate consumer financial products and services that had been vested in these other federal agencies. 12 U.S.C. § 5481(12) and (14).  The Act authorizes the Bureau to bring actions in court or in the Bureau's administrative forum to enforce this prohibition or any other "[f]ederal consumer financial law."  12 U.S.C. § 5563, § 5564(a).

Second, Congress also reinforced and ***expanded*** the role of the States in protecting consumers, recognizing that States have historically been "much closer to abuses and are able to move more quickly when necessary to address them."  S. Rep. No. 111-176, at 174.  To that end, the CFPA: (1) clarified that its provisions do not preempt state consumer financial laws that afford greater protections to consumers than federal law, 12 U.S.C. § 5551(a)(2); (2) eased certain restrictions against state laws governing national banks, certain non-depository institutions, and federal savings associations, *id.* at §§ 25b, 1465; and (3) expanded the role of the States in pursuing enforcement action, *id.* at § 5552(a)(1). [7]  Specifically, the Act authorizes any state attorney general

---

[7]    The CFPA contemplates that the Bureau's consumer financial reforms may follow from state reforms.  The Act authorizes the States to request a federal consumer financial regulation from the Bureau.  *See* 12 U.S.C. § 5551(c).  In doing so, Congress recognized that "State initiatives can be an important signal to Congress and Federal regulators of the need for Federal action."  S. Rep. No. 111-176, at 174.

to sue to enforce the CFPA, by specifying under the heading, "preservation of enforcement powers of States" as follows:

> Except as provided in paragraph (2), the attorney general (or the equivalent thereof) of any State may bring a civil action in the name of such State in any district court of the United States in that State or in State court that is located in that State and that has jurisdiction over the defendant, to enforce provisions of this title or regulations issued under this title, and to secure remedies under provisions of this title or remedies otherwise provided under other law.

*Id*. at § 5552(a)(1).  This concurrent grant of enforcement authority allows States to vindicate their "fundamental right to protect their citizens and prevent harmful conduct from occurring in their jurisdictions" and gives them tools "to pick up slack when the [F]ederal Government fails to enforce and regulate."  *Pennsylvania* v. *Navient Corp.,* 967 F.3d 273, 286 (3d Cir. 2020).

The only enumerated exclusions that appear within Section 5552's grant of concurrent authority is within paragraph (a)(2).  That paragraph excludes "a civil action in the name of such State against a national bank or Federal savings association to enforce a provision of this title" unless "to enforce a regulation prescribed by the Bureau under a provision of this title and to secure remedies under provision of this title or remedies otherwise provided under law."  *Id.* at § 5552(a)(2)(A)-(B).  In other words, States have concurrent enforcement authority under the CFPA unless it involves an action against a "national bank" or "Federal savings association," in which case, the States' power is limited to "enforcing" a Bureau regulation.  *Id.*  Section 5552 contains a "[r]ule of construction," appearing below and contained within the same subheading that grants State authority and the exclusions to that authority.  *Id.* at § 5552(a) (3).  The relevant provisions of the statute states:

> No provision of this title shall be construed as modifying, limiting, or superseding the operation of any provision of an enumerated law that relates to the authority of a State attorney general or State regulator to enforce such Federal law.

11

*Id.* After granting State attorneys general a right to file CFPA claims in 12 U.S.C. § 5552(a), the statute subjects that grant to the following notice provision:

> Before initiating any action. . .to enforce any provision of this title, including any regulation prescribed by the Bureau under this title, a State attorney general. . .shall timely provide a copy of the complete complaint to be filed and written notice describing such action or proceeding to the Bureau. . .

*Id.* at § 5552(b)(1)(A). The notice provision provides that "[i]f prior notice is not practicable," then it can be given "upon instituting the action or proceeding." *Id.* at § 5552(b)(1)(B). Defendant now advances several arguments it believes undercuts Plaintiffs' concurrent enforcement authority, which Plaintiffs frame as "red herring" arguments that utilize "strained and circular" statutory interpretations. (ECF No. 34 at 14, 17.)

**B.     Notice Pursuant to 12 U.S.C 5552 (b)(1)(B)**

Defendant argues that the Bureau could not have "lawfully received" the Plaintiffs' notice given to it on July 11, 2022 in compliance with 12 § U.S.C 5552 (b)(1)(B), because according to a decision from the United States Court of Appeals for the Fifth Circuit, *Community Financial Services Association of America Ltd. et al. v. CFPB*, 51 F.4th 616 (5ᵗʰ Cir. 2022) the Bureau receives funding that violates the Appropriations Clause in the United States Constitution. Currently, the Fifth Circuit's decision in *Community Financial Services Association of America* is on appeal and pending before the United States Supreme Court for consideration as to whether the court erred in holding that the Bureau's funding is unconstitutional and vacating a regulation the Bureau promulgated while it received this funding. *CFPB v. Com. Fin. Services Assn.*, No. 22-cv-448, 2022 WL 16951308, at *1 (Nov. 14, 2022). Moreover, the Second Circuit in *Consumer Financial Protection Bureau v. Law Offices of Crystal Moroney, P.C.*, No. 20-cv-3471, 2023 WL 2604254 at *4 (2d. Cir. March 23, 2023) reached the opposite conclusion. Defendant attempts to utilize this Fifth Circuit case to turn the CFPA's notice provision into one that now removes

"subject matter jurisdiction" from this Court, because it argues Plaintiffs cannot comply with the statute by giving notice to an unconstitutionally funded federal agency.  (ECF No. 52 at 12.) However, in order to adopt Defendant's argument, this Court would have to reach several legal conclusions, which are not supported by any of the case law Defendant cites or by the statute, and to contemplate in speculation and reach a conclusion based on a yet-to-be decided Fifth Circuit case that the Defendant would like to be controlling.  This Court will not do so.  Thus, the determination of this Court on this issue relies solely on the law that is applicable now and the relevant facts.  Underlying Defendant's argument is an assumption that if the Bureau receives unconstitutional sources of funding, it therefore, in essence, cannot exist.  And if it cannot exist, then the notice the Bureau received when fully operational and funded is retroactively invalidated. Certainly, an absence of funding would, practically speaking, make it near impossible for a federal agency to operate without a separate Congressional grant of constitutionally permissible funds. However, there is no need by this Court to contemplate this hypothetical.  There is no dispute that the Bureau received notice while it did have funding and was fully operational.  Furthermore, the Bureau and its funding are constitutional until such time this Court is told by a superior court they are not.  No such ruling has been issued and unless or until it is, the Bureau's source of funding and its constitutionality is moot argument.

Notably, Defendant does not cite a single case that supports the notion that if the Bureau receives unconstitutional funding, that will render the entire CFPA unenforceable by anyone, including the States, who were granted separate and concurrent enforcement authority by Congress.  Indeed, as the Plaintiffs point out, the case law runs counter to Defendant's argument. When faced with an unconstitutional statutory provision, courts perform a severability analysis to see if the entire statute or just the unconstitutional provision within that statute must be stricken.

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.")  If the Court determines that the legislature would have passed the constitutional part of the statute independently of those portions deemed unconstitutional and the different parts are not so intimately connected so as to make the statute one composite whole, the unconstitutional parts may be rejected and the constitutional parts may stand.  *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) ("Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.") (internal quotation omitted).  That was exactly what the Supreme Court did in *Seila Law LLC v. CFPB* when it "use[d] a scalpel rather than a bulldozer" in ruling that the CFPA was unconstitutional insofar as it limited the President's authority to dismiss a Bureau Director, while leaving the rest of the Bureau (and the CFPA) intact.  140 S. Ct. 2183 (2020).  Yet despite the *Seila* court's severability analysis, Defendant espouses a view that asks this Court to, in essence, dismiss this complaint in its entirety based on a procedural notice provision and a factually distinguishable case from the Fifth Circuit.  Nothing Defendant cites supports a severability analysis that would render the entire CFPA unenforceable, particularly given the separate enforcement authority Congress granted to the States.

The language of the statute also does not support Defendant's position, as the Act provides no basis for concluding that the notice provision is jurisdictional.  While jurisdictional rules are absolute bars, "claim-processing" rules, which speak more to the procedural obligations of the parties, may be waived or overcome by considerations of equity such that noncompliance does not remove the court's ability to consider the plaintiff's substantive claims.  *See Henderson   v.*

*Shinseki*, 562 U.S. 428, 435 (2011) (So-called claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times" which "should not be given the jurisdictional brand"); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006) ("[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue . . . [b]ut when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.").

Some courts have considered statutory pre-suit notice provisions not as jurisdictional prerequisites, but as requirements that can be excused or tolled. *See e.g., Zipes v. TWA*, 455 U.S. 385, 398 (1982) (holding that Title VII's requirement that claimants timely file discrimination charges with the EEOC before filing an action in federal court is non-jurisdictional); *Grp. Against Smog & Pollution v. Shenango*, 810 F.3d 116, 123-24 (3d Cir. 2016) (holding the Clean Air Act's notice provision is not a jurisdictional limitation because it is detached from its jurisdictional provision); *National Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 703 (D.C. Cir. 1974) (court excused pre-suit notice required by statute in a citizen suit against the EPA because the "notice provision. . .is not a jurisdictional prerequisite" and would have been futile because the agency's position was "firmly rooted."); *see also La. Envtl. Action Network v. City of Baton Rouge*, 677 F.3d 737, 748 (5th Cir. 2012) (noting that a "sixty-day notice provision is a typical 'claim-processing rule.'").

The language of the notice provisions at issue here suggests that it similarly is not a jurisdictional prerequisite.  Pursuant to the CFPA, States must notify the Bureau of such enforcement actions where "practicable" to facilitate coordination, and the Bureau is then authorized to intervene in those actions.  12 U.S.C. § 5552(b)(1)(B), (2).  The Bureau can remove

the case to a federal district court and/or appeal orders in that proceeding.  *Id.* at § 5552(b)(1)(B),

(C).  But the Bureau's participation does not displace States' ability to proceed with an action.

Rather, Congress contemplated a measure of cooperation "to further coordinate actions with the

State attorneys general and other regulators." *Id.* § 5552(c).  And unlike other federal statutes, the

CFPA does not give the federal government the authority to unilaterally move to dismiss the action.

*Compare* 12 U.S.C. § 5552(b) *with* 31 U.S.C. §§3730(b)(4)(A), (c)(1), (c)(2)(A) (if the

government intervenes in a *qui tam* action, then it "shall be conducted by the Government" and

"t]he Government may dismiss the action notwithstanding the objections of the [relator].")  Even

assuming, arguendo, that the Bureau was receiving unconstitutional funding, that would not

necessarily lead to a cascading conclusion that States would be unable to comply with 12 U.S.C.

§ 5552(b)(1)(A), the Court need not reach the issue as to the impact of the constitutionality of the

Bureau's funding as it is not squarely before the Court.  The Bureau is not a party to this litigation,

there is no binding precedent in the Third Circuit holding that the Bureau's funding is

unconstitutional, and Defendant is not challenging the application of a Bureau regulation, but a

statute as written by Congress.

### C.    Venue for State Enforcement Actions under the CFPA

The parties also take differing views as to the scope of state concurrent enforcement

authority and where such actions may be filed.  Defendant argues that venue is improper in this

Court because, in its opinion, States' concurrent enforcement authority is expressly limited by 12

U.S.C. § 5552(a)(1), such that States may only bring an action under the CFPA in their home state.

(ECF No. 27-2 at 15-18.)  The premise of Defendant's argument is that 12 U.S.C. § 5552(a)(1) is

not a permissive grant of authority that supplements the general venue provisions under 28 U.S.C.

§ 1391, but an exclusive provision that territorially restricts where State's actions may be brought

under the CFPA.  Therefore, according to Defendant, the District of Columbia, New Jersey,

Washington, and Oregon may only sue in a state or federal district court in their locality, and not

here in Pennsylvania.  Plaintiffs' position is opposite to Defendant's: according to Plaintiffs, 12

U.S.C. § 5552(a)(1) is "unambiguously permissive and, consistent with precedent in this and other

Circuits, should be read to supplement, not preempt" 28 U.S.C. § 1391.[8]  (ECF No. 34 at 8.)  The

Court agrees with Plaintiffs.

> Under 28 U.S.C. § 1391, venue is proper in:
>
> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Defendant does not allege that venue is improper under 28 U.S.C. § 1391.  Instead, its position is

that 12 U.S.C. § 5552(a)(1), which provides that States "may bring a civil action in the name of

such State in any district court of the United States in that State or in State court that is located in

that State and that has jurisdiction over the defendant" is the only permissible venue provision for

a CFPA action. And further, the Defendant interprets this provision to create a territorial limitation

that requires States bring CFPA actions within their respective borders.  Accordingly, it believes

that 12 U.S.C. § 5552(a)(1) prohibits "this consolidated, multistate enforcement action" and

warrants dismissal of all Plaintiffs' federal claims including Pennsylvania's claims or "[a]t

---

[8]     Plaintiff also premised venue on 12 U.S.C § 5564(f) but Defendant states this provision only applies to actions brought by the Bureau.  The Court need not decide this issue since venue is proper under 28 U.S.C. § 1391 which it finds is not supplanted by the venue provisions in the CFPA.

minimum, the District of Columbia, New Jersey, Oregon and Washington must be dismissed for improper venue."  (ECF No. 27-2 at 18.)

As a general matter, special venue provisions are often interpreted by courts to supplement, rather than preempt, the general venue statute, such that venue may be proper under either, unless there is an explicit, contrary statutory indication.  *See, e.g. Cortez Byrd Chips v. Bill Harbett Constr. Co.*, 529 U.S. 193, 194 (2000) (holding that the Federal Arbitration Act, 9 U.S.C. §§ 9-11, venue provisions are permissive and thus supplement, but do not supplant the general venue statute under 28 U.S.C. § 1391); *Board of County Comm's. v. Wilshire Oil Co. of Texas*, 523 F. 2d 125, 129-30 (10th Cir. 1975) (finding that the special venue provisions in the Clayton Act for antitrust cases are not exclusive but rather are supplemented by the general venue statute); *Ballard v. Blue Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976) (same); *Hampton v. Navigation Cap. Partners, Inc.*, 64 F. Supp. 3d 622, 630-31 (D. Del. 2014) (WARN Act, 28 U.S.C. § 2104(a)(5) and general venue statute supplement one another).  The language of 12 U.S.C. § 5552(a)(1) supports a similar determination here.  Congress did not use the language "must," "may only" or "shall" in this instance.  Use of those terms would, by definition, create a directive or mandate. When used, such terms demonstrate an intent to supplant a general venue provision with a narrow one specific to a statutory cause of action.  *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("The mandatory 'shall'. . .normally creates an obligation impervious to judicial discretion.").[9]  Instead, Congress used the word "may" which is generally

---

[9]      Contrasting the language of 12 U.S.C. § 5552(a)(1) with other statutes where the statute expressly restricts venue or is the sole venue provision also undermines Defendant's argument. For instance, the Camp Lejeune Justice Act 2022, 28 U.S.C., Pt. VI, Ch. 171 states: "(d) Exclusive Jurisdiction and Venue-The United States District Court for the Eastern District of North Carolina shall have exclusive jurisdiction over any action filed under subsection (b), and shall be the exclusive venue for such an action."  28 USCS, Pt. VI, Ch. 171.  Unlike that statute, 12 U.S.C. §

construed as permissive and not mandatory. *See Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may'. . .contrasts with the legislators' use of a mandatory 'shall' in the very same section"); *Cortez.*, 529 U.S. at 194 (FAA venue provision using the word "may" was permissive and did not supplant the general venue provision.)

Although "may" implies the venue provision in 12 U.S.C. § 5552(a)(1) is supplemental to the general venue provision in 28 U.S.C. § 1391, Defendant nonetheless argues this principle of statutory construction is defeated by contrary statements made on the legislative floor and inferences from other provisions within the CFPA. *See United States v. Rogers,* 461 U.S. 677, 706 (1983) ("The word 'may' when used in a statute, usually implies some degree of discretion[, but] this common-sense principle of statutory construction. . .can be defeated by indications of legislative intent. . .or obvious inferences from the structure and purpose of the statute."). First, Defendant points to a lone statement by a U.S. Senator during the debate on the CFPA. (ECF No. 27-2 at 17.) Second, Defendant argues that Congress' intent to make 12 U.S.C. § 5552(a)(1) restrictive can be gleaned by comparing 12 U.S.C. § 5564(f) – which it believes only applies to actions brought by the Bureau – with the provision that explicitly mentions actions brought by the States, 12 U.S.C. § 5552(a)(1). (ECF No. 52 at 4.) While 12 U.S.C. § 5564(f) authorizes venue wherever "the defendant is located or resides or is doing business," 12 U.S.C. § 5552(a)(1) provides that States "may bring a civil action…in any district court of the United States in that State or in State court that is located in that State and that has jurisdiction over the defendant." Therefore, according to Defendant, "[t]his statutory scheme reflects an express determination by Congress to limit venue in State CFPA actions, contrary to the Plaintiffs' contention that they can

---

5552(a)(1) does not contain explicit language indicating it is the exclusive provision governing venue in a CFPA action brought by States.

rely on the general venue provision in 28 U.S.C. § 1391(b)."[10]   In support of this argument, Defendant cites the statutory principle that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion and exclusion."   *See Russello v. United States*, 464 U.S. 16, 23 (1983).   According to Defendant, because the Bureau can bring a CFPA action wherever a defendant "is located or resides" under 12 U.S.C. § 5564(f), that indicates that 12 U.S.C. § 5552(a)(1) – which explicitly applies to State enforcement actions and refers to venue within a State's borders – is meant to preempt 28 U.S.C. § 1391.

    The practical implications of Defendant's restrictive reading leads to an anomaly directly at odds with the statute.   While the CFPA intended to grant States enforcement authority, adopting Defendant's interpretation could result in instances in which States are unable to bring certain actions ***anywhere*** if personal jurisdiction is lacking over the potential defendant within that State's borders.   True "there have been, and perhaps there still are, occasional gaps in the venue laws, [but] Congress does not, in general, intend to create venue gaps, which take away with one hand what Congress has given by way of jurisdictional grant with the other."   *Cortez,* 529 U.S. 193 (2000) (citing *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.,* 406 U.S. 706, 710 n. 8. (1972)).   When construing venue provisions, it is therefore "reasonable to prefer the construction

---

[10]     Plaintiffs dispute that 12 U.S.C. § 5564(f) is a venue provision limited to actions brought by the Bureau because, although Section 5564 mentions the Bureau in subsections (a), (b), (c), (d), (e), and (g), in subsection (f), which governs "forum," the statute does not contain the word Bureau. (ECF No. 60 at 7-8.)  Plaintiffs also point to the case*, Consumer Financial Protection Bureau v. Harper*, where the court found in an action brought by Florida and the Bureau that "venue in the Southern District of Florida is proper under 28 U.S.C. 1391(b) and 12 U.S.C. 5564(f)."  No. 14-80931, 2015 WL 13708155 (S.D. Fl. May 28, 2015).  Venue in that case had not been challenged, but according to Plaintiff, "no defendant has ever tried this 'Hail Mary' argument before," so that case is instructive.  (ECF No. 58 at 68).

that avoids leaving such a gap." *Id.*  Defendant's proffered interpretation of 12 U.S.C. § 5552(a)(1) would mean that Congress granted States concurrent enforcement authority while simultaneously taking away such authority for a certain subset of claims where there is no "jurisdiction over the defendant" in that State.  12 U.S.C. § 5552(a)(1).  In this action, the potential for this type of "venue gap" is not "hypothetical" and "theoretical" as Defendant argues, but a plausible reality with respect to the District of Columbia's CFPA claims.  (ECF No. 57 at 10-11.)  According to Defendant, it "does not do business in the District of Columbia" and it "doesn't have any branches there," and so while the District of Columbia could attempt to bring its CFPA claims there, Defendant "would hotly contest" jurisdiction.  (ECF No. 58 at 58-59.)  In sum, according to Defendant, the District of Columbia must file in a court in its locality, but it is, in essence, out of luck to seek recourse for its allegedly aggrieved residents because there is also no personal jurisdiction over Defendant in a court within its borders.  (*Id.* at 57-60.)

Defendant subsequently attempts to distance itself from this implication by stating that "Section 5552(a)(1)'s venue limitation should not hinder a State's enforcement authority, because State long-arm statutes allow personal jurisdiction over out-of-state defendants to the maximum extent permitted by the Constitution."  (ECF No. 57 at 10.)  However, not all States have long-arm statutes to the fullest extent permitted by the Constitution.  *See, e.g.* W. Va. Code § 56-3-33 (West Virginia long-arm statute); Del. Code Ann. tit. 10 § 3104 (Delaware long-arm statute); Ohio Rev. Code Ann. § 2307.382 (Ohio long-arm statute).  Therefore, just because the District of Columbia or another locality may have statutes that allow the maximum amount of personal jurisdiction consistent with the Constitution, does not mean there will be sufficient minimum contacts to meet that threshold.  While an out-of-state company could have practices in place that arguably or actually harm consumers residing in another state in violation of the CFPA, its contacts with the

forum where those state's residents are harmed may not be sufficient to establish personal jurisdiction over it. Yet, under Defendant's interpretation, that would mean that the CFPA would provide no forum for that State to seek redress and prevent its citizens from being harmed, in its courts or in another State. The Court finds that interpretation implausible.

If Congress had intended such an illogical or inequitable result, it would have expressed it explicitly and not by using permissive language.[11] Even assuming that 12 U.S.C. § 5564 only applies to actions brought by the Bureau – which Plaintiffs dispute – Defendant's proffered statutory interpretation requires taking a negative inference by contrasting the permissive language in 12 U.S.C. § 5552(a)(1) with the "forum" provision of 12 U.S.C. § 5564(f) to conclude that 12 U.S.C. § 5552(a)(1) is restrictive. In addition to making that negative inference, Defendant's proffered interpretation requires this Court to conclude that 12 U.S.C. § 5564(f) is a venue provision that applies only to actions brought by the Bureau, not the States. While 12 U.S.C. § 5564 mentions the "Bureau" explicitly in subsections (a), (b), (c), (d), (e), and (g), the word "Bureau" is absent from subsection (f) which is the "forum" provision, from which Defendant asks this Court to draw a negative inference. If Congress meant to make 12 U.S.C. § 5552(a)(1)

---

[11]     Where venue provisions have been interpreted to be exclusive, personal jurisdiction is typically not in doubt. For instance, in patent infringement actions, patent venue is limited to the defendant's state of incorporation or where the defendant has committed acts of infringement and has a "regular and established place of business." 28 U.S.C. § 1400(b); *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514 (2017). Personal jurisdiction would be proper over the defendant where venue is also proper under this statute, so there are no venue gaps. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Daimler AG v. Bauman*, 571 U.S. 117 (2014) (corporation's principal place of business and place of incorporation are the "paradigm" forums in which corporations are "essentially at home" under the minimum contacts standard); *Mellon Bank (East) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992) (Specific jurisdiction exists "when the plaintiff's claim is related to or arises out of the defendant's contacts with the forum.")

restrictive with anomalous venue gaps, it would not have done so in such a cryptic fashion, but rather overtly.  Thus, the Court finds no statutory basis for Defendant's interpretation.

Congress' purpose in enacting 12 U.S.C. § 5552(a)(1) was to allow States to sue on behalf of their own citizens in their home districts rather than be forced to sue in other States because, in certain scenarios, 28 U.S.C. § 1391 may not allow them to do so.  Under 28 U.S.C. § 1391, venue may be improper over a nonresident corporation where "a substantial part of the events or omissions giving rise to the claim" did not occur in that District, if venue can be established outside the State under that statute.  Section 5552(a)(1), therefore, reflects an "expansion align[ing] with Congress' intent to establish an additional layer of consumer protection enforcement" by allowing states to bring suit within their borders even when they cannot do so under 28 U.S.C. § 1391.  (ECF No. 53 at 7.)  It does not, contrary to Defendant's arguments, dictate that a state may not sue in another state, if it chooses to do so, where personal jurisdiction and venue under 28 U.S.C. § 1391 are otherwise proper.

The circumstances under which the CFPA was enacted confirm that the intended effect of the CFPA was to treat 12 U.S.C. § 5552(a)(1) as permitting, not limiting, venue choice.  Congress, in enacting the CFPA, envisioned that the States would act in tandem with the Bureau, serving as whistleblowers on the front-line, to prevent the kind of predatory practices the Great Recession taught can be hard for the Federal Government to spot, deter, and investigate, absent robust State and centralized federal, parallel involvement.  Congress, in enacting the CFPA, was cognizant of the "spectacular failure of [federal] prudential regulators" which had led to financial crisis "that nearly crippled the U.S. economy in 2008" and so the CFPA was meant to provide a robust "direct and comprehensive response."  S. Rep. No. 111-176, at 10, 15; S. Rep. No. 176, 111th Cong., 2d Sess. 2 (2010).  The CFPA also recognized that states are "much closer to abuses and are able to

move more quickly when necessary to address them" and so it both reinforced and expanded the role of states in protecting consumers, as reflected also in the statutory text. *See* S. Rep. No. 111-176, at 174; 12 U.S.C. § 5551(a) (clarifying that the CFPA provisions do not preempt state consumer financial laws that afford greater protections to consumers than federal law; *id.* at §§ 25b, 1465 (easing restrictions against state laws governing national banks, certain non-depository institutions, and federal savings associations); *id.* at § 5552(a)(1) (expanding the role of the States in pursuing enforcement action); *id.* at § 5552(a)(1); *see also Pennsylvania v. Navient Corp.,* 967 F.3d 273, 286 (3d Cir. 2020) (the states' concurrent enforcement authority allows them to vindicate their "fundamental right to protect their citizens and prevent harmful conduct from occurring in their jurisdictions" and gives tools "to pick up slack when the [F]ederal Government fails to enforce and regulate.").[12]

Defendant asks this Court to contort the statutory text of the CFPA and adopt an interpretation that would frustrate the purpose of this statute and Congress' legislative choices. The Court declines to do so as there is no basis to conclude that 12 U.S.C. § 5552(a)(1) was intended to be exclusive and impliedly prevent application of 28 U.S.C. § 1391. Rather, the Court finds that the venue provision in 12 U.S.C. § 5552(a)(1) is supplemental to 28 U.S.C. § 1391 and thus, the Plaintiffs are not confined by a territorial limitation to bring CFPA actions within their own States. The Court also finds no support for the notion that the CFPA prohibits Plaintiffs from

---

[12]     Defendant's reference to a lone legislative floor statement does not support a contrary conclusion. Statutes are born of political compromise that may result in a different outcome than what one individual Senator intended, thought, or merely said during floor debates. That is why courts typically "have eschewed reliance on the passing comments of one Member, and causal statements from the floor debates." *Garcia v. U.S.*, 469 U.S. 70, 76 (1984). In light of the CPFA's statutory text, legislative background, and the inequitable result that would follow from adopting Defendant's statutory interpretation, a Senator's "single outlying statement cannot stand against" this "tide of context and history." *See also Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 599 (2004).

joining together to seek redress for harm caused to their own citizens under the CFPA where venue and jurisdiction are otherwise proper.  In the Amended Complaint, Plaintiffs allege that venue is proper under 28 U.S.C § 1391(b) and (c) because "Defendant is located, resides, and/or does business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district." (ECF No. 13 at 14.)  Defendant challenges venue solely pursuant to 12 U.S.C. § 5552(a)(1) and does not dispute venue under 28 U.S.C. § 1391.  By doing so, the Defendant has waived a defense under the latter provision.  Fed. R. Civ. P. 12(h) (venue is a waivable defense); *Davis v. Smith,* 253 F.2d 286, 288 (3d Cir. 1958) (a party waives a venue objection when it "performs some act which indicates to the court that [it] elects not to raise [its] privilege of venue").  In considering the argument as presented by the Defendant, Plaintiffs' action does not run afoul of the venue provisions within the CFPA and this case is properly before the Court.

**D.     States' Authority to Enforce TILA Under the CFPA**

Defendant also argues that 12 U.S.C. § 5552 (a)(3) limits the type of claims the States may assert under the CFPA.  According to Defendant, while the CFPA permits States to bring actions for alleged UDAAP violations, the statute prohibits them from suing to enforce the 18 pre-existing laws that were incorporated into the CFPA as "enumerated consumer laws" if they did not already possess that authority when enacted.  (ECF 27-2 at 26.)  Defendant posits an interpretation of the CFPA in which the Bureau has broad authority to sue for violations of UDAAP and the 18 pre-existing "enumerated consumer laws" while the States' authority is limited to what existed pre-CFPA except for UDAAP violations.  Utilizing this interpretation of the statute, Defendant argues that since Plaintiffs do not have authority to sue for TILA violations under that statute independently, the CFPA does not grant them that separate authority now.  (ECF No. 58 at 65.)

Therefore, Defendant asks this Court to dismiss Plaintiffs' TILA claims in Count V and Count VI of the Amended Complaint.

Similar to Defendant's venue arguments, Defendant asks this Court to adopt a statutory construction directly at odds with the CFPA statutory landscape. In addition to prohibiting UDAAP, 12 U.S.C. § 5536(a)(1) of the CFPA expressly incorporates and makes it a violation of the statute to offer or provide to consumers financial products or services not in conformity with, or that violate, the 18 pre-existing laws, including TILA. *See* 12 U.S.C. § 5536(a)(1) (making it unlawful to offer or provide "to a consumer any financial product or service not in conformity. . .or. . .commit. . [a] violation of a Federal consumer financial law" or engage in "any unfair, deceptive or abusive act or practice."); 12 U.S.C. § 5481 (14) (defining "Federal consumer financial law" as "the provisions of this title, the enumerated consumer laws. . ."); 12 U.S.C. § 5481(12) (listing 18 federal laws that predated the enactment of the CFPA, including TILA).

Although 12 U.S.C. § 5536(a)(1) makes it clear that it is a violation of CFPA to violate these 18 pre-existing consumer protection laws, including TILA, Defendant nonetheless argues that 12 U.S.C. § 5552, which grants States concurrent enforcement authority, simultaneously limits that authority for these 18 laws based on a "[r]ule of construction." That "[r]ule of construction" appears in Section 5552(a)(3) below the grant of concurrent enforcement authority in Section 5552(a)(1) and the enumerated exceptions to that grant in Section 5552(a)(2) and provides as follows:

> "No provision of this title shall be construed as modifying, limiting, or superseding the operation of any provision of an enumerated consumer law that relates to the authority of a State attorney general or State regulator to enforce such Federal law."

12 U.S.C. § 5552(a)(3). The enumerated exceptions in Section 5552(a)(2) restrict certain state enforcement actions brought against a "national bank" or a "Federal savings association." No

enumerated restriction is listed regarding the 18 pre-existing laws, nor does Defendant provide any rationale for why, if Congress had intended to restrict such actions, it would have not done so explicitly in Section 5552(a)(2).  Instead, utilizing a circuitous statutory construction, Defendant argues that because the "[r]ule of construction" appearing directly below the enumerated exceptions says "[n]o provision of this title shall be construed as modifying, limiting, or superseding the operation of any provision," enforcement of the 18 pre-existing laws is restricted. States only authority to enforce those 18 pre-existing laws is if those laws independently "provide states with enforcement authority."  (ECF No. 58 at 65.)  Thus, Defendant asserts the States do not have authority to enforce the 18 pre-existing laws under the CFPA if they did not already have that authority prior to the CFPA's enactment; UDAAP, however, states may enforce because it is a new basis of liability and thus, no laws are "modif[ied]" or "supersed[ed]."  (ECF 27-2 at 25.)

Defendant claims that the "rule of construction" provision meant to prevent Section 5552 from being interpreted as "limiting" states' concurrent enforcement authority under the "title," now instead "limit[s]" this authority because otherwise, Section 5552 would be "modifying" or "superseding" the 18 pre-existing laws at the time of the CFPA's enactment.  This premise lacks credibility.  The CFPA was enacted not to limit, but to expand protections for consumers, in part, by authorizing state enforcement actions.  Defendant's argument that this "rule of construction" provision is intended to limit states ability to do so would in effect undercut the purpose of the Act.  Further, the words "modify" and "supersede" alone do not require that this provision be interpreted as "limiting," particularly as such an interpretation goes against the intent of the statute.  Instead, the Court finds that the logical interpretation of Section 5552(a)(3) so as to not render "modifying" or "superseding" as canceling "limiting" is as follows: if the 18 pre-existing laws provide for greater State enforcement authority than that granted under the CFPA alone, the

CFPA should not be interpreted to contradict or supersede that authority.  For example, under the Fair Credit Reporting Act ("FCRA"), which is one of the 18 pre-existing laws, States are allowed to bring enforcement actions against any person violating that statute, including users of consumer reports that may not be "covered persons" or "service providers" under the CFPA.  12 U.S.C. § 1681s(c)(1).  Section 5552(a)(3), thus, makes clear that since the FCRA independently authorizes States to bring actions, they may do so even if those entities are not "covered persons" or "service providers" as required by the CFPA.  Similarly, TILA authorizes States to enforce provisions of that statute against national banks and federal savings associations, even though the CFPA contains an exclusion for both.  15 U.S.C. § 1640(e).  Thus, States may bring such claims under TILA even though they normally could not under the CFPA due to the restriction in Section 5552(a)(2).  In sum, Congress in Section 5552(a)(3) not only reinforced the States' pre-existing enforcement authority but *expanded* it; Congress did not, as Defendant argues, restrict this authority pursuant to the 18 pre-existing laws to that which existed at the time the CFPA was enacted.

This Court's conclusion is further buttressed by Section 5552(a)(2) restrictions.  If Congress had intended to restrict State enforcement over the 18 pre-existing laws, it could have explicitly done so with specific language in Section 5552(a)(2).  In Section 5552(a)(2), Congress restricted certain actions against national banks and Federal savings associations without additional enumerated exceptions.  Congress chose not to impose additional restrictions on States' concurrent enforcement authority beyond those involving national banks and Federal savings associations.  *See Continental Casualty Co. v. United States,* 314 U.S. 527, 533 (1942) ("[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent."; *Central Bank of Denver v.*

*First Interstate Bank*, 511 U.S. 164, 176-77 (1994)*; see also Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (finding "no indication that Congress intended to make this phase of national banking subject to local restrictions, as it has done by express language in several other instances"); *FCC v. NextWave Personal Communications, Inc*., 537 U.S. 293, 302 (2003) (when Congress has intended to create exceptions to bankruptcy law requirements, "it has done so clearly and expressly").[13]  Here, Defendant does not fit into either of these express exceptions as it is neither a "national bank" nor a "federal savings association."  Instead, the Defendant asks the Court to read an implied exception into the statute.  This argument is rooted in conjecture and therefore unpersuasive.  Thus, Plaintiffs have authority to bring their TILA claims against Defendant.

### E.    Plaintiffs' TILA Claims

In its defense, Mariner argues that Plaintiffs' TILA claims in Counts V and VI of the Amended Complaint should be dismissed for failure to a state a claim under Rule 12(b)(6) because, even if Defendant did not explicitly itemize the commissions it receives from insurance add-ons and third parties, its loan agreements contain an asterisk in fine print that makes its disclosures lawful.  (See ECF No. 13 ¶¶ 24, 80, 156-165, & Ex. A, at 29; 15 U.S.C. § 1638.).  Specifically, Defendant states that the loan agreements contain a statement that "[w]e or our affiliates may receive benefits from your purchase of these items." (ECF No. 27-2 at 23 (citing ECF 13 Ex. A, at 29).)  Mariner fails to cite any case law in support of this assertion, but instead points to a comment

---

[13]    Plaintiffs point to interpretative guidance by the Bureau to support an expansive interpretation of the States concurrent enforcement authority, which the Defendant argue is not to be given deference under *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015), *See Authority of States to Enforce the Consumer Financial Protection Act of 2010*, 12 C.F.R. Chapter X, 87 Fed. Reg. 31,940 (May 26, 2022). The Court need not rely on the Bureau's interpretation as it finds support within the statute and history.

from Bureau regulations.  (ECF No. 27-2 at 30 n. 19.)  The Court is not persuaded by Defendant's argument.  The Fifth, Seventh, and Eleventh Circuits, and a district court in the Third Circuit, have all rejected Defendant's argument.  *See, e.g., Gibson v. Bob Watson Chevrolet-Geo, Inc.*, 112 F.3d 283, 285 (7ᵗʰ Cir. 1997) (Reading the Comment to permit nondisclosure would contradict the statute and is therefore a misinterpretation of the regulations.)  Similarly, the Court does so here, and finds that at this stage of the proceedings, Plaintiffs have alleged sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Iqbal*, 566 U.S. at 678.

## F.      Tenth Amendment Argument

Defendant puts forth a puzzling argument that the CFPA's state enforcement provisions violate the Tenth Amendment's federalism principles, on the basis that one state's authority to exercise its enforcement power pursuant to the CFPA infringes upon the sovereignty of other states.  (ECF No. 27-2 at 22-24.)  The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X; *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 647 (E.D. Pa. 2017).  In other words, the Tenth Amendment is a declaration of the relationship between the ***federal*** and ***state*** governments; it does not govern the relationships among the states. *See United States v. Darby*, 312 U.S. 100, 124 (1941) ("There is nothing in the history of [the Tenth Amendment's] adoption to suggest that it was more than declaratory of the relationship between the national and state governments as had been established by the Constitution before the amendment."); *NCAA v. Governor of N.J.*, 730 F.3d 208, 227 (3d Cir. 2013) (The Tenth Amendment "establishes a system of dual sovereignty between the States and the Federal Government."); *City of Phila v. Sessions*, 280 F. Supp. at 647.  Rather, the relationship among the

States is defined by the Constitution's Full Faith and Credit Clause,[14] which is not at issue in this case.  *See* USCS Const. Art. IV, § 1.  For federal statutes to be found unconstitutional under the Tenth Amendment, they must commandeer, compel, or coerce, the legislative processes of the states by directly compelling states to enact and enforce federal law.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-578 (2012) (collecting cases).

According to Defendant, Plaintiffs are violating the federalism principles embodied in the Tenth Amendment by "attempting to impose their enforcement determinations on other states." (ECF No. 27-2 at 22.)  In essence, Defendants argue that, in filing this lawsuit, Plaintiffs aim to impose their views on what constitutes a UDAAP under the CFPA onto other states in violation of the principles of federalism.  (ECF No. 27-2 at 15-16.)  Defendant believes the only way to interpret the CFPA's "territorial limitation" consistent with the principle of equal sovereignty of the states is to prohibit Plaintiffs "from attempting to exercise the enforcement authority that belongs to other states."  (ECF No. 27-2 at 24.)  The Court disagrees for three key reasons.  First, this argument fundamentally misinterprets the Tenth Amendment, which does not define the relationships among the states.  Second, the Amended Complaint does not seek nationwide, but instead "appropriate" relief deemed proper under the statute by the Court.  (ECF No. 13 at 78, 88, 98, 101-102.)  Third, Defendant fails to put forth any evidence that the states are being unconstitutionally commandeered by the Federal Government here, as required to establish a Tenth Amendment violation.  Indeed, Defendant must show the statute "require[s] (a) the states in their sovereign capacity to regulate their own citizens, (b) the [state] legislature to enact any laws or regulations, or (c) state officials to assist in the enforcement of federal statutes regulating private

---

[14]      The Full Faith and Credit Clause provides in relevant part that "full faith and credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S.C.S. Const. Art. IV, § 1.

individuals." *Reno v. Condon*, 528 U.S. 141, 143 (2000).  Defendant neglects to address any of these elements in its briefing, but rather focuses its argument on the relationship among the states, misconstruing the purpose of the Tenth Amendment.

Accordingly, it is permissible for a state to seek relief for harms caused to their citizens, as Plaintiffs do here.  In this case, Plaintiffs allege that Mariner, from Pennsylvania, directed harm at the citizens of their respective states, and the Plaintiffs, therefore, have the right to seek redress from this Court.  (ECF No. 34 at 24.)  Defendant's Tenth Amendment argument is illogical.  As with many other federal consumer protection statutes, Congress conferred authority to enforce the CFPA to state attorneys general, including Plaintiffs. 12 U.S.C. § 5552(a)(1).  Plaintiffs' Amended Complaint is a legitimate exercise of that authority.

### G.    Separation of Powers under *Seila Law LLC*

In addition, Defendant asserts an equally puzzling separation of powers argument that, under the Supreme Court's holding in *Seila Law LLC*, the CFPA violates the Constitution.  140 S. Ct. 2183.  This Court is not convinced.  In *Seila*, the CFPA's limitation on the President's authority to remove the Director of the Bureau violated the Constitution's separation of powers.  *Seila,* 140 S. Ct. at 2209.  Defendant makes a tenuous comparison, suggesting that because the President cannot remove the state attorneys general (like the Bureau Director, pre-*Seila*), it is unconstitutional for Congress to empower the states to enforce the CFPA.  (ECF No. 27-2 at 22.) Plaintiffs aptly note that this argument contradicts longstanding jurisprudence that upholds many federal laws which delegate to states concurrent authority to enforce federal consumer protection, antitrust, civil rights, and environmental laws.  *See, e.g.*, *California v. Am. Stores Co*., 495 U.S. 271 (1990) (holding California could obtain divestiture as a form of injunctive relief within the meaning of the Clayton Act); *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327

(3d Cir. 2016) (holding Pennsylvania could enforce Clayton Act and directing entry of preliminary injunction requested by the FTC and the Commonwealth).  (ECF No. 34 at 12-13.)  The President of the United States, as the head of the ***executive branch***, has the authority to remove the director of a federal agency within the ***executive branch***–and to restrict this power would be unconstitutional.  *See Seila Law LLC,* 150 S. Ct. at 2191.  However, the Constitution does not grant the President the same authority with regard to removing publicly elected state officials.  The President has no constitutional authority to remove state attorneys general, and in fact, it would be unconstitutional to do so.  Therefore, it defies logic that the CFPA is unconstitutional because the President lacks the power to remove state officials who the President never had nor has the authority to remove.  For these reasons, *Seila* provides no constitutional basis to challenge the ability of state attorneys general to act on behalf of their citizens, as the separation of powers issue in *Seila* is between the federal executive and legislative branches.  Thus, *Seila* does not support dismissal of Plaintiffs' claims.

### H.   Personal Jurisdiction and Supplemental Jurisdiction.

Defendant makes two jurisdictional arguments: first, that the Court lacks personal jurisdiction over Mariner with regard to New Jersey and Washington's state law claims; and second, that if this Court dismisses the federal claims, supplemental jurisdiction over the state law claims does not exist.  (ECF No. 27-2 at 30-32.)  The Court will take each argument in turn.  Regarding personal jurisdiction, Defendant argues that Counts VIII through XI and Count XIII, which allege violations of New Jersey and Washington law, should be dismissed for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  (*Id*. at 30-31.)  Mariner reasons that, because it is a Maryland corporation, the Court lacks general personal jurisdiction over the state law claims.  (*Id*. at 31 n.20.)  Mariner argues as a result, that Plaintiffs must establish

that the Court has specific personal jurisdiction over each claim.  (*Id.*)  Notably, Mariner concedes

the Court has jurisdiction over the federal law claims, which arise from the same factual

circumstances as the state law claims.  Specific jurisdiction requires a showing that: (1) Mariner

"purposefully avail[ed] itself of the privilege of conducting activities" in Pennsylvania; and (2)

Plaintiffs' claims "arise out of or relate to" Mariner's contacts with Pennsylvania.  *Ford Motor Co.*

*v. Montana Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017, 1024-25 (2021) (the second step requires "an

affiliation between the forum and the underlying controversy, principally, [an] activity or an

occurrence that takes place in the forum State and is therefore subject to the State's regulation")

(internal quotation omitted).  Defendant argues that Pennsylvania "has no connection to the state

laws at issue" and therefore the second element cannot be established.  (ECF 27-2 at 24.)  However,

the Complaint alleges that Jeffrey Chepkevich, Senior Vice President of Branch Operations,

oversees and directs Mariner's business operations in Pennsylvania, New Jersey, Oregon, and

Washington—and he is located in Pennsylvania.  (*See* ECF No. 34-1.)  Plaintiffs' Complaint

alleges facts describing numerous occurrences involving Pennsylvania-based Senior Vice

President, from which New Jersey's and Washington's state-law UDAAP claims arise.  (*See* ECF

No. 13 at ¶¶ 129, 140-41, 187, 196, 201.)  Because the alleged violations of New Jersey and

Washington state law relate to and arose in part from this Pennsylvania-based conduct, this Court

finds it has personal jurisdiction with respect to those state law claims (Counts VIII – XI and XIII).

*Id.*

Additionally, regarding supplemental jurisdiction, Defendant argues the Court should

dismiss Counts VII through XV, which assert state law claims, because once the federal law claims

are dismissed the Court will no longer have jurisdiction over the state law claims.  (ECF No. 27-2

at 32.)  Pursuant to Section 1367, district courts have supplemental jurisdiction over federal and

state law claims where the state law claims "form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). Claims are part of the same case or controversy if they "derive from a common nucleus of operative fact." *Sturzenacker v. Cmc Restoration, Inc.*, No. 5:17-CV-00113-JFL, 2017 U.S. Dist. LEXIS 101284, at \*4 (E.D. Pa. June 27, 2017) (*citing United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966)). Counts VII through XV, which arise from the same facts as the federal law claims, are properly before the Court pursuant to the Court's supplemental jurisdiction. *Id*.; (ECF No. 13 at ¶ 47.) Because the Court denies the Defendant's Motion to Dismiss the federal claims, all state law claims will remain properly before this Court.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion is denied. An appropriate Order will follow.

**BY THE COURT:**

/s/ Hon. Kelley B. Hodge

**HODGE, KELLEY B., J.**